IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION,<br>550 17th Street, NW<br>Washington, D.C. 20429,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br>101 South Tryon Street<br>Charlotte, N.C. 28202,<br><br>　　　　　　　Defendant. | Case No. 1:17-cv-36<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), for its Complaint against Bank of America, N.A. ("Bank of America"), alleges as follows:

### INTRODUCTION

1. Bank of America owes the FDIC at least $542 million for deposit insurance that it refuses to pay. Because Bank of America refuses to pay, the FDIC seeks relief from this Court.

2. FDIC-insured institutions, like Bank of America, are responsible for funding the FDIC's Deposit Insurance Fund. The FDIC administers the Deposit Insurance Fund to insure deposits of insured depository institutions up to $250,000.[1] When an insured institution fails, the FDIC ensures that the institution's depositors have timely access to their insured deposits. Since the FDIC was established in 1933, thousands of insured institutions have failed, but no depositor

---

[1] The $250,000 limit is per depositor, per insured depository institution, per account ownership category.

1

has lost a single cent of FDIC-insured funds.  The Deposit Insurance Fund is fundamental to the FDIC's mission to maintain stability and public confidence in the nation's banking system.

3. The Deposit Insurance Fund was established pursuant to the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.* ("FDI Act"), to be administered by the FDIC to carry out its deposit insurance purposes.  To finance the Deposit Insurance Fund, the FDIC imposes quarterly assessments on insured depository institutions.  Under Section 7 of the FDI Act, 12 U.S.C. § 1817, the FDIC is required to establish, by regulation, a risk-based assessment system. The FDIC's assessment system is risk-based so that riskier institutions—*i.e.*, institutions that are more likely to cause a loss to the Deposit Insurance Fund—pay more for deposit insurance than safer institutions.  As authorized by law, the FDIC has created, by regulation, a separate risk-based assessment system for large and small insured depository institutions.  Under the FDIC's regulations, the largest and most highly complex institutions ("HCIs"), like Bank of America, are subject to a particular risk-based assessment system.

4. The FDIC determines an institution's risk profile using financial information self-reported by that institution in accordance with FDIC regulations and reporting instructions.  One of the key indicators of risk for a large HCI is the extent to which its exposure to counterparties is concentrated.  The greater the concentration, the greater the chance that default by, or financial distress at, one or more counterparties could lead to the institution's failure, which in turn could cause a very large loss to the Deposit Insurance Fund.

5. To ensure that this concentration risk factor is measured properly, the FDIC requires that large HCIs like Bank of America report their counterparty exposure at the "consolidated entity level" rather than at the individual company level.  In other words, if Bank of America has significant exposures to two affiliated counterparties, Bank of America must

consolidate the exposure to these two counterparties and treat it as a single exposure to the top-tier parent of these counterparties, rather than report the exposures to each individual counterparty separately.

6. From the second quarter of 2011 through the first quarter of 2016, Bank of America reported incorrect financial information that understated its counterparty exposure. During this period, Bank of America ignored the FDIC's instruction that it report counterparty exposures at the "consolidated entity level" and, in fact, did not consolidate any of its counterparty exposures at all. Notably, of the nine HCIs subject to this reporting requirement, Bank of America is the only one that did not consolidate its exposures in any manner whatsoever.[2] The result is that Bank of America underreported its counterparty exposures by tens of billions of dollars each quarter.

7. By underreporting its counterparty exposures, Bank of America appeared less risky than it actually was and therefore paid lower quarterly assessments to the FDIC for deposit insurance than it should have. All told, Bank of America was able to wrongly keep at least $542 million for the seven quarters at issue here (the second quarter of 2013 through the fourth quarter of 2014) that it should have paid into the Deposit Insurance Fund—an average of approximately $77 million per quarter during this period.

8. Bank of America's total underpayments since 2011 are much larger than the $542 million for the seven quarters that are the subject of this complaint. The total underpayments are in excess of $1 billion. The FDIC has not assessed and invoiced Bank of America yet for

---

[2] The eight other HCIs are: (1) Bank of New York Mellon; (2) Citibank, N.A.; (3) Goldman Sachs Bank USA; (4) JP Morgan Chase Bank, N.A.; (5) Morgan Stanley Bank, N.A.; (6) The Northern Trust Company; (7) State Street Bank and Trust Company; and (8) Wells Fargo Bank, N.A.

underpayments for quarters earlier than the seven quarters at issue here (*i.e.*, for quarters prior to the second quarter of 2013). The FDIC reserves the right to amend its complaint after the invoice is issued.

