## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FEDERAL DEPOSIT INSURANCE
CORPORATION,
550 17th Street, NW
Washington, D.C. 20429,

               Plaintiff,

v.

BANK OF AMERICA, N.A.,
101 South Tryon Street
Charlotte, N.C. 28202,

               Defendant.

Case No. 1:17-cv-36-EGS

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT (REDACTED)

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC"), for its First Amended

Complaint against Bank of America, N.A. ("Bank of America"), alleges as follows:

## INTRODUCTION

1.　　Bank of America owes the FDIC $1.12 billion in assessments for deposit

insurance that it refuses to pay.  Because Bank of America refuses to pay, the FDIC seeks relief

from this Court.

2.　　The FDIC administers the Deposit Insurance Fund, which insures deposits of up

to $250,000 per depositor at insured banks.  Since the FDIC was established in 1933, thousands

of insured institutions have failed, but no depositor has lost a single cent of FDIC-insured funds.

The Deposit Insurance Fund is fundamental to the FDIC's mission to maintain stability and

public confidence in the nation's banking system.  FDIC-insured institutions, like Bank of

America, are responsible for funding the FDIC's Deposit Insurance Fund.

3.      The Deposit Insurance Fund was established pursuant to the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.* ("FDI Act"). The FDIC imposes quarterly assessments on insured depository institutions to finance the Deposit Insurance Fund. Under Section 7 of the FDI Act, 12 U.S.C. § 1817, the FDIC is required to establish, by regulation, a risk-based assessment system. The FDIC's assessment system is risk-based so that riskier institutions—*i.e.*, institutions that are more likely to fail—pay more for deposit insurance than safer institutions.

4.      As authorized by law, the FDIC created, by regulation, separate risk-based assessment systems for large and small insured depository institutions. Under the FDIC's regulations, the largest and most highly complex institutions ("HCIs"), like Bank of America, are subject to a particular risk-based assessment system.

5.      The FDIC determines an institution's risk profile—and thus the assessments the institution owes—using financial information self-reported and certified by that institution in accordance with FDIC regulations and reporting instructions. Because the FDIC relies on an institution's reporting of its own financial information, it is legally required and imperative that the institution truthfully report the information the FDIC needs.

6.      One of the key indicators of risk for an HCI is the extent to which its exposure to counterparties is concentrated. The greater the concentration, the greater the chance that default by, or financial distress at, one or more counterparties could lead to the HCI's failure, which could cause a very large loss to the Deposit Insurance Fund. To ensure that this concentration risk factor is measured properly, the FDIC requires that large HCIs like Bank of America report their counterparty exposures at the "consolidated entity level" rather than at the individual entity level. This means that if Bank of America has significant exposures to two affiliated counterparties, then Bank of America must consolidate the exposures to these two affiliates and

treat them as a single exposure to the top-tier parent of these affiliates, rather than separately report the exposures to each individual affiliated counterparty.

7.     From the first quarter of 2012 through the fourth quarter of 2014, the amounts Bank of America reported to the FDIC substantially understated its counterparty exposure. During this period, Bank of America ignored the FDIC's instruction that it report counterparty exposures at the "consolidated entity level." In fact, it did not consolidate *any* of its counterparty exposures at all. (Bank of America's underreporting of its counterparty exposures actually dates back to the second quarter of 2011, but for reasons discussed below, only the first quarter of 2012 through the fourth quarter of 2014 are at issue here.)

8.     Given Bank of America's size and sophistication, its failure to report accurately its counterparty exposures to the FDIC is noteworthy. Out of all of the HCIs subject to the FDIC's reporting requirement—all of which are, like Bank of America, large sophisticated financial institutions—Bank of America is the only one that failed to consolidate its counterparty exposures in any manner whatsoever.[1] This failure is particularly conspicuous given that Bank of America's parent company, when faced with an identical reporting instruction from another government regulator, reported the consolidated counterparty exposures properly, and the *same* group was responsible for the regulatory reporting at both Bank of America and Bank of America's parent company.

