# EXHIBIT 98

# No. 1:17-cv-36-EGS-ZMF

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>                    Plaintiff,<br><br>         v.<br><br>BANK OF AMERICA, N.A.,<br><br>                    Defendant. | Case No. 1:17-cv-36-EGS |

**EXPERT REPORT OF PAUL H. KUPIEC, PH.D.**

**JUNE 4, 2020**

**(AS CORRECTED ON JULY 16, 2020)**

# TABLE OF CONTENTS

I.    QUALIFICATIONS ........................................................................................1

II.   SCOPE OF ENGAGEMENT ........................................................................2

    A.   Summary of Allegations ...................................................................2

    B.   Assignment .......................................................................................4

    C.   Compensation ...................................................................................5

III.  SUMMARY OF OPINIONS .........................................................................5

IV.   BACKGROUND ..........................................................................................10

    A.   Parties..............................................................................................11

        1.   FDIC and the DIF ............................................................... 11

        2.   BANA ................................................................................. 13

    B.   Relevant Rules and Regulations Governing the FDIC .................15

        1.   The Federal Deposit Insurance Corporation Improvement Act of 1991................................................................................. 15

        2.   The Dodd-Frank Wall Street Reform and Consumer Protection Act ................... 18

        3.   Timeline of FDIC Deposit Insurance Assessment Rules since the Dodd-Frank Act ......................................................... 23

V.    INSURANCE PREMIUMS CHARGED TO A FINANCIAL INSTITUTION SHOULD REFLECT THE RISK OF LOSS TO THE DIF POSED BY THAT PARTICULAR FINANCIAL INSTITUTION....................................26

    A.   Overview..........................................................................................26

    B.   Factors That Affect the Probability That a Financial Institution Will Fail ..................................................................................................28

        1.   Factors That Affect the Probability of a Failure .................... 28

        2.   HCIs Have Certain Attributes That Reduce the Probability of a Failure ............................................................................. 32

    C.   Factors That Affect Losses, If Any, to the DIF Given the Failure of a Financial Institution ........................................................................46

        1.   Resolution through Living Wills Required Under Title I of the Dodd-Frank Act ................................................................. 48

        2.   Resolution through OLA under Title II of the Dodd-Frank Act........................... 50

        3.   Resolution through "Least Cost Resolutions" Available to the FDIC ................................................................................... 54

D.      Historical Losses to the DIF Have Predominantly Been from Non-HCI
        Banks Instead of HCIs ...................................................................................62

VI.     THE 2011/2012 FINAL RULE IS NOT RISK-BASED AND
        ASSESSMENT PREMIUMS FOR HCIS BASED ON THE 2011/2012
        FINAL RULE WOULD NOT REFLECT THE ACTUAL RISK OF LOSS
        POSED TO THE DIF BY HCIS, WHICH IS LOW ..........................................63

        A.      Overview..........................................................................................................63

        B.      Summary of the Assessment System Used by the FDIC to Calculate
                Assessment Rates for HCIs...............................................................................65

        C.      The 2011/2012 Final Rule Is Not Risk Based ..........................................72

                1.      The 2011/2012 Final Rule Is Based on Unverifiable Models and
                        Risk Rankings, and Fails to Take into Account Evidence that
                        Historically Losses to the DIF have been Due to the Failure of
                        Only Non-HCI Institutions ...................................................................... 72

                2.      The 2011/2012 Final Rule Does Not Adequately Consider Loss
                        upon Failure Because the Loss Severity Factor Is Arbitrarily
                        Capped ..................................................................................................... 83

                3.      The 2011/2012 Final Rule Does Not Adequately Consider Risk
                        Mitigating Attributes of HCIs that Reduce Both the Risk of Failure
                        and Potential Losses to the DIF in the Event of a Failure .................... 87

                4.      The 2011/2012 Final Rule Does Not Adequately Consider the
                        Regulatory Tools Available to the FDIC and Actions It Can Take
                        to Prevent or Minimize Losses to the DIF ............................................. 99

                5.      The Treatment of Counterparty Exposure in the 2011/2012 Final
                        Rule Is Arbitrary and Flawed.............................................................. 113

## I.   QUALIFICATIONS

1.   I am a resident scholar at the American Enterprise Institute ("AEI"), where I study systemic risk and the management and regulations of banks and financial markets.  My current research interests focus on risk measurement and management, capital allocation models, the management and regulation of financial institutions, systemic risk measurement, deposit insurance, the relationship between financial sector stability and macroeconomic growth, financial sector stress testing, the design of macro prudential policies and selected topics in derivatives and securities pricing.

2.   Before joining AEI, I was an associate director of the Division of Insurance and Research within the Center for Financial Research at the FDIC, where I oversaw research on bank risk measurement and the development of regulatory policies such as Basel II and Basel III.  I was also director of the Center for Financial Research at the FDIC and chairman of the Research Task Force of the Basel Committee on Banking Supervision.

3.   Prior to the FDIC, I held research positions at the International Monetary Fund ("IMF"), Freddie Mac, J.P. Morgan, the Federal Reserve Board, the Bank for International Settlements, and North Carolina State University, where I was an assistant professor of finance.  I have served as a consultant on financial market issues for the OECD as well as the IMF as a technical expert on banking, stress testing, and financial stability issues.

4.   My scholarly research has been published in numerous academic journals, including the *Journal of Finance*, the *Journal of Financial Intermediation*, the *Journal of Derivatives*, the *Journal of Fixed Income*, the *Journal of Financial Services Research*, the *Journal of Risk*, *The Federal Reserve Bank of New York Economic Policy Review*, the *Journal of Real Estate Finance and Economics*, the *Journal of Investment Management*, *The*

1

*Financial Regulator*, and the *Journal of Risk Management in Financial Institutions*. I have written short opinion articles on public policy issues that have appeared in *The Wall Street Journal*, *The Los Angeles Times*, *The American Banker*, *Forbes*, *The Washington Post*, *The Hill*, *Inside Sources*, *US News & World Report*, *the National Review*, *The Federalist*, *USA Today*, *AEI Ideas*, and *Real Clear Markets*.

5.    I have served on the editorial board of many professional journals, including the *Journal of Financial Services Research*, *Journal of Risk*, *Journal of Investment Management*, and the *Journal of Risk Management in Financial Institutions*.

6.    I have provided congressional testimony on banking regulations and financial policy on numerous occasions, including testimony before, among others, the: Senate Committee on Banking, Housing and Urban Affairs; House Financial Services Committee; House Subcommittee on Financial Institutions and Consumer Credit; House Committee on Financial Services; and the Senate Committee on Banking, Housing, and Urban Development. I have not previously testified as an expert in a litigation.

7.    I hold a B.S. degree in economics from George Washington University and a Ph.D. in economics—with a specialization in finance, theory, and econometrics—from the University of Pennsylvania.

8.    A copy of my CV is attached as **Appendix A**, which includes, among other things, all publications authored by me within the past ten years.

## II.    SCOPE OF ENGAGEMENT

### A.    Summary of Allegations

9.    The Federal Deposit Insurance Corporation (the "FDIC") alleges that Bank of America,

N.A. ("BANA") owes the FDIC $1.12 billion in unpaid deposit insurance assessments (*i.e.*, assessment premiums) for the first quarter of 2012 through the fourth quarter of 2014.[1]

10.    Specifically, the FDIC claims that BANA did not report two metrics related to its counterparty exposure—the amount of the institution's single largest counterparty exposure and the total amount of the institution's 20 largest counterparty exposures—at the "consolidated entity level," which the FDIC says "means that exposures to counterparties that are affiliates of one another must be consolidated at the top-tier parent level of each counterparty."[2]   According to the FDIC, these measures were used to calculate BANA's assessment premiums between the second quarter of 2011 and the fourth quarter of 2014.[3]   The FDIC alleges that by failing to aggregate its counterparty exposure at the "top-tier parent level," BANA understated its level of counterparty risk, and, therefore, paid lower assessment premiums than it owed to the Deposit Insurance Fund (the "DIF").[4]

11.    BANA denies the FDIC's allegations that it underreported its counterparty risk exposure and, therefore, underpaid assessment premiums to the DIF.[5]   In addition, BANA

---

[1]    First Amended Complaint, *Federal Deposit Insurance Corporation v. Bank of America, N.A.*, United States District Court, District of Columbia, Case No. 1:17-cv-36-EGS, April 10, 2017, ¶¶11 and 84 (hereafter, "Amended Complaint").

[2]    *See* Amended Complaint, ¶¶37, 44 and 49.

[3]    *See* Amended Complaint, ¶7.  The FDIC does not contend that BANA owes additional assessments for the second quarter of 2011 through the fourth quarter of 2011.  *See* Amended Complaint, ¶¶7 and 43.

[4]    Amended Complaint, ¶13.

[5]    Answer and Counterclaim, *Federal Deposit Insurance Corporation v. Bank of America, N.A.*, United States District Court, District of Columbia, Case No. 1:17-cv-36-EGS, February 24, 2017, ¶55 (hereafter, "Answer and Counterclaim").

counterclaims that the method used by the FDIC (*i.e.*, assessment system) to calculate assessment premiums for Highly Complex Institutions ("HCIs") such as BANA under rules adopted by the FDIC in 2011 and 2012 (the "2011/2012 Final Rule") are in contravention of the Administrative Procedure Act ("APA") and the Federal Deposit Insurance Act of 1950 ("FDIA").[6, 7]

## B. Assignment

12.     I have been retained by counsel for BANA to provide expert testimony in the above captioned matter.  Specifically, I have been asked to:

- Assess whether the FDIC's assessment system for HCIs such as BANA under the 2011/2012 Final Rule is risk-based and accurately reflects the risk of losses to the DIF; and

- In particular, assess whether aggregating exposures to counterparties that are affiliated to one other through a common parent for purposes of calculating counterparty exposure accurately reflects counterparty risk.

13.     I was originally hired as a consulting expert to assist Charles Calomiris in the preparation

---

[6]     BANA's counterclaim involves FDIC, "Assessments, Large Bank Pricing; Final Rule," Federal Register, Vol. 76, No. 38, February 25, 2011 at 10672 (hereafter, "2011 Final Rule") and FDIC, "Assessments, Large Bank Pricing; Final Rule," Federal Register, Vol. 77, No. 211, Oct. 31, 2012, at 66000 (hereafter "2012 Final Rule"). *See also* Answer and Counterclaim, Counterclaims, ¶1.  As discussed in further detail in Section IV.B.3 below, the changes in the 2012 Final Rule did not affect the overall assessment system for LIDIs and HCIs outlined in the 2011 Final Rule and are not material to the allegations in this matter.  As a result, I refer to the final rules issued in 2011 and 2012 as the 2011/2012 Final Rule.

[7]     Under the 2011 Final Rule, an HCI is defined as: "(i) An insured depository institution (excluding a credit card bank) that has had $50 billion or more in total assets for at least four consecutive quarters that is controlled by a U.S. parent bank holding company that has had $500 billion or more in total assets for four consecutive quarters, or is controlled by one or more intermediate U.S. parent holding companies that are controlled by a U.S. holding company that has had $500 billion or more in assets for four consecutive quarters, or (ii) [a] processing bank or trust company." *See* 2011 Final Rule, at 10688, footnotes 52 and 10707.  Under this definition there are nine HCIs: BANA, Bank of New York Mellon, Citibank, N.A., Goldman Sachs Bank, USA; JP Morgan Chase Bank, N.A., Morgan Stanley Bank, N.A., The Northern Trust Company, State Street Bank and Trust Company, and Wells Fargo Bank.  *See* Amended Complaint, ¶8 and footnote 1.

of his expert report dated January 31, 2020.  I understand Dr. Calomiris has had to withdraw as the expert in this matter because he has taken a government job.  I worked very closely with Dr. Calomiris in preparing his report and supervising a team of employees at Analysis Group, Inc. ("Analysis Group"), a financial and economic consulting firm.  I was and continue to be in full agreement with the content and opinions and as such I have adopted his report.

14.   In forming my opinions, I have relied upon documents and other materials produced in this matter or obtained from public sources.  A complete list of materials I relied upon in forming my opinions is listed in the attached **Appendix B**.  Should additional relevant documents or information be made available to me, I reserve the right to supplement my opinions as appropriate.

### C.   Compensation

15.   I am being compensated at an hourly rate of $850.  I have been assisted in this engagement by the Analysis Group team, who worked under my direction and supervision.  Neither my compensation nor that of Analysis Group is contingent upon my findings or the outcome of this litigation.

## III.   SUMMARY OF OPINIONS

16.   Under the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), the FDIC is required to use a risk-based assessment system in which the assessment premiums charged to an insured depository institution ("IDI") must reflect the risk of the losses, if any, to the DIF that would result from a failure of the IDI.  Specifically, under the FDICIA, the risk-based assessment system is required to take into account both: 1) the probability that an IDI will fail; and 2) the magnitude of expected losses to the DIF, if

any, in the event of a bank failure.  A risk-based assessment system is not only required by law but also important for managing the incentives of IDIs to ensure proper risk management, and to ensure fair and equitable treatment of IDIs in terms of assessment premiums paid to the DIF (*i.e.*, assessment premiums paid by IDIs to the DIF must reflect the risk posed by those institutions).  However, as I explain in this report, the assessment system for HCIs such as BANA under the 2011/2012 Final Rule does not accurately reflect many aspects that lower the risk of failure of HCIs, or potential losses to the DIF, if any, in the event of the failure of such institutions, and thus is not risk-based.

17.   In particular, HCIs such as BANA have certain attributes that minimize the probability that a failure will occur, and also eliminate or reduce expected losses to the DIF in the event a failure does occur.  These attributes include, among others, that HCIs: 1) are subject to the highest level of regulatory oversight, which lowers the risk of failure, and thus, the potential losses to the DIF; 2) typically have large geographic footprints and diversified product mixes that enable them to better withstand stress, further insulating the DIF from potential losses; and 3) are typically part of a bank holding company structure in which affiliates and the parent bank holding company facilitate financial stability of the institution through regulatory provisions such as the Federal Reserve's "Source of Strength" provision or access to additional capital through public markets, providing additional protections against failure, as well as against losses to the DIF in the event of a failure.

18.   Additionally, even if an HCI failure were to occur—which is unlikely due to the factors discussed above—the FDIC has at its disposal a broad range of regulatory tools and actions that it can take to resolve the failure in a manner that limits losses, if any, to the

DIF.  Examples of such regulatory tools available to the FDIC include: 1) the Orderly Liquidation Authority ("OLA") under Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"); 2) the execution of resolution plans (commonly referred to as "living wills") filed by the parent bank holding company under Title I of the Dodd-Frank Act and resolution plans filed by the HCIs with the FDIC; and 3) the FDIC's "Cross Guaranty" provision that makes affiliate IDIs that are part of the same parent bank holding company responsible for any potential losses to the DIF caused by the failure of an HCI.  Moreover, in the case that such regulatory tools are insufficient, the FDIC can also pursue market-based options to liquidate or sell the HCI's assets.  The extent of losses to the DIF, if any, under such market-based options would depend on the HCI's quality of tangible assets, as well as the value of its intangible assets, its capital structure, and its operational structure.  For these reasons, it is not surprising that historically losses to the DIF have predominantly been from non-HCIs.  In fact, as discussed in greater detail below, only one of the 417 total bank failures between 2007 and 2011 involved an HCI (*i.e.*, Washington Mutual, Inc. or "WaMu"), and even then, the failure did not actually result in any losses to the DIF.

19.     An appropriate risk-based assessment system should, therefore, consider the unique attributes of HCIs, as well as the regulatory tools available to the FDIC, that insulate the DIF from potential losses.  However, the 2011/2012 Final Rule does not consider any of these risk-mitigating factors, and, thus, does not accurately reflect the risk posed to the DIF by HCIs.  The 2011/2012 Final Rule is also flawed in other ways that renders it inconsistent with the principle that the assessment system should be risk-based.  As I discuss in greater detail below, these flaws include the following:

- The FDIC does not provide the details necessary to independently validate the models and assumptions it used to design the assessment system for HCIs under the 2011/2012 Final Rule.  For example, the dependent variables in the models used by the FDIC rely on unverifiable opinions of the FDIC staff and assumptions about IDIs that never failed.  Similarly, the assumptions underlying the loss severity measure in the scorecard are also based on historical experience from failures of small institutions and institutions that never failed.  Given that HCIs are quite different in their regulatory status, operational scope and corporate structure from small IDIs, such assumptions are not able to accurately capture the lower risk posed by HCIs to the DIF.

- Second, the impact of the loss severity measure in the scorecard for HCIs is arbitrarily capped in the 2011/2012 Final Rule.  Specifically, the magnitude of the potential losses to the DIF caused by an HCI's failure is capped at 20 percent of an HCI's total score calculated using the scorecard for HCIs under the 2011/2012 Final Rule, even if the potential losses to the HCI would be zero.  By applying such an arbitrary cap, the assessment system fails to fully reflect the range of risk-mitigating factors specific to HCIs that reduce the risk posed by HCIs to the DIF.

- Third, the 2011/2012 Final Rule fails to reflect various risk-mitigating attributes of HCIs, such as the heightened regulatory oversight placed on HCIs and their ability to secure additional sources of financial support either from the public capital markets or through their typical bank

holding company structure, which reduce the risk of failure of an HCI and potential losses, if any, to the DIF in the unlikely event of an HCI failure.

- Fourth, the 2011/2012 Final Rule also fails to reflect the regulatory tools available to the FDIC and market-based actions that the FDIC can take even in the unlikely event of an HCI failure, which further insulate the DIF from potential losses, if any, caused by the failure of an HCI.

- Fifth, there are numerous conceptual flaws in the counterparty exposure measure as contemplated in the 2011/2012 Final Rule such that, from an economic perspective, the assessment rules do not accurately reflect the risk of such counterparty exposure to the HCI, and thus, the risk of potential losses to the DIF.  Specifically, the counterparty exposure measures used in the assessment system for HCIs are arbitrary, and the FDIC provides no explanation or analysis as to why the counterparty exposure measures it chose to use are meaningful predictors of potential risk posed by HCIs to the DIF.  Additionally, the treatment of counterparty exposure under 2011/2012 Final Rule is flawed because it does not distinguish the risk posed by the different types of counterparties. Moreover, aggregating counterparty exposures to the top-tier parent level (as the FDIC purportedly required in the period at issue here) incorrectly assumes that all affiliated counterparties would fail together.  On the contrary, the failure of a given counterparty's affiliate or the counterparty's holding company does not necessarily mean that all counterparties that are affiliates of the failed counterparty will default

together, as the FDIC's interpretation of the 2011/2012 Final Rule assumes.

20. For these reasons, the assessment system under the 2011/2012 Final Rule for HCIs such as BANA does not accurately reflect the risk posed by HCIs to the DIF, and cannot be considered to be risk-based. As such, to the extent the assessment premiums charged to HCIs such as BANA are based on the 2011/2012 Final Rule, the deficiencies in the rule highlighted above indicate that the assessment premiums for HCIs were not risk-based.

21. It is important to recognize that banks such as BANA have no choice but to buy deposit insurance from the FDIC, as required by law. There is no competitor to the FDIC that can provide legally mandated deposit insurance. As such, there is no way for market forces to determine through competition whether the assessment premiums charged by the FDIC are fair and equitable. Moreover, the process used by the FDIC to calculate such assessment premiums lacks transparency. The assessment premiums charged by the FDIC to the IDIs are confidential and not publicly disclosed by the FDIC. Furthermore, the FDIC does not publish information that would even allow someone to gauge how assessment premiums differ across banks of different types (*e.g.*, large versus small banks). As a result, it is not possible for the banks or other interested parties to determine independently how far the assessment premiums charged by the FDIC to HCIs such as BANA deviate from the risk posed by the institutions to the DIF. The deficiencies in the 2011/2012 Final Rule I discuss in this report suggest that the FDIC's method for determining assessments for HCIs systematically overstates the risk that HCIs posed to the DIF.

## IV.   BACKGROUND

A. **Parties**

*1.     FDIC and the DIF*

22.     Congress created the FDIC as an independent agency of the federal government through the Banking Act of 1933 in the aftermath of the Great Depression.[8]  The FDIC is overseen by a Board of Directors and is charged with preserving and promoting public confidence in the U.S. financial system.[9]  To achieve this objective, the agency has three key functions: administration of deposit insurance through the DIF; supervision of IDIs, and receivership management in the event of failure of IDIs.[10]

23.     The FDIC administers the DIF to provide deposit insurance to protect depositors in case of bank insolvency.[11]  The DIF is funded mainly through quarterly deposit insurance assessment premiums paid by insured banks, but also receives interest earned on securities.[12]  An IDI can be part of a bank holding company which can include other IDIs, as in the case of BANA.  The FDIC calculates the assessment premiums for each IDI separately (*i.e.*, at the IDI level) rather than at the combined bank holding company

---

[8]    *See* Julia Maues, "Banking Act of 1933 (Glass-Steagall)," *Federal Reserve History*, November 22, 2013, available at https://www.federalreservehistory.org/essays/glass_steagall_act.  *See also* FDIC, "Who is the FDIC?" last updated May 3, 2017, available at https://www.fdic.gov/about/learn/symbol/index.html.

[9]    *See* FDIC, "Who is the FDIC?," last updated May 3, 2017, available at https://www.fdic.gov/about/learn/symbol/index.html.

[10]   *See* FDIC, "2018-2022 Strategic Plan - The FDIC and the Banking Industry: Perspective and Outlook," January 29, 2018, available at https://www.fdic.gov/about/strategic/strategic/bankingindustry.html.

[11]   Since October 2008, the DIF has insured up to $250,000 per depositor, per insured bank, per account category. The types of FDIC-insured deposit accounts include checking accounts, savings accounts, money market deposit accounts, certificates of deposit, cashier's checks, money orders, and negotiable order of withdrawal accounts.  *See* FDIC, "Press Releases - Basic FDIC Insurance Coverage Permanently Increased to $250,000 Per Depositor," July 21, 2010, available at https://www.fdic.gov/news/news/press/2010/pr10161.html.  *See also* FDIC, "Accounts Covered by the FDIC," January 31, 2018, available at https://www.fdic.gov/deposit/covered/insured.html.

[12]   *See* FDIC, "The Deposit Insurance Fund," last accessed January 15, 2020, available at https://www.fdic.gov/deposit/insurance/.

level.[13]  As of the end of 2014 (*i.e.*, the end of the relevant period in this case), the FDIC

insured 6,509 institutions, which held a combined $15.6 trillion in assets and $10.4

trillion in domestic deposits.[14]  As of the end of 2014, the DIF had a balance of $62.8

billion on $6.2 trillion of insured deposits.[15]

24.     With respect to its oversight role, the FDIC functions as a supervisory authority for IDIs

as the primary federal supervisor for state-chartered banks and savings institutions that do

not belong to the Federal Reserve System.[16]  The FDIC also has certain supervisory

responsibilities for insured large and systemically important financial institutions

("SIFIs") even though it is not the primary federal regulator for such institutions.[17]  For

example, as discussed in further detail below, the FDIC and the Federal Reserve share

responsibility for reviewing and approving living wills filed by certain bank holding

companies and other financial institutions under Title I of the Dodd-Frank Act.[18, 19]

25.     By law, the FDIC serves as the receiver in the event of a failure of an IDI.[20]  As the

---

[13]   *See* 2011 Final Rule, at 10679.

[14]   *See* FDIC, "Quarterly Banking Profile: Fourth Quarter 2014," *FDIC Quarterly*, Vol. 9, No. 1, 2015, p. 25.

[15]   *See* FDIC, "Quarterly Banking Profile: Fourth Quarter 2014," *FDIC Quarterly*, Vol. 9, No. 1, 2015, p. 24.

[16]   As supervisor of such institutions, the FDIC conducts a variety of risk management examinations and monitoring in order to actively assess the health of banks.  *See* FDIC, "2018-2022 Strategic Plan - Supervision Program," January 29, 2018, available at https://www.fdic.gov/about/strategic/strategic/supervision.html.

[17]   *See* FDIC, "2018-2022 Strategic Plan - Supervision Program," January 29, 2018, available at https://www.fdic.gov/about/strategic/strategic/supervision.html.

[18]   *See* FDIC, "Resolution Authority News & Information," May 31, 2019, available at https://www.fdic.gov/resauthority/resplans.html.

[19]   In addition, under certain conditions, the FDIC has backup supervision authority to conduct special examinations of institutions that it does not directly supervise to improve the FDIC's ability to access information necessary to understand, evaluate, and mitigate its exposure to IDIs, especially the largest and most complex firms.  *See* FDIC, "FDIC Board Votes to Revise MOU on Backup Supervision Authority," July 12, 2010, available at https://www.fdic.gov/news/news/press/2010/pr10153.html.

[20]   *See* FDIC, "2018-2022 Strategic Plan - Supervision Program," last updated January 29, 2018, available at https://www.fdic.gov/about/strategic/strategic/supervision.html.

administrator of the DIF, the FDIC has legal authority to collect claims on behalf of depositors, and the FDIC is often the largest creditor of the failed institution.[21]  As discussed in further detail below, the FDIC also has additional receivership roles specified under the OLA of Title II of the Dodd-Frank Act to facilitate the resolution of failed SIFIs.[22]  As the receiver, the FDIC oversees the operations of the failed IDI and bears the responsibility to resolve an IDI failure in a manner that is least-costly to the DIF (*i.e.*, recover as much as possible from the bank's assets to meet its obligations to the failed institution's depositors and creditors).[23]

2.    *BANA*

26.    Bank of America Corporation ("BAC"), the parent company of BANA, is a Delaware-incorporated bank holding company that is one of the world's largest financial institutions.[24]  As of 2018, BAC had $2.4 trillion in assets and a network of 4,300 retail financial centers in approximately 35 countries.[25]

27.    BAC's corporate structure includes two affiliated IDIs, BANA and Bank of America California, National Association ("BACANA"), through which BAC conducts its retail

---

[21]    *See* FDIC, "2018-2022 Strategic Plan - Receivership Management Program," last updated January 29, 2018, available at https://www.fdic.gov/about/strategic/strategic/receivership.html.

[22]    *See* FDIC, "2019 Annual Performance Plan - Receivership Management Program," March 26, 2019, available at https://www.fdic.gov/about/strategic/performance/rcvrship.html.

[23]    *See* FDIC, "2018-2022 Strategic Plan - Supervision Program," January 29, 2018, available at https://www.fdic.gov/about/strategic/strategic/supervision.html.

[24]    *See* BAC, 2014 Form 10-K for the Fiscal Year 2014, last accessed November 13, 2019, available at https://www.sec.gov/Archives/edgar/data/70858/000007085814000012/bac-12312013x10k.htm, p. 23.

[25]    *See* BAC, 2018 Form 10-K for the Fiscal Year 2018, last accessed December 11, 2019, available at https://www.sec.gov/Archives/edgar/data/70858/000007085819000012/bac-1231201810xk.htm, p. 20.

banking activities.[26]  BANA has been FDIC-insured since January 1, 1934.  As of September 2019, BANA had $1.8 trillion in assets and $1.4 trillion in total deposits.[27] BACANA has been FDIC-insured since May 18, 1984.  As of 2019, BACANA had $13.4 billion in assets and $10.8 billion in total deposits.[28]

28.  BAC's bank subsidiaries, BANA and BACANA, are subject to regulation from the Federal Reserve System, Comptroller of the Currency, FDIC, and Consumer Financial Protection Bureau.[29]  Additionally, the Financial Stability Board ("FSB"), in consultation with the Basel Committee on Banking Supervision and national authorities, has designated BAC a global systemically important bank ("G-SIB"), also referred to as a SIFI.[30]  FSB member authorities apply special FSB-prescribed regulatory capital requirements to G-SIBs, such as BAC, which are higher than the capital requirements applied to smaller banks under Basel III standards.[31]  These regulatory requirements

---

[26]  As described in BAC's 2019 Resolution Plan Submission, within BAC's corporate structure, BAC is the parent holding company, NB Holdings Corporation is the "top-tier intermediate holding company," and BAC North America Holding Company is the "intermediate holding company" that controls BANA and BACANA.  *See* BAC, "Bank of America Corporation 2019 Resolution Plan Submission - Public Executive Summary," July 1, 2019, p. 45.

[27]  *See* FDIC, "Bank of America, National Association (FDIC # 3510)," last accessed January 15, 2020, available at https://research2.fdic.gov/bankfind/detail.html?bank=3510&name=Bank%20of%20America%2C%20National%20Association&searchName=&searchFdic=&city=&state=&zip=&address=&tabId=2.

[28]  *See* FDIC, "Bank of America California, National Association (FDIC # 25178)," last accessed January 15, 2020, available at https://research2.fdic.gov/bankfind/detail.html?bank=25178&name=Bank%20of%20America%20California%2C%20National%20Association&searchName=BANK%20OF%20AMERICA&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2.

[29]  *See* BAC, 2018 Form 10-K for the Fiscal Year 2018, last accessed December 11, 2019, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/70858/000007085819000012/bac-1231201810xk.htm, p. 2.

[30]  *See* Financial Stability Board, "2019 List of Global Systemically Important Bank (G-SIBs)," November 22, 2019, p. 3.

[31]  *See* Thomas Wade, "Bank Capital Requirements: A Primer," *American Action Forum*, October 16, 2018, available at https://www.americanactionforum.org/insight/bank-capital-requirements-a-primer/.

include maintaining a higher liquidity coverage ratio, capital buffer and total loss absorbing capacity, regular supervisory stress testing, resolution planning and resolvability assessments, and higher supervisory expectations with relation to risk management functions, risk governance, and internal controls.[32] In particular, systemically important institutions such as BAC "are subject to the most rigorous supervision" under the Federal Reserve's Large Institution Supervision Coordination Committee ("LISCC") program.[33] For instance, in 2018, the Federal Reserve estimated that it spent on average over 55,000 supervisory hours per institution for systemically important institutions compared to only 40 hours per institution for firms with total assets less than $3 billion.[34]

## B.    Relevant Rules and Regulations Governing the FDIC

### 1.    The Federal Deposit Insurance Corporation Improvement Act of 1991

29.    In 1991, Congress passed the FDICIA, which amended the FDIA in response to financial distress and widespread bank failure during the savings and loan crisis, and other bank distress experiences, of the previous decade.[35]

30.    The FDICIA requires that "[t]he [FDIC] Board of Directors shall, by regulation, establish

---

[32]    *See* Financial Stability Board, "2019 List of Global Systemically Important Bank (G-SIBs)," November 22, 2019, pp. 1-2. *See also* The Federal Reserve System, "Supervision and Regulation Report," May 2019, pp. 17-22.

[33]    The LISCC program is "a national program that uses both horizontal and firm-specific supervisory activities to assess the financial resiliency and risk-management practices of firms." *See* The Federal Reserve System, "Supervision and Regulation Report," May 14, 2019, pp. 15-16.

[34]    *See* The Federal Reserve System, "Supervision and Regulation Report," May 14, 2019, pp. 15-16.

[35]    *See* Noelle Richards, "Federal Deposit Insurance Corporation Improvement Act of 1991," *Federal Reserve History*, November 22, 2013, available at https://www.federalreservehistory.org/essays/fdicia.

a risk-based assessment system for insured depository institutions."[36]  A risk-based

assessment system is not only required by law but also important for managing the

incentives of IDIs to ensure proper risk management by IDIs, and to ensure fair and

equitable treatment of IDIs in terms of assessment premiums made to the DIF (*i.e.*,

assessment premiums made by the IDIs to the DIF must reflect the risk posed by those

institutions).

31.     Under the FDICIA, the FDIC's assessment system for IDIs must take into account three

        risk factors: the probability of loss to the DIF, the magnitude of potential losses, and the

        revenue requirements of the DIF.[37]  In particular, to determine the probability of loss to

        the DIF, the FDICIA specifies that the FDIC should consider different types and

        concentrations of assets and liabilities, as well as other factors relevant to the risk of

        loss.[38]  This requirement remains unaffected despite the many changes to the FDIC's

        duties under the Dodd-Frank Act, discussed below.

32.     The FDICIA also contains other provisions that mandate a duty to "minimize[] the

        amount of any loss realized in the resolution of cases," namely the prompt corrective

        action ("PCA") and least-cost resolution ("LCR") provisions.[39]

33.     The PCA provision of the FDICIA established five capital categories to which an

        institution could be assigned.[40]  Upon a bank's classification into one of the three weakest

---

[36]   "Federal Deposit Insurance Corporation Improvement Act of 1991," Public Law 102-242, December 19, 1991, at 2345 (hereafter, "FDICIA").

[37]   *See* FDICIA, at 2345-2346.

[38]   *See* FDICIA, at 2345-2346.

[39]   FDICIA, at 2252.

[40]   The five capital categories under the PCA are "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," and "critically undercapitalized."  *See* FDIC, "FDIC Law, Regulations, Related

capital categories, the provision requires the bank's regulator to act swiftly in accordance with specified guidelines to prevent loss to the DIF.[41]  For example, once a bank reaches the "significantly undercapitalized" category, its chief banking regulator must force the bank either to sell enough shares or obligations to become sufficiently capitalized or to merge or be acquired by another bank.[42]  A bank in the lowest category ("critically undercapitalized") is forbidden from taking a number of actions, including paying interest on subordinated debt, and must be placed into receivership.[43]  The PCA thus delineates certain courses of action that must be undertaken under various circumstances to respond to the risk of potential bank failure, thereby allowing bank regulators to act quickly and aggressively to mitigate potential losses to the DIF.[44]

34.    Similarly, the LCR provision requires the FDIC to resolve a financial institution's failure in a way that is "the least costly to the [DIF] of all possible methods [available] for meeting the [FDIC]'s obligation."[45]  The FDICIA includes a systemic risk exception to the LCR mandate for cases where pursuing the least-cost resolution "would have serious adverse effects on economic conditions or financial stability."[46]  This exception must be approved by at least two-thirds of the FDIC Board of Directors, at least two-thirds of the

---

Acts - 1000 - Federal Deposit Insurance Act," last updated June 29, 2018, available at https://www.fdic.gov/regulations/laws/rules/1000-4000.html.

[41]  *See* FDIC, "FDIC Law, Regulations, Related Acts - 1000 - Federal Deposit Insurance Act," last updated June 29, 2018, available at https://www.fdic.gov/regulations/laws/rules/1000-4000.html.

[42]  *See* FDICIA, at 2258.

[43]  *See* FDICIA, at 2261.

[44]  *See* FDIC, "FDIC Law, Regulations, Related Acts - 1000 - Federal Deposit Insurance Act," June 29, 2018, available at https://www.fdic.gov/regulations/laws/rules/1000-4000.html.