9. As of September 30, 2016, Bank of America held the second largest amount of domestic deposits: approximately $1.2 trillion, out of which $700 billion are estimated insured deposits. The total underpayments since 2011 are material in relation to the size of the Deposit Insurance Fund. As a result of Bank of America's not paying its required share of assessments, the Deposit Insurance Fund has approximately $1 billion less than what it should have—the size of the Deposit Insurance Fund as of September 30 is just under $81 billion instead of just under $82 billion. All insured depository institutions are responsible for paying risk-based assessments to enable the FDIC to meet statutory and regulatory targets for the size of the Deposit Insurance Fund.

10. In December 2016, Bank of America for the first time provided the FDIC with the correct information about Bank of America's counterparty exposures for the second quarter of 2013 through the fourth quarter of 2014. In December 2016, the FDIC invoiced Bank of America for the $542 million that Bank of America owes due to its underreporting for that period, inclusive of interest. Bank of America has refused to pay. This action is to recover the unpaid assessments it owes to the Deposit Insurance Fund.

## THE PARTIES

11. The FDIC is a government corporation and instrumentality of the United States of America headquartered at 550 17th Street, NW, Washington, D.C. 20429. The FDIC brings this suit in its corporate capacity. As of September 30, 2016, the FDIC provides deposit insurance to 5980 banks and savings associations. It also directly examines and supervises more than 4500

commercial banks and savings institutions for operational safety and soundness.

12. Defendant Bank of America is a national banking association whose principal place of business is in Charlotte, North Carolina. Bank of America has operations in all 50 states, the District of Columbia, and more than 35 countries. Bank of America has 29 banking centers and 99 ATMs in the District of Columbia.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 12 U.S.C. § 1817, 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

14. This Court has personal jurisdiction over Bank of America, which at all relevant times conducted business in the District of Columbia.

15. Venue is proper pursuant to 28 U.S.C. § 1391 because Bank of America resides in the District of Columbia by virtue of the business it conducts here.

## FACTUAL ALLEGATIONS

**A.    The Deposit Insurance Fund Is Funded by Assessments Paid By Insured Depository Institutions**.

16. The FDIC insures the balance of each depositor's account at each insured institution up to $250,000. If an institution fails, the FDIC ensures that the institution's depositors have timely access to their insured deposits. Ultimately, if the assets of the failed institution are insufficient to return all insured deposits in full, the FDIC pays the shortfall from its Deposit Insurance Fund. No depositor in an FDIC-insured institution has ever lost his or her insured deposit. This insurance gives depositors confidence that the insured money they deposit with thousands of FDIC-insured institutions across the country is safe.

17.     Bank of America is a particularly significant beneficiary of the FDIC's Deposit Insurance Fund because deposits are its lifeblood.  It has described itself publicly as having "the largest retail deposit share in the U.S."[3]

18.     As required by the FDI Act, the FDIC funds the Deposit Insurance Fund with assessments collected from FDIC-insured institutions like Bank of America.

### B.     The FDIC Calculates Assessments Using a Risk-Based Approach.

19.     As required by law, the FDIC uses a risk-based approach to determine assessments.  Specifically, the FDIC calculates the amount each institution should pay based on its risk profile, including the probability of failure and potential loss to the Deposit Insurance Fund if the institution fails.

20.     To assess each bank's risk profile, the FDIC uses, in relevant part, financial information self-reported by each insured institution.  Each quarter, every insured institution files a Consolidated Report of Condition and Income, or "Call Report," with the Federal Financial Institutions Examination Council (a council of financial regulators that includes the FDIC).

21.     As authorized by law, the FDIC has created a separate risk-based assessment system for large and small insured depository institutions.

22.     Bank of America is a large bank, and more specifically, is an HCI, as are eight other large banks.  Bank of America is subject to the assessment system for HCIs.