9.     Despite additional misrepresentations by the Bank, the FDIC learned the full extent of Bank of America's reporting failure in 2016. For example, ████████████████

---

[1]  The eight other HCIs are: (1) Bank of New York Mellon; (2) Citibank, N.A.; (3) Goldman Sachs Bank USA; (4) JP Morgan Chase Bank, N.A.; (5) Morgan Stanley Bank, N.A.; (6) The Northern Trust Company; (7) State Street Bank and Trust Company; and (8) Wells Fargo Bank, N.A.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

10.     In December 2016, Bank of America finally provided the FDIC with spreadsheets that it represented contained correct counterparty exposure information necessary for the FDIC to assess Bank of America properly for quarters earlier than the first quarter of 2015.

11.     On December 15, 2016, the FDIC invoiced Bank of America for $542 million that it owes for the second quarter of 2013 through the fourth quarter of 2014.  On March 8, 2017, the FDIC invoiced Bank of America for an additional $583 million that it owes for the first quarter of 2012 through the first quarter of 2013.  These two invoices total $1.12 billion.

12.     Bank of America has refused to pay these two invoices, which are past due.

13.     All told, by underreporting its counterparty exposures, Bank of America evaded $1.12 billion in assessments that it should have paid into the Deposit Insurance Fund for 2012–2014.

14.     The FDIC's deposit insurance safeguards hundreds of billions of dollars for Bank of America's depositors.  As of December 31, 2016, Bank of America was estimated to have $716 billion in insured deposits.  This deposit insurance is exceedingly valuable to Bank of America, as it helps Bank of America keep its existing customers and recruit new customers.  By avoiding $1.12 billion in assessments, Bank of America was able to maintain deposit insurance

on hundreds of billions of dollars for its customers without paying its fair share (*i.e.,* the full amount of required assessments) for that insurance.

15.     The FDIC, in its decades of experience administering the Deposit Insurance Fund, has never before encountered a reporting failure that has caused such a large underpayment of assessments—and especially has never had a financial institution refuse to pay such a large amount once the reporting failure came to light and revised assessments were imposed.  This action is to recover the $1.12 billion in unpaid assessments that Bank of America owes to the Deposit Insurance Fund but refuses to pay.

## THE PARTIES

16.     The FDIC is a government corporation and instrumentality of the United States of America headquartered at 550 17th Street, NW, Washington, D.C. 20429.  The FDIC brings this suit in its corporate capacity.  As of December 31, 2016, the FDIC provides deposit insurance to 5913 banks and savings associations.  It also directly examines and supervises almost 3800 commercial banks and savings institutions for operational safety and soundness.

17.     Defendant Bank of America is a national banking association whose principal place of business is in Charlotte, North Carolina.  Bank of America has operations in all 50 states, the District of Columbia, and more than 35 countries.  Bank of America has 29 banking centers and 99 ATMs in the District of Columbia.

## JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction under 12 U.S.C. § 1819, 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Bank of America, which at all relevant times conducted business in the District of Columbia.

20.     Venue is proper pursuant to 28 U.S.C. § 1391 because Bank of America resides in the District of Columbia by virtue of the business it conducts here.

## FACTUAL ALLEGATIONS

**A.     Bank of America Benefits from the FDIC's Deposit Insurance.**

21.     The FDIC insures the balance of each depositor's account at each insured institution up to $250,000.   If an institution fails, the FDIC ensures that the institution's depositors have timely access to their insured deposits.   Ultimately, if the assets of the failed institution are insufficient to return all insured deposits in full, the FDIC pays the shortfall from its Deposit Insurance Fund.   No depositor in an FDIC-insured institution has ever lost a cent of an insured deposit.   This insurance gives depositors confidence that the insured money they deposit with thousands of FDIC-insured institutions across the country is safe.

22.     Bank of America's deposits are its lifeblood, so it is a particularly significant beneficiary of the FDIC's Deposit Insurance Fund.   It has described itself publicly as having "the largest retail deposit share in the U.S."[2]   As of December 31, 2016, Bank of America held approximately $1.26 trillion in domestic deposits—of which an estimated $716 billion were insured deposits.