[45]  FDICIA, at 2274.

[46]  FDICIA, at 2275.

Board of Governors of the Federal Reserve System, and the Secretary of the Treasury (in consultation with the President).[47, 48]

### 2.    *The Dodd-Frank Wall Street Reform and Consumer Protection Act*

35.    The financial crisis of 2008-2009 presented the United States' economy and financial system with severe challenges.[49]  In a three-year period, from 2007 to 2009, the crisis led to the failure of over 150 banks and losses in the stock market of nearly $8 trillion.[50, 51]  Furthermore, the unemployment rate grew significantly, peaking at 10 percent in late 2009.[52]  In response to the financial crisis, the U.S. government took extensive action to restore confidence in the financial markets.  In October of 2008, Congress passed the Emergency Economic Stabilization Act ("EESA") to provide assistance to the financial system.[53]  Subsequently, in June of 2009, President Obama announced "a sweeping overhaul of the financial regulatory system" to increase oversight of the financial system, which culminated with the passing of the Dodd-Frank Act.[54]

---

[47]    *See* FDICIA, at 2275.

[48]    The Dodd-Frank Act restricted the use of the systemic risk exception by, *inter alia*, limiting its application to banks already placed into receivership (as opposed to receiving open-bank assistance).  *See* FDIC, "Crisis and Response: An FDIC History, 2008-2013," 2017, pp. 92-93.

[49]    *See* "Remarks by the President at Signing of Dodd-Frank Wall Street Reform and Consumer Protection Act," *Obama White House Archives*, July 21, 2010, available at https://obamawhitehouse.archives.gov/the-press-office/remarks-president-signing-dodd-frank-wall-street-reform-and-consumer-protection.act.

[50]    *See* FDIC, "Failed Bank list," last updated January 13, 2019, available at https://www.fdic.gov/bank/individual/failed/banklist.html.

[51]    *See* Renae Merle, "A Guide to the Financial Crisis - 10 years later," *The Washington Post*, September 10, 2018, available at https://www.washingtonpost.com/business/economy/a-guide-to-the-financial-crisis--10-years-later/2018/09/10/114b76ba-af10-11e8-a20b-5f4f84429666_story.html.

[52]    *See* Federal Reserve Economic Data, "Unemployment Rate," last updated December 6, 2019, available at https://fred.stlouisfed.org/series/UNRATE.

[53]    *See* "Emergency Economic Stabilization Act of 2008," Public Law 110–343, October 3, 2008, at 3765.

[54]    *See* "Remarks of the President on Regulatory Reform," *Obama White House Archives*, June 17, 2009, available at https://obamawhitehouse.archives.gov/the-press-office/remarks-president-regulatory-reform/.

36.     The Dodd-Frank Act was enacted on July 21, 2010.[55]  The Dodd-Frank Act instituted

broad modifications to the supervision of financial institutions related to banking,

securitization markets, consumer protection, executive compensation, and corporate

governance.[56]  With respect to the FDIC, the Dodd-Frank Act amended the statutory

provisions regulating the agency's management of the DIF and various reserve

requirements.[57]  The major changes included, but were not limited to: 1) amending the

definition of the "Assessment Base" used by the FDIC to calculate assessment premiums

for IDIs; and 2) setting forth regulations regarding how financial institutions prepare for

and respond to financial distress or failure, under Title I and Title II of the Act.[58]

However, despite the many changes to the FDIC's duties, the Dodd-Frank Act did not

change the requirement for the FDIC's assessment system to be risk-based, as established

under FDICIA.

37.     Specifically, the Dodd-Frank Act redefined the "Assessment Base" used by the FDIC to

calculate assessment premiums for IDIs as an amount equal to the average consolidated

---

[55]   *See* "Dodd-Frank Wall Street Reform and Consumer Protection Act," Public Law 111-203, July 21, 2010, at 1376 (hereafter, "Dodd-Frank Act").

[56]   *See* Davis Polk & Wardell LLP, "Summary of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Enacted into Law on July 21, 2010," July 21, 2010, p. i.  *See also* Morrison & Foerster, "The Dodd-Frank Act: A Cheat Sheet," 2010, p. 3.

[57]   *See* 2011 Final Rule, at 10673.  *See also* Davis Polk & Wardell LLP, "Summary of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Enacted into Law on July 21, 2010," July 21, 2010, p. 92.

[58]   Other changes instituted by the Dodd-Frank Act with respect to FDIC included: 1) permanently increasing the maximum FDIC deposit insurance amount to $250,000 per depositor, per insured bank, per account category; 2) increasing the minimum designated reserve ratio ("DRR") from 1.15 percent to 1.35 percent and requiring the FDIC to reach 1.35 percent ratio by September 30, 2020; 3) removing the 1.5 percent cap on the DRR, effectively eliminating the cap on the size of the DIF; 4) requiring that the FDIC "offset the effect" of the requirement to attain a higher DRR of 1.35 percent, on IDIs with total consolidated assets less than $10 billion; and 5) eliminating the requirement that FDIC declare dividends when the DRR exceeds 1.35 percent while continuing FDIC's authority and discretion in determining the declaration of dividends. *See* Dodd-Frank Act, at 1538-1540.

total assets of the depository institution minus the average tangible equity of the depository institution.[59]  The Assessment Base was previously defined to include only the domestic deposits of an IDI.[60]

38.    Additionally, the Dodd-Frank Act also sets forth various regulations regarding how financial institutions prepare for and respond to financial distress or failure, notably in Title I and Title II of the Act.

39.    Title I of the Dodd-Frank Act, Section 165(d) requires certain nonbank financial institutions and bank holding companies such as BAC to regularly prepare ex-ante resolution plans (*i.e.*, living wills).[61]  In addition, the FDIC adopted a final rule (the "IDI Rule") in 2012 requiring IDIs with $50 billion or more in total assets such as BANA to submit periodically to the FDIC contingent plans for the resolution of such institutions in the event of a failure.[62]  These resolution plans are intended to address the risks of insolvency of large and complex IDIs, and to detail strategies "for rapid and orderly resolution in the event of material financial distress or failure" under an FDIC receivership.[63]  Living wills are filed annually and typically contain information on a variety of topics, including a description of business and corporate organization of subsidiaries, summary financial statements, description of regulators and supervising

---

[59]   *See* 2011 Final Rule, at 10674.  *See also* Dodd-Frank Act, at 1538.

[60]   Under the assessment system prior to the passage of the Dodd-Frank Act, the Assessment Base was defined as the domestic deposits minus a few allowable exclusions, such as pass-through reserve balances.  *See* FDIC, "Assessments, Assessment Base and Rates," Federal Register, Vol. 75, No. 226, November 24, 2010, at 72582.

[61]   *See* The Federal Reserve System, "Living Wills (or Resolution Plans)," last updated December 17, 2019, available at https://www.federalreserve.gov/supervisionreg/resolution-plans.htm.

[62]   *See* FDIC, "Resolution Plans Required for Insured Depository Institutions With $50 Billion or More in Total Assets," Federal Register, Vol. 77, No. 14, January 23, 2012, at 3075.

[63]   Dodd-Frank Act, at 1426.

authorities, and a summary of the resolution plan.[64]  These plans are subject to review and approval by the FDIC and Federal Reserve.[65]

40.     Title II of the Dodd-Frank Act, the OLA, provides a framework through which the FDIC may act as receiver to resolve a troubled financial institution, extending the FDIC's receivership role to institutions that had not been subject to FDIC receivership authority.[66]  Previously, the FDIC's receivership authority was limited to IDIs.  Title II significantly broadened the agency's powers and allows it to function as receiver for bank holding companies, in addition to their bank subsidiaries.[67]  The authority to invoke OLA lies with the Secretary of the Treasury, in consultation with the President.[68]  Additionally, to ensure the overall stability of the financial system, the Dodd-Frank Act also established an Orderly Liquidation Fund ("OLF") at the Treasury "as a liquidity facility that the FDIC may draw upon, subject to terms set by Treasury, to lend to the financial institution in receivership."[69]  Importantly, the funding of the OLF is completely separate from the DIF and may rely on a special assessment on other HCIs that have not failed.

---

[64]   Institutions prepare both a public and confidential plan.  Confidential plans contain substantially more information and details related to how the bankruptcy proceedings or FDIC receivership could be carried out. *See* Randall D. Guynn, "Resolution Planning in the United States," in Andreas Dombert and Patrick S. Kenadijian, *The Bank Recovery and Resolution Directive: Europe's Solution for "Too Big to Fail"?*, 2013, 109-163, p. 120.

[65]   *See* FDIC Office of Inspector General, "The FDIC's Resolution Plan Review Process," last accessed January 15, 2020, available at https://www.fdicoig.gov/publications/fdics-resolution-plan-review-process.

[66]   *See* Aaron Klein, "A Primer on Dodd-Frank's Orderly Liquidation Authority," *Brookings Institution*, June 5, 2017, available at https://www.brookings.edu/blog/up-front/2017/06/05/a-primer-on-dodd-franks-orderly-liquidation-authority/.

[67]   *See* Aaron Klein, "A Primer on Dodd-Frank's Orderly Liquidation Authority," *Brookings Institution*, June 5, 2017, available at https://www.brookings.edu/blog/up-front/2017/06/05/a-primer-on-dodd-franks-orderly-liquidation-authority/.

[68]   *See* Dodd-Frank Act, at 1451.

[69]   The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," February 21, 2018, p. 1.

These special assessments are not drawn from the DIF and are assessed in addition to those institutions' DIF insurance costs.

41. Under the Dodd-Frank Act, the resolution under the OLA must not impose any losses on taxpayers.[70] As a result, the process through which the OLF is funded differs considerably from the process to fund the DIF. For example, unlike the DIF, the OLF is not pre-funded by financial institutions through regular assessments.[71] Instead, in the event of a bank failure, the Treasury funds the OLF, which the FDIC then uses to provide secured loans and temporary liquidity to the receivership of the failed institution.[72] If the institution's remaining assets are insufficient to repay the loans from the OLF in full within five years, the FDIC must then seek payment from any creditors who may have received additional payments based on the FDIC's discretion to favor certain creditors with the same hierarchy.[73] If recovered assets are still insufficient to repay the OLF, the FDIC may impose a special assessment on certain large financial institutions with at least $50 billion in assets.[74] The OLA has never been triggered, and thus there has never been a need for the Treasury to fund the OLF to provide financial support to a failed financial institution.[75]

---

[70]  *See* Dodd-Frank Act, at 1518.

[71]  *See* The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," February 21, 2018, p. 1.

[72]  *See* The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," February 21, 2018, pp. 5 and 38.

[73]  *See* The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," February 21, 2018, p. 6.

[74]  *See* Dodd-Frank Act, at 1518.

[75]  *See* Aaron Klein, "A Primer on Dodd-Frank's Orderly Liquidation Authority," *Brookings Institution*, June 5, 2017, available at https://www.brookings.edu/blog/up-front/2017/06/05/a-primer-on-dodd-franks-orderly-liquidation-authority/.

3.  *Timeline of FDIC Deposit Insurance Assessment Rules since the Dodd-Frank Act*

42.  As discussed in Section IV.A.1, the FDIC calculates deposit insurance assessments at the IDI level instead of the bank holding company level.  An IDI's assessment premium is calculated by multiplying its Assessment Base by its "Assessment Rate."[76]  Prior to the passage of the Dodd-Frank Act, an IDI's Assessment Rate was determined by the IDI's risk category.  IDIs were assigned to one of four risk categories based on their capital levels and supervisory rating.  Initial Assessment Rates within each category were dependent on the "weighted average CAMELS component ratings and certain financial ratios."[77, 78]  Additionally, long-term debt issuer ratings were also used for large institutions (institutions with greater than $10 billion in assets).[79]  These initial Assessment Rates were then subject to multiple adjustments such as the unsecured debt adjustment, secured liability adjustment and brokered deposit adjustment based on the risk category of an institution.[80]

---

[76]  *See* 2011 Final Rule, at 10673.

[77]  *See* 2011 Final Rule, at 10672.

[78]  The CAMELS component rating refers to the composite rating assigned to a financial institution under the Uniform Financial Rating System ("UFIRS").  Under UFIRS, the composite rating assigned to an institution is based on an evaluation and rating of six component factors relating to the institution's financial condition and operations.  These component factors include: Capital Adequacy, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk.  The composite and component ratings are assigned based on a 1 to 5 numerical scale.  A rating of 1 indicates the highest rating and least degree of supervisory concern, while a rating of 5 indicates the lowest rating and the highest degree of supervisory concern.  *See* FDIC, "Uniform Financial Institutions Rating System," April 20, 2014, available at https://www.fdic.gov/regulations/laws/rules/5000-900.html.  *See also* The Federal Reserve System and FDIC, "Request for Information on Application of the Uniform Financial Institutions Rating System," October 17, 2019.

[79]  *See* 2011 Final Rule, at 10672.

[80]  *See* 2011 Final Rule, at 10672.

43.    Following the passage of the Dodd-Frank Act, the FDIC published a number of proposed

rulemaking notices outlining changes to the rules governing the agency's management of

the DIF and assessment of large IDIs.  Specifically, in October 2010, the FDIC published

a notice of proposed rulemaking on reducing pro-cyclicality of the assessment system,

maintaining a strategy for assessment dividends, and setting a revised DRR (the "October

NPR").[81]  In addition, on November 9, 2010, the FDIC published two notices of proposed

rulemaking that 1) expanded the definition of an institution's Assessment Base (the

"Assessment Base NPR"), and 2) revised the assessment system used for Large Insured

Depository Institutions ("LIDIs") and HCIs (the "Large Bank NPR").[82, 83]  The FDIC

sought comments on all three proposed rulemaking notices and received 55 written

comments in response from various financial institutions and concerned parties.[84]

44.    On February 25, 2011, the FDIC issued a single final rule (*i.e.*, the 2011 Final Rule) that

adopted the proposed rule changes in the October NPR, Assessment Base NPR, and the

Large Bank NPR.  The 2011 Final Rule revised the definition of the Assessment Base to

be the average consolidated total assets minus average tangible equity, and provided the

FDIC discretion to apply appropriate adjustments to the Assessment Base for custodial

banks and banker's banks.[85]  The 2011 Final Rule also implemented a scorecard

methodology to calculate Assessment Rates for LIDIs and HCIs, instead of basing

---

[81]    *See* 2011 Final Rule, at 10674.

[82]    *See* 2011 Final Rule, at 10674.

[83]    Under the 2011 Final Rule, an LIDI is an institution that has assets greater than $10 billion and does not fit the
definition of an HCI.  *See* 2011 Final Rule, at 10707.

[84]    *See* 2011 Final Rule, at 10676.

[85]    *See* 2011 Final Rule, at 10676.

Assessment Rates on the risk categories and long-term debt issuer ratings that had

previously been used for calculating the assessments of large institutions.[86]   The

scorecard methodology used by the FDIC under the 2011 Final Rule is described in

further detail in Section VI.B.

45.   The FDIC made further revisions to the rules governing the assessment system for LIDIs

and HCIs in 2012 and 2014.   In 2012, the FDIC revised the definitions of certain higher

risk assets such as leveraged loans and subprime consumer loans for LIDIs and HCIs,

clarified when an asset must be classified as higher risk, clarified the way securitizations

are classified as higher risk, and further defined certain terms relating to LIDIs and

HCIs.[87]

46.   Similarly, in 2014, the FDIC revised the ratios and ratio thresholds for capital evaluations

used in the assessment system to conform to the PCA capital ratios and ratio thresholds

under FDICIA, revised the Assessment Base calculation for custodial banks to conform

to asset risk weights adopted by federal banking agencies, and required all HCIs to

measure counterparty exposure using the Basel III standardized approach.[88]

Additionally, whereas the 2011 Final Rule stated that "counterparty exposure is equal to

the sum of Exposure at Default (EAD) associated with derivatives trading and Securities

Financing Transactions (SFTs) and the gross lending exposure (including all unfunded

commitments) for each counterparty or borrower at the consolidated entity level,"[89] the

---

[86]   *See* 2011 Final Rule, at 10688.

[87]   *See* 2012 Final Rule, at 66001.

[88]   *See* FDIC, "Assessments; Final Rule," Federal Register, Vol. 79, No. 228, November 26, 2014 (hereafter, "2014 Final Rule"), at 70427.

[89]   2011 Final Rule, at 10721.

2014 Final Rule removed the phrase "consolidated entity level" and stated instead that "[e]xposures to entities that are affiliates of each other are treated as exposures to one counterparty (or borrower)."[90]

## V.   INSURANCE PREMIUMS CHARGED TO A FINANCIAL INSTITUTION SHOULD REFLECT THE RISK OF LOSS TO THE DIF POSED BY THAT PARTICULAR FINANCIAL INSTITUTION

### A.   Overview

47.   As discussed in Section IV.B.1, the FDICIA requires the FDIC to use a risk-based assessment system in which the assessment premiums charged to a particular IDI must reflect the risk of the losses, if any, posed to the DIF that would result from a failure of the IDI.  Specifically, under the FDICIA the risk-based assessment system is required to take into account both: 1) the probability that an IDI will fail; and 2) the magnitude of expected losses to the DIF, if any, in the event of a bank failure.  A risk-based assessment system is not only required by law, but is also important for managing the incentives of IDIs to ensure proper risk management by IDIs, and to ensure fair and equitable treatment of IDIs in terms of assessment premiums made to the DIF (*i.e.*, assessment premiums made by the IDIs to the DIF must reflect the risk posed by those institutions).

48.   As I explain in greater detail in this section, HCIs such as BANA have certain attributes that minimize the probability that a failure will occur, and also eliminate or reduce expected losses to the DIF in the event a failure does occur.  These attributes include, among others, that HCIs: 1) are subject to a high level of regulatory oversight, which lowers the risk of failure, and thus, the potential losses to the DIF; 2) typically have large

---

[90]   2014 Final Rule, at 70438.

geographic footprints and diversified product mixes that enable them to better withstand stress, further insulating the DIF from potential losses; and 3) are typically part of a bank holding company structure in which affiliates and the parent bank holding company facilitate financial stability through regulatory provisions such as the Federal Reserve's Source of Strength provision, providing additional protections against failure, as well against losses to the DIF in the event of a failure.

49.     Additionally, even if an HCI failure were to occur—which is unlikely due to the factors discussed above—the FDIC has at its disposal a broad range of regulatory tools and actions that it can take to resolve the failure in a manner that limits losses, if any, to the DIF.  Examples of such regulatory tools available to the FDIC include: 1) the OLA under Title II of the Dodd-Frank Act, which requires coordination with the Secretary of the Treasury; 2) the execution of resolution plans filed by the parent bank holding company under Title I of the Dodd-Frank Act and/or resolution plans filed by the IDI with the FDIC; and 3) the FDIC's Cross Guaranty provision that makes affiliate IDIs that are part of the same parent bank holding company responsible for any potential losses to the DIF caused by the failure of an HCI.  For these reasons, it is not surprising that historical losses to the DIF have predominantly been from non-HCIs.  In fact, as discussed in greater detail below, only one of the 417 total bank failures between 2007 and 2011 involved an HCI (*i.e.*, WaMu), and even then, it did not actually result in any losses to the DIF.

50.     An appropriate risk-based assessment system should consider the unique attributes of HCIs, as well as the regulatory tools available to the FDIC that insulate the DIF from potential losses.  However, the 2011/2012 Final Rule does not consider any of these risk-

mitigating factors, and, therefore, does not accurately reflect the risk posed to the DIF by HCIs.  The 2011/2012 Final Rule is also flawed in other ways which result in an approach that is inconsistent with the principle that the assessment system should be risk-based.

51.    In the sections that follow, I first discuss the factors that affect the probability that a financial institution will fail.  I then discuss the characteristics that are unique to HCIs that curtail the risk that such a failure would occur.  I then discuss the variety of options available to the FDIC that allow it to minimize losses, if any, to the DIF in the event an HCI were to fail.  Lastly, in Section VI, I discuss in greater detail the numerous shortcomings of the 2011/2012 Final Rule that make it not risk-based with respect to HCIs.

**B.    Factors That Affect the Probability That a Financial Institution Will Fail**

*1.    Factors That Affect the Probability of a Failure*

52.    The failure of a financial institution is a regulatory event that is the result of an involved and lengthy monitoring process by bank examiners and regulators that culminates in the closure of a bank by a federal or state banking regulatory agency.[91]  A bank failure could occur either when a bank no longer has enough liquidity to fulfill its short-term payment obligations or when the bank in question has become insolvent.[92]  In many cases, the

---

[91]    *See* FDIC, "When a Bank Fails - Facts for Depositors, Creditors, and Borrowers," July 28, 2014, available at https://www.fdic.gov/consumers/banking/facts/.

[92]    A bank is considered to be insolvent when its liabilities (*e.g.*, customer deposits and short and long term debt) are greater than its assets (*e.g.*, cash, reserves, and loans).  Under PCA rules, if an HCI's tangible equity-to-asset ratio is below two percent, the HCI is considered to be severely undercapitalized.  Under these circumstances, the HCI needs to be resolved by the FDIC within 270 days unless the OCC and the FDIC agree on a different

triggering event that precipitates bank resolution is a need for additional liquidity that the Federal Reserve is unwilling to provide under its authority as a lender of last resort to the financial institution.[93]  Similarly, a financial institution may be closed either when it is no longer able to raise additional funding to meet its minimum regulatory capital requirements or when its assets prove insufficient in value to meet its financial obligations to creditors and depositors.[94]

53.   In general, there are a number of factors that reduce the probability that a financial institution will fail.  These factors include:[95]

- Policy, planning, and management quality: A strong risk management system, together with precautionary resolution planning, allows the bank to promptly identify and address existing and emerging risk factors that could lead to a bank failure;

- Adequacy of assets relative to liabilities: By maintaining an adequate level of assets relative to liabilities, a bank is more likely to be able to fulfill its short-term payment obligations and thus less likely to experience insolvency, which, by definition, lowers the probability of a bank failure;

---

course of action.  *See* FDIC, "FDIC Law, Regulations, Related Acts - 1000 - Federal Deposit Insurance Act," last updated June 29, 2018, available at https://www.fdic.gov/regulations/laws/rules/1000-4000.html.

[93]   *See* Douglas W. Diamond and Raghuram G. Rajan, "Liquidity Shortages and Banking Crises," *NBER Working Paper*, No. 8937, May 2002, p. 1.

[94]   *See* Stanley V. Ragalevsky and Sarah J. Ricardi, "Anatomy of a Bank Failure," *Banking Law Journal*, December 2009, pp. 870-871.

[95]   *See* Office of the Comptroller of the Currency, "Bank Failure: An Evaluation of the Factors Contributing to the Failure of National Banks," June 1988.  *See also* A. Dale Tussing, "The Case for Bank Failure," *The Journal of Law & Economics*, Vol. 10, October 1967, pp. 129-147.

- <u>Quality of asset portfolio and liquidity management</u>: The strength of a bank's asset portfolio, coupled with liquidity management, enables the bank to maintain a sufficient buffer of liquid assets to be able to survive extended periods of financial distress and meet the potential pressures from creditors, depositors, and counterparties to prevent a bank failure;

- <u>Ability to access the financial markets</u>: A bank's ability to access the financial markets is crucial both in normal times and during a state of financial distress, and provides a bank with additional means to meet its short-term debt obligations to prevent failure; and

- <u>General economic environment</u>: Aside from the bank-specific factors, the general economic environment is an important external factor that affects the probability of a bank failure.  Statistics show that the vast majority of failed banks operated in significantly or marginally depressed economic conditions.[96]

54.    In addition, a bank's franchise value, defined as its economic value in excess of its tangible net worth—which reflects intangible value related to its ability to earn net income from charging fees and the value of its customer relationships and know how—is an important factor in determining a bank's risk of failure, and its expected loss severity given failure.  Franchise value is affected by the bank's "market power" as well as the quality of its management in devising an effective business strategy to develop skills within the institution and attract and maintain valuable client relationships.  The value of

---

[96]    *See* Office of the Comptroller of the Currency, "Bank Failure: An Evaluation of the Factors Contributing to the Failure of National Banks," June 1988, p. 10.

a bank is emphatically not equal to its tangible net worth, which is reflected in the fact that the market value attributable to banks or non-bank affiliates within holding companies (which is also reflected in the price-to-book ratio of bank holding company equity) varies dramatically across financial institutions.  The value of a bank's intangible assets is also an important factor in determining a bank's risk of failure (as well as loss severity given failure, discussed below).  For example, banks with higher intangible value will find it easier to recapitalize in the wake of a large loss on tangible assets.  Moreover, if they must sell the franchise, higher intangible value will attract more bidders and higher bids, and thereby mitigate both the risk of failure and the loss severity if a failure occurs.

55.   Using price-to-book ratios of bank holding companies as a measure of franchise value, numerous academic studies have shown that bank holding companies with greater franchise value are more likely to be able to secure additional sources of funding during a state of distress to prevent failure.  These bank holding companies are also more capable of mitigating risk by maintaining greater capital reserves and more diversified portfolios even in distress, thereby having a lower risk of default as reflected in a wide range of risk measures.[97]  In addition, as a source of strength, bank holding companies with higher franchise value have more financial leverage to support their subsidiary IDIs in periods of financial distress to help reduce the probability of a failure as well as potential losses to the DIF.

---

[97]   *See* Michael C. Keeley, "Deposit Insurance, Risk, and Market Power in Banking," *American Economic Review*, Vol. 80, No. 5, December 1990, pp. 1183-1200.  *See also* Rebecca S. Demsetz, et al., "Banks with Something to Lose: The Disciplinary Role of Franchise Value," *Federal Reserve Bank of New York Economic Policy Review*, October 1996.

56.     In particular, Calomiris and Nissim (2014) have developed a quantitative approach that uses market values of bank holding companies to measure the intangible franchise value created within bank and nonbank subsidiaries of the holding company.[98]  The study identifies four important factors that contribute to higher franchise value of a bank holding company, many of which are specifically traceable to its bank subsidiaries: 1) higher value of bank loans and related relationship intangibles; 2) higher value of core bank deposit and related bank relationship intangibles; 3) higher value of other sources of income (*e.g.*, bank and nonbank fee income and noninterest expenses) and higher market capitalization multiples attached to those sources of income; and 4) higher value associated with asset size, leverage, dividend payments, and net asset re-pricing (a proxy for duration mismatch).

57.     As I will explain below, HCIs possess a number of key characteristics that affect these factors and, as a result, help reduce their risk of failure.

### 2.     *HCIs Have Certain Attributes That Reduce the Probability of a Failure*

58.     HCIs have several attributes that help reduce their risk of failure, and thus, potential losses to the DIF.  Such risk-mitigating attributes include high levels of regulatory scrutiny, support from affiliated entities through a holding company structure, as well as special access to potential assistance from the federal government.  As a result, HCIs pose a lower risk to the DIF compared to smaller financial institutions that lack these risk-mitigating attributes.  An appropriate risk-based assessment system must, therefore, consider such risk-mitigating factors, and assessment premiums charged to HCIs must

---

[98]     *See* Charles W. Calomiris and Doron Nissim, "Crisis-Related Shifts in the Market Valuation of Banking Activities," *Journal of Financial Intermediation*, Vol. 23, No. 3, 2014, pp. 400-435.

reflect the lower risk posed by such institutions to the DIF.  In this section, I discuss each of these mitigating factors in further detail.

> a.   *HCIs Are Subject to High Levels of Regulatory Scrutiny and Reporting Requirements*

59.   Compared to smaller banks, HCIs are subject to high levels of regulatory scrutiny and reporting requirements, which enable regulators to promptly identify and address potential issues that could cause a bank failure, and thus, minimize losses to the DIF. Since the financial crisis, the Federal Reserve "has significantly heightened its expectations of these institutions."[99]  There are a number of supervisory and regulatory measures designed only for large financial institutions, especially the HCIs, to reduce their risk of failure and the risk posed by such institutions to the financial system, which in turn minimizes the potential for losses to the DIF.

60.   For instance, HCIs are required to satisfy a more stringent liquidity coverage ratio requirement, which mandates a higher level of eligible collateral compared to that required of smaller banks.[100]  Specifically, the liquidity coverage ratio is defined as the ratio of the firm's liquid assets to its projected net cash outflow.  Under the liquidity coverage ratio requirement, each HCI is required to "hold high quality, liquid assets (HQLA) such as central bank reserves and government and corporate debt that can be

---

[99]   The Federal Reserve System, "Large Financial Institutions," March 6, 2019, available at https://www.federalreserve.gov/supervisionreg/large-financial-institutions.htm.

[100]   *See* The Federal Reserve System, et al., "Federal Banking Regulators Finalize Liquidity Coverage Ratio," September 3, 2014, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20140903a.htm. The liquidity coverage ratio requirement applies to "all banking organizations with $250 billion or more in total consolidated assets or $10 billion or more in on-balance sheet foreign exposure and to these banking organizations' subsidiary depository institutions that have assets of $10 billion or more."  A modified, less stringent rule applies to "bank holding companies and savings and loan holding companies that do not meet these thresholds, but have $50 billion or more in total assets."

converted easily and quickly into cash in an amount equal to or greater than its projected cash outflows minus its projected cash inflows during a 30-day stress period."[101]  The liquidity coverage ratio requirement ensures that HCIs have enough liquidity to withstand a period of elevated financial stress, allowing the bank management and regulators additional time to take appropriate actions to reduce the risk of a bank failure and thus potential losses to the DIF.

61.     Additionally, as I pointed out above, holding companies must be a source of strength to their bank subsidiaries, and the presence of stronger nonbank pieces of holding companies reduces the probability of bank failure and the expected loss severity if a bank failure occurs.  Thus, additional regulatory measures that strengthen holding companies also strengthen the banks within them.  In particular, bank holding companies of HCIs and other large financial institutions are required to participate in the Comprehensive Capital Analysis and Review ("CCAR"), an annual exercise conducted by the Federal Reserve to ensure that these financial institutions "have sufficient capital to continue operations throughout times of economic and financial stress" and that they "have robust, forward-looking capital-planning processes that account for their unique risks."[102]  The annual CCAR identifies capital adequacy issues on a regular basis, ensuring sufficient capital is held by these financial institutions to meet obligations to depositors, creditors, and counterparties even in a severely adverse operating environment.[103]

---

[101]   The Federal Reserve System, et al., "Federal Banking Regulators Finalize Liquidity Coverage Ratio," September 3, 2014, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20140903a.htm.

[102]   The Federal Reserve System, "Stress Tests and Capital Planning," March 7, 2017, available at https://www.federalreserve.gov/supervisionreg/stress-tests-capital-planning.htm.

[103]   *See* The Federal Reserve System, "Comprehensive Capital Analysis and Review 2019, Summary Instructions," March 2019.

62.     Similarly, the Dodd-Frank Act also requires bank holding companies of HCIs and other
large financial institutions to go through regular, mandatory stress testing and meet
associated regulatory capital requirements.  Specifically, the Dodd-Frank Act Stress
Testing ("DFAST") is "a forward-looking [evaluation] conducted both by the Federal
Reserve and those financial companies supervised by the Federal Reserve to help assess
whether institutions have sufficient capital to absorb losses and support operations during
adverse economic conditions."[104]  Complementary to the CCAR, the DFAST is designed
for large bank holding companies to maintain an adequate amount of capital to reduce
their likelihood of insolvency during a financial crisis and the risk burden on the financial
system.  In addition to regular reviews and stress-testing required of bank holding
companies, the Dodd-Frank Act also required IDIs with greater than $10 billion in assets
to conduct company-run stress tests and submit the results to their primary federal bank
regulatory agency.[105]  These mandatory regular reviews and stress-testing requirements
are designed to proactively identify potential future threats that could result in capital
inadequacy.  By strengthening the HCIs and/or their bank holding companies, these
regulatory measures help strengthen the financial stability of the HCIs, thereby reducing
their risk of failure and thus potential losses to the DIF.

63.     As discussed in Section IV.B.2, the holding companies of HCIs (such as BAC) are also

---

[104]   The Federal Reserve System, "Stress Tests and Capital Planning," March 7, 2017, available at
https://www.federalreserve.gov/supervisionreg/stress-tests-capital-planning.htm.

[105]   *See* FDIC, "Resolution Plans Required for Insured Depository Institutions With $50 Billion or More in Total
Assets," Federal Register, Vol. 77, No. 14, January 23, 2012, at 3075.  The FDIC issued new rules in October
2019 on company-run stress tests to comply with the Economic Growth, Regulatory Relief, and Consumer
Protection Act.  The FDIC raised the threshold from $10 billion to $250 billion, reduced the frequency of the
required stress tests, and reduced the number of required stress test scenarios from three to two.  *See* also
Doreen R. Eberley, "Final Rule: Company-Run Stress Testing Requirements for FDIC supervised State
Nonmember Banks and State Savings Associations," *FDIC*, October 15, 2019.

required to prepare and submit ex-ante resolution plans each year under Title I of the

Dodd-Frank Act for an orderly resolution under the bankruptcy code.  These plans are

subject to review and approval by the FDIC and the Board of Governors of the Federal

Reserve System.[106]  In addition, in 2012 the FDIC began requiring IDI's with $50 billion

or more in total assets (such as BANA) to submit contingency plans to the FDIC for the

resolution of such institutions in the event of a failure.[107]  Thus, with formal guidance

from the FDIC and Federal Reserve in the resolution planning process, HCIs have not

only developed credible proposals to support their critical operations during potential

resolution, but also taken steps to review their financial strength, corporate structure, and

governance mechanisms from a precautionary perspective.[108]  The required submission of

resolution plans has enhanced the capability of HCIs to "monitor and track liquidity

needs under normal and stressed conditions at both the consolidated and material entity

level," thereby further reducing the risk of failure for the HCIs and potential losses to the

DIF.[109]

64.     Finally, the primary federal supervisor of BANA (a national bank), the Office of the

Comptroller of the Currency ("OCC"), conducts periodic onsite bank examinations to

---

[106]   *See* FDIC Office of Inspector General, "The FDIC's Resolution Plan Review Process," last accessed January 15, 2020, available at https://www.fdicoig.gov/publications/fdics-resolution-plan-review-process.

[107]   *See* FDIC, "Resolution Plans Required for Insured Depository Institutions With $50 Billion or More in Total Assets," Federal Register, Vol. 77, No. 14, January 23, 2012, at 3075.  *See also* FDIC, "Resolution Plans Required," Vol. 84, No. 212, November 1, 2019.