23.     An HCI is: (1) an insured depository institution, with the exception of a credit card bank, that has had $50 billion or more in total assets for at least four consecutive quarters that is either controlled by a U.S. parent holding company that has had $500 billion or more in

---

[3] *See* BANK OF AMERICA CORPORATION 2015 ANNUAL REPORT at 3 (March 2016), *available at* http://www.banktrack.org/download/annual_report_2015_pdf/annual_report_2015.pdf.

total assets for four consecutive quarters, or is controlled by one or more intermediate U.S. parent holding companies that are controlled by a U.S. holding company that has had $500 billion or more in assets for four consecutive quarters; or (2) a processing bank or trust company. *See* 12 C.F.R. § 327.8(g)(1).

24. Due to the structural and operational complexity of HCIs, these institutions pose unique challenges and risks in case of failure. HCIs hold over $4 trillion in domestic deposits nationwide, which include approximately $2 trillion in estimated insured deposits. In Washington, D.C., there were approximately $46 billion in deposits as of June 30, 2016, of which over $22 billion (or nearly half) were held by HCIs.

25. Even among these HCIs, Bank of America stands out: it has the second largest amount of domestic deposits, approximately $1.2 trillion as of September 30, 2016, and approximately $11 billion of the deposits in Washington, D.C. (as of June 30, 2016)—almost 25 percent of all of the deposits with insured institutions in this jurisdiction. Accurately measuring the large risks concentrated among the few HCIs, including Bank of America, is critically important to the viability of the Deposit Insurance Fund.

26. On April 1, 2011, following notice and comment, the FDIC implemented a rule (the "2011 Final Rule") to calculate an HCI's quarterly assessment based in part on the probability that the Deposit Insurance Fund will incur a loss with respect to the HCI.

27. The FDIC inputs the information that HCIs submit in their Call Reports into a scorecard that uses a number of metrics, including each HCI's ability to withstand asset-related stress. The score for the ability to withstand asset-related stress is a weighted average of the scores for four measures. One of these scores is for the "concentration measure," which is the highest score (as determined under the scorecard) of the following ratios: (1) the sum of the

reporting HCI's total exposure amount to its largest 20 counterparties divided by Tier 1 capital (a measure of regulatory capital) and reserves; (2) the amount of the reporting HCI's exposure to the largest counterparty divided by Tier 1 capital and reserves; and (3) the reporting HCI's total amount of higher-risk assets divided by Tier 1 capital and reserves.  12 C.F.R. § 327.9(b)(2).

28.     In accordance with the 2011 Final Rule, in Schedule RC-O of the Call Report, each HCI must report financial information regarding its single largest counterparty exposure and its total exposure to its top 20 largest counterparties.  Schedule RC-O Memorandum Items 14 and 15 appear as follows:

| | | |
|---|---|---|
| Memorandum items 14 and 15 are to be completed by "highly complex institutions" as defined in FDIC regulations. | | |
| 14. Amount of the institution's largest counterparty exposure | K673 | M.14. |
| 15. Total amount of the institution's 20 largest counterparty exposures | K674 | M.15. |

29.     Schedule RC-O of the Call Report requires each HCI to report only the total amounts it calculates for its counterparty exposures, without disclosing the identity of the counterparties.  While HCIs are not required to explain how they came to the amounts reported or to provide the underlying data that corroborates them, they are required to keep records supporting their calculations.

30.     The FDIC relies upon the data each HCI submits in the Call Report regarding its counterparty exposures to calculate the concentration risk each one faces.  By statute, each Call Report must contain two certifications as to its accuracy.  First, the Call Report "shall contain a declaration by the president . . . or by any other officer designated by the board of directors or trustees of the reporting depository institution to make such declaration, that the report is true and correct to the best of his knowledge and belief," 12 U.S.C. § 1817(a)(3).  Second, "[t]he correctness of said report of condition shall be attested by the signatures of at least two directors or trustees of the reporting depository institution other than the officer making such declaration."

*Id*.