23.     Deposit insurance affords Bank of America the benefit of being able to offer customers deposit accounts that are insured against loss in the event of failure.   This allows Bank of America to attract new customers and keep existing ones.   The security of having deposits insured also helps Bank of America prevent a "bank run," during which a panic about Bank of America's solvency could lead to queues of people seeking to withdraw their money.

---

[2]   *See* BANK OF AMERICA CORPORATION 2015 ANNUAL REPORT at 3 (March 2016), *available at* http://www.banktrack.org/download/annual_report_2015_pdf/annual_report_2015.pdf.

**B.      The Deposit Insurance Fund Is Funded Through Risk-Based Assessments on Insured Depository Institutions.**

24.      As required by the FDI Act, the FDIC funds the Deposit Insurance Fund with assessments collected from FDIC-insured institutions.  The FDIC uses a risk-based approach to determine the amount of an institution's assessments.  Specifically, in addition to assessing the revenue needs of the Deposit Insurance Fund, the FDIC calculates the amount each institution should pay based on its risk profile, including the probability of failure and the potential amount of loss to the Deposit Insurance Fund if the institution fails.

25.      As authorized by law, the FDIC has created separate risk-based assessment systems for large and small insured depository institutions.  Bank of America is a large bank, and more specifically, is one of nine HCIs with insured deposits.  Bank of America is thus subject to the assessment system for HCIs.

26.      An HCI is: (1) an insured depository institution, with the exception of a credit card bank, that has had $50 billion or more in total assets for at least four consecutive quarters that is either controlled by a U.S. parent holding company that has had $500 billion or more in total assets for four consecutive quarters, or is controlled by one or more intermediate U.S. parent holding companies that are controlled by a U.S. holding company that has had $500 billion or more in assets for four consecutive quarters; or (2) a processing bank or trust company. *See* 12 C.F.R. § 327.8(g)(1).

27.      Due to the structural and operational complexity of HCIs, these institutions pose unique challenges and risks if they fail.  HCIs hold over $4 trillion in domestic deposits nationwide, which include approximately $2 trillion in estimated insured deposits.  In Washington, D.C., there were approximately $46 billion in deposits as of June 30, 2016, of which over $22 billion (or nearly half) were held by HCIs.

28.     Even among these HCIs, Bank of America stands out: it has the largest amount of domestic deposits, approximately $1.26 trillion as of December 31, 2016, and approximately $11 billion of the deposits in Washington, D.C. (as of June 30, 2016)—almost 25 percent of all of the deposits at insured institutions in this jurisdiction.   Accurately measuring the large risks concentrated among the few HCIs, including Bank of America, is critically important to the viability of the Deposit Insurance Fund.

29.     To assess the risk each HCI poses to the Deposit Insurance Fund, the FDIC uses financial information self-reported by each insured institution.   Each quarter, every insured institution files a Consolidated Report of Condition and Income, or "Call Report," with the Federal Financial Institutions Examination Council (a council of financial regulators that includes the FDIC).

30.     The FDIC inputs the information that HCIs submit in their Call Reports into a scorecard that uses a number of metrics to determine the amount each HCI should be assessed. These metrics include each HCI's ability to withstand asset-related stress.   The score for the ability to withstand asset-related stress is a weighted average of four measures.   One of these scores is for the "concentration measure," which is the highest score (as determined under the scorecard) of the following ratios: (1) the sum of the reporting HCI's total exposures to its largest 20 counterparties divided by Tier 1 capital (a measure of regulatory capital) and reserves; (2) the amount of the reporting HCI's exposure to the largest counterparty divided by Tier 1 capital and reserves; and (3) the reporting HCI's total amount of higher-risk assets divided by Tier 1 capital and reserves.   12 C.F.R. § 327.9(b)(2).