[108]   For example, BAC and BANA have simplified their corporate structure by combining various business entities.  *See* BAC, "Bank of America Corporation Resolution Plan, Public Executive Summary," July 1, 2015, p. 12.  *See also* FDIC, "Agencies Provide Feedback on Second Round Resolution Plans of 'First-Wave' Filers," August 5, 2014, available at https://www.fdic.gov/news/news/press/2014/pr14067.html.

[109]   The Federal Reserve System and FDIC, "Resolution Plan Assessment Framework and Firm Determinations (2016)," April 13, 2016, p. 7.

"help ensure the stability of insured depository institutions by identifying undue risks and weak risk management practices."[110]  The FDIC also has personnel involved in the regular supervision process of BANA, although it has a lesser role than the OCC. Additionally, BAC (a bank holding company) is supervised by the Federal Reserve Board.  The examinations of both banks and holding companies usually include an evaluation of their capital, assets, management, earnings, liquidity, sensitivity to market risk, and adherence to laws and regulations.[111]  The frequency and scope of the examinations vary widely, depending on the size, complexity, and risk profile of each bank.  Large IDIs must have an examination at least every twelve months.  Large numbers of examiners are stationed permanently within the banks, so supervision is continuous, ensuring constant oversight on their risk management practices.  In contrast, examinations of small banks often occur only once every two years, and are not linked to the same stringent regulatory requirements that large IDIs or HCIs face.[112]  Such close monitoring of the HCIs allows HCIs and regulators to identify existing and emerging risks in a timely manner and implement corrective measures to reduce the risk of both a failure and potential losses to the DIF.

65.    Taken together, the high level of regulatory requirements and supervisory scrutiny that HCIs and their parent bank holding companies are subjected to significantly reduce the probability of a failure in the first place, and in turn the risk of potential losses to the

---

[110]  FDIC, "RMS Manual of Examination Policies," December 2019, pp. 1.1-2.

[111]  *See* FDIC, "RMS Manual of Examination Policies," December 2019, pp. 1.1-2.

[112]  *See* Office of the Comptroller of the Currency, "Large Bank Supervision," last accessed January 15, 2020, available at https://www.occ.treas.gov/about/who-we-are/organizations/large-bank-supervision/index-large-bank-supervision.html ("Large Bank Supervision maintains a continuous, on-site presence at the largest national banks, federal savings associations, and federal branches and agencies under OCC supervision.").

DIF.[113]

### b.    HCIs Are Usually Part of Bank Holding Company Structure

66.    As already noted, HCIs are usually part of a bank holding company structure, which

provides HCIs with an additional source of financial strength in periods of distress, and

thus, reduces their risk of failure and insulates the DIF from potential losses.[114, 115]  The

bank holding companies of HCIs typically have diversified business models and strong

risk management systems, which enable them to survive extended periods of challenging

economic circumstances for banks.[116]  For example, bank holding companies are eligible

to engage in a variety of activities that banks themselves are not, such as broker-dealer

---

[113]   Specifically, the examination process generates formal supervisory issues that must be addressed by the bank management in a timely matter.  These are formally known as "Matters requiring attention" (MRAs) and more serious, "Matters requiring immediate attention" (MRIA).  Examiners present their findings to the bank board of directors who must agree to rectify MRAs and MRIAs in a timely manner.  *See* Office of the Comptroller of the Currency, "OCC Revises Process for Managing Matters Requiring Attention," October 30, 2014, available at https://www.occ.treas.gov/news-issuances/news-releases/2014/nr-occ-2014-150.html.  *See also* Greg Baer and Jeremy Newell, "The MRA is the Core of Supervision, but Common Standards and Practices are MIA," *Bank Policy Institute*, February 8, 2018, available at https://bpi.com/the-mra-is-the-core-of-supervision-but-common-standards-and-practices-are-mia/.

[114]   *See* Partnership for Progress, "Bank Holding Companies," *Federal Reserve Partnership for Progress*, December 31, 2012, available at https://www.fedpartnership.gov/bank-life-cycle/manage-transition/bank-holding-companies#02 ("More than 73 percent of small banks with assets of less than $100 million are owned by BHCs, while this percentage increases to 95 percent for large banks with more than $10 billion in assets.").

[115]   For example, in 2018, BANA's revenue accounted for 80.3 percent of BAC's total revenue.  Across all nine HCIs, on average the revenues from HCIs accounted for 66.9 percent of the holding companies' total revenues in 2018.  *See* FDIC, "FDIC Details and Financials - Institution Directory (ID)," last accessed January 14, 2020, available at https://www7.fdic.gov/idasp/.  *See also* BAC, 2018 Form 10-K for the Fiscal Year 2018, last accessed December 11, 2019, available at https://www.sec.gov/Archives/edgar/data/70858/000007085819000012/bac-1231201810xk.htm.

[116]   *See* Rebecca S. Demsetz and Philip E. Strahan, "Diversification, Size, and Risk at Bank Holding Companies," *Federal Reserve Bank of New York Research Paper*, No. 9506, April 1995, p. 1.  *See also* Nick Haugen, "Implementing Risk Management: Safety & Soundness Update - April 2018," *Federal Reserve Bank of Minneapolis*, May 9, 2018, available at https://www.minneapolisfed.org/article/2018/implementing-risk-management.

operations, insurance underwriting, and merchant banking.[117]  Moreover, as the primary

agency responsible for overseeing bank holding companies, the Federal Reserve conducts

regular examinations of bank holding companies and issues ratings for such institutions

based on a variety of criteria.[118]  The Federal Reserve uses such ratings to evaluate and

inform supervisory actions and responses to potential risks faced by the bank holding

companies.[119]  From 2005 to 2018, the Federal Reserve used the RFI/C(D) rating system,

which assigns each bank holding company a score from one (best) to five (worst) for the

following component factors: risk management, financial condition, the impact of non-

depository entities on the bank holding company's depository entities, an overall

composite score for the bank holding company, and a rating for the bank holding

company's depository institutions that typically reflects the composite CAMELS rating

assigned by the bank's primary regulatory.[120, 121]  Historically, larger bank holding

---

[117]  *See* Federal Reserve Bank of St. Louis, "Holding Company Supervision," last accessed January 15, 2020, available at https://www.stlouisfed.org/bank-supervision/supervision-and-regulation/federal-reserve-bank-holding-companies.

[118]  *See* John Krainer and Jose A. Lopez, "Off-Site Monitoring of Bank Holding Companies," *Federal Reserve Bank of San Francisco Economic Letter*, No. 2002-15, May 17, 2002, p. 1.

[119]  *See* FDIC, "Bank Holding Company Rating System," Federal Register, Vol. 69, No. 233, December 6, 2004 at 70444.

[120]  *See* FDIC, "Bank Holding Company Rating System," Federal Register, Vol. 69, No. 233, December 6, 2004 at 70444 and 70448.

[121]  From 1979 to 2004, the Federal Reserve's rating system was called BOPEC and included evaluation of the following component factors: bank subsidiaries (B), other non-bank subsidiaries (O), parent company (P), bank holding company earnings (E), and bank holding company capital (C).  *See* Michael E. Bleier, "The Federal Reserve Board's New Rating System for Bank Holding Companies and Financial Holding Companies," *Review of Banking & Financial Law*, 2007, pp. 286-287.

In 2018, the Federal Reserve updated its rating system again for bank holding companies, non-insurance savings and loan holding companies ("SLHCs"), and non-commercial SLHCs with total consolidated assets of at least $100 billion.  The updated rating system is called the LFI rating system.  *See* The Federal Reserve System, "SR 19-4/ CA 19-3: Supervisory Rating System for Holding Companies with Total Consolidated Assets Less Than $100 Billion," February 26, 2019, available at https://www.federalreserve.gov/supervisionreg/srletters/sr1904.htm.

companies tend to receive better ratings from the Federal Reserve due to such banks having more diversified asset portfolios and lines of business.[122]

67.    In addition, the structure and financial strength of the parent bank holding company can also facilitate access to additional capital and liquidity from the market, if needed, thereby reducing the likelihood of both the failure of HCIs and potential losses to the DIF.[123]  Furthermore, even if the holding company itself became distressed, a diverse holding company with many intangible assets would attract bidders, thus mitigating the risk of loss to a bank subsidiary if its distress was sufficient to cause large losses to the parent bank holding company.

68.    Injections of additional capital into an undercapitalized bank can be mandated by regulatory provisions (*i.e.*, the PCA).  Specifically, the FDIC and the Federal Reserve can require a bank holding company to downstream additional capital to an IDI to keep the institution open and operating and prevent a failure.  As noted above, under the Federal Reserve's Source of Strength provision, "the bank holding company or savings and loan holding company [are required to] serve as a source of financial strength for any subsidiary of the bank holding company or savings and loan holding company that is a depository institution."[124]  This provision ensures the injection of additional capital and liquidity from the parent and affiliated companies into an HCI, thereby reducing the

---

[122]   *See* John Krainer and Jose A. Lopez, "Off-Site Monitoring of Bank Holding Companies," *Federal Reserve Bank of San Francisco Economic Letter*, No. 2002-15, May 17, 2002, pp. 2-3.

[123]   For example, BAC lists 24 "affiliate companies" on its website.  Among the subsidiaries held by BAC, two are IDIs with FDIC insurance—BANA and BACANA.  *See* BAC, "Affiliate Companies," last accessed January 15, 2020, available at https://www.bankofamerica.com/security-center/affiliate-companies/.

[124]   FDIC, "FDIC Law, Regulations, Related Acts - 1000 - Federal Deposit Insurance Act," last updated June 29, 2018, available at https://www.fdic.gov/regulations/laws/rules/1000-4000.html#fdic1000sec.38A-a.

likelihood of capital inadequacy, and thus the risk failure and potential losses to the DIF. Moreover, in cases where a bank holding company becomes distressed because some of its non-bank subsidiaries suffer losses, Federal Reserve Act Section 23A and 23B restricts the ability of the group's IDIs to support the non-bank operations of the holding company.[125]  In other words, the holding company must be a source of strength for its IDIs, but the holding company has a limited ability to use its IDIs as a source of strength for the non-bank affiliates in the bank holding company.

69.    Additionally, a bank holding company may also voluntarily transfer capital it maintains to its subsidiary banks, thereby providing a crucial source of funding for the distressed banks, which in turn reduces their likelihood of failure and minimizes potential losses to the DIF.[126]  For example, according to the latest regulatory reports, BAC has approximately $265 billion in equity capital (not including minority interests), of which $212 billion is equity in BANA and $2 billion is equity in BACANA.[127]  Thus, in the event that BANA experiences financial distress, there is in excess of $50 billion in non-IDI equity capital at BAC that could be down-streamed to BANA to support its operations and keep it out of resolution.

---

[125]    *See* The Federal Reserve System, "Federal Reserve Act, Section 23A. Relations with Affiliates," February 12, 2017, available at https://www.federalreserve.gov/aboutthefed/section23a.htm.  *See also* The Federal Reserve System, "Adoption of Regulation W Implementing Sections 23A and 23B of the Federal Reserve Act," January 9, 2003, available at https://www.federalreserve.gov/boarddocs/srletters/2003/sr0302.htm.

[126]    *See* Dmytro Holod and Joe Peek, "Capital Constraints, Asymmetric Information, and Internal Capital Markets in Banking: New Evidence," *Journal of Money, Credit and Banking*, Vol. 42, 2010, pp. 879–906.

[127]    *See* The Federal Reserve System, "Bank Holding Company Performance Report, Bank of America Corporation," September 30, 2019, p. 6.  *See also* BANA, "Consolidated Reports of Condition and Income for a Bank With Domestic and Foreign Offices - FFIEC 031," *Federal Financial Institutions Examination Council*, September 30, 2019, p. 10; BACANA, "Consolidated Reports of Condition and Income for a Bank With Domestic and Foreign Offices - FFIEC 041," *Federal Financial Institutions Examination Council,* September 30, 2019, p. 7.

70.     Moreover, the bank holding companies for HCIs also have access to the public capital
        markets or other sources of funding, which can provide additional support to their
        subsidiary banks.[128, 129]  Depending on their financial strength, the holding companies
        may also be able to issue new debt and equity when required to inject capital into HCIs to
        prevent a failure.[130]  Additionally, banks that belong to a bank holding company may also
        benefit from the market's perception of implicit support from the parent bank holding
        company and thus may be valued more favorably by the market, thereby allowing them
        to access public capital markets directly.[131]  The ability to raise capital—whether by an
        institution in financial distress or by its parent bank holding company—is influenced by
        the financial institution's franchise value.  For example, academic research, which
        frequently relies on core deposits as a partial proxy for a bank's franchise value,
        identifies a link between franchise value and access to capital.[132]  Moreover, large banks
        enjoy greater access to capital markets generally, owing to their size and geographic
        diversification.[133]  For HCIs, a higher franchise value provides them with a stronger

---

[128]   *See* Partnership for Progress, "Bank Holding Companies," *Federal Reserve Partnership for Progress*,
        December 31, 2012, available at https://www.fedpartnership.gov/bank-life-cycle/manage-transition/bank-
        holding-companies#02 ("Increased access to capital markets is one of the primary advantages to the BHC
        structure.").

[129]   *See* Adam B. Ashcraft, "Are Bank Holding Companies a Source of Strength to Their Banking Subsidiaries,"
        *Journal of Money, Credit and Banking*, Vol. 40, No. 2-3, March-April 2008, p. 276.

[130]   *See* Federal Reserve Bank of St. Louis, "Holding Company Supervision," lased accessed January 15, 2020,
        available at https://www.stlouisfed.org/bank-supervision/supervision-and-regulation/federal-reserve-bank-
        holding-companies.  *See also* Adam B. Ashcraft, "Are Bank Holding Companies a Source of Strength to Their
        Banking Subsidiaries," *Journal of Money, Credit and Banking*, Vol. 40, No. 2-3, March-April 2008, p. 281.

[131]   *See* Radoslav Raykov and Consuelo Silva-Buston, "Multibank Holding Companies and Bank Stability," *Bank
        of Canada Staff Working Paper*, October 2018, p. 20.

[132]   *See* Sangkyun Park, "Market Discipline by Depositors: Evidence from Reduced Form Equations," *Federal
        Reserve Bank of St. Louis Working Paper Series*, 1995, p. 6.  *See also* FDIC, "Study on Core Deposits and
        Brokered Deposits," July 8, 2011, p. 73.

[133]   *See* William R. Keeton, "Has Multi-Market Banking Changed the Response of Small Business Lending to
        Local Economic Shocks?" *Federal Reserve Bank of Kansas City*, 2009, p. 12.

financial position and more credibility from the perspective of the public capital markets, which in turn allows them to raise sufficient capital to fulfill their short-term obligations and maintain normal operations even during prolonged periods of economic stress.

71.     As a result, a bank holding company structure provides an additional source of financial support and liquidity to a distressed HCI reducing not only its risk of failure but also the potential losses to the DIF, if any.  Risk-based assessment premiums must properly consider the prospective advantages afforded to HCIs through a bank holding company structure, especially when the parent bank holding company has a strong record of earnings and valuable intangible assets.  Risk-based assessment premiums would also take account of the overall condition of the holding company when measuring banks' risks of loss.

                    *c.*     *Federal Government May Provide Assistance as a Last Resort*

72.     For HCIs that are determined to be systemically important financial institutions (*i.e.*, SIFIs or G-SIBs), the federal government may potentially also intervene to provide additional short-term capital or support to reduce the risk of failure as a lender of last resort.  During the financial crisis, various government entities—including the Federal Reserve, the FDIC, and the Treasury—intervened in financial markets in order to support distressed banks.  Such government intervention provides short-term relief for financially distressed banks, giving them additional time to address capital and funding issues.  The additional time afforded by such intervention is invaluable in periods of distress and helps reduce the risk of a failure.

73.     In particular, under Section 13(3) of the Federal Reserve Act, the Federal Reserve is

authorized to provide emergency lending in "unusual and exigent circumstances."[134]  The

central role of banks in the financial system and the economy has been recognized for

over two centuries as justifying their special access to a lender of last resort.  During the

Financial Crisis, the Federal Reserve provided extensive assistance to banks, for example,

through its Term Auction Facility (TAF).[135]  While the Dodd-Frank Act has curtailed the

Federal Reserve's discretion and authority with regard to its lending programs, Section

13(3) nevertheless serves as an important backstop mechanism through which the federal

government could potentially stave off bank failures.[136]

74.     In addition to established government regulation, Congress may also intervene during a

financial crisis by passing targeted legislation to prevent failure of systemically important

HCIs.  For example, during the financial crisis, Congress created the Troubled Asset

Relief Program ("TARP") under the EESA, and provided the Treasury with $700 billion

in order to inject capital into distressed financial institutions.[137]  Although banks of all

types were eligible to apply for TARP assistance, the largest IDIs were provided with

special assistance at the beginning of the implementation of TARP, and later were offered

---

[134]   Federal Reserve Act, 12 U.S.C. 344 § 13(3).

[135]   The TAF, a program authorized by Section 10B of the Federal Reserve Act, extended as much as $493 billion in collateralized loans to banks using discount-eligible collateral.  See John Weinberg, "Federal Reserve Credit Programs During the Meltdown," *Federal Reserve History*, November 22, 2015, available at https://www.federalreservehistory.org/essays/fed_credit_programs.

[136]   Among the changes imposed by the new legislation, the Federal Reserve may no longer direct its emergency lending to individual institutions or design its lending programs for the purpose of helping an institution avoid bankruptcy failure.  Instead, any emergency lending programs would require "broad-based eligibility," which the Federal Reserve later clarified to mean the program must have at least five eligible participants.  *See* Dodd-Frank Act, at 2113.  *See also* The Federal Reserve System, "Extension of Credit by Federal Reserve Banks," Federal Register, Vol. 80, No. 243, December 18, 2015, at 78959-60.

[137]   *See* The Department of the Treasury, Office of Financial Stability, "Citizens' Report on the Troubled Asset Relief Program (TARP)," March 2, 2010, p. 1.

special kinds of assistance not available to other banks.[138]   Under TARP, the Treasury

injected capital into 982 financial institutions through 13 different programs in order to

bolster them and prevent catastrophic bank failures.[139]   In addition, the Capital Purchase

Program ("CPP"), an initiative under TARP, provided $205 billion in the form of

preferred stock to 707 financial institutions.[140]   For depository institutions owned by bank

holding companies, the assistance was channeled to the banks by injecting capital into

their parent bank holding companies.[141]   This program was widely regarded as a

success.[142]   In the future, under similar circumstances, such assistance would occur under

Title II of Dodd Frank; however, since 2010 the possibility of such circumstances should

be considered remote.   As of February 2019, only $20 million of the federal

government's CPP disbursements were still outstanding and the Congressional Budget

Office projected a net gain of $16 billion in the form of dividends, interest, and other

gains.[143]   Aside from the CPP, the Treasury also provided support through the Targeted

Investment Program and Asset Guarantee Program to two bank holding companies; both

of these institutions promptly repaid the $20 billion each received, resulting in an $8

---

[138]   *See* Charles W. Calomiris and Urooj Khan, "An Assessment of TARP Assistance to Financial Institutions" *Journal of Economic Perspectives*, Vol. 29, No. 2, Spring 2015, pp. 53-64.

[139]   *See* Paul Kiel and Dan Nguyen, "Bailout Tracker," *ProPublica*, October 2, 2019, available at https://projects.propublica.org/bailout/.

[140]   *See* Congressional Budget Office, "Report on the Troubled Asset Relief Program - April 2019," April 2019, p. 3.

[141]   *See* The Department of the Treasury, "Quarterly Analysis of Institutions in the Capital Purchase Program, Fourth Quarter 2010," p. 16.

[142]   *See* Timothy Bowler, "TARP's Bank Programs: A Success Story," *The Department of the Treasury*, July 10, 2014.  *See also* United States Government Accountability Office "Troubled Asset Relief Program: Capital Purchase Program Largely Has Wound Down," May 2016, p. 4.

[143]   *See* Congressional Budget Office, "Report on the Troubled Asset Relief Program - April 2019," April 2019, p. 3.

billion net gain to the federal government.[144]  Further, financial support was also

available from the FDIC through the FDIC Temporary Liquidity Guarantee Program,

which guaranteed all noninterest-bearing demand deposit balances, as well as the FDIC

Debt Guarantee Program, which guaranteed almost $350 billion of new bank and bank

holding company subordinated debt between the fall of 2008 and June 2009.[145]

75.     Thus, the possibility of government intervention implies a reduced risk of failure of

systemically important HCIs, which in turn, reduces the risk of losses to the DIF posed

by such HCIs.

### C.     Factors That Affect Losses, If Any, to the DIF Given the Failure of a Financial Institution

76.     As discussed above, HCIs have several risk-mitigating attributes that reduce the risk of a

failure of an HCI, and the severity of loss conditional on failure, and thus, also reduce the

expected costs that they pose to the DIF.  Additionally, in the unlikely event of failure,

the FDIC has at its disposal a number of regulatory tools and can pursue several courses

of action to prevent or minimize losses to the DIF.  The options available to the FDIC to

resolve an HCI failure and the corresponding risk of losses to the DIF, if any, are

illustrated in the following diagram (**Figure 1**), and discussed in further detail below.

---

[144]  *See* Congressional Budget Office, "Report on the Troubled Asset Relief Program - April 2019," April 2019, p. 4.

[145]  *See* FDIC, "Temporary Liquidity Guarantee Program," last updated February 19, 2019, available at https://www.fdic.gov/regulations/resources/tlgp/index.html.

**Figure 1: Potential Outcomes Affecting Losses to the DIF, If Any,
In the Event of a Failure of an HCI**



77.     For comparison purposes, there are relatively fewer options available to the FDIC in the event of a failure of a small IDI.  OLA is authorized only to prevent a systemic breakdown, and thus the prospective failure of a small IDI or its holding company would not warrant federal government intervention through OLA.[146]  Additionally, small IDIs that are not part of bank holding companies are not required to file living wills.  As a result, the risk of losses to the DIF from the failure of a small IDI could be higher than that from the failure of an HCI.  The options available to the FDIC to resolve a small IDI failure and the corresponding risk of losses to the DIF, are illustrated in the following

---

[146]   *See* Dodd-Frank Act, at 1451.

diagram (**Figure 2**).

**Figure 2: Potential Outcomes Affecting Losses to the DIF, If Any,
In the Event of a Failure of a Small Financial Institution**



78.     As a result, a risk-based assessment system must take into consideration the much larger

set of regulatory tools and market-based actions that the FDIC can employ to resolve the

failure of an HCI compared to smaller financial institutions.  Such tools and actions can

prevent or minimize losses to the DIF in the event of an HCI failure, and thus the

assessment premiums for HCIs must reflect the lower risk posed by HCIs to the DIF.

    *1.     Resolution through Living Wills Required Under Title I of the Dodd-Frank
    Act*

79.     In the event of a failure of a large, systemically important financial institution, the Dodd-

Frank Act mandates that either FDIC resolution (if it is a bank) or bankruptcy (if it is a

nonbank) be considered as the first resolution option before other alternative options are

pursued.[147]  If an HCI bank failure needs to be resolved by the FDIC, the first option

available to the FDIC is to use the living wills submitted by the HCI or the parent bank

---

[147]   In fact, the Dodd-Frank Act mandates that the OLA be invoked only as a last resort in case bankruptcy is
determined to be inappropriate for a SIFI given the risk posed to the financial system.  *See* FDIC, "Title II
Orderly Liquidation Authority," December 10, 2012, p. 31.  *See also* Aaron Klein, "A Primer on Dodd-Frank's
Orderly Liquidation Authority," *Brookings Institution*, June 5, 2017, available at
https://www.brookings.edu/blog/up-front/2017/06/05/a-primer-on-dodd-franks-orderly-liquidation-authority/.

holding company to resolve the failure.

80.     As discussed in Section IV.B.2, large bank holding companies and individual HCIs are required to prepare and submit ex-ante resolution plans (*i.e.*, living wills) on an annual basis under Title I of the Dodd-Frank Act and under the FDIC's IDI Rule.[148]  The living wills are evaluated and approved jointly by the FDIC and the Federal Reserve.[149]  At the simplest level, living wills provide a framework through which either bank holding companies or IDIs may be resolved in an orderly manner through either the bankruptcy code (for a holding company) or an FDIC receivership (for an IDI), where "orderly manner" implicitly means without creating significant disruptions in financial markets or to other institutions.  Practically, however, living wills provide a variety of plans and can include the sale or liquidation of assets of either the individual failed institution or the entire parent bank holding company and its affiliate entities, which may be accomplished through an FDIC receivership rather than a bankruptcy.[150]

---

[148]  As explained in Section IV.B.2, IDIs are classified into one of four categories for the purpose of resolution planning, each of which is subject to different resolution planning requirements and frequency of submission.

[149]  The authorities identify shortcomings to the plans' credibility and notify firms of their plans' informational completeness within 60 days of receipt.  *See* FDIC Office of Inspector General, "The FDIC's Resolution Plan Review Process," last accessed January 15, 2020, available at https://www.fdicoig.gov/publications/fdics-resolution-plan-review-process.

[150]  For example, the FDIC's preferred method for resolution of a G-SIB holding company in an OLA resolution is the Single Point of Entry ("SPOE") approach, not a bankruptcy.  Under the SPOE approach the FDIC typically charters a new bridge holding company while certain of its operating subsidiaries continue to operate under the new corporate structure.  In contrast, the Multiple Points of Entry ("MPOE") approach involves resolutions at multiple levels of an organization, including the parent and individual subsidiaries, and may involve the FDIC placing individual banks into receivership.  *See* FDIC, "Remarks by Martin J. Gruenberg, Acting Chairman, FDIC to the Federal Reserve Bank of Chicago Bank Structure Conference; Chicago, IL," May 10, 2012, available at https://www.fdic.gov/news/news/speeches/chairman/spmay1012.html.  *See also* Paul Kupiec and Peter Wallison, "Can the 'Single Point of Entry' Strategy be Used to Recapitalize a Systemically Important Failing Bank?," *Journal of Financial Stability*, 2005, Vol. 20, pp. 184-197; Paul L. Lee, "A Paradigm's Progress: The Single Point of Entry in Bank Resolution Planning," *Columbia Law School Blue Sky Blog*, January 18, 2017, available at http://clsbluesky.law.columbia.edu/2017/01/18/a-paradigms-progress-the-single-point-of-entry-in-bank-resolution-planning/.

81.   The required submission of living wills may result in significant improvements in the resolvability of large, complex financial institutions, thereby reducing the potential risk posed to the financial system and potential losses to the DIF.[151]  According to the FDIC, this requirement has "enhance[d] the FDIC's ability to reduce losses to the Deposit Insurance Fund and resolve the institutions in a manner that limits any disruption from their insolvency."[152]

82.   As a result, a risk-based assessment system must consider the enhanced resolvability of HCIs due to living wills, and the assessment premiums for HCIs must reflect the resulting lower potential losses to the DIF.

*2.     Resolution through OLA under Title II of the Dodd-Frank Act*

83.   In case the FDIC determines that the living will filed by the failed HCI or its parent bank holding company is inadequate to resolve the failure, the FDIC will likely intervene and take receivership of the failed institution.  As discussed in Section IV.B.2, in the event of a failure, the OLA allows the government to take the parent bank holding company of an HCI into a Title II resolution and use the assets of the bank holding company, and, if necessary, additional liquidity support from the OLF, to resolve the bank failure.

84.   The decision to invoke OLA requires an administrative review process.  To determine whether a financial institution should be placed in FDIC receivership under Title II of the

---

[151]   *See* The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," February 21, 2018, p. 13.

[152]   FDIC, "FDIC Board Approves Final Rule Requiring Resolution Plans for Insured Depository Institutions Over $50 Billion," January 17, 2012, available at https://www.fdic.gov/news/news/press/2012/pr12003.html.  *See also* FDIC Office of Complex Financial Institutions Dodd-Frank Act Title I, "Living Wills Overview," January 25, 2012, p. 3.

Dodd-Frank Act, the Secretary of the Treasury applies a two-part test.[153]  First, the

Secretary determines whether the financial institution is in default or in danger of

default.[154]  Second, the Secretary evaluates the systemic risk involved in the potential

default of the financial institution, including its impact on the stability of the financial

system and its impact on creditors, shareholders, counterparties of the financial

institution, as well as other market participants.[155]  The Secretary also considers the

feasibility of other resolution alternatives, such as bankruptcy or private sector

acquisitions.[156]  If it is determined that a receivership is appropriate given all the

considerations above, the FDIC will be appointed as the receiver and take full control of

the assets, obligations, and operations of the financial institution.  As receiver for a failed

bank holding company, the FDIC would charter a new temporary bridge bank holding

company, transfer the failing bank holding company's assets to the bridge institution

pending resolution, and resolve the failing bank holding company following the FDIC's

so-called SPOE strategy.[157]

---

[153]  *See* Legal Information Institute, "Dodd-Frank: Title II - Orderly Liquidation Authority," last accessed January 16, 2020, available at https://www.law.cornell.edu/wex/dodd-frank_title_II.

[154]  *See* Legal Information Institute, "Dodd-Frank: Title II - Orderly Liquidation Authority," last accessed January 16, 2020, available at https://www.law.cornell.edu/wex/dodd-frank_title_II.

[155]  *See* The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," February 21, 2018, p. 8.

[156]  *See* Legal Information Institute, "Dodd-Frank: Title II - Orderly Liquidation Authority," last accessed January 16, 2020, available at https://www.law.cornell.edu/wex/dodd-frank_title_II.

[157]  A parent bank holding company may fail without the failure of the IDIs they own.  For example, Lehman Brothers owned two banks—Lehman Brothers Bank, FSB and Lehman Brothers Commercial Bank.  Neither of these banks failed or needed to be resolved by the FDIC following the bankruptcy of Lehman Brothers.  *See* Lehman Brothers Holdings Inc., "2007 Annual Report," February 15, 2018, accessed using Internet Archive Wayback Machine, p. 121.  *See also* FDIC, "Lehman Brothers Bank, FSB  (FDIC # 30890)," last accessed January 20, 2020, available at https://research2.fdic.gov/bankfind/detail.html?bank=30890&name=Lehman%20Brothers%20Bank%2C%20FSB&searchName=Lehman%20Brothers%20bank&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2; FDIC, "Lehman Brothers Commercial Bank  (FDIC #

85.     Additionally, to ensure the overall stability of the financial system, the Dodd-Frank Act also established the OLF at the Treasury "as a liquidity facility that the FDIC may draw upon, subject to terms set by Treasury, to lend to the financial institution in receivership."[158]  This is entirely separate from the DIF, ensuring that any assistance provided under OLA entails no loss to the DIF.  Indeed, by addressing problems under OLA, funded by OLF, possible losses to the DIF that might otherwise occur are avoided.

86.     As discussed in Section IV.B.2, the FDIC may draw upon the OLF, which is initially financed by the Treasury, to provide temporary liquidity through secured loans to failed financial institutions.[159]  In case the remaining assets from the failed institution are insufficient to fully repay the OLF, the FDIC is authorized to impose an assessment on remaining HCIs so that taxpayers bear no loss.[160]

87.     Given the financial complexity of large banks and their parent bank holding companies, and their potential impact on the stability of the financial system, it is likely that OLA would be a viable option in cases of financial distress affecting both a bank and its bank holding company.  The use of private financing sources within the receivership (*i.e.*, an HCI's own assets or funding through a bridge bank holding company), together with the additional liquidity provided by the OLF, provides multiple layers of protection to the

---

58009)," last accessed January 20, 2020, available at https://research2.fdic.gov/bankfind/detail.html?bank=58009&name=Lehman%20Brothers%20Commercial%20Bank&searchName=Lehman%20Brothers%20bank&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2.

[158]   *See* The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," Report to the President of the United States, February 21, 2018, p. 1.

[159]   *See* Ben S. Bernanke, "Why Dodd-Frank's Orderly Liquidation Authority Should Be Preserved," *Brookings Institution*, February 28, 2017, https://www.brookings.edu/blog/ben-bernanke/2017/02/28/why-dodd-franks-orderly-liquidation-authority-should-be-preserved/.

[160]   *See* Jay B. Sykes, "Regulatory Reform 10 Years After the Financial Crisis: Systemic Risk Regulation of Non-Bank Financial Institutions," *Congressional Research Service*, April 12, 2018, p. 36.

DIF and minimizes potential losses, if any, to the DIF in the event of an HCI failure.  As a result, if the parent bank holding company is resolved through the OLA under the Dodd-Frank Act, there would likely be more than sufficient resources needed to recapitalize the IDIs and keep them open and operating, preventing any losses to the DIF.

88.     Thus, to summarize, the high levels of regulatory scrutiny that HCIs are subjected to makes it improbable that factors that could cause large losses are not identified by regulators long before a bank failure occurs.  Additionally, the HCIs are required to maintain higher levels of capital than other banks and liquidity coverage ratios; as such, to the extent an HCI encountered large losses, the capital and tangible assets held by the HCIs could be used to absorb losses to keep them open and operating, precluding losses to the DIF.  Further, HCIs hold many of the characteristics that researchers have connected to high franchise value, which facilitates recapitalization through the parent bank holding company or via public capital markets.  Moreover, in the unlikely event that the HCI's own capital and assets are insufficient, the non-IDI assets of the parent bank holding company, coupled with the liabilities of the IDI or the parent bank holding company that are statutorily subordinate to FDIC claims, can also absorb losses by providing further resources to recapitalize the IDIs and keep them open and operating.  Lastly, any losses that remain would likely be covered by the OLF under Title II of the Dodd-Frank Act in the form of a fee charged to the surviving HCIs instead of losses incurred to the DIF.  A risk-based assessment system must consider these multiple layers of protection available to the DIF that would prevent or minimize potential losses to the DIF.

### 3. Resolution through "Least Cost Resolutions" Available to the FDIC

89. When a failed financial institution is placed into FDIC receivership, the FDIC is required by law to pursue the "least-cost option" to the DIF.[161]  In the absence of explicit government support (such as a Title II resolution), there are both regulatory measures in place and market-based resolution options available to the FDIC that would help ensure the maximum recovery of assets and reduce losses to the DIF due to the failure.

### a. Regulatory Options Available to the FDIC

90. In the event of a failure, the FDIC's Cross Guaranty provision makes every IDI owned by the same parent bank holding company financially responsible for any DIF losses incurred by the failure of an affiliated IDI.[162]  Under the provision, once a IDI has failed and been placed into FDIC receivership, the FDIC has the right (and the obligation, under its LCR mandate) to request either immediate or scheduled payments from an eligible affiliate bank to recover incurred losses.[163]  Moreover, the FDIC has the right to shut down solvent affiliate banks in order to recoup losses incurred by a commonly controlled depository institution insured by the FDIC.[164]  That power clearly implies that the strength of the other affiliate banks within the holding company, and their collective

---

[161]   *See* FDICIA, at 2281.