### C. The Rules Require That Counterparty Exposures Be Reported at the Consolidated Entity Level.

31. The FDIC's 2011 Final Rule instructs HCIs to report counterparty exposures at the "consolidated entity level." Each HCI must report its two counterparty exposure measures based on the following instructions:

> Top 20 Counterparty Exposure/Tier 1 Capital and Reserves … Sum of the total exposure amount to the largest 20 counterparties (in terms of exposure amount) divided by Tier 1 capital and reserves. Counterparty exposure is equal to the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all unfunded commitments) for each counterparty or borrower *at the consolidated entity level*.
>
> Largest Counterparty Exposure/Tier 1 Capital and Reserves … The amount of exposure to the largest counterparty (in terms of exposure amount) divided by Tier 1 capital and reserves. Counterparty exposure is equal to the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all unfunded commitments) for each counterparty or borrower *at the consolidated entity level*.

76 Fed. Reg. 10672, 10721 (Feb. 25, 2011) (emphasis added). The instruction to report "at the consolidated entity level" means that exposures to counterparties that are affiliates of one another must be consolidated at the top-tier level of each counterparty.

32. Accurately measuring the risks posed by each HCI's concentration of large exposures to a handful of consolidated entities is critically important to the viability of the Deposit Insurance Fund. As the FDIC explained in the rulemaking: "recent experience shows that the concentration of a highly complex institution's exposures to a small number of counterparties—either through lending or trading activities—significantly increase[s] the institution's vulnerability to unexpected market events." 76 Fed. Reg. 10672, 10696 (Feb. 25,

9

2011).  Thus, "[t]he FDIC uses the top 20 counterparty exposure and the largest counterparty exposure to capture this risk."  *Id.*

33. In December 2011, the FDIC again informed the HCIs that:

> for the purposes of calculating deposit insurance premiums, highly complex institutions should report counterparty credit exposure on a *consolidated entity basis (legal consolidated entity)*.  The FDIC believes that highly complex institutions should have the ability to *aggregate* exposures arising from financial contracts with entities within a legal consolidated entity and report the exposure as outlined in the final rule.

76 Fed. Reg. 77315, 77322 (Dec. 12, 2011) (emphasis added).

34. In the context of counterparty exposure reporting, a counterparty is a party that owes or potentially owes Bank of America money, whether under a lending contract (*e.g.*, a borrower) or under a derivative contract, or securities financing transaction.  In simple terms, the exposure to a counterparty estimates the amount Bank of America could lose if the counterparty defaults (*i.e.*, it fails to pay its obligations to Bank of America).  Measuring concentration of counterparty exposures at the consolidated entity level helps ensure that the FDIC adequately captures the HCI's *concentration* of counterparty exposures—which is the risk the FDIC sought to "capture" in the 2011 Final Rule[4]—because the risks posed by counterparties that are affiliates of each other are generally correlated; that is, if one counterparty defaults, the risk that its affiliates will also default increases.

35. Because both the institution's largest counterparty exposure as well as its top 20 largest exposures are to be reported "at the consolidated entity level," an HCI's failure to report its counterparty exposures at the consolidated entity level understates the concentration risk that the FDIC is trying to measure.  As an example, if an HCI has exposures to affiliated

---

[4] 76 Fed. Reg. 10672, 10696 (Feb. 25, 2011).

counterparties A, B, and C, but reports its exposure to each separately, this unconsolidated reporting necessarily violates the Rule because no "consolidation" has occurred. The consequence of listing affiliated counterparties A, B, and C as three separate counterparties, rather than one (the consolidated entity), is they take up three spots rather than just one on the HCI's top 20 counterparties list. With a finite list of 20 counterparties, taking up two extra spots with entities that should have been consolidated means that two other counterparties are not reported and the HCI's exposure to those omitted counterparties is not included in the top 20 counterparty exposure measure calculation. Similarly, not consolidating exposures significantly understates the single largest counterparty exposure in cases where, as here, the reporting HCI has a number of large exposures to various entities within a particular consolidated entity. Accordingly, failing to consolidate counterparty exposure to affiliated counterparties reduces the reported concentration risk. This can, in turn, result in significant underpayments of deposit insurance assessments where, as here, the concentration risk is the key measure affecting an institution's scorecard.