31.     The FDIC relies upon the data each HCI submits in the Call Report.   By statute, each Call Report must contain two certifications as to its accuracy.   First, the Call Report "shall

contain a declaration by the president . . . or by any other officer designated by the board of directors or trustees of the reporting depository institution to make such declaration, that the report is true and correct to the best of his knowledge and belief," 12 U.S.C. § 1817(a)(3). Second, "[t]he correctness of said report of condition shall be attested by the signatures of at least two directors or trustees of the reporting depository institution other than the officer making such declaration." *Id.*

**C.      HCIs Must Report The Amounts of Their Counterparty Exposures at the Consolidated Entity Level.**

32.     The FDIC first implemented the regulatory regime for calculating HCI assessments through a final rule promulgated, following notice and comment, in February 2011 (the "2011 Final Rule").  *See* 75 Fed. Reg. 23516 (May 3, 2010); 75 Fed. Reg. 72612, 72613 (Nov. 24, 2010); 76 Fed. Reg. 10672, 10674 (Feb. 25, 2011).  During the comment period, Bank of America did not comment on the Rule's requirement that HCIs report the amount of their counterparty exposures in Schedule RC-O at the "consolidated entity level," even though it had the opportunity to do so.

33.     The 2011 Final Rule provides that each HCI must report its two counterparty exposure measures "at the consolidated entity level" as follows:

> Top 20 Counterparty Exposure/Tier 1 Capital and Reserves … Sum of the total exposure amount to the largest 20 counterparties (in terms of exposure amount) divided by Tier 1 capital and reserves.  Counterparty exposure is equal to the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all unfunded commitments) for each counterparty or borrower *at the consolidated entity level.*

> Largest Counterparty Exposure/Tier 1 Capital and Reserves … The amount of exposure to the largest counterparty (in terms of exposure amount) divided by Tier 1 capital and reserves.  Counterparty exposure is equal to the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all

unfunded commitments) for each counterparty or borrower *at the consolidated entity level.*

76 Fed. Reg. 10672, 10721 (Feb. 25, 2011) (emphasis added).

34.     In accordance with the 2011 Final Rule, in Schedule RC-O of the Call Report, each HCI must report the amount of its largest counterparty exposure and the total amount of its top 20 largest counterparty exposures.  Schedule RC-O Memorandum Items 14 and 15 appear as follows:

| *Memorandum items 14 and 15 are to be completed by "highly complex institutions" as defined in FDIC regulations.* | | |
|---|---|---|
| 14. Amount of the institution's largest counterparty exposure............................................ | K673 | M.14. |
| 15. Total amount of the institution's 20 largest counterparty exposures.............................. | K674 | M.15. |

35.     It bears emphasizing that Schedule RC-O of the Call Report requires each HCI to report only the *amounts* of its counterparty exposures, and not the *identities* of its counterparties. As a result, a person reviewing a Call Report cannot know from the Call Report itself which counterparties the HCI used when calculating the total amount of counterparty exposures, and thus cannot know when the HCI understated the total amount of its counterparty exposures by calculating the amount based on the wrong list of counterparties.  While HCIs are not required to explain in the Call Report how they computed the amounts reported or to provide the underlying data that corroborates them, they are required to keep records supporting their calculations.  And, of course, they are required to certify that their Call Reports are accurate.

36.     In December 2011, the FDIC again informed the HCIs that:

for the purposes of calculating deposit insurance premiums, highly complex institutions should report counterparty credit exposure on a *consolidated entity basis (legal consolidated entity).*   The FDIC believes that highly complex institutions should have the ability to *aggregate* exposures arising from financial contracts with entities within a legal consolidated entity and report the exposure as outlined in the final rule.

76 Fed. Reg. 77315, 77322 (Dec. 12, 2011) (emphasis added).

10

37.     The instruction to report "at the consolidated entity level" means that exposures to counterparties that are affiliates of one another must be consolidated at the top-tier parent level of each counterparty.  As an example, if an HCI has exposures to affiliated counterparties A, B, and C, the HCI must consolidate the exposures to A, B, and C, treating the three affiliated counterparties as a single entity, rather than as three separate entities.   Furthermore, if counterparty D is also affiliated with A, B, and C, but the HCI's exposure to D is not, by itself, among its top 20 largest counterparty exposures, the HCI must still consolidate its exposure to D with its exposures to A, B, and C.   Thus, when tallying the total amount of its top 20 counterparty exposures, the HCI would include its exposures to A, B, C, and D (all of which form a single counterparty exposure), as well as its 19 other largest counterparty exposures (each of which is also calculated at the consolidated-entity level).  By contrast, the HCI would violate the 2011 Final Rule if it failed to consolidate its exposures to A, B, C, and D when calculating the total amount of its top 20 counterparty exposures.