[162]   Specifically, the provision is part of the Financial Institutions, Reform, Recovery and Enforcement Act of 1989 and states that any affiliated IDI shall be liable for any loss incurred by the FDIC due to the default of or assistance provided to a commonly controlled insured bank (*i.e.*, a bank controlled by the same company, also known as a "sister bank")  *See* FDIC, "FDIC Law, Regulations, Related Acts - 1000 - Federal Deposit Insurance Act," last updated June 29, 2018, available at https://www.fdic.gov/regulations/laws/rules/1000-600.html#fdic1000sec.5e.  *See also* FDIC, "FDIC Cross Guaranty Provision," October 30, 2009, available at https://www.fdic.gov/news/news/press/2009/pr09195b.html.

[163]   The "Cross Guaranty" provision does not apply to nonbank affiliates.  *See* Paul L. Lee, "The Source-of-Strength Doctrine Revered and Revisited," *The Banking Law Journal*, Vol. 129, No. 9, October 2012, pp. 778-779.

[164]   *See* Adam B. Ashcraft, "Are Banks Really Special? New Evidence from the FDIC-Induced Failure of Healthy Banks," *Federal Reserve Bank of New York Staff Reports*, No. 176, December 2003, p. 12.

financial strength, should play an important role in the FDIC's assessment of the risk that any bank's failure might pose to the DIF.

91.     The FDIC has exercised the Cross Guaranty provision at least six times since the early 1990s.[165]  For example, the FDIC exercised the Cross Guaranty provision to close 38 subsidiary banks of First Republic Bank Corporation in 1988, and 18 subsidiary banks of First City Bancorporation of Texas, Inc. in 1992 when lead banks from each of these Texas-based bank holding companies were declared insolvent.[166]

92.     Similar to the Cross Guaranty provision, the FDIC adopted a "Cross Support Obligation" provision on August 26, 2009, where "[i]f one or more Investors own 80 percent or more of two or more banks or thrifts, the stock of the banks or thrifts commonly owned by these Investors shall be pledged to the FDIC, and if any one of those owned depository institutions fails, the FDIC may exercise such pledges to the extent necessary to recoup any losses incurred by the FDIC as a result of the bank or thrift failure."[167]

93.     Given the typical bank holding company structure of HCIs that includes other affiliate

---

[165]   These cases include: *In the Matter of Maine National Bank Portland, Maine Related to Bank of New England National Association Boston, Massachusetts*, Docket No. FDIC-91-100kk, April 28, 1992; *In the Matter of First City, Texas-Austin, National Association Austin, Texas, et al.*, Docket No. FDIC-92-316kk, December 14, 1993; *In the Matter of The Meriden Trust and Safe Deposit Company, Meriden, Connecticut*, Docket No. FDIC-92-241kk, September 21, 1993; *In the Matter of Stephen G. Smith, BayBank, Burlington, Massachusetts*, Docket No. FDIC93-91e, September 16, 1993; *In the Matter of The Bank of Hartford, Hartford, Conn.*, Docket No. FDIC-92-212kk, April 11, 1995; and *In the Matter of Richard D. Donohoo, Craig R. Mathies, Leonard C. Misenor, Bruce A. Rasmussen, Cherly C. Godbout-Bandal, Wayne Field, Bruce A. Rasmussen & Associates, and Lindquist & Vennum, Capital Bank, St. Paul, Minn.*, Docket Nos. 92-249c&b, FDIC-92-250e, FDIC92-251e, and FDIC-92-252k, July 9, 1995.  *See* FDIC, "ED&O Search Form," last accessed January 16, 2020, available at https://orders.fdic.gov/s/searchform.

[166]   *See* FDIC, "Managing the Crisis: THE FDIC and RTC Experience 1980-1994," August 1998, pp. 577 and 602-603.  In total, the FDIC closed 40 failed subsidiary banks of First Republic Bank Corporation, including two lead banks in Dallas and Houston that were declared insolvent, along with 38 other affiliate banks to the lead banks as a result of the "Cross Guaranty" provision.  *See also* Adam B. Ashcraft, "Are Banks Really Special? New Evidence from the FDIC-Induced Failure of Healthy Banks," *Federal Reserve Bank of New York Staff Reports*, No. 176, December 2003, pp. 2-3.

[167]   FDIC, "Final Statement of Policy on Qualifications for Failed Bank Acquisitions," August 26, 2009, p. 37.

banks, the Cross Guaranty and the Cross Support Obligation provisions enable the FDIC to tap into additional sources of funding from the parent bank holding company and thus minimize the potential losses to the DIF in the event of an HCI failure.  An appropriate risk-based assessment system must consider these options available to the FDIC, and assessment premiums for HCIs must reflect the resulting lower potential losses to the DIF.

94.   The FDIC also has additional powers to limit systemic risks that could result in losses to the DIF.  In cases where resolution under the least-cost option would lead to "serious adverse effects on economic conditions or financial stability," the FDIC is relieved from its least-cost resolution mandate under a systemic risk exception in the FDICIA.[168]  This implies that the FDIC may undertake risk-reducing actions to avoid problems at large banks, which further reduces the risk of loss to the DIF from those institutions.  During the financial crisis of 2008-2009, the FDIC used this systemic risk exception to offer funding to several financial institutions.[169]  Though the Dodd-Frank Act curtailed the use of the systemic risk exception, it still allows the FDIC to apply the exceptions to institutions already placed into receivership.[170]  Therefore, in the event of an HCI failure, the FDIC could still provide the failed institution with additional funding under the systemic risk exception to prevent any systemic risk to the financial system and reduce potential losses to the DIF.  Again, this adds an additional reason to expect lower losses to the DIF from large banks, after taking all else into account.  As such, an appropriate

---

[168]   FDICIA, at 2275.

[169]   These financial institutions were Wachovia Corporation (Wachovia), Citigroup, Inc. (Citigroup), and Bank of America Corporation (Bank of America, or BofA).  *See* FDIC, "Crisis and Response: An FDIC History, 2008-2013," November 30, 2017, pp. 68.

[170]   *See* FDIC, "Crisis and Response: An FDIC History, 2008-2013," November 30, 2017, pp. 92-93.

risk-based assessment system must also consider the systemic risk exception available to the FDIC under FDICIA and the associated possibility of government intervention to minimize losses, if any, to the DIF.

### b.   Market-Based Options Available to the FDIC

95. In addition to regulatory provisions, the FDIC can also pursue market-based options such as the sale of the failed institution or liquidation of its assets once it is placed into FDIC receivership.  As discussed above, such market-based options could also be part of resolutions under the OLA or through the living will submitted by HCIs.

96. There are two methods used by the FDIC when resolving a failure through market-based options: purchase and assumption ("P&A") transactions and deposit payoffs.[171]  In order to fulfill its duty to implement the resolution method that poses the least-cost to the DIF, the FDIC reviews bids from stable financial institutions to purchase some or all of the failed bank's assets and liabilities through P&A transactions.[172]  In a deposit payoff, the FDIC winds down and liquidates the remaining institution's assets and sends each insured depositor a check.[173]  Deposit payoff is not used very frequently, as it is generally regarded as a higher cost means of resolution.  Because deposit payoffs require the FDIC to expend resources to liquidate the institution's assets, the FDIC may only resolve a failed institution through a deposit payoff if none of the P&A bids would meet the least-cost test.[174]

---

[171] *See* FDIC, "Resolutions Handbook," last updated December 23, 2014, p. 16.

[172] *See* FDIC, "Resolutions Handbook," last updated December 23, 2014, p. 16.

[173] *See* FDIC, "Resolutions Handbook," last updated December 23, 2014, p. 19.

[174] *See* FDIC, "Resolutions Handbook," last updated December 23, 2014, p. 6.

97.    The extent of losses to the DIF, if any, under such market-based options would depend on the financial institution's quality of tangible assets, value of intangible assets, capital structure, and operational structure.  For example, in case of a liquidation, the FDIC can use the unencumbered assets and liabilities that are subordinate to the FDIC's claims to absorb the institution's losses and insulate the DIF from potential losses.[175]

98.    As a result, an assessment system based on the risk and amount of losses to the DIF must accurately account for how an institution's quality of assets, capital structure, and operational structure, among other characteristics, affect the DIF's exposure.  For an HCI that has high-quality assets, substantial subordinate liabilities or additional support from affiliate companies, the assessment premiums for the institution should reflect the ability of such risk-mitigating factors to absorb losses to the DIF.

99.    The institution's franchise value is another key determinant of potential losses, if any, to the DIF in the event that a failed financial institution is acquired or liquidated.  Academic literature provides ample evidence that higher franchise value leads to lower losses to the DIF in the event of a failure.  In fact, the FDIC itself acknowledged the importance of franchise value in minimizing losses to the DIF in a report to Congress, where it stated that "[t]he greater a failed bank's franchise value, the lower the losses that the DIF will incur, all else equal."[176]

100.    In order to study the relationship between franchise value and loss severity, numerous

---

[175]  Specifically, in a receivership, the FDIC can sell the assets of the HCI and use the proceeds to pay off the insured depositors, then uninsured deposits, and FDIC receivership costs, thereby imposing losses on the subordinated liabilities of the HCI.

[176]  FDIC, "Study on Core Deposits and Brokered Deposits," July 8, 2011, p. 48.

researchers have relied on core deposits as a partial proxy for franchise value.[177]  Core deposits provide a stable and low-cost source of funding for banks and represent the intangible value of customer relationships, which may be attractive to potential acquirers.[178]  Studies show that a higher core deposit base, and therefore franchise value, is associated with lower losses to the DIF during FDIC resolutions.[179]  In a resolution, intangible asset value is realized as the premium (over book value) that the acquiring bank is willing to pay to acquire the deposit relationships (and other valuable intangible assets) of the failing bank.  Similarly, researchers have also shown that the value of bank loan relationships can also be a source of intangible value, as can be the bank's market power (*e.g.,* its competitive advantage due to a concentration of its branches in one city or state), and all these sources of greater intangible value increase the value of a bank franchise to bidders, thereby lowering expected losses to the DIF during a resolution.[180]

101.    Clearly, then, one of the mechanisms through which higher franchise value reduces the expected losses to the DIF is through the higher premiums acquirers would pay for banks

---

[177]  *See* Christopher James, "The Losses Realized in Bank Failures," *The Journal of Finance*, Vol. 46, No. 4, September 1991, p. 1230.  *See also* James R. Barth, et al., "Determinants of Thrift Institution Resolution Costs," *The Journal of Finance*, Vol. 45, No. 3, July 1990, p. 734; Kathleen McDill, "Resolution Costs and the Business Cycle," FDIC Working Paper, No. 2004-01, March 2004, p. 13; Rosalind L. Bennett and Haluk Unal, "The Cost Effectiveness of the Private-Sector Reorganization of Failed Banks, *FDIC Working Paper*, January 2011, p. 22; William P. Osterberg and James B. Thomson, "Underlying Determinants of Closed-Bank Resolution Costs, *Federal Reserve of Cleveland Working Paper*, No. 9403, March 1994, p. 5.

[178]  *See* FDIC, "Study on Core Deposits and Brokered Deposits," July 8, 2011, p. 73.

[179]  *See* Christopher James, "The Losses Realized in Bank Failures," *The Journal of Finance*, Vol. 46, No. 4, September 1991, p. 1233.  *See also* James R. Barth, et al., "Determinants of Thrift Institution Resolution Costs," *The Journal of Finance*, Vol. 45, No. 3, July 1990, pp. 747 and 751; Kathleen McDill, "Resolution Costs and the Business Cycle," *FDIC Working Paper,* No. 2004-01, March 2004, pp. 18, 25; Rosalind L. Bennett and Haluk Unal, "The Cost Effectiveness of the Private-Sector Reorganization of Failed Banks, *FDIC Working Paper*, January 2011, p. 27; William P. Osterberg and James B. Thomson, "Underlying Determinants of Closed-Bank Resolution Costs, *Federal Reserve of Cleveland Working Paper*, No. 9403, March 1994, p. 7.

[180]  *See* Rosalind L. Bennett and Haluk Unal, "The Effects of Resolution Methods and Industry Stress on the Loss on Assets from Bank Failures," *Journal of Financial Stability*, Vol. 15, 18-31, July 2014, pp. 23 and 32.

with higher franchise values in FDIC auctions.[181]  To resolve a failure in the least-costly way, the FDIC solicits bids from other banks to acquire some or all of the failed institution's assets and liabilities.  Bids typically have two components: one part for the institution's assets and the other for its deposits.[182]  The bid premium over book value for deposits is often referred to as the bank's franchise value or the "intangible asset portion of the bid," which reflects an attempt to "estimate the future earnings flows that might emanate from the long-term deposit and loan relationships which developed with the failed bank's customers."[183, 184]  All else equal, banks with higher franchise value attract more buyers and therefore larger premiums at auction, resulting in a lower losses, if any, to the DIF.[185, 186]  This is recognized by practitioners as well as researchers.  For instance, the Chairman of the Resolution Trust Corporation, a federal agency established in the aftermath of the savings and loan (S&L) crisis to manage failed institutions has stated that "[b]y preserving the franchise value of the [failed] institution, it will be more attractive to investors, and this will lower the ultimate cost of its resolution."[187]

102.    A concrete example of the importance of franchise value in bank resolutions can also be

---

[181]   *See* Christopher James, "The Losses Realized in Bank Failures," *The Journal of Finance*, Vol. 46, No. 4, September 1991, p. 1225.

[182]   *See* FDIC, "Resolutions Handbook," last updated December 23, 2014, p 12.

[183]   FDIC, "Resolutions Handbook," last updated December 23, 2014, p 12.

[184]   John R. Walter, "Closing Troubled Banks: How the Process Works," *Federal Reserve Bank of Richmond Economic Quarterly*, Volume 90/1, Winter 2004, pp. 51-68.

[185]   *See* Christopher James, "The Losses Realized in Bank Failures," *The Journal of Finance*, Vol. 46, No. 4, September 1991, p. 1225.

[186]   *See* Rosalind L. Bennett and Haluk Unal, "The Cost Effectiveness of the Private-Sector Resolution of Failed Bank Assets," *FDIC Center for Financial Research Working Paper*, No. 2009-11, January 2010, p. 3.

[187]   *See* Benjamin B. Christopher, "Recent Developments Affecting Depository Institutions," *FDIC Banking Review*, Vol. 4, No. 1, Spring/Summer 1991, p. 40.

found by comparing two major bank failures in recent history.  WaMu is the only institution with greater than $50 billion in assets (*i.e.*, an HCI) that has failed in the recent past.[188]  As part of the FDIC resolution for the bank, all banking operations of the bank were acquired by JPMorgan Chase.[189]  At the time of its acquisition by J.P. Morgan, WaMu operated more than 2,200 branches and held a "strong deposit base" and therefore, had high franchise value.[190]  WaMu's funding structure also relied upon a significant amount of unsecured debt to absorb losses.[191]  Due to these reasons, despite its size, the resolution of WaMu did not result in any losses to the DIF.[192]  On the other hand, The Independent National Mortgage Corporation ("IndyMac") was not an HCI, and operated just 33 branches focusing primarily on originating and securitizing subprime prime mortgages.[193]  It also held a large amount of brokered deposits, which, unlike core deposits, are not a source of franchise value to the bank that relies upon them.  Several studies find that heavy reliance on brokered deposits in place of core deposit funding is associated with low bank franchise values because such banks lack the market value

---

[188]  *See* FDIC, "Bank Failures and Assistance Data," last accessed January 17, 2020, available at https://banks.data.fdic.gov/explore/failures.

[189]  *See* FDIC, "JPMorgan Chase Acquires Banking Operations of Washington Mutual," September 25, 2008, available at https://www.fdic.gov/news/news/press/2008/pr08085.html.

[190]  Robin Sidel, et al., "WaMu Is Seized, Sold Off to J.P. Morgan, in Largest Failure in U.S. Banking History," *Wall Street Journal*, last updated September 26, 2008, available at https://www.wsj.com/articles/SB122238415586576687.

[191]  *See* Martin J. Gruenberg, Member, Board of Directors, FDIC, "An Underappreciated Risk: The Resolution of Large Regional Banks in the United States," *Brookings Institution*, October 16, 2019, available at https://www.fdic.gov/news/news/speeches/spoct1619.html, p. 3.

[192]  *See* FDIC, "Bank Failures and Assistance Data," last accessed January 17, 2020, available at https://banks.data.fdic.gov/explore/failures.

[193]  *See* DealBook, "F.D.I.C. Closes Sale of IndyMac," *New York Times*, March 20, 2009, available at https://dealbook.nytimes.com/2009/03/20/fdic-closes-sale-of-indymac-to-onewest/.

generated by enduring customer relationships.[194]  Consistent with these facts about the importance of intangible assets for resolution costs, the resolution of IndyMac was the most expensive FDIC resolution to date, resulting in significant losses to the DIF.[195]

103.    Therefore, an appropriate risk-based assessment system must estimate and take into account an institution's franchise value, given that a high franchise value serves to minimize potential losses, if any, to the DIF in the event of a failure.  As HCIs hold many of the characteristics that researchers have connected to high franchise value—such as greater core deposits, valuable loan relationships, and larger branch networks—the assessment premiums for HCIs must reflect the lower risk posed by such institutions to the DIF due to their high franchise value.

### D.    Historical Losses to the DIF Have Predominantly Been from Non-HCI Banks Instead of HCIs

104.    Given the various attributes of HCIs that limit the probability of a failure, coupled with the various options available to the FDIC that minimize losses to the DIF as discussed above, the risk of losses to the DIF posed by HCIs owned by strongly capitalized and well-managed parent bank holding companies is minimal.  For these reasons, it is not surprising that historical losses to the DIF have predominantly been from non-HCI banks instead of HCIs.

105.    Specifically, as shown in Exhibit 1, the FDIC's own data show that only one out of 417 total bank failures (0.24 percent) between 2007 and 2011 involved an institution with

---

[194]  *See* FDIC, "Unsafe and Unsound Banking Practices: Brokered Deposits and Interest Rate Restrictions," Federal Register, Vol. 84, No. 25, February 6, 2019, at 2370 and 2388.

[195]  *See* FDIC, "Bank Failures and Assistance Data," last accessed January 17, 2020, available at https://banks.data.fdic.gov/explore/failures.

assets greater than $50 billion (*i.e.*, an HCI), which was WaMu, as discussed above.  And even then, as shown in Exhibit 2, WaMu's failure did not result in any losses to the DIF given the regulatory tools available to the FDIC, coupled with WaMu's franchise value.

106.    Therefore, in summary, an appropriate risk-based assessment system should consider the unique attributes of HCIs—including heightened regulatory scrutiny, holding company structure, and factors that contribute to higher franchise value—that insulate the DIF from potential losses.  In addition, an appropriate risk-based assessment system should also consider the regulatory tools available to the FDIC to resolve failures—including how franchise value impacts those resolutions—that minimize or eliminate losses to the DIF.  However, as I discuss in the next section, the 2011/2012 Final Rule does not consider any of these risk-mitigating factors, and, therefore, does not reflect the risk posed by HCIs to the DIF.  The 2011/2012 Final Rule is also flawed in other ways such that the rule is not risk-based.

## VI.    THE 2011/2012 FINAL RULE IS NOT RISK-BASED AND ASSESSMENT PREMIUMS FOR HCIS BASED ON THE 2011/2012 FINAL RULE WOULD NOT REFLECT THE ACTUAL RISK OF LOSS POSED TO THE DIF BY HCIS, WHICH IS LOW

### A.    Overview

107.    The 2011/2012 Final Rule governing the assessment premiums paid by HCIs does not fully take into account several important risk-mitigating factors that reduce both the probability of failure of an HCI and the severity of losses to the DIF, if any, in the event of a failure.  As a result, the 2011/2012 Final Rule cannot be considered to be risk-based.

108.    As discussed in greater detail in this section, the 2011/2012 Final Rule fails to accurately reflect the risk posed by HCIs to the DIF for the following reasons:

- The FDIC does not provide the details necessary to independently validate the models and assumptions it used to design the assessment system for HCIs under the 2011/2012 Final Rule.  Specifically, the models used by the FDIC rely on the unverifiable judgment and opinions of the FDIC staff, undisclosed determinations regarding banks that the FDIC "deemed to have failed," and assumptions about IDIs that never failed.  Similarly, the assumptions underlying the loss severity measure in the scorecard are also based on historical experience from the failures of small institutions and hypothetical losses from institutions that never actually failed.  HCIs are fundamentally different from small IDIs and, as a result, such assumptions are not likely to accurately capture the lower risk posed by HCIs to the DIF.

- The impact of the loss severity measure for HCIs is arbitrarily capped in the 2011/2012 Final Rule.  By applying such a cap, the assessment system fails to fully reflect the range of risk-mitigating factors that reduce the risk posed by HCIs to the DIF.

- Moreover, the 2011/2012 Final Rule fails to reflect various risk-mitigating attributes of HCIs such as: 1) the high level of regulatory scrutiny; 2) risk management techniques that can be employed by HCIs, and 3) availability of additional support from a bank holding company structure, which reduce both the risk of failure of an HCI and potential losses to the DIF.

- The 2011/2012 Final Rule also fails to reflect the regulatory tools available to the FDIC, such as its Cross Guaranty provision and the OLA, and market-based actions that the FDIC can take in the event of a failure.

- Finally, the treatment of counterparty exposure under the 2011/2012 Final Rule is flawed because, from an economic perspective, the assessment rules do not accurately reflect the risk of such counterparty exposure to the HCI, and, thus, the risk of potential losses to the DIF.  Among other flaws, the counterparty exposure measures used in the assessment system for HCIs are arbitrary as they do not distinguish the risk posed by the different types of counterparties, and aggregating counterparty exposures to the top-tier parent level (as the FDIC purportedly required during the period at issue in this case) incorrectly assumes that all affiliated counterparties would fail together, which may not be true.

**B.      Summary of the Assessment System Used by the FDIC to Calculate Assessment Rates for HCIs**

109.   As discussed in Section IV.B.3, the 2011/2012 Final Rule changed the assessment system used by the FDIC to determine the Assessment Rates for LIDIs and HCIs.  The 2011/2012 Final Rule eliminated the use of risk categories and long-term debt issuer

ratings, and instead introduced a "scorecard" to calculate Assessment Rates for LIDIs and HCIs.[196]

110.    Under the 2011/2012 Final Rule, the FDIC uses two different scorecards for LIDIs and HCIs.[197]  The overall structures of both scorecards are generally similar,[198] but the HCI scorecard includes additional factors or assigns different weights to certain factors compared to the scorecard for LIDIs.[199]  The score for an institution calculated using the scorecard (*i.e.*, the "Total Score") is used to determine the Assessment Rates for the institution.[200]  All else equal, an institution with a lower Total Score is assessed a lower Assessment Rate, and thus, lower assessment premiums.

111.    **Figure 3** provides an overview of the revised assessment system under the 2011/2012 Final Rule used by the FDIC to calculate the Assessment Rates for HCIs.

---

[196]  *See* 2011 Final Rule, at 10688.

[197]  *See* 2011 Final Rule, at 10688.

[198]  *See* 2011 Final Rule, at 10695.

[199]  *See* 2011 Final Rule, at 10696-97.

[200]  *See* 2011 Final Rule, at 10689.

**Figure 3: Overview of Scorecard Methodology for HCIs
Under the 2011/2012 Final Rule**



112. Under the 2011/2012 Final Rule, an HCI's Total Score is based on two different scores: a "Performance Score" and a "Loss Severity Score."[201]

113. The Performance Score purportedly measures an "institution's financial performance and its ability to withstand stress."[202]  The Performance Score for a given institution is based on three component scores:[203]

---

[201]   *See* 2011 Final Rule, at 10689.

[202]   2011 Final Rule, at 10689.

[203]   *See* 2011 Final Rule, at 10696.

- Weighted average CAMELS rating score, which accounts for 30 percent of the institution's Performance Score;[204]

- Ability to withstand asset-related stress score, which accounts for 50 percent of the institution's Performance Score; and

- Ability to withstand funding-related stress score, which accounts for 20 percent of the institution's Performance Score.

114.   Each of these component scores are further based on sub-measures that are calculated as weighted sums of specific IDI balance sheet and income statement characteristics as shown in **Figure 4**.  In particular, the institution's ability to withstand asset-related stress score includes a measure of concentration in an institution's risk exposures (*i.e.*, the "Concentration Measure") which is defined as "the greatest of the higher-risk assets to the sum of Tier 1 capital and reserves score, the top 20 counterparty exposure to the sum of Tier 1 capital and reserves score, or the largest counterparty exposure to the sum of Tier 1 capital and reserves score."[205]  As discussed above, the FDIC's claims in this matter relate to how BANA reported its counterparty exposure measures, which are used as inputs in calculating the Concentration Measure for BANA.[206]

---

[204]   The weighted average CAMELS rating score is calculated using a weighted average of an institution's CAMELS component rating.  In the calculation the CAMELS component ratings are assigned the following weights: Capital Adequacy (25 percent); Asset Quality (20 percent); Management (25 percent); Earnings (10 percent); Liquidity (10 percent); and Sensitivity to Market Risk (10 percent).  The weighted average CAMELS rating is then converted to a score that ranges from 25 to 100, where a weighted average CAMELS component rating of 1 equals a score of 25 and a 3.5 or greater equals a score of 100.  *See* 2011 Final Rule, at 10712.

[205]   2011 Final Rule, at 10696.

[206]   *See* Amended Complaint, ¶43.

**Figure 4: Factors Included in the HCI Scorecard**

| | Measures and components | Measure weights (percent) | Component weights (percent) |
|---|---|---|---|
| P ........... | Performance Score | .................... | .................... |
| P.1 ........ | Weighted Average CAMELS Rating | 100 | 30 |
| P.2 ........ | Ability to Withstand Asset-Related Stress | .................... | 50 |
| | Tier 1 Leverage Ratio | 10 | .................... |
| | Concentration Measure | 35 | .................... |
| | Core Earnings/Average Quarter-End Total Assets | 20 | .................... |
| | Credit Quality Measure and Market Risk Measure | 35 | .................... |
| P.3 ........ | Ability to Withstand Funding-Related Stress | .................... | 20 |
| | Core Deposits/Total Liabilities | 50 | .................... |
| | Balance Sheet Liquidity Ratio | 30 | .................... |
| | Average Short-Term Funding/Average Total Assets | 20 | .................... |
| L ........... | Loss Severity Score | .................... | .................... |
| L.1 ........ | Loss Severity Measure | .................... | 100 |

Source: 2011 Final Rule, at 10695.

115.   The Loss Severity Score is purportedly "based on a loss severity measure that estimates the relative magnitude of potential losses to the FDIC in the event of a large institution's failure."[207]  The loss severity measure includes assumptions regarding the change in amount of deposits (*i.e.*, the "Liability Runoff" assumptions) and recovery value of different asset categories (*i.e.*, the "Asset Loss Rate" assumptions) in the event of a failure to estimate the potential losses to the DIF.[208]  The Liability Runoff assumptions were based on data from IDIs "that either failed or came close to failure during the 2007 through 2009 period."[209]  Similarly, the Asset Loss Rate assumptions were "based on estimates of recovery values for insured depository institutions that either failed or came to close to failure."[210]  The estimates of asset recovery values were purportedly "based on

---

[207]   2011 Final Rule, at 10694.  *See also* 2011 Final Rule, at 10697.

[208]   *See* 2011 Final Rule, at 10694.

[209]   2011 Final Rule, at 10694.

[210]   2011 Final Rule, at 10694.

independent valuations obtained by the FDIC in 2009 on assets expected to be taken into receivership."[211]

116.   The Loss Severity Score is calculated separately from the Performance Score, and then converted into a "Loss Severity Factor," which ranges in value between 0.8 and 1.2.[212] The Performance Score is then multiplied by the Loss Severity Factor to calculate the Total Score for an HCI.[213]  The initial deposit insurance assessment rate is an increasing function of an HCI's Total Score, so a smaller Total Score produces a lower deposit insurance assessment rate.  Given this construct, an institution's Total Score cannot be lower than 80 percent of its Performance Score (*i.e.*, Performance Score * 0.8) or greater than 120 percent of its Performance Score (*i.e.*, Performance Score * 1.2).  Thus, the maximum benefit an HCI can achieve from having characteristics consistent with a favorable Loss Severity Score (*i.e.*, the magnitude of potential losses to the DIF in the event of failure) on the Total Score for the institution is only 20 percent.[214]

117.   Under the revised methodology, the FDIC also proposed retaining the ability to apply a discretionary adjustment to the Total Score (*i.e.*, the "Large Bank Adjustment") by "a maximum of 15 points up or down" to account for "significant risk factors that are not captured in the scorecards."[215]  In determining whether to make such an adjustment, the FDIC stated that it "may consider such information as financial performance and

---

[211]   2011 Final Rule, at 10694.

[212]   *See* 2011 Final Rule, at 10697.

[213]   *See* 2011 Final Rule, at 10697.

[214]   *See* 2011 Final Rule, at 10697.

[215]   2011 Final Rule, at 10699.

condition information and other market or supervisory information" and "will also consult with an institution's primary federal regulator and, for state chartered institutions, state banking supervisor."[216]   As far as I am aware, such discretionary adjustments have never been made by the FDIC.

118.   The Total Score for an HCI is then converted into an "Initial Base Assessment Rate" using a formula stipulated in the 2011/2012 Final Rule.[217]   Based on the formula, an HCI with a Total Score of 30 would pay the minimum Initial Base Assessment Rate, an HCI with a Total Score of 90 would pay the maximum Initial Base Assessment Rate, and the Initial Base Assessment Rate would rise at an increasing rate for Total Scores between 30 and 90.[218]

119.   Additionally, the FDIC can adjust the Initial Base Assessment Rate to determine the final Assessment Rate for a given HCI.   The 2011/2012 Final Rule specifies three such adjustments that can be made to the Initial Base Assessment Rate:

- Unsecured Debt Adjustment, which purportedly factors in that "[a]ll other things equal, greater amounts of long-term unsecured debt can reduce the FDIC's loss in the event of a failure;"[219]

---

[216]   2011 Final Rule, at 10699.

[217]   *See* 2011 Final Rule, at 10698.

[218]   *See* 2011 Final Rule, at 10698.

[219]   2011 Final Rule, at 10680.

- Depository Institution Debt Adjustment, which "offset[s] the benefit received by institutions that issue long-term, unsecured liabilities when those liabilities are held by other IDIs;"[220] and

- Brokered Deposit Adjustment, which purportedly accounts for an "increase [in] an institution's risk profile" due to "significant reliance on brokered deposits."[221]

### C.   The 2011/2012 Final Rule Is Not Risk Based

120.   The assessment system for HCIs under the 2011/2012 Final Rule has a number of fundamental flaws, such that the Assessment Rates for HCIs calculated using the system do not accurately reflect the lower risk posed by HCIs to the DIF.  As a result, the assessment system for the HCIs under 2011/2012 Final Rule is not risk-based.  I discuss each of these flaws in the 2011/2012 Final Rule in greater detail in the sections below.

> 1.   *The 2011/2012 Final Rule Is Based on Unverifiable Models and Risk Rankings, and Fails to Take into Account Evidence that Historically Losses to the DIF have been Due to the Failure of Only Non-HCI Institutions*

121.   To design the HCI scorecard in the 2011/2012 Final Rule, the FDIC purportedly carried out a number of different analyses.

122.   The FDIC used an ordinary least squares ("OLS") regression model to determine "the risk measures included in the performance score and the weights assigned to those

---

[220]   2011 Final Rule, at 10681.

[221]   However, "[t]he brokered deposit adjustment [would] not apply to those large institutions that are well-capitalized and have a composite CAMELS rating of 1 or 2."  2011 Final Rule, at 10682.

measures" in the scorecard for HCIs under the 2011/2012 Final Rule.[222]  The OLS model used data from 2005 through 2008 for a set of risk measures to determine how well the risk measures predicted the FDIC's internal risk ranking of large institutions as of year-end 2009 (*i.e.*, "expert judgement ranking").[223]  The expert judgment rankings used in the OLS model apparently reflected the FDIC staff's opinions based on its "experience and judgment" of "the proper rank ordering of risk […] for large institutions as of year-end 2009."[224]  The risk measures that were included in the HCI scorecard were then selected based on the results of the OLS model.[225]

123.  The FDIC also used a logistic regression model to test how well the measures included in the scorecard were able "to predict whether a large institution would fail or receive significant government support prior to year-end 2009."[226]  For the logistic regression model, the FDIC used as the dependent variable the probability of "whether an institution failed before year-end 2009."[227]  The FDIC "deemed to have failed" not just banks that actually failed, but also banks "that received significant government support or that came close to failure."[228]

124.  The Liability Runoff and Asset Loss Rate assumptions used by the FDIC to calculate the Loss Severity Score in the HCI scorecard were also based on institutions that "either

---

[222]  2011 Final Rule, at 10702-10703 and 10727.

[223]  *See* 2011 Final Rule, at 10727.

[224]  2011 Final Rule, at 10727.

[225]  *See* 2011 Final Rule, at 10727.

[226]  2011 Final Rule, at 10703.

[227]  2011 Final Rule, at 10727.

[228]  2011 Final Rule, at 10727, footnote 1.

failed or came close to failure."[229]  Specifically, the Liability Runoff assumptions were based on data from IDIs "that either failed or came close to failure during the 2007 through 2009 period."[230]  The FDIC further stated that these data included data from the failure of small institutions, which "were added to improve the robustness of the analysis."[231]  Similarly, the Asset Loss Rate assumptions were "based on estimates of recovery values for insured depository institutions that either failed or came to close to failure."[232]  The estimates of asset recovery values were purportedly "based on independent valuations obtained by the FDIC in 2009 on assets expected to be taken into receivership."[233]

125.   There are several problems with these analyses and assumptions, and, as a result, the risk measures included in the HCI scorecard that are derived from them.

126.   First, the analyses and methodology underlying the risk ranking of institutions used in the OLS model, and the FDIC's determinations of which banks to "deem[] to have failed" because they "came close to failure" or received "significant government support" for the logistic regression model, are not publicly available.  In addition, several of the variables included in the scorecard for the HCIs are also based on non-public data.[234]  As a result, it

---

[229]   2011 Final Rule, at 10694.

[230]   2011 Final Rule, at 10694.

[231]   2011 Final Rule, at 10695.