36. The FDIC promulgated the 2011 Final Rule after public notice published in the Federal Register and opportunity to comment. *See* 75 Fed. Reg. 23516 (May 3, 2010); 75 Fed. Reg. 72612, 72613 (Nov. 24, 2010); 76 Fed. Reg. 10672, 10674 (Feb. 25, 2011). Although the Rule was subsequently modified in 2012 and 2014—along with corresponding changes to the Call Report Instructions—the requirement that HCIs report counterparty exposure at the consolidated entity level never changed.

### D. Bank of America Failed to Report Counterparty Exposures at the Consolidated Entity Level.

37. Commencing with the second quarter of 2011 (which ended on June 30, 2011), Bank of America began reporting its counterparty exposures in Schedule RC-O of its quarterly

Call Reports. The FDIC used these Call Reports to calculate Bank of America's quarterly assessments.

38. Unknown to the FDIC, and contrary to the requirement to report counterparty exposures at the consolidated entity level, from 2011 until the spring of 2016, Bank of America failed to report either its largest counterparty exposure or the sum of its top 20 counterparty exposures at the consolidated entity level. This failure resulted in Bank of America significantly underreporting both counterparty exposure measures.

      **a.    Bank of America Failed to Report its Largest Counterparty at the Consolidated Entity Level.**

39. During the operative time period, Bank of America had counterparty exposures to a particular top-tier parent company, described in this complaint as "Largest Counterparty" in order to preserve confidentiality. Under the 2011 Final Rule, Bank of America had to calculate its exposure to Largest Counterparty at the consolidated entity level, which would be the sum of Bank of America's exposure to Largest Counterparty itself plus Bank of America's exposure to Largest Counterparty's affiliates.

40. Bank of America failed to follow this rule. In calculating its counterparty exposures, Bank of America (before the spring of 2016) never consolidated any of its exposures at any time. Instead, in calculating its exposures, Bank of America treated Largest Counterparty and each affiliate of Largest Counterparty to which Bank of America had exposures as separate counterparties of Bank of America.

41. Had Bank of America performed the consolidation required by the 2011 Final Rule, Bank of America's consolidated exposure to Largest Counterparty would have been its single largest counterparty exposure, which is reported in Schedule RC-O Memorandum Item 14. In addition, the amount reported for Item 14 would have been significantly greater. For example,

for the fourth quarter of 2014, Bank of America treated Largest Counterparty and three subsidiaries of Largest Counterparty as four separate counterparties. Had Bank of America consolidated its exposures to Largest Counterparty with its exposures to these three subsidiaries of Largest Counterparty, Bank of America would have reported a single largest counterparty exposure in Item 14 that was almost three times the amount that Bank of America actually reported in that Item.

42. This one failure—Bank of America's failure to consolidate its counterparty exposure to Largest Counterparty with its exposures to Largest Counterparty's subsidiaries—*by itself*—resulted in the $542 million in assessment underpayments for the seven quarters at issue here. More generally, this failure resulted in over $1 billion in underpayments since the second quarter of 2011.

        **b.**      **Bank of America Failed to Report its Top 20 Counterparty Exposures at the Consolidated Entity Level.**

43. For the same reason, Bank of America also failed to report correctly the sum of its top 20 largest counterparty exposures.

44. For example, in the second quarter of 2013, had Bank of America consolidated its counterparty exposures and reported at the consolidated entity level as required, it would have reported a top 20 counterparty exposure sum that was tens of billions of dollars higher than the amount it erroneously reported. It would have also included in its calculation of that sum exposures to another six entities. By failing to consolidate, Bank of America effectively reported the sum of only 14 of its top 20 counterparties (rather than the sum of its top 20 as required).

45. Similarly, in the fourth quarter of 2014, Bank of America's failure to report at the consolidated entity level resulted in its understating the sum of its top 20 counterparty exposures by about 20 percent and leaving five counterparties off its top 20 list.

**E.     Among the Nine HCIs, Bank of America Alone Failed to Report at the Consolidated Entity Level.**

46.    The 2011 Final Rule and its requirement to consolidate counterparty exposures at the "consolidated entity level" applied to all nine HCIs.

47.    Of the nine HCIs, Bank of America is the only one that did not consolidate its exposures in any manner whatsoever under the Rule for the seven quarters at issue here.