38.     Failing to consolidate counterparty exposures can cause an understatement not only of the total amount of an HCI's top 20 counterparty exposures but also of the total amount of its largest single counterparty exposure.  For example, if an HCI has exposures to affiliated counterparties A, B, and C, and the exposure to A is, by itself, the HCI's largest single counterparty exposure, the HCI will understate the total amount of its largest counterparty exposure if it reports its exposure only to A and not to A + B + C.

39.     Measuring concentration of counterparty exposures at the consolidated entity level helps ensure that the FDIC adequately captures the HCI's *concentration* of counterparty exposures, because the risks posed by counterparties that are affiliates of each other are generally correlated; that is, if one counterparty defaults, the risk that its affiliates will also default

increases.  An HCI's failure to report its counterparty exposures at the consolidated entity level understates the concentration risk that the FDIC is required by law to measure.

40.     Accurately measuring the risks posed by each HCI's concentration of large exposures to a handful of consolidated entities is critically important to the viability of the Deposit Insurance Fund.  As the FDIC explained in the rulemaking: "recent experience shows that the concentration of a highly complex institution's exposures to a small number of counterparties—either through lending or trading activities—significantly increase[s] the institution's vulnerability to unexpected market events."  76 Fed. Reg. 10672, 10696 (Feb. 25, 2011).  Thus, "[t]he FDIC uses the top 20 counterparty exposure and the largest counterparty exposure to capture this risk." *Id.*

41.     The FDIC subsequently modified the 2011 Final Rule through notice-and-comment procedures in 2012 and 2014, although the requirement that HCIs report counterparty exposure at the consolidated entity level never changed.  77 Fed. Reg. 66000 (Oct. 31, 2012); 79 Fed. Reg. 70427 (Nov. 26, 2014).

**D.     Bank of America Failed to Report Counterparty Exposures at the Consolidated Entity Level.**

42.     Unknown to the FDIC, and contrary to the requirement in the 2011 Final Rule, Bank of America *never* consolidated its counterparty exposures when reporting the amounts of its counterparty exposures in any of its Call Reports for the second quarter of 2011 through the fourth quarter of 2014.  Because the FDIC relied on Bank of America's Schedule RC-O submissions, which Bank of America certified were true and correct, the FDIC was—until 2016—unaware that Bank of America was not reporting consolidated counterparty exposures on Schedule RC-O as required by the 2011 Final Rule.

43.     Bank of America's failure to report its consolidated counterparty exposures dates back to the second quarter of 2011—which is when the 2011 Final Rule first took effect. However, for the second quarter of 2011 through the fourth quarter of 2011, Bank of America would not have owed additional assessments if it had properly reported its counterparty exposures because ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

### 1. Bank of America Failed to Report its Largest Counterparty at the Consolidated Entity Level.

44.     During the operative time period, Bank of America's single largest counterparty exposure was to ████████████████████████████████████ Rather than consolidating its counterparty exposures, Bank of America never reported its exposures to ████ at the consolidated entity level in any of its Call Reports for the second quarter of 2011 through the fourth quarter of 2014.

45.     Instead, when filing its Call Reports, Bank of America improperly treated ████ and each of ████ subsidiaries to which Bank of America had exposure as separate counterparties of Bank of America.

46.     As the FDIC now knows, had Bank of America performed the consolidation required by the 2011 Final Rule, the amount of Bank of America's consolidated exposure to ████ would have been significantly greater.