[232]   2011 Final Rule, at 10694.

[233]   2011 Final Rule, at 10694.

[234]   The non-public measures in the scorecard for HCIs include an institution's CAMELS rating, Higher Risk Assets, Top 20 Counterparty Exposure, the Largest Counterparty Exposure, and Criticized and Classified Items. *See* 2011 Final Rule, at 10688, Footnote 53. *See also* Julie Stackhouse, "The ABCs of CAMELS," *Federal Reserve Bank of St. Louis*, July 24, 2018, available at https://www.stlouisfed.org/on-the-economy/2018/july/abcs-camels.

is not possible to validate the results of the models.  Moreover, it is not possible to verify the FDIC's assertion that the risk measures included in the scorecard for HCIs are a good predictor of risk of failure and potential losses to the DIF for HCIs.[235]

127.    As discussed previously, the FDIC requires HCIs to go through periodic stress testing.[236] These stress tests are complex and presumably produce a far more detailed view of an institution's ability to weather periods of stress than the relatively simple measures included in the HCI scorecard under the 2011/2012 Final Rule.  Despite having the results of such stress testing available to it, it is unclear why the FDIC chose to rely on subjective rankings of banks by its staff and unexplained decisions to "deem" banks to have failed if they received government support during the financial crisis, rather than objective measures, such as the results of stress tests.  More importantly, there is no method to independently verify if the baselines that the FDIC used in its models align with the results of such stress testing.  In cases where the results of stress testing differ from the assumptions in the FDIC's models, both cannot be true.  However, due to the lack of data provided by the FDIC it is not possible to know which one, if either, is accurate.

128.    The manner in which the FDIC's models are constructed (*e.g.,* using risk-rankings the FDIC itself created based on unverifiable data and criteria) amounts to performing statistical analysis on made-up numbers, or as is colloquially said, "garbage in, garbage

---

[235] Also, I am not able to verify whether the coefficients derived from the FDIC's model were adjusted as the result of possible subsequent changes in the definitions of the right-hand-side variables that are used in the scorecard estimation.

[236] *See* Darryl E. Getter, "U.S. Implementation of the Basel Capital Regulatory Framework," *United States Congressional Research Service*, April 9, 2014, p. 20. *See also* FDIC, "FDIC Approves Final Rules Regarding Large Bank Stress Tests and Large Bank Assessment Pricing and Releases An Update on the DIF Projections," October 9, 2012, available at https://www.fdic.gov/news/news/press/2012/pr12116.html.

out," and is likely to result in errors induced by "confirmation bias."  Among the problems with this approach is that it allows misconceptions (*i.e.*, incorrect beliefs that real data could refute) to go unchallenged.  The recognition that researchers' impressions are often wrong is the reason economists spend considerable effort doing empirical research.  Substituting one's uncorroborated beliefs for empirical findings, and then using them alongside real statistics in a regression analysis to generate risk estimates—as the FDIC did in developing the 2011/2012 Final Rule—is insufficient for it to be accepted as a valid method for assessing the risk posed by HCIs to the DIF.  As such, the FDIC's statistical models are unverifiable, and the 2011/2012 Final Rule cannot be considered to be risk-based (even if one were to ignore the other flaws I discuss below).

129.    Second, it is hard to know how the risk ranking of institutions or the FDIC's subjective decisions of which banks it "deemed to have failed" could have been based on any relevant experience of FDIC staff.[237]  The historical experience that informs the FDIC staff's opinions is almost exclusively from failures of non-HCI institutions.  As discussed in Section V.D, losses to the DIF between 2007 and 2011 have been produced entirely by the failure of non-HCI institutions, predominantly small IDIs.  In fact, the only HCI that failed during this time period was WaMu, a failure that did not result in any losses to the DIF.  Given such limited data on failure of HCIs, it is unclear what relevant experience the FDIC is relying on, or why it considers the opinions of its staff to be reliable predictors of future HCI failure.

130.    As discussed in Section V.B, HCIs are very different from smaller institutions.  They

---

[237]   *See* 2011 Final Rule, at 10727, footnote 1.

typically have larger geographic footprint, diverse product mix, better risk management systems, and are subjected to much more intensive supervision and regulation compared to smaller institutions.  Moreover, as I pointed out above, there are additional risk-mitigating factors that limit their potential for creating losses to the DIF.  As a result, conclusions based on analyses of data and/or experience pertaining to smaller institutions are not applicable to HCIs, and cannot accurately capture the risk of failure or potential losses to the DIF in the event of an HCI failure.  The FDIC itself acknowledged this shortcoming: "[U]sing the recent experience of small banks to determine the scorecard factors and weights would likely result in a system that misprices the risk posed by large institutions."[238]  The word "likely" is an understatement.  The many factors listed in this report that would differentiate the failure risk of large and small institutions point in the direction of lower risk for large institutions.  A model of risk to the DIF that is based on small institutions will almost assuredly overstate the risks posed by HCIs and other large banks.  In fact, commenters noted that the revised rules would unfairly shift the burden of funding the DIF to larger institutions even though losses to the DIF as a proportion of insured deposits have been higher for smaller institutions historically.[239]

131.    Third, as noted by the FDIC itself, "neither of the dependent variables in the two

---

[238]   2011 Final Rule, at 10702.

[239]   *See, e.g.*, Daryl Bible, "Reference RIN 3064-AD66 Assessments, Large Bank Pricing," BB&T Corporation, January 3, 2011, AR00159, at 160.  Bible writes: "While the FDIC maintains that the proposal is revenue neutral to the DIF, we believe that it will result in increased assessments for the industry and inappropriately and unfairly shift a significant portion of the funding burden to large IDIs in a manner that is inconsistent with the FDIC's statutory mission to assess IDIs based on their risk to the DIF.  During a December 20 conference call, FDIC staff noted that under the current assessment structure, large IDIs pay approximately 70% of all assessments, but will pay approximately 80% under the proposed methodology.  We believe this change is unreasonable, given that during the period 2006 to 2009, the DIF incurred losses on just .8% of insured deposits at large IDIs, compared to losses of 1.5% for smaller IDIs." (Emphasis added).

regressions reflect the expected (or actual loss) given failure."[240]  For example, as
discussed previously, possible losses that would entail costs to the OLF, as opposed to the
DIF, should not be included in deposit insurance assessments, given that the OLF has its
own separate funding sources.  In particular, the FDIC treated "institutions that received
significant government support or that came close to failure" as failed institutions even
though the institutions never failed.[241]  Moreover, the FDIC provided no explanation as to
what types of government support received by institutions during the financial crisis it
considered to be problematic.  To the contrary, not all government support during the
relevant time period was enacted to prevent failure of distressed institutions.  For
example, the banks' access to the Federal Reserve Term Asset-Backed Securities Loan
Facility ("TALF") was encouraged by regulators to reduce the systemic liquidity
problems and should not be taken as a sign of bank distress.[242]  In addition, the FDIC
demand deposit guarantee was also a blanket guarantee for all non-interest transactions
accounts and did not differentiate among banks.[243]  Similarly, the FDIC's new issue
subordinated debt guarantee was also open to all eligible institutions and was not

---

[240]  2011 Final Rule, at 10728.

[241]  2011 Final Rule, at 10731, footnote 1.  To justify its approach, the agency simply stated in the 2011 Final Rule
that the "analysis included institutions that failed but did not cause a loss to the DIF in the sample, since these
models were used to select measures and assign appropriate weights for the performance score, not the loss
severity score." 2011 Final Rule, at 10703.  However, without considering the risk of potential losses, if any, to
the DIF and the fact that HCIs have never caused a loss to the DIF, the dependent variables used by the FDIC
cannot capture the low risk posed by HCIs to the DIF.  As discussed in Section V, HCIs possess several risk-
mitigating factors that reduce both the risk of their failure and likelihood of losses to the DIF in the event of
failure.

[242]  *See* The Federal Reserve System, "Term Asset-Backed Securities Loan Facility (TALF)," last updated
November 24, 2015, available at https://www.federalreserve.gov/monetarypolicy/talf.htm.

[243]  *See* FDIC, "Temporary Liquidity Guarantee Program," last updated February 19, 2019, available at
https://www.fdic.gov/regulations/resources/tlgp/index.html.

selective with respect to an institution's capital adequacy or performance.[244]

132.   Fourth, the Liability Runoff and Asset Loss Rate assumptions used by the FDIC in the Loss Severity scorecards suffer from similar flaws that are present in the FDIC's statistical models.  In particular, the FDIC provides no analyses to support why its Liability Runoff and Asset Loss Rate assumptions are reasonable, nor does it provide any data that can be used to independently verify the assumptions.  Additionally, the assumptions are based on historical experience of IDIs that may not be applicable to HCIs or be good predictors of the risk posed by HCIs to the DIF.  Similarly, the data used by the FDIC to develop the assumptions include institutions that came close to failure but never failed or caused any losses to the DIF even if they failed.

133.   Finally, the calibration of the assessment system (*i.e.*, the weights assigned to the various components of an institution's Total Score and the formula used by the FDIC to scale the Total Score to the Initial Base Assessment Rate) appear to be motivated by the FDIC's need to make the assessment system under the 2011/2012 Final Rule "revenue neutral," which may preclude the assessment system from accurately capturing the risk posed by HCIs to the DIF.  Specifically, under the Dodd-Frank Act, "the FDIC is required to offset the effect on small IDIs (those with less than $10 billion in assets) of the statutory requirement that the fund reserve ratio increase from 1.15 percent to 1.35 percent by September 30, 2020,"[245]  however, the Dodd-Frank Act does not state that small IDIs

---

[244]   *See* FDIC, "Temporary Liquidity Guarantee Program," last updated February 19, 2019, available at https://www.fdic.gov/regulations/resources/tlgp/index.html.

[245]   *See* 2011 Final Rule, at 10683, footnote 36.  The reserve ratio is defined by the FDIC as the total amount of the DIF divided by the total estimated insured deposits.  *See* FDIC, "Deposit Insurance Assessments, Assessment Changes Since 2016," last updated December 23, 2019, available at https://www.fdic.gov/deposit/insurance/assessments/changesassessments.html.

should be subsidized at the expense of large IDIs (which is what the FDIC has done with the 2011/2012 Final Rule).[246]  The FDIC contends that the changes to the assessment system under the 2011/2012 Final Rule in response to the statutory requirement to increase the reserve ratio "should not change the overall amount of assessment revenue that the FDIC would otherwise have collected," and "[t]herefore, for insured institutions in aggregate, the changes in assessment rates and the assessment base [under the 2011/2012 Final Rule] will not affect [their] aggregate earnings and capital."[247]  In constraining the assessment system to be revenue neutral across all IDIs, the FDIC ignores differences in risk posed by different types of IDIs (*i.e.*, small IDIs compared to HCIs) and limits the assessment system's ability to accurately reflect the low risk posed by HCIs to the DIF.  As such, the assessment system under the 2011/2012 Final Rule shifts the burden of funding the DIF to large institutions such as HCIs even though they pose a relatively lower risk to the DIF, and therefore, the rule cannot be considered to be risk-based.

134.   The shortcomings of the FDIC's models and assumptions highlighted above directly contradict the FDIC's assertion that the assessment system for HCIs under the 2011/2012 Final Rule "reasonably represent[s] both the probability that the DIF will incur a loss with respect to the institution and the likely amount of any such loss."[248]

135.   The comments that the FDIC received in response to the proposed rule changes in 2010 also highlighted these issues with the FDIC's analyses and assumptions.  For example:

---

[246]   *See* Dodd-Frank Act, at 1538 - 1540.

[247]   2011 Final Rule, at 10683 and 10725.

[248]   2011 Final Rule, 10701.

- BAC highlighted that "[m]ost of the data upon which the FDIC has based its assumptions and analysis have come from experience relating to small bank failures or hypothetical models of what could have happened if a large bank failed, but have not been tested with actual experience." It further noted that "[b]ecause of the complexity of the data, the model and assumptions, it is extremely difficult for the industry to validate the FDIC's assumptions are fair and reasonable" and that "[t]here should be greater transparency in the FDIC's models and assumptions."[249]

- Ely & Company, a financial consulting firm, also noted the limited data on failures of large institutions, and questioned the FDIC's treatment of large institutions that received government support as failed institutions even though such resolutions caused no losses to the DIF.[250] It further stated

---

[249] Phillip A. Wertz, "Proposed Regulations Regarding Asset-Based Assessments and Risk-Based Assessments," BAC, January 3, 2011, AR00660, at 665-666. Wertz writes: "Most of the data upon which the FDIC has based its assumptions and analysis have come from experience relating to small bank failures or hypothetical models of what could have happened if a large bank failed, but have not been tested with actual experience. The formulas for risk assessment are so complicated that it is almost impossible to calculate without the FDIC's automated scorecard tool. The benefit of using so many complicated metrics for risk measurement is unclear. Because of the complexity of the data, the model and assumptions, it is extremely difficult for the industry to validate the FDIC's assumptions are fair and reasonable. There should be greater transparency in the FDIC's models and assumptions which should be subject to a more robust study and public debate and comment. There appears to be a high potential that these complex risk measurements overlap and may double count risk." (Emphasis added).

[250] Bert Ely, "RIN number 3064-AD66; Assessments, Large Bank Pricing NPR; RIN number 3064-AD66; Assessments, Assessment Base and Rates NPR," Ely & Company, Inc., January 3, 2011, AR00762, at 764. Ely writes: "The size distribution of failed IDIs relative to non-failed IDIs (as reflected in the distribution of the assessment base by IDI size) is especially relevant given that the FDIC proposes to extrapolate from data about small-IDI failures in determining risk factors for much larger IDIs. That is the case because the FDIC has very limited data on larger failed IDIs because there have been so few of them. The validity of this extrapolation is even more questionable when extended to highly complex IDIs given the enormous difference between the size and complexity of failed IDIs and highly complex IDIs." (Emphasis added). Ely also writes: "[I]t appears that the FDIC has treated as failed IDIs institutions in which the resolution did not cause a loss to the DIF, as is evident in footnote 33 in the Large Bank NPR (FR page 72624), which states that 'for the purpose of regression analysis, large institutions that received significant government support or merged with another entity with government support' were treated as failed institutions."

that the FDIC in the proposed rulemaking notice failed "to adequately

make the case that the opinions of FDIC staff are sufficiently reliable

predictors of a potential IDI failure that will cause a loss to the DIF."[251]

- Similarly, the American Bankers Association remarked that there is no

   evidence that the characteristics of large banks are similar to those found

   in small banks and that the FDIC's analysis is limited to the most recent

   bank failure cycle which may not adequately capture the variables that

   would trigger failure of large institutions in the future.[252]

- The Clearing House also criticized the FDIC's reliance on small bank data

   to determine the loss severity assumptions for large institutions.  It also

   highlighted that the failure of WaMu, the only HCI to fail during the

   financial crisis, did not cause any losses to the DIF.[253]

---

[251] Bert Ely, "RIN number 3064-AD66; Assessments, Large Bank Pricing NPR; RIN number 3064-AD66; Assessments, Assessment Base and Rates NPR," Ely & Company, Inc., January 3, 2011, AR00762, at 764.  Ely writes: "FDIC staff may have devoted substantial effort to developing rank orderings of the riskiness of large and highly complex IDIs, but those rank orderings are merely opinions untested by actual failures which created a loss for the DIF. As noted above, the FDIA clearly limits the FDIC's risk-based assessment system to a system "based on the probability that the Deposit Insurance Fund will incur a loss with respect to the institution." The NPRs fail to adequately make the case that the opinions of FDIC staff are sufficiently reliable predictors of a potential IDI failure that will cause a loss to the DIF."

[252] James Chessen, "RIN 3064-AD66; Notice of Proposed Rulemaking Regarding the Pricing of Large Bank Assessments; 12 CFR Part 327; 75 Federal Register 72612, November 24, 2010," American Bankers Association, January 3, 2011, AR01256, at 259.  Chessen writes: "Because there have been few failures of banks with assets greater than $10 billion, the FDIC was required to set parameters based on smaller bank failures and CAMELS downgrades. Yet nowhere is there evidence that the asset mix, liability mix, and risk-mitigants in large banks are similar to those found in those small bank failures or in banks with CAMELS downgrades.  Moreover, the analysis covers only the most recent bank failure cycle, which, while instructive, may not adequately capture the variables that would trigger failures of large banks in the future.  Banks have noted that provisions in the DFA related to oversight and management of systemic risks change this calculation considerably, yet there is no evidence that this was considered by the FDIC." (Emphasis added).

[253] Paul Saltzman, "RIN 3064-AD66: Notices of Proposed Rulemaking - Deposit Insurance Assessment Base and Rates and Large Bank Pricing," The Clearing House, January 3, 2011, AR00669 at 680.  Saltzman writes: "This critical [loss severity] measure is based on a standardized set of assumptions regarding liability runoffs and the recovery value of asset categories.  These assumptions are applied to the institution's balance sheet for a given quarter to measure possible losses to the FDIC in the event of the institution's failure.  However, the

- Additionally, BB&T Corporation, a bank holding company, noted that the revised rules unfairly shifted the burden of funding the DIF to larger institutions even though losses to the DIF as a proportion of insured deposits have been higher for smaller institutions historically.[254]

- Similarly, Ely & Company also argued that the degree of cross-subsidy provided by large institutions to small banks under the revised rule was not defensible given that losses to the DIF historically have occurred due to failure of smaller IDIs.[255]

   2.   *The 2011/2012 Final Rule Does Not Adequately Consider Loss upon Failure Because the Loss Severity Factor Is Arbitrarily Capped*

136.   As explained above, the maximum reduction of the Loss Severity Score (*i.e.*, the magnitude of potential losses to the FDIC in the event of failure) on the Total Score for

---

assumptions used by the FDIC are based predominantly on failures of small banks in the past several years whose balance sheets have vastly different characteristics than those of large banks, thereby posing very different risks to the DIF. Those failed banks generally had a heavy concentration in real estate loans and substantial reliance on brokered deposits. The Clearing House notes that, during the financial crisis, the only truly large depository institution to fail, Washington Mutual, resulted in no net loss to the FDIC." (Emphasis added).

[254] Daryl Bible, "Reference RIN 3064-AD66 Assessments, Large Bank Pricing," January 3, 2011, BB&T Corporation, AR00159, at 160. Bible writes: "While the FDIC maintains that the proposal is revenue neutral to the DIF, we believe that it will result in increased assessments for the industry and inappropriately and unfairly shift a significant portion of the funding burden to large IDIs in a manner that is inconsistent with the FDIC's statutory mission to assess IDIs based on their risk to the DIF. During a December 20 conference call, FDIC staff noted that under the current assessment structure, large IDIs pay approximately 70% of all assessments, but will pay approximately 80% under the proposed methodology. We believe this change is unreasonable, given that during the period 2006 to 2009, the DIF incurred losses on just .8% of insured deposits at large IDIs, compared to losses of 1.5% for smaller IDIs." (Emphasis added).

[255] Bert Ely, "RIN number 3064-AD66; Assessments, Large Bank Pricing NPR; RIN number 3064-AD66; Assessments, Assessment Base and Rates NPR," Ely & Company, Inc., January 3, 2011, AR00762 at 763. Ely writes: "[W]hile all of the DIF's losses in recent years (since February 2007 when failures resumed after a 31-month stretch with no failures) have occurred in smaller IDIs, the bulk of the FDIC assessment base, and future premium collections, will come from IDIs of a size which have not generated any losses for the DIF. It is quite possible, under the assessment system proposed in the NPR, that IDIs with more than $50 billion in total assets will pay more than 69% of the total DIF assessments. While there is some element of cross-subsidy within deposit insurance, from the large to the small, the degree of cross-subsidy due to the assessment rates proposed in the two NPRs is not defensible."

the institution is limited to 20 percent.  By applying such a cap, the assessment system fails to fully reflect the range of risk-mitigating factors that reduce the risk posed by HCIs to the DIF.

137.    As discussed in greater detail in Section V.B.2, HCIs have a number of risk-mitigating characteristics that reduce both the probability of failure, and, thus, the potential losses to the DIF.  In addition, even in the event of a failure, the FDIC has at its disposal a number of regulatory tools that can prevent losses to the DIF.  There may also be unencumbered assets and subordinate liabilities held by the HCI or its parent bank holding company and affiliate companies that can further insulate the DIF from losses.  However, due to the arbitrary limit on the range of the Loss Severity Factor, the Total Score for an HCI under the 2011/2012 Final Rule cannot be reduced by more than 20 percent no matter how many such risk-mitigating factors are present or how unlikely a failure is to result in any loss to the DIF.  As a result, the 2011/2012 Final Rule is again not risk-based, and assessment premiums calculated using the assessment system do not reflect the true risk posed by HCIs to the DIF.

138.    Moreover, the FDIC does not provide any analysis or support for why it is appropriate to cap the impact of the loss severity measure on the Total Score.  Indeed, the scorecard system is unable to accurately anticipate and set insurance premiums consistent with the total absence of DIF losses that occurred with the failure of WaMu, the only recent HCI failure.  In the 2011/2012 Final Rule, the FDIC simply stated that "it is prudent at this time to incorporate this measure in a limited way and evaluate it further before increasing its effect on the assessment rate," as the "the loss severity measure does not yet incorporate off-balance sheet obligations, complex funding structures and other

qualitative factors that can have a significant effect on DIF losses in the event of failure."[256]  This response, rather than explaining the FDIC's reasoning or support for the arbitrary cap on the Loss Severity Factor, further demonstrates that the 2011/2012 Final Rule is not risk-based as it does not adequately consider all factors that impact the potential losses to the DIF in the event of a failure.

139.  Comments received by the FDIC in response to the proposed rule changes in 2010 also highlighted these issues.  Commentators specifically noted that due to the arbitrary cap on the Loss Severity Factor, the scorecard for HCIs overstates the risk posed to the DIF by HCIs and makes it impossible for HCIs to take risk-mitigating actions to reduce their Assessment Rate to the lowest rate possible.  For example:

- The Clearing House noted that "[t]he arbitrary scaling of the loss severity score dilutes the influence of the calculated loss on failure variable (the loss severity ratio)" resulting "in an unrealistically high level of assumed losses for LDIs given failure and, thereby, vastly overstates the potential risk to the DIF."[257]

- The American Bankers Association also argued that "[a] major failure of the Scorecard, which undermines its objective to quantify risk to the

---

[256]   2011 Final Rule, at 10698.

[257]   Paul Saltzman, "RIN 3064-AD66: Notices of Proposed Rulemaking - Deposit Insurance Assessment Base and Rates and Large Bank Pricing," The Clearing House, January 3, 2011, AR00669, at 678.  Saltzman writes: "The arbitrary scaling of the loss severity score dilutes the influence of the calculated loss on failure variable (the loss severity ratio). This results in an unrealistically high level of assumed losses for LDIs given failure and, thereby, vastly overstates the potential risk to the DIF. For example, several of our members have a calculated loss severity ratio of zero, yet will face over $2.5 billion in annual assessment costs. In the absence of empirical evidence supporting the disparate treatment of these two scores, the Large Bank NPR's discounting of the loss severity score is arbitrary and without foundation. This approach not only prevents an accurate evaluation of risk of loss to the DIF, but also distorts the assessment process among insured banks." (Emphasis added.).

insurance fund, is its focus on asset and liquidity risks, while it under-weights and mis-measures the potential loss to the fund should a large bank fail."  It further noted that "the effect of the Loss Severity Score is limited to 20 percent of the Performance Score, whereas no analytical support is provided for this arbitrary weighting," and that such "weighting appears unreasonable for some large banks funded with relatively small amounts of insured deposits, which therefore, pose minimal risk exposure to the insurance fund."[258]

- Additionally, BAC noted that by putting a floor under the Loss Severity Factor "at 0.80, it becomes impossible for a large bank to take any risk-mitigating action that can reduce its rate to the lowest rate."  It further noted that "[t]he FDIC provides no support as to why this is an appropriate loss severity factor and has any bearing on overall risk of loss to the DIF for an institution," and that "[a]pplying this range adds to the anomalous results that the all-in assessments paid do not correlate to risk of the DIF."[259]

---

[258] James Chessen, "RIN 3064-AD66; Notice of Proposed Rulemaking Regarding the Pricing of Large Bank Assessments; 12 CFR Part 327; 75 Federal Register 72612, November 24, 2010," American Bankers Association, January 3, 2011, AR01256, at 259.  Chessen writes: "ABA sees the Loss Severity Score as a critical element of the Scorecard.  A major failure of the Scorecard, which undermines its objective to quantify risk to the insurance fund, is its focus on asset and liquidity risks, while it under-weights and mis-measures the potential loss to the fund should a large bank fail.  We note that the effect of the Loss Severity Score is limited to 20 percent of the Performance Score, whereas no analytical support is provided for this arbitrary weighting. This weighting appears unreasonable for some large banks funded with relatively small amounts of insured deposits, which therefore pose minimal risk exposure to the insurance fund." (Emphasis added).

[259] Phillip A. Wertz, "Proposed Regulations Regarding Asset-Based Assessments and Risk-Based Assessments," BAC, January 3, 2011, AR00660, at 667. Wertz writes: "[T]he FDIC's proposal limits the weight given in the loss severity metric to a range such that even an institution with zero risk cannot have a factor lower than .80 or higher than 1.20 of the overall risk score.  The FDIC should remove the proposed downward limit.  By capping it at .80, it becomes impossible for a large bank to take any risk-mitigating action that can reduce its rate to the

3.   *The 2011/2012 Final Rule Does Not Adequately Consider Risk Mitigating Attributes of HCIs that Reduce Both the Risk of Failure and Potential Losses to the DIF in the Event of a Failure*

140.   The 2011/2012 Final Rule also completely ignores important risk-mitigating attributes of HCIs—such as the heightened regulatory oversight that HCIs are subject to and the holding company structure that is typical of HCIs (among other factors discussed in Section V.B.2 above)—that minimize HCIs' risk of failure, and, thus, the likelihood of potential losses to the DIF.  A risk-based assessment system must take into account such risk-mitigating attributes of HCIs to accurately reflect the risk posed by such institutions to the DIF.

a.   *The 2011/2012 Final Rule Does Not Adequately Consider the Fact that HCIs are Subject to High Level of Regulatory Scrutiny which Reduces the Risk of Failure and Potential Losses to the DIF*

141.   As discussed above, HCIs are required to meet stringent liquidity coverage ratio requirements, undergo annual stress testing by the Federal Reserve through CCAR and DFAST assessments, and submit ex-ante resolution plans approved by the FDIC and the Federal Reserve.  Such stringent oversight allows HCIs and regulators to quickly identify potential issues and proactively take potential risk-mitigating actions that improve an institution's overall performance as well as its ability to withstand stress.  As a result, the high level of regulatory scrutiny and risk-mitigating actions that institutions can take in response to such oversight reduces the risk of an HCI failure, and, thus, the likelihood of

---

lowest rate. The FDIC provides no support as to why this is an appropriate loss severity factor and has any bearing on overall risk of loss to the DIF for an institution. Applying this range adds to the anomalous results that the all-in assessments paid do not correlate to risk of the DIF. … [I]f there is zero risk of loss to the DIF, there is no risk-based rationale to impute that the assessment rate will assume there is an 80% risk factor." (Emphasis added).

potential losses to the DIF.

142. The 2011/2012 Final Rule does not take into consideration risk-mitigating actions that institutions can take such as collateralization over required limits, hedging and insurance to limit their exposure in certain transactions, adoption of stricter underwriting standards, and implementation of better risk management systems, which reduce the risk posed by the institution to the DIF.  In fact, the Federal Reserve and other banking officials have stated that new regulations put in place after the financial crisis have substantially reduced the riskiness of the largest financial institutions.  Despite such statements, the FDIC has not altered the assessment system for HCIs.  Clearly if the risk posed by HCIs to the DIF have been substantially reduced, but the assessment system has not been changed to reflect such risk reductions, then the assessment system for HCIs cannot accurately capture the lower risk posed by HCIs to the DIF.  As a result, the 2011/2012 Final Rule is not risk-based.

143. Comments received by the FDIC in response to the proposed rule changes in 2010 also highlighted specific issues along this dimension.  For example:

- BAC noted that the revised rule ignored the fact that large institutions such as HCIs are subject to a high level of regulatory scrutiny which mitigates the risk posed by such institutions to the DIF.  As examples of regulations unique to large institutions that mitigate risk to the DIF, BAC highlighted: prudential regulation and stricter capital and liquidity requirements for systemically important institutions; requirements to undergo regular stress testing and maintenance of capital and liquidity plans to survive adverse economic scenarios; requirements to adopt recovery and resolution plans

that will help prevent a failure and make any failure more orderly; and

active on-site supervision by U.S. and non-U.S. banking regulators that

allow for meaningful oversight and real time monitoring of risk.[260]

- Similarly, the American Bankers Association noted that provisions in the

Dodd-Frank Act such as capital and liquidity requirements, risk

management requirements, limits on credit exposure and concentration

risks, stress testing, and changes in resolution authority are designed to

reduce the probability of failure of large banking institutions and reduces

the risk of losses to the DIF.[261]  It further noted that the Performance Score

calculations in the scorecard glaringly omitted recognition of risk-

mitigating factors such as "collateralization, insurance, hedging,

underwriting standards, and other risk mitigants aside from capital" and

---

[260]  *See* Phillip A. Wertz, "Proposed Regulations Regarding Asset-Based Assessments and Risk-Based Assessments," BAC, January 3, 2011, AR00660, at 666.  Wertz writes: "The FDIC's proposal also ignores other very important regulations and policies that also serve to mitigate risks of failure for larger institutions and, in fact, should result in larger institutions posing significantly less risk to the DIF than smaller institutions. Among the risk mitigating requirements applicable only to larger institutions are: a. Title I of the Dodd-Frank Act and the heightened prudential regulation, capital and liquidity requirements for systemically important financial institutions; b. BASEL III requirements for higher capital and stricter components of capital; c. Requirements for ongoing enterprise stress testing and maintenance of capital and liquidity plans to survive adverse economic scenarios; d. Requirements for large institutions to adopt recovery and resolution plans that will help prevent a failure and make any failure more orderly; and e. The ongoing, active, on-site supervisory activities of the U.S. and non-U.S. banking regulators that provide meaningful oversight of large banks and real time monitoring of risk (which is far more robust than the level of supervision applied to smaller institutions)." (Emphasis added).

[261]  *See* James Chessen, "RIN 3064-AD63; Assessment Dividends, Assessment Rates and Designated Reserve Ratio; 12 CFR Part 327; 75 Federal Register 66272, October 27, 2010," American Bankers Association, November 24, 2010, AR00367, at 373.  Chessen writes: "Many provisions of the Dodd-Frank Act are designed to reduce the number of bank failures and the cost to the FDIC.  These include the strengthening of prudential standards including capital, liquidity, risk management requirements, credit exposure, concentration limits, and stress tests for large banks, changes in resolution authority (including broad back-up examination authority and living wills for large banking firms, and the impact of the Financial Stability Oversight Council which is intended to avert severe economic dislocations.  Such factors should not be disregarded.  Nor can the ineffectiveness of previous laws be reason to assume the current changes are doomed to be effective and would have no impact on bank failures and failure costs." (Emphasis added).

concluded that "[a]ssessment pricing that does not consider risk mitigation cannot truly correlate with risk and does not encourage better risk management."[262]

- Additionally, MidFirst Bank noted that as a bank's financial health deteriorates, regulators may put in place stricter controls and monitoring to prevent further investments in high risk assets.[263]

### b. The 2011/2012 Final Rule Does Not Adequately Consider the Fact that HCIs Can Access Additional Funding from Parent Bank Holding Companies and Public Capital Markets

144. Another risk-mitigating attribute of HCIs is that they are typically part of a bank holding company structure that includes other affiliate entities.  As discussed in Section V.B.2 above, bank holding companies typically have a more diversified business model and better risk management systems that make them better equipped to withstand periods of financial stress.  Additionally, as discussed previously, bank holding companies designated as G-SIBs, such as BAC, face higher level of regulatory scrutiny and must adhere to higher level of regulatory capital and liquidity requirements, regular mandatory

---

[262]  James Chessen, "RIN 3064-AD66; Notice of Proposed Rulemaking Regarding the Pricing of Large Bank Assessments; 12 CFR Part 327; 75 Federal Register 72612, November 24, 2010," American Bankers Association, January 3, 2011, AR01256, at 267.  Chessen writes: "The Performance Score should take account of risk mitigation.  A glaring omission from the 'ability to withstand asset-related stress' measures is that there is no recognition of risk mitigants, including collateralization, insurance, hedging, underwriting standards, and other risk mitigants aside from capital.  Assessment pricing that does not consider risk mitigation cannot truly correlate with risk and does not encourage better risk management." (Emphasis added).

[263]  See Charles Lee, "RIN 3064-AD66 - Assessments, Large Bank Pricing NPR," MidFirst Bank, January 3, 2011, AR01171, at 174.  Lee writes: "In the second place, the model assumes that the material growth in the balance sheet is then allocated among asset classes in proportion to the IDI's current assets. Then, projected loss rates are applied to the asset classes. Highly liquid classes such as cash and certain securities receive 0 percent loss rates, while consumer and commercial loans receive loss rates ranging from 11 percent to 41 percent. The problem with this assumption is that the underlying assumption is unreasonable, namely, that growth leading up to an IDI's failure will occur in asset classes other than highly liquid assets.  As an IDI approaches failure, bank supervisors put in place agreements and other controls to prevent IDI's from increasing investments in higher risk asset classes. So, to the extent that the FDIC's loss severity model projects net growth in the balance sheet, the assumption should be that the growth is kept only in cash and liquid assets." (Emphasis added).

stress testing requirements, and resolution planning requirements.  Such regulatory oversight and requirements are designed to make the parent bank holding company more capable of keeping their systemically important HCI affiliates, such as BANA, well capitalized and operating during potential periods of stress by making them responsible for potential losses of affiliate HCIs.  Therefore, the structure and financial strength of the parent bank holding company provides additional support to HCIs and can facilitate access to additional funding in periods of financial distress to prevent a bank failure and minimize potential losses to the DIF.  As discussed above, such additional injection of capital can come from regulatory provisions such as Federal Reserve's Source of Strength provision, voluntary transfer of capital by the parent bank holding company, or through new equity and debt issued in public capital markets.  Therefore, the additional support and access to capital provided by a bank holding company structure to HCIs is extremely valuable in periods of financial stress and reduces their risk of a failure, and, thus, potential losses to the DIF.