**F.     Bank of America Interprets "Consolidated Entity Level" Correctly in One Other Directly Analogous Context.**

48.    In 2008, three years before the FDIC promulgated the 2011 Final Rule at issue here, the Federal Reserve Bank of New York ("FRBNY") instituted its "Top 20" Counterparty Project. Like the FDIC's 2011 Final Rule, the FRBNY Top 20 Counterparty Project required HCI holding companies to report counterparty exposures at the "consolidated entity level." The instruction was identical—and was the model the FDIC used three years later when it drafted the 2011 Final Rule for reporting HCI counterparty exposures. Just as with the 2011 Final Rule, the objectives of the Top 20 Project data collection initiative of the FRBNY were to provide regulators with information about concentrations of exposures among large firms, particularly with respect to large firms' exposure to each other and to common counterparties.

49.    Beginning in 2008, Bank of America's holding company, Bank of America Corporation ("BAC"), participated in the FRBNY program. For the FRBNY program, BAC consolidated its counterparty exposures at the top-tier level of each counterparty. In other words, interpreting the identical instruction—that counterparty exposures be reported at the "consolidated entity level"—Bank of America's holding company did it the right way for the FRBNY, while Bank of America did it the wrong way for the FDIC.

**G.     Bank of America Refuses to Pay What it Owes.**

50.     On December 1, 2016, Bank of America for the first time provided the FDIC with revised data that correctly reported its counterparty exposures at the consolidated entity level for the second quarter of 2013 through the fourth quarter of 2014.

51.     Those revised data show that, had Bank of America correctly reported its counterparty exposures, its risk profile would have resulted in $540,261,499.90 in additional assessments for the seven quarters at issue here (the second quarter of 2013 through the fourth quarter of 2014).

52.     On December 15, 2016, the FDIC invoiced Bank of America in the amount of $541,997,517.66—$540,261,499.90 in assessment underpayments plus $1,736,017.76 in interest thereon—for these seven quarters.

53.     Those payments were due on December 30, 2016, but Bank of America refused to pay.

## CAUSES OF ACTION

## COUNT ONE

**Failure to Pay Mandatory Assessments as Required by 12 U.S.C. § 1817**

54.     The FDIC incorporates by reference each of the allegations set forth above.

55.     Bank of America underreported its counterparty exposures by failing to report its largest counterparty exposure and its total exposure to its top 20 counterparties at the consolidated entity level.  As a direct and proximate result of its reporting errors, Bank of America failed to pay $541,997,517.66 in assessment fees inclusive of interest that Bank of America should have remitted to the FDIC.

56. The FDIC issued invoices for the estimated amount of the additional assessment fees owed by Bank of America, together with interest, but Bank of America has refused to pay the invoiced amount.

57. In accordance with 12 U.S.C. § 1817, the FDIC is entitled to recover the past due assessments owed by Bank of America.

## PRAYER FOR RELIEF

WHEREFORE, the FDIC prays that final judgment be entered against Bank of America declaring, ordering, and adjudging that:

    a. Bank of America violated the obligation imposed by 12 U.S.C. § 1817 and the Rule;

    b. Bank of America underpaid its FDIC insurance assessments inclusive of interest by $541,997,517.66;

    c. Bank of America must pay the FDIC the full amount of its underpayment, prejudgment interest, and costs of this action; and

    d. Such other relief as may be appropriate and as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC respectfully demands a trial by jury for all issues in this case that are so triable.

DATED:     January 9, 2017

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*Ethan Glass*

Jon Corey (D.C. Bar No. 491311)
Eric Lyttle (D.C. Bar No. 482856)
Ethan Glass (D.C. Bar No. 1034207)
777 6th Street, NW, 11th Floor
Washington, D.C. 20001
Phone: (202) 538-8100

*Attorneys for Plaintiff Federal Deposit Insurance Corporation*

OF COUNSEL:

Barbara Katron
Senior Counsel
Herbert G. Smith II (D.C. Bar No. 450811)
Counsel
Andrew A. Nicely (D.C. Bar No. 458805)
Counsel
Minodora D. Vancea (D.C. Bar No. 492335)
Counsel
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive
Arlington, VA 22226-3500
Tel. (703) 516-5729
Fax (703) 516-5067