47.     For example, for the fourth quarter of 2014, Bank of America separately reported counterparty exposures for ████████████████████████████████████████████████ ████████████████████████████████████ even though all three ████████████ entities are subsidiaries of ████ The result was that Bank of America reported its largest

counterparty exposure to be about ███████████████████ Had Bank of America properly consolidated these four counterparty exposures and reported them as a total exposure at the consolidated entity level (at the ████ level), it would have reported a largest counterparty exposure of about ████████ for that quarter—almost three times the amount it actually reported for its largest counterparty exposure.   And the identity of the largest counterparty would have been ███████████████

48.    Bank of America's failure to consolidate its counterparty exposure to ████ with its exposures to ███████ subsidiaries *by itself* resulted in the additional $1.12 billion in assessments for the twelve quarters at issue here (first quarter of 2012 through the fourth quarter of 2014).   Accordingly, even under █████████████████████████████ █████████████████████████████████████████████ Bank of America would still owe $1.12 billion related to its failure to consolidate its contractual exposure to ███████████████████

**2.   Bank of America Failed to Report its Top 20 Counterparty Exposures at the Consolidated Entity Level.**

49.    In every quarter from the second quarter of 2011 through the fourth quarter of 2014, Bank of America also failed to report correctly the total amount of its top 20 largest counterparty exposures.

50.    For example, in the third quarter of 2013, Bank of America reported that the sum of its top 20 counterparty exposures was approximately ██████████ Had Bank of America consolidated its counterparty exposures and reported at the consolidated entity level as required, it would have reported a top 20 counterparty exposure sum of about ██████████ Bank of America also would have reported a counterparty exposure sum that included exposures to six additional entities, as six of the counterparties whose exposures were included in the top 20

counterparty exposure sum would not have occupied six separate spots in the top 20 counterparty exposure sum, but would have been consolidated with affiliated counterparties and reported in a single spot.   As a result, Bank of America underreported the total amount of its top 20 counterparty exposures by over ███████ and effectively reported, at most, only the sum of its top 14 "unconsolidated" counterparty exposures, rather than the sum of its top 20 as required.

**E.      Among the Nine HCIs, Bank of America Alone Failed to Report at the Consolidated Entity Level.**

51.     The 2011 Final Rule and its requirement to consolidate counterparty exposures at the "consolidated entity level" applied to all nine HCIs.

52.     For the 12 quarters at issue here, Bank of America is the only HCI that failed to consolidate its counterparty exposures in any manner whatsoever when reporting the total amounts of its counterparty exposures in its Call Reports.

**F.      Bank of America's Holding Company Interprets "Consolidated Entity Level" Correctly in a Directly Analogous Context.**

53.     In 2008, three years before the FDIC promulgated the 2011 Final Rule at issue here, the Federal Reserve Bank of New York ("FRBNY") instituted its "Top 20" Counterparty Project.   As with the 2011 Final Rule, the goal of the Project was to assess accurately the counterparty exposure risk presented "when a firm operates through many of its own legal vehicles, which in turn conduct business with many external entities, including some that may ultimately be owned by or affiliated with the same counterparty."[3]   A key component of the Top

---

[3]  Senior Supervisors Group, Progress Report on Counterparty Data, January 15, 2014, at 1, *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/banking/2014/ SSG_Progress_Report_on_Counterparty_January2014.pdf.

20 Counterparty Project was ensuring that financial institutions could "quickly and accurately aggregat[e] counterparty exposures." *Id.*

54.     Like the FDIC's 2011 Final Rule, the FRBNY Top 20 Counterparty Project required reporting entities (in this case the HCI holding companies) to report counterparty exposures at the "consolidated entity level" in order to capture the "full credit relationship to [each holding company's] largest counterparties."

55.     The instruction was identical—and was the model the FDIC used three years later when it promulgated the 2011 Final Rule for reporting HCI counterparty exposures.  As with the 2011 Final Rule, the objective of the Top 20 Project data collection initiative of the FRBNY was to provide regulators with information about concentrations of exposures among large firms, particularly with respect to large firms' exposures to each other and to common counterparties.

56.     Beginning in 2008, Bank of America's parent company, Bank of America Corporation ("BAC"), participated in the FRBNY program.  For the FRBNY program, BAC consolidated its counterparty exposures at the top-tier level of each counterparty.  In other words, interpreting the identical instruction—that counterparty exposures be reported at the "consolidated entity level"—Bank of America's holding company did it the right way for the FRBNY, while Bank of America did it the wrong way for the FDIC.

**G.     The Same Group at Bank of America Properly Reported Its Counterparty Exposures at the Consolidated Entity Level to the FRBNY But Wrongly Reported Them to the FDIC.**

57.     Both Bank of America and BAC used the same risk systems to identify and report counterparty exposure risk, and the same group within Bank of America was responsible for the regulatory reporting for both entities.