145.   The 2011/2012 Final Rule, however, does not adequately consider the existence of such bank holding company structures.[264]  In particular, the FDIC calculates assessment premiums at the IDI level, ignoring any and all information about the strength, resilience

---

[264] While the FDIC acknowledges that "[t]he financial, technical, and managerial capacity of holding companies, commercial parents, and other affiliates can provide significant and often substantial support to a subsidiary bank," the FDIC also states—incorrectly, in my opinion—that "it will not always be necessary for examiners to conduct a detailed assessment of whether a parent company can be considered a source of strength for the subsidiary financial institution."  Moreover, in instances where a bank examiner decides to evaluate the source of strength of the parent bank holding company when calculating the institution's CAMELS rating (*i.e.*, Uniform Bank Ratings), the FDIC interestingly—and again incorrectly, in my opinion—instructs its examiners to "only incorporate the actual support provided at the time of the […] examination" ignoring the "projected future resources of the parent."  *See* FDIC, "DSC Risk Management Manual of Examination Policies, Related Organizations," Section 4.3, p. 10.

and support capacity afforded by the parent bank holding company of the HCIs.[265]   As a result, the assessment system for HCIs only considers the asset and capital held by the individual institution, and fails to consider other assets and capital held by the parent bank holding company and other affiliate companies that could be used in periods of distress to prevent an HCI's failure or minimize potential losses to the DIF, if any, in the event of a failure.   As discussed in Section IV.B.2, the Federal Reserve rates the strength and financial health of parent bank holding companies using the RFI/C(D) rating system.[266, 267]   Under federal regulations the Federal Reserve can make such ratings available to the FDIC upon request.[268]   HCIs are typically part of bank holding companies, and the FDIC has access to such ratings; an appropriate risk-based system should factor in such information regarding the strength of bank holding companies in its assessment system for HCIs.

146.   Similarly, the 2011/2012 Final Rule does not adequately consider HCIs' access to public capital markets for additional funding, either through the parent bank holding company or directly, to prevent a failure and potential losses to the DIF.   The bank holding companies for HCIs have access to the public capital markets or other sources of funding.

---

[265]   *See* 2011 Final Rule, at 10674 and 10676.

[266]   *See* The Federal Reserve System, "Bank Holding Company Rating System," Federal Register, Vol. 69, No. 233, December 6, 2004, at 70444.

[267]   I note that the Federal Reserve's RFI/C(D) system for bank holding companies explicitly incorporates risk related to potential future outcomes.   For example, the Federal Reserve specifically stated that the component measuring the potential effect of the non-depository subsidiaries on the depository entities in the ratings "should consider existing as well as potential issues and risks that may impact the subsidiary depository institution(s) now or in the future."   *See* The Federal Reserve System, "SR 19-4 / CA 19-3: Supervisory Rating System for Holding Companies with Total Consolidated Assets Less Than $100 billion," February 26 2019, pp. 4-6.

[268]   *See* "Subpart C—Confidential Information Made Available to Supervised Institutions, Financial Institution Supervisory Agencies, Law Enforcement Agencies, and Others in Certain Circumstances," 12 CFR §261.20, at 248-252.

Moreover, banks that belong to a bank holding company may also benefit from the market's perception of implicit support from the parent company and thus may be valued more favorably by the market, allowing them to access public capital markets directly.

147.    Moreover, as discussed in Section V.B.2 above, the ability to raise capital through public capital markets is highly dependent on the financial institution's franchise value, commonly defined as the market price-to-book ratio of a bank, or more generally, the value of its intangible assets.  HCIs hold many of the characteristics that researchers have connected to high franchise value, including, for example, high amount of core deposits, valuable lending relationships, and large branch networks.  In the 2011/2012 Final Rule, the FDIC stated that the "potential franchise value is an important factor to consider in the overall assessment of loss severity."[269]  However, the FDIC does not adequately consider the franchise value of the HCIs or their parent bank holding companies in the 2011/2012 Final Rule.  The definition of franchise value used by the FDIC in the 2011/2012 Final Rule appears to be narrowly confined to only the value of deposits held by an institution, and the role of even this measure of franchise value in risk assessment appears to be quite limited.[270]  The FDIC does not consider the value of an institution's other intangible assets such as loan relationships and other revenue generating lines of business, which are important sources of an institution's franchise value and thus its market value.  The market value of the institution is what matters when raising capital

---

[269]   2011 Final Rule, at 10695.

[270]   Specifically, the 2011 Final Rule discusses franchise value in relation to treatment of the noncore funding ratio and treatment of brokered deposits for the Brokered Deposit Adjustment.  *See* 2011 Final Rule, at 10682 and 10695.  However, such discussion of franchise value included in the 2011 Final Rule is specifically focused only on the value of deposits held by an institution and does not consider other factors that may also impact an institution's franchise value.

through public financial markets.  In the 2011/2012 Final Rule, the FDIC also stated that

it would take into account qualitative factors that affect an institution's franchise value

when determining whether to apply a large bank adjustment.  However, as far as I am

aware, such discretionary adjustments have never been made by the FDIC.

148.     Furthermore, the assessment system for HCIs under the 2011/2012 Final Rule

inappropriately weighs an institution's ability to withstand asset-related stress more

heavily than its ability to withstand funding-related stress.  As explained above, in

calculating the Performance Score in the HCI scorecard, the asset-related stress measure

accounts for 50 percent of the institution's overall Performance Score, while funding-

related stress measure accounts for only 20 percent of the overall Performance Score.

However, as discussed in Section V.B.1, liquidity and funding related issues are typically

the main cause of bank failures.  The FDIC provides no explanation or justification as to

why an institution's ability to withstand asset-related stress would be more important than

its ability to withstand funding-related stress.  Moreover, the ability to withstand asset-

related stress measured in the scorecard does not consider the results of mandatory stress

testing that HCIs are required to undergo regularly.  Such stress tests are designed to

ensure that an HCI is able to survive an extended period of severe economic and asset-

related stress.  Therefore, such disproportionate underweighting of the funding-related

stress measure, combined with the fact that the scorecard does not consider the results of

mandatory regular stress testing, means that the 2011/2012 Final Rule is not accurately

capturing factors affecting bank failures in general, and more importantly, is not fully

considering the lower risk posed by HCIs to the DIF due to their ability to secure

additional funding.

149.   In sum, additional support from parent bank holding companies and the ability to access public capital markets during periods of financial stress are key risk-mitigating attributes of HCIs that reduce both their risk of failure and potential losses to the DIF in the event of a failure.  As the 2011/2012 Final Rule does not fully consider such important risk-mitigating attributes of HCIs, it does not accurately reflect the low risk posed by HCIs to the DIF, and therefore, is not risk-based.

150.   To illustrate the potential importance of considering important risk-mitigating attributes, which are largely ignored by the FDIC, in Exhibit 3 I provide a range of estimated Assessment Rates and an example Assessment Rate for Wells Fargo Bank, NA, and Citibank, NA as of the third quarter of 2012.  For the scorecard variables that are publicly available, I used their values provided in the FDIC's Assessment Rate calculator for the banks in constructing Exhibit 3.[271]  As noted earlier, the data for some of the measures used by the FDIC in the HCI scorecard are not publicly available, these include: weighted average CAMELS rating measure, Concentration Measure (*i.e.*, Higher Risk Assets, Largest Counterparty Exposure, and Top 20 Counterparty Exposure Measure), and Criticized and Classified Items Measure.[272]  To identify the potential range of Assessment Rates for the two banks, for the non-publicly available measures required by the scorecard, I show the effect of assuming values at the 25th percentile, median, and 75th percentile values of the descriptive statistics for these non-public scorecard measures as

---

[271]   *See* FDIC, "Assessment Rate Calculator for Highly Complex Institutions (Updated February 26, 2013)," accessed using Internet Archive Wayback Machine, last accessed January 20, 2020, available at https://web.archive.org/web/20130323193227/https://www.fdic.gov/deposit/insurance/calculator.html.

[272]   The Criticized and Classified Items measure is one of the components used by the FDIC to calculate the credit quality measure included in HCI scorecard under the 2011 Final Rule.  *See* 2011 Final Rule, Table 18, at 10697.

reported by the FDIC in the 2011 Final Rule.[273]  As shown in the exhibit, the lower

bound of the range of potential Assessment Rates is higher for Wells Fargo Bank

compared to Citibank, and the Citibank range of values overall is lower than for Wells

Fargo.

151.    Despite the absence of the non-public information, results of the CCAR stress tests

performed by the Federal Reserve (reported in March 2013) indicate that Citigroup's

tangible asset risk and book value of equity position were at least as favorable as Wells

Fargo's at that time.[274]  Specifically, Citigroup exited the severely adverse scenario with

a risk-based minimum capital ratio of roughly 12 percent, which was more than a

percentage point higher than that of Wells Fargo.[275]  Using that information, I assume

that the unobservable components of the FDIC's scorecard should not have been assumed

to be much better for Wells Fargo Bank than they were for Citibank.  So I assume that

both banks had a Weighted Average CAMELS Rating of 1 (*i.e.*, the highest rating

indicating least degree of supervisory concern).  Similarly, for the Higher Risk Assets

measure I assume that both banks have the median value reported for the measure by the

FDIC in the 2011 Final Rule.  Third, for the Largest Counterparty Exposure, and Top 20

Counterparty Exposure, and Criticized and Classified Items measures, I conservatively

assume that Citibank has the 75th percentile value and Wells Fargo has the 25th percentile

---

[273]  *See* 2011 Final Rule, Table 2.1, at 10728.

[274]  The Federal Reserve performs the CCAR stress test at the bank holding company level.  Citigroup Inc. ("Citigroup") and Wells Fargo & Company ("Wells Fargo") are the parent bank holding company of Citibank and Wells Fargo Bank, respectively.

[275]  *See* The Federal Reserve System, "Comprehensive Capital Analysis and Review 2013: Assessment Framework and Results," March 2013, p. 7.

value reported by the FDIC for the measures in the 2011 Final Rule.[276]  Using these assumptions, I calculate an example Assessment Rate for Wells Fargo Bank of 6.49 basis points and for Citibank of 6.87 basis points, as shown in Exhibit 3.  In other words, as best one can tell, Wells Fargo Bank and Citibank likely faced similar Assessment Rates in 2012.

152.   While I recognize that it is conceivable that the FDIC employed more pessimistic assumptions on the publicly unobserved variables of Citibank relative to Wells Fargo Bank than those assumed in my example, my point is that a focus only on the variables included in the scorecard would imply a roughly similar appropriate deposit insurance premium for the two banks.  However, the values of the intangible assets of the holding companies of these two banks were dramatically different.  As of September 28, 2012, Wells Fargo had a price-to-book ratio of 1.31, while Citigroup's price-to-book ratio was 0.47.  This indicates that the value of intangible assets (or franchise value) of Wells Fargo was about one-third the amount of its book equity, while the intangible assets of Citigroup were significantly negative in value (equal to roughly 53 percent of its book equity).[277]  Given the potential importance that franchise value of the bank and its holding company affiliates can play in reducing the risk of failure and the severity of loss conditional on failure, this omission may have led the FDIC to potentially view two very dissimilar situations as much more similar than they were.  This example illustrates that

---

[276]  I have no reason to assume that the two banks actually differ in these items, but I assume an inferior value for Citibank as a conservative calculation, given that the conclusion of the calculation is that the two banks end up with similar assessment rates. It is a conservative assumption in the sense that if one assumes instead that Citibank was equal to Wells Fargo Bank on all unobserved criteria, that conclusion is even stronger.

[277]  Price-to-book ratio is taken from S&P Capital IQ.  S&P Capital IQ calculates price-to-book ratio by dividing the company's daily closing stock price by the book value of the company equity per share reported for the last available period.  *See* S&P Capital IQ.

the Assessment Rates under the 2011/2012 Final Rule can fail to take account of highly

relevant information about important risk-mitigating attributes of HCIs, such as franchise

values, and, as such, does not accurately reflect the risk posed by HCIs to the DIF.

153.    Comments received by the FDIC in response to the proposed rule changes in 2010

highlighted similar issues.  For example:

- SunTrust Bank in its comments highlighted the fact that "[t]he scorecard

   weights asset stress heavily for large and highly complex institutions

   versus funding-related stresses; however, it is the ability, or lack thereof,

   of [a] financial institution to fund itself that may be most important during

   financial stress."  It further argued that "[a]lthough the commentary to the

   proposed rulemaking suggests that the pro-cyclicality of assessments is

   mitigated by a focus on long-term risk, in reality many of the measures

   presumably penalize financial institutions with higher assessment once

   they are facing a crisis" and specifically noted that "some of the measures

   described in the 'Ability to Withstand Asset-Related Stress" portion of the

   scorecard, such as (i) the ratio of criticized and classified items to Tier 1

   capital and reserves, (ii) underperforming assets to Tier 1 capital and

   reserves, and (iii) the ratio of core earning to average total assets are

   significant only when the financial institution has already begun to

   experience little to no earnings, and possibly losses, during times of

   financial crisis."[278]

---

[278]  McHenry Kane, "Attention: Comments," SunTrust Bank, July 1, 2010, AR00234, at 236.

4.   *The 2011/2012 Final Rule Does Not Adequately Consider the Regulatory Tools Available to the FDIC and Actions It Can Take to Prevent or Minimize Losses to the DIF*

154.   The 2011/2012 Final Rule also does not adequately consider the regulatory tools and market-based actions that the FDIC can employ to prevent or insulate the DIF from losses in the event of a failure.  Such regulatory tools and market-based actions, discussed in greater detail in Section V.C, allow the FDIC to take receivership of the HCI's and/or its parent bank holding company's assets to absorb the institution's losses and prevent losses to the DIF.  A risk-based assessment system must consider all such options available to the FDIC when evaluating potential losses to the DIF in the event of an HCI failure.

a.   *The 2011/2012 Final Rule Does Not Consider Regulatory Tools Available to the FDIC that Could Prevent or Minimize Losses to the DIF*

155.   In an event of an HCI failure, the FDIC has several regulatory tools available that it can use to prevent or minimize losses to the DIF, such as the FDIC's Cross Guaranty provision, Cross Support Obligation provision, and the systemic risk exception provision. Additionally, the OLA under Title II of the Dodd-Frank Act, which can be invoked in coordination with the Secretary of the Treasury, can also limit the risk of failure and the severity of potential loss given failure for HCIs.  Under the OLA, the FDIC acting as the receiver would have access not only to the HCI's assets but also to the assets of the parent bank holding company and any affiliate companies.  The OLA, as designed, allows the FDIC to use a so-called "Single Point of Entry" or SPOE approach, where the FDIC could create a bridge bank holding company and use the assets of the holding company to keep the systemically important IDIs under the holding company open and fully operational.  The intent of the FDIC is to use this structure to eliminate any potential

losses to the DIF.  Assuming the FDIC's SPOE approach will work, the DIF should avoid

any losses from the failure of an HCI.  Furthermore, the government could support a

distressed systemically important bank holding company and fund the losses from

surviving banks through the OLF facility under Title II of Dodd-Frank, thus avoiding any

potential loss to the DIF.  Indeed, the experience during the financial crisis, where none

of the losses to the DIF were caused by the failure of HCIs, provides an example of why

perceptions about the risks of HCI distress, in general, do not translate into the amount of

risk they pose to the DIF.  Indeed, the fact that the FDIC would use its tools to reduce the

risk of failure of HCIs, and the fact that some of the risks produced by HCIs to the DIF

are absorbed by parent bank holding companies and potentially by other surviving banks

(under Title II of Dodd-Frank) implies that, for the same amount of fundamental financial

risk, HCIs pose significantly less risk to the DIF than smaller banks.

156.    However, the 2011/2012 Final Rule does not take into account such regulatory tools

available to the FDIC or the U.S. government when assessing the potential loss severity

from a failure of an HCI.  As explained previously, the FDIC calculates assessment

premiums for HCIs at the individual IDI level without taking into consideration the

strength of support available from its parent bank holding company, or affiliated IDIs

within the same bank holding company.[279]  As a result, the FDIC fails to consider any

assets, liabilities, and capital held by the parent bank holding company or affiliate

entities, which may be used voluntarily by the bank holding company to reduce risk, or

may be used by the FDIC under its regulatory authority to prevent or reduce losses to the

DIF.  By ignoring such regulatory options available to the FDIC, the 2011/2012 Final

---

[279]   *See* 2011 Final Rule, at 10674 and 10676.

Rule fails to accurately reflect the true risk or the magnitude of potential of losses to the DIF in the event of an HCI failure, and therefore, is not risk-based.

157. Comments received by the FDIC in response to the proposed rule changes in 2010 highlighted such regulatory tools available to the FDIC in the event of an HCI failure. For example:

- Commentary from BAC noted that under "the cross-bank guarantee provisions of the Federal Deposit Insurance Act [...] each bank would be required to make payments to the FDIC upon a default in order to reduce potential losses to the DIF."[280]

- The American Bankers Association noted that "[m]any provisions of the Dodd-Frank Act are designed to reduce the number of bank failures and the cost to the FDIC" and that "such factors should not be disregarded." It specifically highlighted factors such as "the strengthening of prudential standards including capital, liquidity, risk management requirements, credit exposure, concentration limits, and stress tests for large banks, changes in resolution authority (including broad back-up examination authority and living wills for large banking firms), and the impact of the Financial Stability Oversight Council which is intended to avert severe economic dislocations" and argued that "the ineffectiveness of previous

---

[280] Phillip A. Wertz., "Proposed Regulations Regarding Asset-Based Assessments and Risk-Based Assessments," BAC, January 3, 2011, AR00660, at 665.

laws [cannot] be reason to assume the current changes are doomed to be effective and would have no impact on bank failures and failure costs."[281]

- Similarly, the Clearing House also recommended "the FDIC to coordinate with other federal agencies, including the Financial Stability Oversight Council and the Board of Governors of the Federal Reserve System ("Federal Reserve"), in the context of implementing various mandates of the Dodd-Frank Act regarding heightened supervision of LDIs."  As examples of such Dodd-Frank Act mandates leading to heightened supervision of LIDs it highlighted "among others, Title I of the Dodd-Frank Act and the heightened prudential regulation, capital and liquidity requirements for systemically important financial institutions; requirements for large institutions to adopt recovery and resolution plans that will help prevent a failure and make any failure more orderly; and Title II of the Dodd-Frank Act and the establishment of the new Orderly Liquidation Authority."[282]

  b.   *The 2011/2012 Final Rule Does Not Consider Market-Based Options Available to the FDIC that Could Prevent or Minimize Losses to the DIF*

158.   In addition, the FDIC must also pursue least-cost, market-based options to resolve a failed HCI, which can serve to minimize losses, if any, to the DIF in the case of a bank failure.  Such market-based options can range from liquidating the HCI's assets

---

[281]   James Chessen, "RIN 3064-AD63; Assessment Dividends, Assessment Rates and Designated Reserve Ratio; 12 CFR Part 327; 75 Federal Register 66272, October 27, 2010," American Bankers Association, November 24, 2010, AR00367, at 373.

[282]   Paul Saltzman, "RIN 3064-AD66: Notices of Proposed Rulemaking - Deposit Insurance Assessment Base and Rates and Large Bank Pricing," The Clearing House, January 3, 2011, AR00669, at 674.

individually to selling the HCI to another institution once it is placed into FDIC receivership.  Such market-based options are complementary to the regulatory tools available to the FDIC and can help further insulate the DIF from losses.

159.    As discussed in Section V.C.3 above, franchise value is a key determinant of the value that the FDIC receives in such market-based resolutions.  HCIs hold many of the characteristics that researchers have connected to high franchise value, including, for example, high amounts of core deposits and large branch networks.  All else equal, banks with higher franchise value attract more buyers, which enables a distressed institution to either recapitalize itself or find an acquirer for its business, thereby preventing the need for an FDIC resolution, or allows the FDIC to secure higher value for the failed bank's assets in auctions, thus, preventing or reducing losses to the DIF.  The FDIC itself acknowledged in the 2011/2012 Final Rule that the "potential franchise value is an important factor to consider in the overall assessment of loss severity."[283]

160.    However, the 2011/2012 Final Rule does not adequately account for an HCI's or its parent bank holding company's franchise value.  In particular, the definition of franchise value used in the 2011/2012 Final Rule is narrowly confined to the value of deposits held by an institution, and does not consider the value of intangible assets such as an institution's loan relationships and other revenue generating lines of business.[284]  Such intangible assets increase an institution's market value and, as a result, reduce its risk of

---

[283]   2011 Final Rule, at 10695.

[284]   Specifically, the 2011 Final Rule discusses franchise value with relation to treatment of the noncore funding ratio and treatment of brokered deposits for the Brokered Deposit Adjustment.  *See* 2011 Final Rule, at 10682 and 10695.  However, such discussion of franchise value included in the 2011 Final Rule is specifically focused only on value of deposits held by an institution and does not consider other factors that may also impact an institution's franchise value.

failure.  Even if failure does occur, the value of the intangible assets allows the FDIC to secure a higher price for an institution's assets, in turn reducing the cost to the DIF from a resolution (*i.e.*, greater the franchise value of the failed institution, the lower the losses to the DIF, all else equal).[285]  Moreover, though the FDIC claimed that it would take into account qualitative factors that affect an institution's franchise value as part of a discretionary large bank adjustment,[286] as far as I am aware, such discretionary adjustments have never been made by the FDIC.

161.   By ignoring important aspects such as an institution's franchise value, the 2011/2012 Final Rule overestimates the risk posed by HCIs to the DIF and, therefore, is not risk-based.  In particular, as discussed above, HCIs have many of the characteristics that researchers have connected to high franchise value, such as greater core deposits and larger branch networks.  As a result, in the event of a failure of an HCI, its higher franchise value should allow the HCI to secure higher prices for the institution's assets and reduce potential losses to the DIF.

162.   This was evidenced, as discussed above, by the resolution of WaMu in which the bank's high franchise value allowed its failure to be resolved through an acquisition without any losses to the DIF.  Comments received by the FDIC in 2010 also noted this problem.  For example:

---

[285]   *See* Rosalind L. Bennett and Haluk Unal, "The Cost Effectiveness of the Private-Sector Resolution of Failed Bank Assets," *FDIC Center for Financial Research Working Paper*, No, 2009-11, January 2010, p. 3.

[286]   2011 Final Rule, at 10695.

- The International Bank of Commerce noted that "[m]any of the large banks that failed, such as Washington Mutual, were purchased by and the acquisition of entities greatly limited the impact on the DIF."[287]

163.   Another factor that determines the potential losses to the DIF in the event of a failure is the quality of tangible assets held by an institution.  In the event of a failure, the assets of the HCI or its parent bank holding company and affiliates could absorb losses of the failed institution, preventing or reducing losses to the DIF.

164.   As discussed above, in the 2011/2012 Final Rule, the FDIC applies Asset Loss Rate assumptions (*i.e.*, the asset value the FDIC expects to recover in the event of a failure) to broad asset categories held by an institution to estimate the potential losses to the DIF in the event of a failure.  These estimates are then used to calculate the Loss Severity Score. These Asset Loss Rate assumptions were purportedly based on independent valuations obtained by the FDIC in 2009 for assets of IDIs that either failed or came to close to failure.[288]

165.   However, as noted previously, these assumptions cannot be independently verified, and rely inappropriately on the data from failures of small institutions and from non-HCI institutions that have never failed or caused losses to the DIF.  Additionally, when estimating the potential recovery value of an institution's tangible assets, the FDIC does not consider the quality or potential liquidity of individual assets held by the institution.

---

[287]   Dennis E. Nixon, "RIN 3064-AD66; 12 CFR Part 327; 75 Federal Register 72612; Assessments, Large Bank Pricing - Notice of Proposed Rulemaking and Request for Comment," International, Bank of Commerce, December 31, 2010, AR01081, at 083.

[288]   *See* 2011 Final Rule, at 10694.

Specifically, the FDIC used valuation of assets of "institutions that either failed or came close to failure" (*i.e.*, had not failed), which it expected to take into receivership in 2009 to estimate the potential recovery values for broad asset categories.[289]  Then, under the 2011/2012 Final Rule, the FDIC applied these general assumptions about recovery values based on experience that may not be applicable to broad asset categories held by the HCIs.  As a result, these broad assumptions about asset recovery values in the event of failure may not adequately reflect the full value of an institution's tangible assets.[290]  In cases where such estimated recovery values understate the actual value of an institution's assets, the 2011/2012 Final Rule would overstate the potential losses to the DIF and the risk posed by HCIs to the DIF.  In fact, in the 2011/2012 Final Rule, the FDIC recognized "that the loss rates applied to broad categories of assets may overstate or understate potential losses, depending on the composition of those assets."[291]

166.   Moreover, as discussed previously, the FDIC calculates assessment premiums at the IDI level, ignoring any and all information about the strength, resilience, and support capacity afforded by the parent bank holding company of the HCIs.  As such, the FDIC does not carry out any analysis of the quality of assets held by the HCI's parent bank holding company, even though such parent bank holding company assets could absorb losses in the event of an HCI failure.  Data on the quality of assets held by the bank holding

---

[289]   2011 Final Rule, at 10694.

[290]   I also note that Loss Rate Assumptions should depend on the quality of the institution's underwriting process. Using the loss rates from failed institutions could induce upward-biased estimates of asset losses (*i.e.*, lower estimates of recovery value) because presumably banks with weaker underwriting standards have a higher likelihood of failure.  Such one-size fits all Loss Rate Assumptions do not seem at all consistent with the stringent demands for risk management data and systems that regulators require of systemically important HCIs.

[291]   2011 Final Rule, at 10694.

company would be readily available to the FDIC, yet it is unclear why it chose not to consider such an important factor in determining the risk posed by HCIs to the DIF.  For example, as discussed in Section V.B.2, the Federal Reserve requires HCI bank holding companies to undergo regular mandatory stress tests such as DFAST.  As part of such stress tests, the Federal Reserve evaluates the performance of assets held by the bank holding company.

167.    That the 2011/2012 Final Rule does not account for the quality of assets held by an HCI or its parent bank holding company means that the estimated recovery value of an institution's assets and the estimated risk posed by the institution to DIF under the Rule may not be accurate.  Therefore, the assessment system for HCIs under the 2011/2012 Final Rule again does not accurately reflect the risk posed by HCIs to the DIF and, thus, is not risk-based.

168.    Moreover, the Assessment Base used under the 2011/2012 Final Rule includes certain accounting constructs, such as goodwill.  However, goodwill has no corresponding financial value, and therefore, a loss or write-off of accounting assets such as goodwill poses no additional risk of loss to the DIF, as it is not an asset that the FDIC would expect to recover in the event of failure.  By including goodwill in the Assessment Base, the 2011/2012 Final Rule inflates the assessment premiums assessed to IDIs.  As such, the 2011/2012 Final Rule is again not accurately capturing the true risk posed by an institution to the DIF, and, therefore, is not risk-based.

169.    Comments received by the FDIC in response to the proposed rule changes in 2010 highlighted that an institution's assets could absorb losses to insulate the DIF and noted issues with how bank assets are valued by the FDIC.  For example:

- The Clearing House, stated that it was "simply not credible for insurance assessment calculations to ignore the loss absorption benefits of [HCI] balance sheet structures for insured depositors in the event of a failure."  It also estimated that the losses to the DIF would occur only where losses on assets exceeded 45 percent, and noted that only two bank failures from 2006 to 2009 resulted in losses as a percentage of assets greater than 25 percent.[292]

- Similarly, BAC argued that "a true risk-based assessment should factor in potential loss given default," and "[t]he greater the unencumbered assets of an institution, the more likely [it would be that] they will mitigate potential losses to the DIF."  It further noted that the FDIC's loss rate assumptions appear to be arbitrary as it assumes that most assets would have an immediate drop in market value in the event of a default without considering the quality or potential liquidity of such assets.[293]

---

[292]   Paul Saltzman, "RIN 3064-AD66: Notices of Proposed Rulemaking - Deposit Insurance Assessment Base and Rates and Large Bank Pricing," The Clearing House, January 3, 2011, AR00669, at 679-680.  Saltzman writes: "We estimate that approximately 38% of [HCI] liabilities are statutorily subordinated to the FDIC claims, and that these institutions have equity of approximately 10% of assets. This means that the losses on assets must exceed about 45% from the FDIC to suffer a loss from the failure of a [HCI]. In comparison, of the 19 LDIs that failed or needed substantial government assistance from 2006 to 2009, in no instance did the FDIC experience DIF losses as a percentage of IDI assets above 45% - in fact, only two LDI failures resulted in DIF losses greater than 25% of assets. In this light, it is simply not credible for insurance assessment calculations to ignore the loss absorption benefits of [HCI] balance sheet structures for insured depositors in the event of failure." (Emphasis added).

[293]   Phillip A. Wertz, "Proposed Regulations Regarding Asset-Based Assessments and Risk-Based Assessments," BAC, January 3, 2011, AR00660, at 666.  Wertz writes: "[T]he FDIC has made very dire assumptions about the likely run-off of assets and discount of the value of assets upon a default. We firmly believe that a true risk-based assessment should factor in potential loss given default. The greater the unencumbered assets of an institution, the more likely they will mitigate potential losses to the DIF. While the FDIC acknowledges this in principle to an extent, the FDIC's methodology discounts the value of assets upon a default based on extreme and unsupported assumptions. The FDIC has presented no reasonable data or analysis to support the anticipated run-off rates of assets or the anticipated discounted value of assets following a failure. The assumptions appear arbitrary and without a transparent and reviewable model. For example, the FDIC has assumed that

- Additionally, the American Bankers Association noted that "[b]ankers feel that intangible assets should be deducted from the assessment base as they cannot pose any risk exposure to the insurance fund."  It further recommended that "[G]oodwill be included in the Unsecured Debt Adjustment" and "treated like unsecured debt."[294]

- Capital One Financial Corporation also noted that FDIC should "exclude goodwill from the assets making up the assessment base or provide for a goodwill-based adjustment that would permit institutions to reduce their assessment rate based on the amount of goodwill in their assessment base."  It argued that such "changes would avoid penalizing institutions for assets that pose no additional risk of loss to the DIF and avoid creating a disincentive for acquisitions through which goodwill may be created" and further noted "that bank regulatory capital ratios exclude goodwill from both the capital base and total assets, and that approach seems equally appropriate here."[295]

170.  Similarly, unsecured liabilities and other liabilities held by an institution that would be subordinate to the FDIC's claims could also help absorb the institution's losses in the

---

automatically upon a failure, most assets would have an immediate drop in market value, without even considering the potential liquidity of the markets for those assets or the quality of those assets. The FDIC should not discount assets in its rate calculations. It should base them on the value of such assets on the bank's balance sheet, which is the best data available and reflects the risk of an institution as of now, not based on unknowable and hypothetical events." (Emphasis added).

[294]  James Chessen, "RIN 3064-AD66; Notice of Proposed Rulemaking Regarding the Pricing of Large Bank Assessments; 12 CFR Part 327; 75 Federal Register 72612, November 24, 2010," American Bankers Association, January 3, 2011, AR01256, at 263.

[295]  Stephen Linehan, "Assessments, Large Bank Pricing NPR, Change in Assessment Base, (RIN No. 3064-AD66)," Capital One Financial Corporation, January 7, 2011, AR01285, at 287.

event of a failure and insulate the DIF from losses.  Typically, large institutions, in particular HCIs, fund themselves with substantial amount of liabilities such as unsecured short-term and long-term debt, uninsured domestic deposits, and foreign deposits on their balance sheet.  Such liabilities are usually subordinate to the FDIC's claims in the event of a failure, and could again prevent or minimize losses to the DIF.[296]

171.    As discussed above, the FDIC purportedly applies an Unsecured Debt Adjustment to the Assessment Rate calculated using the scorecard to take into account an institution's unsecured debt.  However, under the 2011/2012 Final Rule, the FDIC only considers an institution's long-term unsecured debt when calculating the adjustment.[297]  Such an approach appears to be arbitrary since other types of subordinate liabilities typically held by an HCI could also absorb losses in the event of a failure in the same way that long term unsecured debt does.[298]

172.    By failing to account for all such subordinate liabilities, the 2011/2012 Final Rule again does not accurately capture the potential losses, if any, to the DIF in the event of an HCI failure.  As a result, the 2011/2012 rule overstates the risk posed by HCIs to the DIF, and,

---

[296]  The ability of subordinated liabilities to absorb losses and provide additional protection to senior debt holders is well recognized by market participants.  For example, credit rating agencies typically consider the availability of subordinated debt to absorb losses in assigning credit ratings to senior debt.  *See* Moody's Investors Service, Global Credit Research, "Demystifying Securitization for Unsecured Investors," *Moody's Corporation*, January 2003, p. 5.  *See also* S&P Global Ratings, "Reflecting Subordination Risk In Corporate Issue Ratings," S*&P Global*, March 28, 2018, p. 4.

[297]  *See* 2011 Final Rule, at 10672 and 10680.

[298]  To defend its arbitrary approach, the FDIC in the 2011 Final Rule stated that short-term unsecured liabilities "provide less protection to the DIF in the event of failure" as "[b]y the time an institution fails, unsecured debt remaining at an institution is primarily longer-term debt that has not yet come due."  Similarly, it argued that "there is likely to be a significant reduction in [foreign deposits] by the time of failure," and "they can be subject to asset ring fencing that effectively makes them similar to secured liabilities."  However, again, the FDIC does not provide any analysis or evidence to support these broad conclusions about these significant sources of liabilities on an HCI's balance sheet.  *See* 2011 Final Rule, at 10681.

therefore, is not risk-based.

173.   Comments received by the FDIC in response to the proposed rule changes in 2010 also

highlighted such issues with the FDIC's inconsistent treatment of subordinate liabilities.

For example:

- The Clearing House noted that in contrast to small institutions, almost all

  HCIs typically have very substantial liabilities that are statutorily

  subordinate to the FDIC's claims reducing the risk of losses to the DIF.[299]

  It further recommended that FDIC take into account all unsecured debt in

  calculating assessment premiums and not just long term unsecured debt.[300]

  It further noted "[t]he fact that the DIF suffered no loss in the largest

  failure of an insured depository institution in the history of the FDIC,

  Washington Mutual, was […] not a coincidence or an anomaly" and that

  "[b]ecause there were substantial liabilities subordinated to the FDIC, the

  FDIC was able to structure a bid package for Washington Mutual that

  resulted in no loss to the DIF."[301]

---

[299]  Paul Saltzman, "RIN 3064-AD66: Notices of Proposed Rulemaking - Deposit Insurance Assessment Base and Rates and Large Bank Pricing," The Clearing House, January 3, 2011, AR00669, at 679.  Saltzman writes: "Because almost all [HCIs] and a number of other LDIs have very substantial liabilities that are statutorily subordinate to the FDIC's claims - in contrast to the low amounts of such liabilities at small- and medium-sized banks - the DIF's exposure of loss is far lower in the case of these LDI's relative to small- and medium-sized banks because of the differences in their liability structures.  Accordingly, the absolute risk of loss to the DIF is also very low and is not proportionate to, and, indeed, is totally disconnected from total assets."