58.     Thus, the same group that correctly understood "consolidated entity level" in the FRBNY's program as requiring BAC to consolidate counterparty exposures at the parent-

company level when reporting the total amount of its top 20 counterparty exposures starting in 2008 (and continuing to this day) decided not to consolidate Bank of America's counterparty exposures at the top-tier parent level when faced with the FDIC's materially identical reporting requirement starting in 2011.

59.     This decision was made despite the fact that the FDIC always had a hotline available that Bank of America could have called at any time if it needed clarification as to how to correctly report its counterparty exposures pursuant to the 2011 Final Rule.  Bank of America also could have emailed the FDIC about these issues at RRPSadministrator@fdic.gov or Assessments@fdic.gov.  Bank of America never emailed or called the hotline to clarify any uncertainty it may have had regarding how to report at the "consolidated entity level."

60.     By failing to consolidate its counterparty exposures at the parent-company level, Bank of America was able to evade assessments of $1.12 billion.

**H.     Bank of America Refuses to Pay What it Owes.**

61.     In April 2016, the FDIC's Large Bank Pricing Section initiated an off-site review of Bank of America as part of its efforts to ensure that all nine HCIs were complying with official reporting requirements.

62.     During the course of this review, the FDIC asked Bank of America to provide, within 30 days, supporting details for the counterparty exposure amounts reported for the fourth quarter of 2015.

63.     In May 2016, Bank of America submitted a written response conceding that it had failed to treat exposures to counterparties that are affiliates of each other as exposures to one counterparty.  Bank of America acknowledged that this error understated the exposure amounts it reported for both its largest counterparty and its top 20 counterparty exposures.  Due to this error,

Bank of America informed the FDIC that it was revising the Schedule RC-O items in its Call Reports for all four quarters of 2015 and the first quarter of 2016.

64.     In June 2016, Bank of America filed amended Call Reports correcting its Schedule RC-O counterparty exposures for the first quarter of 2015 through the first quarter of 2016. These amendments reflected that Bank of America's underreporting of its counterparty exposures had enabled it to avoid assessments of $100 million from the first quarter of 2015 through the first quarter of 2016.

65.     Subsequently, in December 2016, Bank of America for the first time provided the FDIC with spreadsheets that it represented had correct counterparty exposure data for quarters earlier than the first quarter of 2015. This new information enabled the FDIC to invoice Bank of America for new assessments to make up the difference for what Bank of America had avoided paying by improperly reporting its counterparty exposures for the first quarter of 2012 through the fourth quarter of 2014. That new data showed that, had Bank of America properly reported its counterparty exposures as instructed by the 2011 Final Rule, its risk profile would have resulted in $1,120,563,178.49 in additional assessments for the 12 quarters at issue here.

66.     ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████

67.     ███████████████████████████████████
███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

68.     Every Call Report that Bank of America submitted for the first quarter of 2012 through the fourth quarter of 2014 was certified as true and correct pursuant to 12 U.S.C. § 1817(a)(3), despite the fact that Bank of America did not consolidate its counterparty exposures at the consolidated entity level in any of the Call Reports it submitted.

69.     For the quarters at issue, Bank of America has not made any effort to amend and re-certify its Call Reports such that they comport with the 2011 Final Rule.

70.     On December 15, 2016, and March 8, 2017, the FDIC invoiced Bank of America in the amount of $1,120,563,178.49 in assessments for the first quarter of 2012 through the fourth quarter of 2014, plus interest in the amount of $4,906,268.56 based on the revised data it had received about Bank of America's actual counterparty exposures in that period.

71.     These amounts are past due and Bank of America has refused to pay them.

## CLAIMS

## COUNT ONE

### Failure to Pay Mandatory Assessments as Required by 12 U.S.C. § 1817

72.     The FDIC incorporates by reference each of the allegations set forth above.

73.     Bank of America underreported its counterparty exposures by failing to consolidate its counterparty exposures at the consolidated entity level when reporting the total amount of its largest counterparty exposure and of its top 20 counterparty exposures.