[300]  Paul Saltzman, "RIN 3064-AD66: Notices of Proposed Rulemaking - Deposit Insurance Assessment Base and Rates and Large Bank Pricing," The Clearing House, January 3, 2011, AR00669, at 683.  Saltzman writes: "The Clearing House strongly recommends that the FDIC provide complete recognition and use all unsecured debt of an institution as a measure of risk in calculating assessment and not, as currently contemplated, only long-term unsecured debt instruments. In the event of a failure, short-term debt absorbs loss upon failure and thereby affords the FDIC protection, just as well as long-term debt."

[301]  Joseph Alexander, "Federal Deposit Insurance Corporation Notice of Proposed Rulemaking Relating to Assessments: RIN 3064-AD57," The Clearing House, June 16, 2010, AR00217, at 222-223.

- The American Bankers Association also suggested that the Unsecured Debt Adjustment should recognize a broader spectrum of liabilities that are subordinate to the FDIC's claims, and highlighted the fact that short-term unsecured debt, just like long-term unsecured debt, mitigates losses to the DIF upon the failure.[302]

- Similarly, Ely & Company also noted that there was no justification for the FDIC's exclusion of other liabilities such as domestic uninsured deposits, foreign deposits, and short-term unsecured borrowings that could absorb losses to DIF in the event of a failure from the calculation of Unsecured Debt Adjustment.[303]

- Additionally, Capital One criticized a feature of the FDIC's proposed Unsecured Debt Adjustment which would cease to consider even long-term debt when its maturity falls below one year.[304]

---

[302] James Chessen, "RIN 3064-AD66; Notice of Proposed Rulemaking Regarding the Pricing of Large Bank Assessments; 12 CFR Part 327; 75 Federal Register 72612, November 24, 2010," American Bankers Association, January 3, 2011, AR01256, at 263.  Chessen writes: "ABA recommends that the Unsecured Debt Adjustment in the final rule recognize the broader spectrum of funding subordinate to the FDIC's claims. In the event of failure, short-term unsecured debt absorbs losses before the FDIC as well as long-term unsecured debt. […] ABA similarly recommends that foreign office deposits should be included in the Unsecured Liability Adjustment […]."

[303] Bert Ely, "RIN number 3064-AD66; Assessments, Large Bank Pricing NPR; RIN number 3064-AD66; Assessments, Assessment Base and Rates NPR," Ely & Company, Inc., January 3, 2011, AR00762, at 768-769. Ely writes: "The proposed regulation's unsecured debt adjustment is limited to 'long-term, unsecured liabilities' yet the rationale for that adjustment - 'greater amounts of long-term unsecured debt provide a cushion that can reduce the cost to the DIF in the event of failure' - also applies to liabilities other than insured deposits, including (1) domestic uninsured deposits, (2) all foreign-office deposits, and (3) short-term unsecured borrowings.  The proposed regulation provides absolutely no justification for these three exclusions from the unsecured debt adjustment."

[304] Stephen Linehan, "Assessments, Large Bank Pricing NPR Change in Assessment Base (RIN No. 3064-AD66)," Capital One Financial Corporation, January 7, 2011, AR01285, at 288.  Linehan writes: "We understand the FDIC's desire to provide a powerful incentive for banks to issue long-term unsecured debt. However, instead of denying the benefit of the unsecured debt adjustment when the instrument has a remaining maturity of less than one year, we believe that the definition of 'long-term unsecured debt' should focus on the instrument's original

5.      *The Treatment of Counterparty Exposure in the 2011/2012 Final Rule Is Arbitrary and Flawed*

174.    As explained above, under the 2011/2012 Final Rule the calculation of an institution's ability to withstand asset-related stress, a component of the institution's Performance Score, included a Concentration Measure.  The 2011 Final Rule defined the Concentration Measure as "the greatest of the higher-risk assets to the sum of Tier 1 capital and reserves score, the top 20 counterparty exposure to the sum of Tier 1 capital and reserves score, or largest counterparty exposure to the sum of Tier 1 capital and reserves score (emphasis added)."[305]  With respect to the calculations of counterparty exposure included in the measure (underlined above), the FDIC stated that: "counterparty exposure is equal to the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all unfunded commitments) for each counterparty or borrower at the consolidated entity level (emphasis added)."[306]

175.    The FDIC alleges that BANA failed to report its Largest Counterparty Exposure and the Top 20 Counterparty Exposure at the "consolidated entity level,"[307] which resulted in BANA understating its level of counterparty risk, and therefore, paying lower assessments to the DIF than it owed.[308]

---

maturity. Such a change would provide an efficient benefit throughout the life of the instrument and properly incent institutions to issue instruments that absorb loss upon failure."

[305]   2011 Final Rule, at 10696.

[306]   2011 Final Rule, at 10721.

[307]   *See* Amended Complaint, ¶¶44 and 49.

[308]   *See* Amended Complaint, ¶13.

176.   However, as I discuss in greater detail below, there are numerous flaws in the counterparty exposure measure the FDIC uses for HCIs under the 2011/2012 Final Rule such that, from an economic perspective, the assessment rules do not accurately reflect the risk of such counterparty exposure to the HCI, and thus, the risk of potential losses to the DIF.  Thus, any premium assessments charged to HCIs that are based on this flawed counterparty risk measure would not be risk-based.

        *a.*      *The FDIC Does Not Explain Why the Counterparty Exposure Measures It Uses are Meaningful Predictors of Potential Risk Posed by HCIs to the DIF*

177.   The counterparty exposure measures used by the FDIC in the assessment system for HCIs (*i.e.*, the Largest Counterparty Exposure and the Top 20 Counterparty Exposure) appear to be arbitrary.  The FDIC provided no explanation or analysis as to why these counterparty exposure measures (versus, for example, the top 10 or top 25) are meaningful or good predictors of potential risk posed by HCIs to the DIF.  The FDIC simply stated that "recent experience shows that the concentration of a highly complex institution's exposures to a small number of counterparties […] significantly increase[d] the institution's vulnerability to unexpected market events."[309]  However, this response does not explain why the specific counterparty exposures the FDIC chose to use for HCIs are a better measure of risk posed by such institutions to the DIF, as opposed to other measures of counterparty exposure.

178.   In contrast to the HCI scorecard, the LIDI scorecard under the 2011/2012 Final Rule used a "growth-adjusted portfolio concentration" measure to calculate the Concentration

---

[309]   2011 Final Rule, at 10696.

Measure for LIDIs instead of the counterparty exposure measures used for HCIs.[310]  The growth-adjusted portfolio concentration measure appears to be a more detailed process where the FDIC attempted to consider to some degree the variation in risk posed by different types of underlying transactions.  For instance, the growth-adjusted portfolio concentration measure is estimated by calculating concentration levels for broad loan portfolio categories, weighing the concentration levels for each portfolio category based on historical loss rates for such loan portfolios, and applying a growth factor to account for changes in the amount of loans held by the institution in each portfolio category.

179.    The FDIC provides no explanation or support as to how the risk posed by LIDIs to the DIF is different from the risk posed by HCIs, and/or why it is appropriate to use different scorecards for the two types of institutions under the 2011/2012 Final Rule.  To the extent that the FDIC believes that the scorecard for HCIs appropriately measures the risk posed to the DIF, it is not clear why the FDIC does not apply the same methodology for LIDIs as well, or vice versa.  Moreover, the FDIC's methodology to measure the Concentration Measure appears to be more detailed for LIDI's; it is unclear why the FDIC did not implement the same or similar methodology to measure the Concentration Measure for HCIs.

> b.    *The FDIC's Counterparty Exposure Measures Do Not Distinguish Between Different Types of Counterparties*

180.    However they are ultimately supposed to be "consolidated," the counterparty measures used in the 2011/2012 Final Rule are overly simplistic and inappropriate in that they do not consider any difference in default risk across different types of counterparties.  For

---

[310]   2011 Final Rule, at 10690.

example, assume that an institution has equal exposure to two counterparties, one an HCI such as JPMorgan Chase ("JPMC") Bank, and the other a thrift bank focused primarily on originating mortgage loans. As discussed previously, HCIs are typically better equipped to weather periods of economic distress relative to non-HCI financial institutions due to their heightened level of oversight, larger geographic footprint, diverse product mix, and better risk management. In such a scenario, even though the institution's exposure to the counterparties may be the same in terms of dollar amount, the smaller thrift bank would likely pose a greater risk—or at a minimum, a counterparty risk that is not equivalent to—the counterparty risk posed by JPMC Bank. However, the 2011/2012 Final Rule does not account for this difference. It treats exposures to the two institutions as presenting exactly the same risk.[311]

181. Additionally, the 2011/2012 Final Rule directs HCIs to apply the 2006 Basel II framework when calculating the exposure at default to estimate counterparty exposure.[312] The Basel II framework referenced by the FDIC explicitly recognizes that a bank's overall risk from a counterparty exposure is not determined by exposure at default alone in the case of a single counterparty or the sum of exposure at default in the case of a specific number of counterparties, but instead depends on probability of default ("PD") and loss given default ("LGD") attached to each counterparty exposure.[313] As discussed

---

[311] I also note that the 2011/2012 Final Rule assumes, without any basis, that exposures to one's own affiliated entities carry the same level of counterparty risk as exposures to unaffiliated third parties. The FDIC provides no support or justification as to why HCI's own affiliated entities and unaffiliated third party entities would have equivalent counterparty risk or why it should be part of the counterparty measures used in the 2011/2012 Final Rule.

[312] See 2011 Final Rule, at 10722, Note 1.

[313] See Basel Committee on Banking Supervision, "An Explanatory Note on the Basel II IRB Risk Weight Functions," *Bank for International Settlements,* July 2005, pp. 3-4.

above, the PD and LGD are different for each counterparty—often dramatically different. Moreover, unlike the assumption implicit in the FDIC's top 20 counterparty exposure measure, the possibility of multiple counterparties simultaneously defaulting (let alone 20 counterparties simultaneously defaulting) is extremely remote.  Consequently, default correlation among a bank's counterparties also figures prominently in the Basel II framework for measuring the loss exposure generated by the simultaneous default of counterparties.[314]  For instance, the Internal Models Approach specified in the Basel II framework takes multiple factors into account, not just exposure at default, when measuring the loss (capital needed) to offset the risk of a counterparty exposure.[315]  As such, the FDIC's approach for measuring counterparty exposure risk is also incongruous with the approaches specified in the Basel II framework.

> c.   *Aggregating Exposures across Affiliated Counterparty Entities to the Top-Tier Parent Level Does Not Accurately Capture the Risk Posed by such Exposures to the DIF*

182.   The FDIC's interpretation of the 2011/2012 Rule would require HCIs to aggregate counterparty exposure to the top-tier parent level of affiliated counterparties.  However, aggregating the exposure across affiliated counterparty entities to the parent level or the holding company level of a counterparty, as the FDIC contends was required, would not accurately capture the risk posed to the DIF by HCIs' counterparty exposure.

---

[314]   *See* Basel Committee on Banking Supervision, "An Explanatory Note on the Basel II IRB Risk Weight Functions," *Bank for International Settlements*, July 2005, p. 8.

[315]   The Basel II framework defines three methods that can be used to calculate exposure at default: Internal Model Method, Standardized Approach, and Current Exposure Method.  *See* Basel Committee on Banking Supervision, "Treatment of Counterparty Credit Risk and Cross-Product Netting," International Convergence of Capital Measurements and Capital Standards, Annex 4, *Bank for International Settlements*, June 2006, pp. 260-277.  It is my understanding that BANA was not authorized to use the Internal Model Method for computing its counterparty exposure risk during the relevant time period.

183.    Specifically, underlying the FDIC's interpretation of the rule is the assumption that there

is a perfect correlation between the failure of a counterparty's parent company and its

affiliates (*i.e.*, that failure of the counterparty's parent company or any of its affiliates

will necessarily lead to a failure of the entire family of companies).  However, this

assumption is demonstrably not true.  In fact, IDIs have failed in the past without the

parent bank holding company also being taken into FDIC receivership.  For example, in

the case of Amcore Bank, although the bank failed and was subsequently closed by the

FDIC, the holding company of the bank, Amcore Financial, Inc., was not included in the

closure or the resulting receivership of the failed bank.[316]  Likewise, bank holding

companies may fail without the failure of the IDI subsidiaries that they own.  For

example, as discussed above, two banks owned by Lehman Brothers did not fail and were

open and operating, and meeting their financial obligations, following the bankruptcy of

the Lehman holding company.[317]  Indeed, laws such as Title II of the Dodd-Frank Act are

specifically designed to keep IDIs open and operating even in the event of a failure of

their parent bank holding companies (as discussed above).  Additionally, as discussed

above, in the event an IDI is distressed, the typical bank holding company structure of

HCIs provides an additional source of potential support to the IDI making it less prone to

failure.  As such, the failure of a given counterparty's affiliate or the counterparty's

---

[316]  *See* FDIC, "Question and Answer Guide, Amcore Bank, National Association, Rockford, IL," last accessed January 20, 2020, available at https://www.fdic.gov/bank/individual/failed/amcore-q-and-a.html.

[317]  *See* FDIC, "Lehman Brothers Bank, FSB  (FDIC # 30890)," last accessed January 20, 2020, available at https://research2.fdic.gov/bankfind/detail.html?bank=30890&name=Lehman%20Brothers%20Bank%2C%20FSB&searchName=Lehman%20Brothers%20bank&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2; and FDIC, "Lehman Brothers Commercial Bank  (FDIC # 58009)," last accessed January 20, 2020, available at https://research2.fdic.gov/bankfind/detail.html?bank=58009&name=Lehman%20Brothers%20Commercial%20Bank&searchName=Lehman%20Brothers%20bank&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2.

holding company does not necessarily mean that all counterparties that are affiliates of the failed counterparty will default together, as the FDIC's interpretation of the 2011/2012 Final Rule assumes.

184.    For instance, as illustrated in **Figure 5** below, suppose that BANA has counterparty exposure to two JPMC entities: JPMC Bank owes BANA $50 million related to interest rate contracts; in addition, JMPC Bank's parent bank holding company ("JPMC Holding Company") owes BANA $50 million related to oil price derivative contracts.  In such a scenario, under the 2011/2012 Final Rule, as interpreted by the FDIC, BANA would sum its counterparty exposure across both JPMC entities and report a total exposure to JPMC of $100 million.  By summing the exposures across the JPMC entities together, BANA would implicitly be assuming that both JPMC Bank and JPMC Holding Company will fail together and the entire $100 million exposure across both entities would be at risk in the event of a JPMC default.

**Figure 5: Failure of a Counterparty Affiliate May Not Result in a Failure of the Entire Counterparty Institution**



185.    However, such an assumption is incorrect.  Since JPMC Bank is one of the systemically important HCIs, in the event of a failure of JPMC Holding Company, the FDIC could take the entire JPMC Holding Company into receivership and transfer JPMC Bank into a bridge bank holding company to keep it open and operating under Title II of the Dodd-

Frank Act.  Additionally, the assets of the JPMC Holding Company may also provide additional support to JPMC Bank in such a receivership making the failure of JPMC Bank less likely.  In such a scenario, there would be no default by JPMC Bank, and as a result, BANA would incur no losses associated with its $50 million exposure with JPMC Bank.  Therefore, consolidating BANA's exposure to JPMC Bank's ultimate parent level, as purportedly required by the 2011/2012 Final Rule, would not result in an accurate estimate of the risk to BANA of its exposure to JPMC.

186.   When HCI credit portfolios include higher concentrations to particular counterparties, these counterparty concentrations can increase the DIF's potential loss exposure relative to an HCI with homogeneous counterparty exposures.  However, the extra exposure created by counterparty concentration is not accurately measured by the largest single counterparty, or the sum of the exposures to the largest 20 counterparties (*i.e.*, the measures used by the FDIC to estimate concentration risk).  Precise methods exist that can be used to calculate the marginal DIF exposure generated by counterparty risk concentrations,[318] but the FDIC's approach of measuring counterparty concentration risk using these two simple measures (the largest single counterparty or the largest 20 counterparties) is not consistent with these methods.  Instead, accurate risk measurement approaches require significant computational effort using multiple inputs, and taking account of an HCI's total exposure at default, estimated loss given default for each counterparty, and default correlation assumptions for the various counterparties.

---

[318]   *See*, *e.g.*, John Hull and Alan White, "Valuation of a CDO and an n-th to Default CDS Without Monte Carlo Simulation," *Journal of Derivatives*, Vol. 12, No. 2, Winter 2004, pp. 8-23;  *See also* Paul Kupiec, "Portfolio Diversification in Concentrated Bond and Loan Portfolios," *Journal of Investment Management*, Vol. 14, No. 2, 2016.

187. The Basel II framework for calculating the exposure at default cited by the FDIC in the 2011/2012 Final Rule defines three methods that can be used to calculate exposure at default: Internal Model Method, Standardized Approach, and Current Exposure Method.[319]  I understand that during the relevant time period, BANA had not been approved to use the Internal Model Method for calculating its regulatory capital requirements.  As a result, BANA would have been required to use one of the other two methods (*i.e.*, the Standardized Approach or the Current Exposure Method) specified in the Basel II framework to calculate exposure at default and the counterparty exposures under the rule.  These methods are relatively simplistic in comparison to the Internal Model Method and do not take into account the multiple inputs required for accurate risk measurement.  As a result, the approach specified by the FDIC in the 2011/2012 Final Rule is not consistent with known best-practice methods of measuring counterparty concentration risk.

188. Moreover, all of the methods specified in the Basel II standards direct the banks to aggregate and appropriately offset all exposures and associated collateral consistent with each of the banks' legally binding netting agreements (*i.e.*, at the "Netting Set" level).[320] However, not all counterparty affiliates may be included in the legally binding netting agreements between BANA and its counterparties, and if they are not included, these affiliate exposures would not be included in the counterparty credit exposure calculations

---

[319]  *See* Basel Committee on Banking Supervision, "Treatment of Counterparty Credit Risk and Cross-Product Netting," International Convergence of Capital Measurements and Capital Standards, Annex 4, *Bank for International Settlements*, June 2006, pp. 260-277.

[320]  *See* Basel Committee on Banking Supervision, "Treatment of Counterparty Credit Risk and Cross-Product Netting," International Convergence of Capital Measurements and Capital Standards, Annex 4, *Bank for International Settlements*, June 2006, pp. 258.

under the Basel II framework.  Thus, the aggregation method proposed by Basel II aligns with netting agreements, not according to overall corporate structure, as required by the FDIC.

189.   Specifically, the Basel II counterparty credit risk framework clearly identifies the Netting Set as the appropriate unit of consolidation for calculating counterparty exposures. Consequently, the FDIC's directions to use the 2006 Basel II rules to calculate counterparty risk exposure and to calculate counterparty exposure at the top-tier parent level of affiliated counterparties appear to be internally inconsistent.  Given that the FDIC never (to my knowledge) issued additional guidance on this matter, the appropriate approach for calculating counterparty credit risk exposures for purposes of calculating the assessment premiums for HCIs remains ambiguous.

190.   Taken together, these issues with the counterparty exposure measures included in the 2011/2012 Final Rule for HCIs further support my opinion that the 2011/2012 Final Rule does not accurately reflect the true risk posed by HCIs to the DIF.  Aggregating an HCI's counterparty exposures to the parent company level, as the FDIC interprets the rule, to calculate arbitrary counterparty exposure measures without considering the differences in risk posed by different types of counterparties or different types of underlying transactions will not result in an accurate estimate of risk of potential losses from such exposures to the institution or the DIF.  As a result, the 2011/2012 Final Rule is not risk-based.

Signed on July 16, 2020.

Paul H. Kupiec, Ph.D.



**Notes**:
[1] Banks with at least $10 billion in assets are classified as LIDIs by the FDIC.
[2] Banks with at least $50 billion in assets are classified as HCIs by the FDIC.
[3] Between 2007-2011, only one HCI, WaMu, failed. WaMu failed in 2008.

**Sources:**
[1] FDIC, "Bank Failures and Assistance Data," last updated October 2017, available at https://banks.data.fdic.gov/explore/failures.
[2] 2011 Final Rule, at 10674, footnote 15, and 10688, footnote 52.



**Exhibit 2**
**Estimated Losses to the DIF Due to Bank Failure by Total Assets[1]**
**2007 – 2011**

**Notes**:
[1] Estimated losses reflect the difference between the amount paid to depositors from the DIF and the amount recovered, or estimated to be recovered, from the liquidation of the receivership estate.
[2] Banks with at least $10 billion in assets are classified as LIDIs by the FDIC.
[3] Banks with at least $50 billion in assets are classified as HCIs by the FDIC.
[4] The failure of WaMU, the only HCI that failed between 2007-2011 did not result in any losses to the DIF.

**Sources:**
[1] FDIC, "Bank Failures and Assistance Data," last updated October 2017, available at https://banks.data.fdic.gov/explore/failures.
[2] 2011 Final Rule, at 10674, footnote 15, and 10688, footnote 52.

**Exhibit 3**
**Range of Potential Assessment Rates for Wells Fargo Bank and Citibank**
**As of Q3-2012**



**Notes:**
[1] Assessment rates are calculated using the FDIC's assessment rate calculator for highly complex institutions. There are six risk measures marked as confidential in the assessment rate calculator for which data are not publicly available. These include: Weighted Average CAMELS Rating, Higher Risk Assets, Largest Counterparty Exposure, Top 20 Counterparty Exposure, and Criticized and Classified Items. The range of potential assessment rates for the two banks is calculated using the 25th percentile, median, and 75th percentile values reported in the 2011 Final Rule for these risk measures.
[2] Example assessment rates are calculated assuming: (i) Weighted Average CAMELS Rating equal to 1 for both banks; (ii) Higher Risk Assets are equal to the median value from the descriptive statistics for both banks; and (iii) Largest Counterparty Exposure, Top 20 Counterparty Exposure, and Criticized and Classified Items equal the 25th percentile values from the descriptive statistics  for Wells Fargo Bank and 75th percentile values for Citibank.

**Sources:**
[1] FDIC, "Assessment Rate Calculator for Highly Complex Institutions (Updated February 26, 2013)," accessed using Internet Archive Wayback Machine, available at https://web.archive.org/web/20130323193227/https://www.fdic.gov/deposit/insurance/calculator.html.
[2] 2011 Final Rule, Table 2.1, at 10728.

## APPENDIX A

## CURRICULUM VITAE

**Paul H. Kupiec**
**5600 Wood Thrush Court**
**Fairfax, Virginia, 22032**
**May 2020**

Contacts: work (202) 862-7167; home (703) 250-5469
Work email: paul.kupiec@aei.org
Home email: sandstone601@verizon.net

**Current Position**

| | |
|---|---|
| 2013- | *Resident Scholar, American Enterprise Institute* |

**Prior Experience**

| | |
|---|---|
| 2004-2013 | *Director FDIC Center for Financial Research (CFR) and, Associate Director, Center for Financial Research Branch, Division of Insurance and Research, Federal Deposit Insurance Corporation* |
| 2010-2013 | *Chairman, Research Task Force Subcommittee of the Basle Committee on Bank Supervision* |
| 2000–2004 | *Deputy Division Chief, Banking Supervision and Regulation, Monetary and Financial Systems Department, International Monetary Fund.* |
| 1998-2000 | *Director / Principal Economist, Financial Research, Freddie Mac, McLean, Virginia.* |
| 1997-1998 | *Vice President, The Risk Metrics Group, J. P. Morgan, New York, New York.* |
| 1988 -1997 | *Senior Economist, Division of Research and Statistics, Federal Reserve Board, Washington, D.C.* |
| 1990-1991 | *Official, Bank for International Settlements, Basle Switzerland* |
| 1985-1988 | *Assistant Professor of Finance, North Carolina State University, Raleigh, NC.* |

**Professional Service**

Editor*, The Journal of Financial Services Research* (2007-2013)
Associate Editor**,** *The Journal of Financial Services Research* (2005-2007)
Associate Editor, *The Journal of Risk* (1998-present)
Editorial Board, *The Journal of Risk Management in Financial Institutions* (2007-present)
Associate Editor, *Journal of Investment Management* (2013-present)
Director, Southern Finance Association (2013-2015)
Referee for many academic journals

**Education**

The University of Pennsylvania
Ph.D. in Economics, 1985.
 Specialization in Finance, Theory and Econometrics

The George Washington University, Washington D.C.
B.S. Economics, 1980.

**Publications**
(Chronological)

"Initial Margin Requirements and Stock Returns Volatility: Another Look," *Journal of Financial Services Research*, Vol. 3, No. 2/3, pp. 189-202, 1989.

"A Survey of Exchange-Traded Basket Instruments," *Journal of Financial Services Research*, Vol. 4, No. 3, pp. 175-190, 1990.

"Animal Spirits, Margin Requirements and Stock Price Volatility," *Journal of Finance*, Vol. 46, No. 2, pp. 717-732, 1991, (joint with Steve Sharpe).

"Stock Market Volatility in OECD Countries: Recent Trends, Consequences for the Real Economy, and Proposals for Reform," *OECD Economic Studies*, No. 17, Autumn, pp. 31-62, 1991.

"A Primer on Program Trading and Stock Price Volatility: a Survey of the Issues and the Evidence," in *Research in Financial Services Private and Public Policy*, Vol. 4, (joint with Pat White and Greg Duffee).
 —Reprinted in: *Finanzmarkt und Portfolio Management*, 1992.

"A Securities Transactions Tax: Beyond the Rhetoric," Research in Financial Services Private and Public Policy, Vol. 5, 1993. (joint with Pat White and Greg Duffee)

"Futures Margins and Stock Price Volatility: Is There Any Link*?", The Journal of Futures Markets*, Vol. 13, No. 6, 1993.

"Do Stock Prices Exhibit Excess Volatility, Frequently Deviate from Fundamental Values, and Generally Behave Inefficiently? "(monograph) *Financial Markets, Institutions & Instruments*, 1993.

"Prudential Margin Policy in a Futures-Style Settlement System," *The Journal of Futures Markets*, Vol. 13, No. 8, 1993. (joint with George Fenn)

"The Performance of S&P500 Futures Product Margins Under the SPAN Margining System," *The Journal of Futures Markets*, Vol. 14, No. 7, 1994.

"A Securities Transaction Tax and the Efficiency of Capital Markets," *Contemporary Economic Policy*, Vol. 13, No. 1, 1995.

"Internal Affairs," *Risk*, May, 1995. (joint with Jim O'Brien)

"Model Alternative," *Risk*, June, 1995. (joint with Jim O'Brien)

"Techniques for Verifying the Accuracy of Risk Measurement Models," *The Journal of Derivatives*, Vol.3, No. 2, pp. 73-84, 1995.
 —Reprinted in: *VAR: Understanding and Applying Value at Risk*, Risk Publications, 1997.
 —Also reprinted in: *Risk Measurement and Systemic Risk*: Proceedings of a joint Central Bank Research Conference, Federal Reserve Board, 1996.

"Noise Traders, Excess Volatility, and a Securities Transactions Tax," *Journal of Financial Services Research*, Vol. 10, No. 2, pp. 115-129, 1996.

"Regulatory Competition and the Efficiency of Alternative Derivative Product Margining Systems, *The Journal of Futures Markets*, 1996. (joint with Pat White)

"Commitment is the Key," *Risk*, September, 1996. (joint with Jim O'Brien).
"Pre-Commitment," *The Financial Regulator*, Vol. 1, No. 3, pp. 41-46, 1996.
 (joint with Jim O'Brien).

"Recent Developments in Bank Capital Regulation of Market Risks," in *Advances in Finance, Investment and Banking: Derivatives Regulation and Banking*, Barry Schachter editor, Amsterdam: North Holland, 1997. (joint with Jim O'Brien)

"Margin Requirements, Volatility, and Market Integrity: What have we learned since the Crash?" *Journal of Financial Services Research*, Vol. 13, No. 3, 1998.

"Deposit Insurance, Bank Incentives, and the Design of Regulatory Policy," *The Federal Reserve Bank of New York Economic Policy Review*, Vol. 4, No. 3, 1998. (joint with Jim O'Brien).

"Stress Testing in a Value at Risk Framework," *The Journal of Derivatives*, Vol. 6, No. 1, 1998.

"Risk Capital and VaR," *The Journal of Derivatives*, Vol. 7, No. 2 (Winter), 1999, pp. 41-52.
 ——Reprinted in Risk Publications volume on "Model Risk".

"On the Origin and Interpretation of OAS," *Journal of Fixed Income*, Vol. 9, No. 3 (December), pp. 82-92, 1999.

"Stress Tests and Risk Capital," *The Journal of Risk,* Vol. 2, No. 4, 2000, pp. 27-40.

"An alternative to Basle's reform proposals," *Risk*, March 2000, pp. 54-57.

"Estimating Credit Risk Capital: What's the Use?" *The Journal of Risk Finance,* Vol. 2, No. 3, pp. 17-34, 2001.

 "The devilish detail of Basel," *Risk,* June 2001.

"Credit Risk Capital: More Than One Way to Guard a Guarantee," in *Risk Management: The State of the Art,* Stephen Figlewski and Richard Levich, editors. Boston: Kluwer Academic Publishers, 2002.

"What Exactly Does Credit VaR Measure?" *The Journal of Derivatives,* Vol. 9, No. 3, pp. 46-59, 2002.

"Does CP 3 get it right? *Risk,* Vol. 16, No. 8, (August) 2003.

"Understanding the expected loss debate," *Risk,* November 2003.

"Is the Basel Accord Incentive Compatible?" in *The New Basel Accord,* Benton Gup editor. SouthWestern/Thompson Publishing Co., 2004.

"Assessing Systemic Risk Exposure from Banks and GSEs Under Alternative Approaches to Capital Regulation," (with David Nickerson), *The Journal of Real Estate Finance and Economics,* Vol.28, No. 2&3, 2004.

"Estimating Economic Capital Allocation for Market and Credit Risks," The Journal of Risk, Vol. 6, No. 4, pp. 11-29, 2004.

"Internal Model-Based Capital Regulation and Bank Risk-Taking Incentives," *The Journal of Derivatives,* Summer 2004.

"Principles for the Supervision of State-Owned Financial Institutions" (with J. Fiechter), in, The Future of Financial Institutions.  Washington DC: Brookings Institution Press, 2004.

"Insurers are not Banks: Assessing Liquidity, Efficiency and Solvency Risk Under Alternative Approaches to Capital Adequacy" (with Dave Nickerson), *The Geneva Papers on Risk and Insurance - Issues and Practice*, Palgrave Macmillan, vol. 30(3), pages 498-521, July 2005.

"Using a Mandatory Subordinated Debt Issuance Requirement to Set Regulatory Capital Requirements for Bank Credit Risks," in, *Capital Adequacy: Beyond Basel,* Hal Scott editor. Boston: Oxford University Press, 2005.

"Financial Stability and Basel II," *Annals of Finance*, Vol. 3, pp. 107-130, 2007.

"Capital Allocation for Portfolio Credit Risk," *The Journal of Financial Services Research,* Vol. 32, No. 1-2, p. 103-122, 2007.

"Estimating Recovery Discount Rates: A Methodological Note," *The Journal of Risk Management in Financial Institutions*," Vol. 1, No. 1, 2007.

"Basel II: A Case for Recalibration," in Handbook of Financial Intermediation and Banking, Anjan Thakor and Arnoud Boot, editors. New York: North Holland, 2008.

*"*A Generalized Single Common Factor Model of Portfolio Credit Risk," *The Journal of Derivatives,* Vol. 15, No. 3, pp. 25-40, 2008.

"Bank Failures and the Cost of Systemic Risk: Evidence from 1900-1930" (joint with Carlos Ramirez), *The Journal of Financial Intermediation,* Vol. 22, No.3, pp. 285-307, 2013.

"How Big is Big Enough?" *The Journal of Financial Intermediation*, Vol. 22, No. 4, pp. 529-531, 2013.

"Portfolio Diversification in Concentrated Bond and Loan Portfolios," *Journal of Investment Management*, Vol. 14, No. 2, 2016.

"Capital for Concentrated Credit Portfolios," *Journal of Risk Management in Financial Institutions,* Vol. 8, No. 4, pp. 314-322, 2015.

"Can the "Single Point of Entry" strategy be used to recapitalize a systemically important failing bank?" (with Peter Wallison), *Journal of Financial Stability*, Vol. 20, pp. 184-197, 2015.

"Federal Reserve Accountability and Reform," *Insurance and risk management,* Vol. 82, No. 3-4, (July-December), pp. 95-110, 2015.

"Will TLAC regulations fix the G-SIB too-big-to-fail problem?" *Journal of Financial Stability*, Vol. 24 (June), pp. 158-169, 2016.

"Testing for Systemic Risk Using Stock Returns," (with Levent Guntay), Journal of Financial Services Research, Vol. 49, No. 2, pp. 203-227, 2016.

"Fixing Prompt Corrective Action," *Journal of Risk Management in Financial Institutions*, Vol. 9, No. 3 (Summer), pp. 207-223, 2016.

"Does Bank Supervision Impact Bank Loan Growth?", *Journal of Financial Stability*, Vol. 28 (Feb), pp. 29-48, 2017.

"On the accuracy of alternative approaches for calibrating bank stress test models*," Journal of Financial Stability*, Vol. 38 (Oct), pp. 138-146, 2018.

"Stress testing and the representative bank model," *Journal of Risk Management in Financial Institutions*, Vol. 12, No. 4, 2019.

## Other Public Writings

"Commentary of presidents, politics and the Federal Reserve Board of Governors: Is there a new PhD standard?" AEI, July 16, 2019.

"Public comment on Federal Reserve proposed changes to Regulation D, reserve requirements for depository institutions," May 13, 2019.

"Public comment on Federal Reserve proposed rule on total loss-absorbing capacity," Feb 1, 2016.

"Regulatory Stress Tests and the Blind Scales of Justice," AEI, Jan 17, 2018.

"When governments direct bank credit, the economy suffers," AEI, March 4, 2014.

"Basel III: Some costs will outweigh the benefits," AEI, Nov 12, 2013.

"SEC Comment on the OFR Report 'Asset Management and Financial Stability,'" AEI, Nov. 1, 2013.