74.     The group in Bank of America that is responsible for complying with the FDIC's reporting requirement decided not to report its counterparty exposures at the consolidated entity level even though the same group, when faced with an identical reporting requirement for Bank of America's parent company, reported properly the parent company's counterparty exposures at the consolidated entity level.

75.     As a direct and proximate result of its underreporting, Bank of America evaded assessment fees of $1.12 billion for the first quarter of 2012 through the fourth quarter of 2014.

76.     On December 15, 2016, the FDIC invoiced Bank of America for the revised assessments for the second quarter of 2013 through the fourth quarter of 2014.

77.     The invoiced amount for those revised assessments was $541,997,517.66.

78.     Bank of America received the December 15, 2016, invoice.

79.     The revised assessments were correctly calculated based on the revised data Bank of America provided to the FDIC in December 2016.

80.     The due date for payment of this invoice was December 30, 2016.

81.     Bank of America failed to pay any portion of the revised assessments it owes.

82.     To this day, Bank of America has not made any payment toward the revised assessments for the second quarter of 2013 through the fourth quarter of 2014.

83.     On March 8, 2017, the FDIC invoiced Bank of America for the revised assessments for the first quarter of 2012 through the first quarter of 2013.

84.     The invoiced amount for those revised assessments was $583,471,929.39.

85.     Bank of America received the March 8, 2017, invoice.

86.     The revised assessments were correctly calculated based on the data Bank of America provided to the FDIC.

87.   The due date for payment of this invoice was March 30, 2017.

88.   Bank of America failed to pay any portion of the revised assessments it owes.

89.   To this day, Bank of America has not made any payment toward the revised assessments for the first quarter of 2012 through the last quarter of 2014.

90.   In accordance with 12 U.S.C. § 1817(g), the FDIC is entitled to recover the past due assessments owed by Bank of America.

## COUNT TWO

### Unjust Enrichment

91.   The FDIC incorporates by reference each of the allegations set forth above.

92.   Bank of America has unjustly enriched itself at the expense of the FDIC by retaining $1.12 billion that it owes the FDIC.

93.   Furthermore, Bank of America benefited by being able to offer insured accounts to its depositors despite not paying its fair share of assessments.

94.   The FDIC is entitled to disgorgement and/or a constructive trust equal to the amount Bank of America was unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, the FDIC prays that final judgment be entered against Bank of America declaring, ordering, and adjudging that:

a.  Bank of America violated the obligation imposed by 12 U.S.C. § 1817 and the 2011 Final Rule;

b.  Bank of America underpaid for its FDIC insurance by $1.12 billion;

c.  Bank of America must pay the FDIC the full amount it owes, including interest, prejudgment interest, and costs of this action;

d.  Bank of America was unjustly enriched as a result of its actions;

e.  Bank of America must disgorge the amount that it was unjustly enriched by underpaying for its FDIC insurance;

f.  the imposition of a constructive trust equal to the amount Bank of America was unjustly enriched; and

g.  such other relief as may be appropriate and as the Court may deem just and proper.


## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC respectfully demands a trial by jury for all issues in this case that are so triable.

DATED:        April 7, 2017                Respectfully submitted,

                                           QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP

                                           *Ethan Glass*

                                           Jon Corey (D.C. Bar No. 491311)
                                           Eric Lyttle (D.C. Bar No. 482856)
                                           Ethan Glass (D.C. Bar No. 1034207)
                                           777 6th Street, NW, 11th Floor
                                           Washington, D.C.  20001
                                           Phone:  (202) 538-8100

                                           *Attorneys for Plaintiff Federal Deposit*
                                           *Insurance Corporation*

OF COUNSEL:

Barbara Katron
Senior Counsel
Herbert G. Smith II (D.C. Bar No. 450811)
Counsel
Andrew A. Nicely (D.C. Bar No. 458805)
Counsel
Minodora D. Vancea (D.C. Bar No. 492335)
Counsel
Federal Deposit Insurance Corporation
3501 N. Fairfax Drive
Arlington, VA 22226-3500
Tel. (703) 516-5729
Fax (703) 516-5067