## Published Editorials (reverse chronological order)

"Will the global liquidity tsunami rekindle economic growth or spark inflation?" AEI Ideas, May 26, 2020.

"Intrusive interventions have unintended consequences," AEI Ideas, May 20, 2020.

"If we can't develop a COVID-19 vaccine, is there a 'plan B' for the economy?" AEI Ideas, April 29, 2020.

"A compromised credit cultural reduces economic growth," AEI Ideas, April 8, 2020.

"Could short-term government assistance make the COVID-19 recession worse?" AEI Ideas, April 6, 2020.

"Could the CARES Act unintentionally accelerate house price declines?" AEI Ideas, April 2, 2020.

"Speedbumps for small business recovery loans," AEI Ideas, March 28, 2020.

"The COVID-19 relief bill's self-defeating complexity," AEI Ideas, March 26, 2020.

"Why loans are better than cash checks to bolster the economy," The Hill, March 24, 2020.

"Why Congress should give people loans instead of handouts," The Federalist, March 23, 2020.

"Halt in accounting rules will allow banks to lend and business to run," The Hill, March 20, 2020.

"Coronavirus stimulus: Provide tax-refund loans, not handouts," USA Today, March 19, 2020.

"Say 'yes!' to a prepaid tax refund," Inside Sources, March 18, 2020.

"An immediate economic stimulus plan with no extra taxpayer costs," The Hill, March 13, 2020.

"Virginia and Maryland are missing something when trying to tax plastic bags," The Washington Post, March 9, 2020.

"Are baby-boomers ruining the housing market for everyone else?" Los Angeles Times, January 6, 2020.

"The Tax code can't handle negative rates," Wall Street Journal, Nov. 28, 2019.

"Why Libra must be treated like a traditional bank and currency," The Hill, Nov 4, 2019.

"The Federal Reserve must think twice about new capital buffers," The Hill, Aug 16, 2019.

"Why consumers must beware Libra," The Hill, July 25, 2019.

"Libra rising: The risk of a new international shadow bank," AEIdeas, July 23, 2019.

"Federal Reserve has bad idea for interest rates on different banks," The Hill, April 9, 2019.

"The Fed refuses to do business with the safest bank on earth—and depositors pay the price," AEIdeas, Nov 28, 2018.

"Booming housing market today creates serious risk for the future," The Hill, July 17, 2018.

"The government creates another housing bubble," The Wall Street Journal, June 1, 2018.

"Finding the right level of regulation for Bitcoin," AEIdeas, March 9, 2018.

"Bitcoin needs 'Goldilocks' regulation," Inside Sources, Mar 2, 2018.

"Cash, credit or Bitcoin: Do cryptocurrencies make good spending money?" AEIdeas, Feb 22, 2018.

"The high cost of affordable housing mandates," The Wall Street Journal, Feb 13, 2018.

"The price of Bitcoin and other virtual currencies: A simple case of supply and demand," AEIdeas, Feb 7, 2018.

"To regulate or not to regulate? Cryptocurrencies beg question," The Hill, Feb 1, 2018.

"Democrats lamenting Trump policies now see Dodd-Frank's problems," American Banker, Dec. 14, 2017.

"A simple change to push bank subsidies to depositors," Inside Sources, Sep 19, 2017.

"American taxpayers, not banks, deserve Fed interest payments," The Hill, Sep 6, 2017.

"Fed chair Yellen takes premature victory lap with latest speech," Aug 31, 2017.

"The major flaw in the big banks' argument against the leverage ratio," American Banker, Aug 7, 21017.

"Is systemic risk a Dodd-Frank fallacy?" American Banker, May 9, 2017.

"Big banks will always be too big, Glass Steagall or not," April 25, 2017.

"Financial oversight board's review process cloaked in mystery," The Hill, March 30, 2017.

"Why we must base the banking regulation debate on real data," the Hill, Feb 28, 2017.

"Higher leverage ratio is hardly a big-bank giveaway," American Banker, Feb 10, 2017.

"How the Feds can really spread the wealth around," The Wall Street Journal, Dec. 9, 2016.

"Negative rates aren't working. Why do central banks persist?" Real Clear Markets, Sep. 26, 2016.

"How a higher minimum wage makes everyone worse off," Forbes, July 4, 2016.

"Let's relocate the federal government," Washington Examiner, June 7, 2016.

"Not a dime more for Metro—yet," The Washington Post, June 3, 2016.

"The high cost of ultra-low interest rates," The Wall Street Journal, May 23, 2016.

"Make colleges back up their student loans," National Review, May 2, 2016.

"Minimum-Wage Activists Should Look to Puerto Rico for Clues to the Future," Nation Review, April 13, 2016.

"Finding too big to fail", US News & World Report, Feb 18, 2016.

"A plan to perpetuate the big banks while liquidating small ones," Real Clear Markets, Jan 22, 2016.

"You say TLAC, I say TBTF", American Banker, November 24, 2015.

"At long last, a compromise on Dodd-Frank reform," American Banker, May 20, 2015.

"Dem criticism of Shelby bill unfounded, The Hill, May 15, 2015.

"Negative Interest Rates Threaten the Banking System" Wall Street Journal, March 6, 2015

"3 easy fixes to Dodd-Frank," Wall Street Journal, November 6, 2014.

"A loan to help home owners build equity fast," American Banker, October 28, 2014.

"SIFI designations aren't meant to last forever." American Banker, October 8, 2014.

"When central bankers become central planners," The Wall Street Journal, September 28, 2014.

"Why taxpayers will be on the hook when it's time to raise rates," American Banker, August 27, 2014.

"Why the 'living will' process sets banks up for failure," American Banker, August 11, 2014.

"The real 'systemic risk' is the FDIC's broken resolution process," Real Clear Markets, August 6, 2014.

"Dodd-Frank doesn't end 'too big to fail' ", The Hill, July 31, 2014.

"Scrapping Basel II for stress tests would be a big mistake," American Banker, July 2, 2014.

"The Fed's blueprint for financial control," The Wall Street Journal, May 21, 2014.

"Bank regulators do make more," The Wall Street Journal, May 13, 2014.

"Guess who makes more than bankers: Their regulators," The Wall Street Journal, April 21, 2014.

"SEC probe of mortgage securities sales is much ado about nothing," Real Clear Markets, Jan. 9, 2014.

"The Volcker Rule won't reduce risk," Real Clear Policy, Dec. 20, 2013.

"The worst fears about Dodd-Frank's FSOC are being confirmed," Forbes, Nov. 26, 2013.

"Basel II is just too complex as risks outweigh benefits," National Post, No 13, 2013.

**Congressional Testimony**

"Assessing the impact of the Dodd-Frank Act four years later," Testimony before the House Financial Services Committee, July 22, 2014.

"What makes a bank systemically important?" Testimony before the Senate Committee on Banking, Housing, and Urban Development, July 16, 2014.

"Government financial policy and credit availability," Testimony before the House Financial Services Subcommittee on Monetary Policy and Trade, March 12, 2014.

"Federal Reserve Accountability and Reform," Testimony before the Senate Committee on Banking, Housing, and Urban Development, March 4, 2015.

"Fed Oversight: lack of transparency and accountability," Testimony before the House Committee on Financial Services, Subcommittee on Oversight and Investigations, July 14, 2015.

"Examining Federal Reserve Reform Proposals," Testimony before the House Committee on Financial Services, Subcommittee on Monetary Policy and Trade, July 22, 2015.

"Examining the designation and regulation of bank holding company SIFIs," Testimony before the House Committee on Financial Services, July 8, 2015.

"Examining Legislative Proposals to Reduce Regulatory Burdens on Main Street Job Creators," Testimony before the House Subcommittee on Financial Institutions and Consumer Credit, October 21, 2015.

"Bank Capital and Liquidity Regulation", Testimony before the Senate Committee on Banking, Housing and Urban Affairs, June 7, 2016.

"Is there a uniform standard for FSOC designation?" Testimony before the House Financial Services Subcommittee on Oversight and Investigations, March 28, 2017.

"The Federal Reserve's credibility problem on main street," Testimony before the House Financial Services Committee, June 28, 2017.

**Co-Authored IMF Country Reports**

Finland: Financial System Stability Assessment, including Reports on the Observance of Standards and Codes on the following topics: Financial Policy Transparency, Banking Supervision, Insurance Supervision, Securities Regulation, and Payment Systems. Country Report No. 01/214, November 2001.

Portugal 2002 Article IV Consultation Staff Report. Country Report No. 03/99, April 2003.

Portugal 2001 Article IV Consultation Staff Report. Country Report No. 02/90, April 2002.

Iceland 2001 Article IV Consultation Staff Report. Country Report No. 02/130, July 2002.

Iceland: Financial System Stability Assessment Update, including Report on the Observance and Standards and Codes on the following topics: Banking Supervision, Insurance Regulation, Securities Regulation, Payment Systems, and Monetary and Financial Policy Transparency. Country Report No. 03/271, August 2003.

Japan: Financial System Stability Assessment and Supplementary Information. Country Report No. 3/287, September 2003.

Singapore: Financial System Stability Assessment and Supplementary Information, No. 4/104, 2004.

New Zealand: Financial System Stability Assessment and Supplementary Information, No. 4/417, 2004.

Iceland FSAP Update, No. 8/369, 2008.

Netherlands FSAP, No. 11/144, 2011.

Mexico FSAP, March, 2012.

Ireland, Selected Reports on Irish Banking System Developments under the IMF Program (2013).

Dynamic Stress Testing Models for Selected Eastern Caribbean Currency Union banks: IMF CARTAC Technical Assistance Report for the Eastern Caribbean Central Bank, December 2015.

## Recent Unpublished Working Papers

"Is Dodd-Frank orderly liquidation authority necessary to fix too-big-to-fail?", October 22, 2015, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2678234

"Incentive Compensation for Risk Managers when Effort is Unobservable," October 2013/revised January 2014. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2344907

"The Leverage Ratio is Not the Problem," Aug 18, 2017. https://www.aei.org/wp-content/uploads/2017/08/Leverage-ratio-is-not-the-problem.pdf

"Policy Uncertainty and Bank Stress Testing," July 8, 2019. https://www.aei.org/wp-content/uploads/2019/07/Kupiec-Policy-Uncertainty-and-Bank-Stress-Testing-WP.pdf

## Professional Conference Organization Committees

Program committee member, Southern Finance Association Annual Meetings, (2005-12).

Co-organizer (with Haluk Unal), the FDIC-JFSR Fall Banking Research Conference (2004-2012).

Co-organizer (with Robert Jarrow and Stuart Turnbull), the annual Derivative Securities and Risk Management Conference (2005-2012).

Program Committee and organizer for the 2007 Basel Research Task Force Workshop held at the FDIC.

Program Committee for Basel Research Task Force Conference on the Integration of Market and Credit Risk Measurement (Berlin 2007).

Program Committee for Basel Research Task Force on Stress Testing (Amsterdam 2008).

**Other Professional Service**

2009-2015   The Financial Stability Institute (FSI), a service organization supported by the Bank for International Settlements and Basel Committee on Bank Supervision member institutions.

    ---Lecturer at multiple FSI Workshops on various topics in risk measurement, regulatory capital, stress testing, deposit insurance, financial sector crisis management, and Basle capital and leverage regulations.

## APPENDIX B

## MATERIALS RELIED UPON

# I.   DOCUMENTS FROM THE ADMINISTRATIVE RECORD

Bert Ely, "RIN number 3064-AD66; Assessments, Large Bank Pricing NPR; RIN number 3064-AD66; Assessments, Assessment Base and Rates NPR," Ely & Company, Inc., January 3, 2011, AR00762.

Charles Lee, "RE: RIN 3064-AD66 - Assessments, Large Bank Pricing NPR," MidFirst Bank, January 3, 2011, AR01171.

Daryl Bible, "Reference RIN 3064-AD66 Assessments, Large Bank Pricing," BB&T Corporation, January 3, 2011, AR00159.

Dennis E. Nixon, "RIN 3064-AD66; 12 CFR Part 327; 75 Federal Register 72612; Assessments, Large Bank Pricing - Notice of Proposed Rulemaking and Request for Comment," International Bank of Commerce, December 31, 2010, AR01081.

James Chessen, "Re: RIN 3064-AD63; Assessment Dividends, Assessment Rates and Designated Reserve Ratio; 12 CFR Part 327; 75 Federal Register 66272, October 27, 2010," American Bankers Association, November 24, 2010, AR00367.

James Chessen, "RIN 3064-AD66; Notice of Proposed Rulemaking Regarding the Pricing of Large Bank Assessments; 12 CFR Part 327; 75 Federal Register 72612, November 24, 2010," American Bankers Association, January 3, 2011, AR01256.

Joseph Alexander, "Federal Deposit Insurance Corporation Notice of Proposed Rulemaking Relating to Assessments: RIN 3064-AD57," The Clearing House, June 16, 2010, AR00217.

McHenry Kane, "Attention: Comments," SunTrust Bank, July 1, 2010, AR00234.

Paul Saltzman, "RIN 3064-AD66: Notices of Proposed Rulemaking - Deposit Insurance Assessment Base and Rates and Large Bank Pricing," The Clearing House, January 3, 2011, AR00669.

Phillip A. Wertz, "Proposed Regulations Regarding Asset-Based Assessments and Risk-Based Assessments," BAC, January 3, 2011, AR00660.

Stephen Linehan, "Assessments, Large Bank Pricing NPR, Change in Assessment Base, (RIN No. 3064-AD66)," Capital One Financial Corporation, January 7, 2011, AR01285.

# II.   LEGAL FILINGS

Answer and Counterclaim, *Federal Deposit Insurance Corporation v. Bank of America, N.A.*, United States District Court, District of Columbia, Case No. 1:17-cv-36-EGS, February 24, 2017.

First Amended Complaint, *Federal Deposit Insurance Corporation v. Bank of America, N.A.*, United States District Court, District of Columbia, Case No. 1:17-cv-36-EGS, April 10, 2017.

*In the Matter of First City, Texas-Austin, National Association Austin, Texas, et al.*, Docket No. FDIC-92-316kk, December 14, 1993.

*In the Matter of Maine National Bank Portland, Maine Related to Bank of New England National Association Boston, Massachusetts*, Docket No. FDIC-91-100kk, April 28, 1992.

*In the Matter of Richard D. Donohoo, Craig R. Mathies, Leonard C. Misenor, Bruce A. Rasmussen, Cherly C. Godbout-Bandal, Wayne Field, Bruce A. Rasmussen & Associates, and Lindquist & Vennum, Capital Bank, St. Paul, Minn.*, Docket Nos. 92-249c&b, FDIC-92-250e, FDIC92-251e, and FDIC-92-252k, July 9, 1995.

*In the Matter of Stephen G. Smith, BayBank, Burlington, Massachusetts*, Docket No. FDIC93-91e, September 16, 1993.

*In the Matter of The Bank of Hartford, Hartford, Conn.*, Docket No. FDIC-92-212kk, April 11, 1995.

*In the Matter of The Meriden Trust and Safe Deposit Company, Meriden, Connecticut*, Docket No. FDIC-92-241kk, September 21, 1993.

## III.   PUBLICLY AVAILABLE SOURCES

### A.   Academic Articles

A. Dale Tussing, "The Case for Bank Failure," *The Journal of Law & Economics*, Vol. 10, October 1967.

Adam B. Ashcraft, "Are Bank Holding Companies a Source of Strength to Their Banking Subsidiaries," *Journal of Money, Credit and Banking*, Vol. 40, No. 2-3, March-April 2008.

Adam B. Ashcraft, "Are Banks Really Special? New Evidence from the FDIC-Induced Failure of Healthy Banks," *Federal Reserve Bank of New York Staff Reports*, No. 176, December 2003.

Benjamin B. Christopher, "Recent Developments Affecting Depository Institutions," *FDIC Banking Review*, Vol. 4, No. 1, Spring/Summer 1991.

Charles W. Calomiris and Doron Nissim, "Crisis-Related Shifts in the Market Valuation of Banking Activities," *Journal of Financial Intermediation*, Vol. 23, No. 3, 2014.

Charles W. Calomiris and Urooj Khan, "An Assessment of TARP Assistance to Financial Institutions," *Journal of Economic Perspectives*, Vol. 29, No. 2, Spring 2015.

Christopher James, "The Losses Realized in Bank Failures," *The Journal of Finance*, Vol. 46, No. 4, September 1991.

Dmytro Holod and Joe Peek, "Capital Constraints, Asymmetric Information, and Internal Capital Markets in Banking: New Evidence," *Journal of Money, Credit and Banking*, Vol. 42, 2010.

Douglas W. Diamond and Raghuram G. Rajan, "Liquidity Shortages and Banking Crises," *NBER Working Paper*, No. 8937, May 2002.

James Barth, et al., "Determinants of Thrift Institution Resolution Costs," *The Journal of Finance*, Vol. 45, No. 3, July 1990.

John Hull and Alan White, "Valuation of a CDO and an n-th to Default CDS Without Monte Carlo Simulation," Journal of Derivatives, Vol. 12, No. 2, Winter 2004.

John Krainer and Jose A. Lopez, "Off-Site Monitoring of Bank Holding Companies," *Federal Reserve Bank of San Francisco Economic Letter*, No. 2002-15, May 17, 2002.

John R. Walter, "Closing Troubled Banks: How the Process Works," *Federal Reserve Bank of Richmond Economic Quarterly*, Vol. 90, No. 1, Winter 2004.

Kathleen McDill, "Resolution Costs and the Business Cycle," *FDIC Working Paper*, No. 2004-01, March 2004.

Michael C. Keeley, "Deposit Insurance, Risk, and Market Power in Banking," *American Economic Review*, Vol. 80, No. 5, December 1990.

Michael E. Bleier, "The Federal Reserve Board's New Rating System for Bank Holding Companies and Financial Holding Companies," *Review of Banking & Financial Law*, 2007.

Paul Kupiec and Peter Wallison, "Can the 'Single Point of Entry' Strategy be Used to Recapitalize a Systemically Important Failing Bank?," *Journal of Financial Stability*, Vol. 20, 2005.

Paul Kupiec, "Portfolio Diversification in Concentrated Bond and Loan Portfolios," *Journal of Investment Management*, Vol. 14, No. 2, 2016.

Paul L. Lee, "The Source-of-Strength Doctrine Revered and Revisited," *The Banking Law Journal*, Vol. 129, No. 9, October 2012.

Radoslav Raykov and Consuelo Silva-Buston, "Multibank Holding Companies and Bank Stability," *Bank of Canada Staff Working Paper*, October 2018.

Rebecca S. Demsetz and Philip E. Strahan, "Diversification, Size, and Risk at Bank Holding Companies," *Federal Reserve Bank of New York Research Paper*, No. 9506, April 1995.

Rebecca S. Demsetz, Marc R. Saidenberg, and Philip E. Strahan, "Banks with Something to Lose: The Disciplinary Role of Franchise Value," *Federal Reserve Bank of New York Economic Policy Review*, October 1996.

Rosalind L. Bennett and Haluk Unal, "The Cost Effectiveness of the Private-Sector Reorganization of Failed Banks, *FDIC Working Paper*, January 2011.

Rosalind L. Bennett and Haluk Unal, "The Cost Effectiveness of the Private-Sector Resolution of Failed Bank Assets," *FDIC Center for Financial Research Working Paper*, No. 2009-11, January 2010.

Rosalind L. Bennett and Haluk Unal, "The Effects of Resolution Methods and Industry Stress on the Loss on Assets from Bank Failures," FDIC Working Paper, *Journal of Financial Stability*, Vol. 15, July 2014.

Sangkyun Park, "Market Discipline by Depositors: Evidence from Reduced Form Equations," *Federal Reserve Bank of St. Louis Working Paper Series*, 1995.

Stanley V. Ragalevsky and Sarah J. Ricardi, "Anatomy of a Bank Failure," *Banking Law Journal*, December 2009.

William P. Osterberg and James B. Thomson, "Underlying Determinants of Closed-Bank Resolution Costs, *Federal Reserve of Cleveland Working Paper*, No. 9403, March 1994.

William R. Keeton, "Has Multi-Market Banking Changed the Response of Small Business Lending to Local Economic Shocks?," *Federal Reserve Bank of Kansas City*, 2009.

## B.    Congressional Research Service Publications

Darryl E. Getter, "U.S. Implementation of the Basel Capital Regulatory Framework," *Congressional Research Service*, April 9, 2014.

Jay B. Sykes, "Regulatory Reform 10 Years After the Financial Crisis: Systemic Risk Regulation of Non-Bank Financial Institutions," *Congressional Research Service*, April 12, 2018.

## C.    The Department of the Treasury Publications

Office of the Comptroller of the Currency, "Bank Failure: An Evaluation of the Factors Contributing to the Failure of National Banks," June 1988.

Office of the Comptroller of the Currency, "Large Bank Supervision."

Office of the Comptroller of the Currency, "OCC Revises Process for Managing Matters Requiring Attention," October 30, 2014.

The Department of the Treasury, "Quarterly Analysis of Institutions in the Capital Purchase Program, Fourth Quarter 2010."

The Department of the Treasury, "Report to the President of the United States, Orderly Liquidation Authority and Bankruptcy Reform," February 21, 2018.

The Department of the Treasury, Office of Financial Stability, "Citizens' Report on the Troubled Asset Relief Program (TARP)," March 2, 2010.

Timothy Bowler, "TARP's Bank Programs: A Success Story," *The Department of the Treasury*, July 10, 2014.

### D.    FDIC Publications

Doreen R. Eberley, "Final Rule: Company-Run Stress Testing Requirements for FDIC Supervised State Nonmember Banks and State Savings Associations," *FDIC*, October 15, 2019.

FDIC, "2018-2022 Strategic Plan - Receivership Management Program," January 29, 2018.

FDIC, "2018-2022 Strategic Plan - Supervision Program," January 29, 2018.

FDIC, "2018-2022 Strategic Plan - The FDIC and the Banking Industry: Perspective and Outlook," January 29, 2018.

FDIC, "2019 Annual Performance Plan - Receivership Management Program," March 26, 2019.

FDIC, "Accounts Covered by the FDIC," January 31, 2018.

FDIC, "Agencies Provide Feedback on Second Round Resolution Plans of 'First-Wave' Filers," August 5, 2014.

FDIC, "Assessment Rate Calculator for Highly Complex Institutions (Updated February 26, 2013)," accessed using Internet Archive Wayback Machine.

FDIC, "Bank Failures and Assistance Data."

FDIC, "Bank of America, National Association (FDIC # 3510)."

FDIC, "Bank of America California, National Association (FDIC # 25178)."

FDIC, "Crisis and Response: An FDIC History, 2008-2013," November 30, 2017.

FDIC, "Deposit Insurance Assessments, Assessment Changes Since 2016," last updated December 23, 2019.

FDIC, "DSC Risk Management Manual of Examination Policies, Related Organizations."

FDIC, "ED&O Search Form."

FDIC, "Failed Bank list," last updated January 13, 2019.

FDIC, "FDIC Approves Final Rules Regarding Large Bank Stress Tests and Large Bank Assessment Pricing and Releases An Update on the DIF Projections," October 9, 2012.

FDIC, "FDIC Board Approves Final Rule Requiring Resolution Plans for Insured Depository Institutions Over $50 Billion," January 17, 2012.

FDIC, "FDIC Board Votes to Revise MOU on Backup Supervision Authority," July 12, 2010.

FDIC, "FDIC Cross Guaranty Provision," October 30, 2009.

FDIC, "FDIC Details and Financials - Institution Directory (ID)."

FDIC, "FDIC Law, Regulations, Related Acts - 1000 - Federal Deposit Insurance Act," last updated June 29, 2018.

FDIC, "Final Statement of Policy on Qualifications for Failed Bank Acquisitions," August 26, 2009.

FDIC, "JPMorgan Chase Acquires Banking Operations of Washington Mutual," September 25, 2008.

FDIC, "Lehman Brothers Bank, FSB (FDIC # 30890)."

FDIC, "Lehman Brothers Commercial Bank (FDIC # 58009)."

FDIC, "Managing the Crisis: THE FDIC and RTC Experience 1980-1994," August 1998.

FDIC, "Press Releases - Basic FDIC Insurance Coverage Permanently Increased to $250,000 Per Depositor," July 21, 2010.

FDIC, "Quarterly Banking Profile: Fourth Quarter 2014," *FDIC Quarterly*, Vol. 9, No. 1, 2015.

FDIC, "Question and Answer Guide, Amcore Bank, National Association, Rockford, IL."

FDIC, "Remarks by Martin J. Gruenberg, Acting Chairman, FDIC to the Federal Reserve Bank of Chicago Bank Structure Conference; Chicago, IL," May 10, 2012.

FDIC, "Resolution Authority News & Information," May 31, 2019.

FDIC, "Resolutions Handbook," last updated December 23, 2014.

FDIC, "RMS Manual of Examination Policies," December 2019.

FDIC, "Study on Core Deposits and Brokered Deposits," July 8, 2011.

FDIC, "Temporary Liquidity Guarantee Program," last updated February 19, 2019.

FDIC, "The Deposit Insurance Fund."

FDIC, "Title II Orderly Liquidation Authority," December 10, 2012.

FDIC, "Uniform Financial Institutions Rating System," April 20, 2014.

FDIC, "When a Bank Fails - Facts for Depositors, Creditors, and Borrowers," July 28, 2014.

FDIC, "Who is the FDIC?," last updated May 3, 2017.

FDIC Office of Inspector General, "The FDIC's Resolution Plan Review Process."

FDIC Office of Complex Financial Institutions Dodd-Frank Act Title I, "Living Wills Overview," January 25, 2012.

Martin J. Gruenberg, Member, Board of Directors, FDIC, "An Underappreciated Risk: The Resolution of Large Regional Banks in the United States," *FDIC*, October 16, 2019.

### E.    The Federal Reserve System Publications

Federal Reserve Bank of St. Louis, "Holding Company Supervision."

Federal Reserve Economic Data, "Unemployment Rate."

John Weinberg, "Federal Reserve Credit Programs During the Meltdown," *Federal Reserve History*, November 22, 2015.

Julia Maues, "Banking Act of 1933 (Glass-Steagall)," *Federal Reserve History*, November 22, 2013.

Julie Stackhouse, "The ABCs of CAMELS," *Federal Reserve Bank of St. Louis*, July 24, 2018.

Nick Haugen, "Implementing Risk Management: Safety & Soundness Update - April 2018," *Federal Reserve Bank of Minneapolis*, May 9, 2018.

Noelle Richards, "Federal Deposit Insurance Corporation Improvement Act of 1991," *Federal Reserve History*, November 22, 2013.

The Federal Reserve System, "Adoption of Regulation W Implementing Sections 23A and 23B of the Federal Reserve Act," January 9, 2003.

The Federal Reserve System, "Bank Holding Company Performance Report, Bank of America Corporation," September 30, 2019.

The Federal Reserve System, "Comprehensive Capital Analysis and Review 2013: Assessment Framework and Results," March 2013.

The Federal Reserve System, "Comprehensive Capital Analysis and Review 2019, Summary Instructions," March 2019.

The Federal Reserve System, "Federal Reserve Act, Section 23A. Relations with Affiliates," February 12, 2017.

The Federal Reserve System, "Large Financial Institutions," March 6, 2019.

The Federal Reserve System, "Living Wills (or Resolution Plans)," last updated December 17, 2019.

The Federal Reserve System, "SR 19-4/ CA 19-3: Supervisory Rating System for Holding Companies with Total Consolidated Assets Less Than $100 Billion," February 26, 2019.

The Federal Reserve System, "Stress Tests and Capital Planning," March 7, 2017.

The Federal Reserve System, "Supervision and Regulation Report," May 14, 2019.

The Federal Reserve System, "Term Asset-Backed Securities Loan Facility (TALF)," last updated November 24, 2015.

The Federal Reserve System, et al., "Federal Banking Regulators Finalize Liquidity Coverage Ratio," September 3, 2014.

The Federal Reserve System and FDIC, "Request for Information on Application of the Uniform Financial Institutions Rating System," October 17, 2019.

The Federal Reserve System and FDIC, "Resolution Plan Assessment Framework and Firm Determinations (2016)," April 13, 2016.

## F.    Other Publications

Aaron Klein, "A Primer on Dodd-Frank's Orderly Liquidation Authority," *Brookings Institution*, June 5, 2017.

BAC, "Affiliate Companies."

BACANA, "Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 041," *Federal Financial Institutions Examination Council*, September 30, 2019.

BANA, "Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031," *Federal Financial Institutions Examination Council*, September 30, 2019.

Basel Committee on Banking Supervision, "An Explanatory Note on the Basel II IRB Risk Weight Functions," *Bank for International Settlements*, July 2005.

Basel Committee on Banking Supervision, "Treatment of Counterparty Credit Risk and Cross-Product Netting," International Convergence of Capital Measurements and Capital Standards, Annex 4, *Bank for International Settlements*, June 2006.

Ben S. Bernanke, "Why Dodd-Frank's Orderly Liquidation Authority Should Be Preserved," *Brookings Institution*, February 28, 2017.

Congressional Budget Office, "Report on the Troubled Asset Relief Program - April 2019," April 2019.

Davis Polk & Wardell LLP, "Summary of Dodd-Frank Wall Street Reform and Consumer Protection Act, Enacted into Law on July 21, 2010," July 21, 2010.

DealBook, "F.D.I.C. Closes Sale of IndyMac," *New York Times*, March 20, 2009.

Financial Stability Board, "2019 List of Global Systemically Important Bank (G-SIBs)," November 22, 2019.

Greg Baer and Jeremy Newell, "The MRA is the Core of Supervision, But Common Standards and Practices are MIA," Bank Policy Institute, February 8, 2018.

Legal Information Institute, "Dodd-Frank: Title II - Orderly Liquidation Authority."

Lehman Brothers Holdings Inc., "2007 Annual Report," February 15, 2018, accessed using Internet Archive Wayback Machine.

Moody's Investors Service, Global Credit Research, "Demystifying Securitization for Unsecured Investors," *Moody's Corporation*, January 2003.

Morrison & Forester, "The Dodd-Frank Act: A Cheat Sheet," 2010.

Partnership for Progress, "Bank Holding Companies," *Federal Reserve Partnership for Progress*, December 31, 2012.

Obama White House Archives, "Remarks by the President at Signing of Dodd-Frank Wall Street Reform and Consumer Protection Act," July 21, 2010.

Obama White House Archives, "Remarks of the President on Regulatory Reform," June 17, 2009.

Paul Kiel and Dan Nguyen, "Bailout Tracker," *ProPublica*, October 2, 2019.

Paul L. Lee, "A Paradigm's Progress: The Single Point of Entry in Bank Resolution Planning," *Columbia Law School Blue Sky Blog*, January 18, 2017.

Randall D. Guynn, "Resolution Planning in the United States," in Andreas Dombert and Patrick S. Kenadijian, The Bank Recovery and Resolution Directive: Europe's Solution for "Too Big to Fail"?, 2013, 109-163.

Renae Merle, "A Guide to the Financial Crisis - 10 Years Later," *The Washington Post*, September 10, 2018.

Robin Sidel, et al., "WaMu Is Seized, Sold Off to J.P. Morgan, in Largest Failure in U.S. Banking History," *Wall Street Journal*, last updated September 26, 2008.

S&P Global Ratings, "Reflecting Subordination Risk In Corporate Issue Ratings," *S&P Global*, March 28, 2018.

Thomas Wade, "Bank Capital Requirements: A Primer," *American Action Forum*, October 16, 2018.

United States Government Accountability Office "Troubled Asset Relief Program: Capital Purchase Program Largely Has Wound Down," May 2016.

## IV.    REGULATIONS AND LEGISLATION

### A.    Federal Register

FDIC, "Assessments, Assessment Base and Rates," Federal Register, Vol. 75, No. 226, November 24, 2010.

FDIC, "Assessments, Large Bank Pricing; Final Rule," Federal Register, Vol. 76, No. 38, February 25, 2011.

FDIC, "Assessments, Large Bank Pricing; Final Rule," Federal Register, Vol. 77, No. 211, October 31, 2012.

FDIC, "Assessments; Final Rule," Federal Register, Vol. 79, No. 228, November 26, 2014.

FDIC, "Bank Holding Company Rating System," Federal Register, Vol. 69, No. 233, December 6, 2004.

FDIC, "Resolution Plans Required," Federal Register, Vol. 84, No. 212, November 1, 2019.

FDIC, "Resolution Plans Required for Insured Depository Institutions With $50 Billion or More in Total Assets," Federal Register, Vol. 77, No. 14, January 23, 2012.

FDIC, "Unsafe and Unsound Banking Practices: Brokered Deposits and Interest Rate Restrictions," Federal Register, Vol. 84, No. 25, February 6, 2019.

The Federal Reserve System, "Extension of Credit by Federal Reserve Banks," Federal Register, Vol. 80, No. 243, December 18, 2015.

### B.    Other Legislations and Regulations

"Dodd-Frank Wall Street Reform and Consumer Protection Act," Public Law 111-203, July 21, 2010.

"Emergency Economic Stabilization Act of 2008," Public Law 110–343, October 3, 2008.

"Federal Deposit Insurance Corporation Improvement Act of 1991," Public Law 102-242, December 19, 1991.

"Federal Reserve Act," Public Law 63-43, December 23, 1913.

"Subpart C—Confidential Information Made Available to Supervised Institutions, Financial Institution Supervisory Agencies, Law Enforcement Agencies, and Others in Certain Circumstances," 12 CFR §261.20.

## V.  REGULATORY FILINGS

BAC, "Bank of America Corporation 2019 Resolution Plan Submission - Public Executive Summary," July 1, 2019.

BAC, "Bank of America Corporation Resolution Plan, Public Executive Summary," July 1, 2015.

BAC, 2014 Form 10-K for the Fiscal Year 2014.

BAC, 2018 Form 10-K for the Fiscal Year 2018.

Bank of New York Mellon Corporation, 2018 Form 10-K for the Fiscal Year 2018, Exhibit 13.1.

Citigroup Inc., 2018 Form 10-K for the Fiscal Year 2018.

JPMorgan Chase & Co., 2018 Form 10-K for the Fiscal Year 2018.

Morgan Stanley, 2018 Form 10-K for the Fiscal Year 2018.

Northern Trust Corporation, 2018 Form 10-K for the Fiscal Year 2018.

State Street Corporation, 2018 Form 10-K for the Fiscal Year 2018.

The Goldman Sachs Group, Inc., 2018 Form 10-K for the Fiscal Year 2018.

Wells Fargo & Company, 2018 Form 10-K for the Fiscal Year 2018, Exhibit 13.

## VI.  DATA SOURCES

S&P Capital IQ.