# EXHIBIT 6
# FILED UNDER SEAL

# No. 1:17-cv-36-EGS-ZMF

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA

2

3   - - - - - - - - - - - - - - -+
                                 |
4   FEDERAL DEPOSIT INSURANCE    |
    CORPORATION,                 |
5                                |
             Plaintiff,          |    Case Number:
6                                |
       vs.                       |    1:17-cv-36-EGS
7                                |
    BANK OF AMERICA NA,          |
8                                |
             Defendant.          |
9   - - - - - - - - - - - - - - -+

10

11

12              Videotaped Deposition of
13                 BRENDA E. BRUNO
14                 Washington, D.C.
15             Thursday, April 25, 2019
16                    9:12 a.m.
17

18

19

20

21

22

23   Job No. 3286934
24   Reported by:  Laurie Donovan, RPR, CRR, CLR
25

Page 2

1              Videotaped Deposition of

2               BRENDA E. BRUNO

3

4  Held at the offices of:

5          Gibson, Dunn & Crutcher, LLP

6          1050 Connecticut Avenue, NW

7          Washington, D.C. 20036

8          (202)955-8500

9

10

11

12

13

14

15

16

17

18

19          Taken pursuant to notice, before

20    Laurie Donovan, Registered Professional

21    Reporter, Certified Realtime Reporter, and

22    notary public for the District of Columbia.

23

24

25

Page 3

1                    A P P E A R A N C E S

2   ON BEHALF OF THE PLAINTIFF:

3              Quinn, Emanuel, Urquhart & Sullivan

4              1300 I Street, NW

5              Suite 900

6              Washington, D.C. 20005

7              (202)538-8162

8              By:  Eric C. Lyttle, Esq.

9                   ericlyttle@quinnemanuel.com

10                  Kyra Simon, Esq.

11                  kyrasimon@quinnemanuel.com

12  ON BEHALF OF THE DEFENDANT:

13             Gibson, Dunn & Crutcher, LLP

14             1050 Connecticut Avenue, NW

15             Washington, D.C. 20036

16             (202)955-8500

17             By:  Marshall R. King, Esq.

18                  mking@gibsondunn.com

19                  Josh Robbins, Esq.

20                  jrobbins@gibsondunn.com

21                  Jason Shaffer, Esq.

22                  jshaffer@gibsondunn.com

23

24

25

Page 4

1   (Appearances continued)

2   ALSO PRESENT:

3               Malcolm Peplow, Videographer

4               Floyd I. Robinson, in-house for FDIC

5               Andrew A. Nicely, in-house for FDIC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 EXAMINATION INDEX

2                                              PAGE

3   EXAMINATION BY MR. KING . . . . . . . . . .    9

4   EXAMINATION BY MR. LYTTLE . . . . . . . . .   284

5   FURTHER EXAM BY MR. KING   . . . . . . . . .   286

6

7

8

9

10                  E X H I B I T S

11   EXHIBIT     DESCRIPTION                    PAGE

12   Exhibit 1   Schedule RC-O - Other Data for

13               Deposit Insurance and FICO

14               Assessments, BANA-00142876 . . .   44

15   Exhibit 2   Email chain with attachments,

16               FDIC-00000983 . . . . . . . . . .   76

17   Exhibit 3   FDIC, 12 CFR Part 327 - Final

18               Rule, BANA-00160736 . . . . . . .   98

19   Exhibit 4   Email chain with attachments,

20               FDIC-00004828 . . . . . . . . . .

21   Exhibit 5   Email from Brenda Bruno to

22               Patrick Mitchell, October 16, 2011,

23               with attachment, Bank of America

24               scorecard results, FDIC-00001035   145

25

Page 6

1  (Exhibits continued)

2  EXHIBIT       DESCRIPTION                        PAGE

3  Exhibit 6   Email exchange between Brenda

4              Bruno, Chris Hovik and David

5              Swett, September 19, 2011,

6              FDIC-00001037 . . . . . . . . .  152

7  Exhibit 7   Email chain with attachment,

8              FDIC-00001046 . . . . . . . . .  159

9  Exhibit 8   Email chain with attached

10              PowerPoint presentation "FDIC

11              Expense Calculation," FDIC 989 .  176

12  Exhibit 9   Email chain, FDIC-00002526 . . .  185

13  Exhibit 10  Email chain with attachments,

14              FDIC-00001240 . . . . . . . . .  199

15  Exhibit 11  Email chain, FDIC-00002539 . . .  206

16  Exhibit 12  Email from Brenda Bruno to David

17              Swett, dated May 11, 2012,

18              FDIC-00001002 . . . . . . . . .  212

19  Exhibit 13  Email chain, FDIC-00001005 . . .  218

20  Exhibit 14  Email chain, FDIC-00001701 . . .  231

21  Exhibit 15  Email chain with attachments,

22              FDIC-00003255 . . . . . . . . .  240

23

24

25

Page 7

1   (Exhibits continued)

2   EXHIBIT       DESCRIPTION                         PAGE

3   Exhibit 16  Email from Ed Jaklitsch to John

4               James and others, January 27, 2012,

5               with attached updated BANA Call

6               Report . . . . . . . . . . . . .  251

7   Exhibit 17  Email from La'Tonza Pettus to

8               Keith Mayle and others, dated

9               July 23, 2012, with attached

10              spreadsheets, FDIC-00000303 . . .  262

11  Exhibit 18  Email chain, FDIC-00003243 . . .  264

12  Exhibit 19  Email from Brenda Bruno to Chris

13              Hovik and Chris Cook, March 24,

14              2014, FDIC-00003240 . . . . . . .  272

15  Exhibit 20  Email chain, FDIC-00004536 . . .  278

16

17

18

19

20

21

22

23

24

25

Page 8

1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  Good morning.

3      We are going on the record at 9:12 a.m. on

4      Thursday, April 5, 2019.  This is media unit

5      1 of the video-recorded deposition of

6      Ms. Brenda Bruno taken by counsel for

7      defendant in the matter of Federal Deposit

8      Insurance Corporation versus Bank of America

9      NA, filed in the United States District Court

10     for the District of Columbia.

11                   This deposition is being held at

12     Gibson Dunn located at 1050 Connecticut

13     Avenue, Northwest, Washington, D.C.

14                   My name is Malcolm Peplow from the

15     firm Veritext Legal Solutions, and I am the

16     videographer.  The court reporter is Laurie

17     Donovan from the firm Veritext Legal

18     Solutions.  I am not authorized to administer

19     an oath, I am not related to any party in

20     this action, nor am I financially interested

21     in the outcome.

22                   Counsel and all present in the room

23     will now state their appearances and

24     affiliations for the record.  If there are

25     any objections to proceeding, please state

Page 14

1   sense of going on site and assigning CAMELS

2   ratings and assessing risk.

3        Q    Your answer makes me think you had some

4   role in interacting with or reviewing information

5   from Bank of America.

6             Is that correct?

7        A    Yes, that is correct.

8        Q    And what was that?

9        A    So when I moved into the large bank

10  insurance pricing section, we had developed a new

11  pricing assessment system for large banks, of

12  which Bank of America was one -- BANA, in

13  particular -- and my role in that was to assess

14  the appropriateness of the assessment rates to

15  Bank of America and any other large banks.  We had

16  about 100, 110 large banks in the portfolio, and

17  BANA was one of them.

18       Q    Okay.  I, I was actually -- my, my

19  earlier question, if it wasn't clear -- just let's

20  make the record clear -- was asking about

21  interactions you may have had while you were an

22  examiner until 2008.

23            Do I have that right?  You were, you

24  were an examiner until 2008, right?

25       A    That's correct.

```
                                          Page 15
 1      Q    During that period of time, did you have
 2   interactions with or review information from Bank
 3   of America or any of its predecessors?
 4      A    No.
 5      Q    Okay, but the answer you just gave dealt
 6   with the next position that you took when you were
 7   a senior financial analyst in the large bank
 8   pricing section, correct?
 9      A    That is correct.
10      Q    Okay.  What were your duties as senior
11   financial analyst in the large bank pricing
12   section?
13      A    So one of my duties was to assess the
14   appropriateness of deposit insurance assessments,
15   actually deposit insurance assessment ratings for
16   the 110 large banks that were designated as large
17   banks, and in doing that, I worked with a group of
18   individuals to develop, you know, various tools
19   to, to monitor the risk of these institutions.
20           I would also be responsible for -- when
21   I was assigned a particular institution, I might
22   be responsible for looking to see -- doing more of
23   a deeper dive and see if the institution, if the
24   institution's risk profile was consistent with the
25   assessment rate.
```

```
                                          Page 16
 1           I was also involved in some rulemaking
 2   when I was within the, when I was within that
 3   section.
 4                 THE REPORTER:  Rulemaking or role
 5       making?
 6                 THE WITNESS:  Rulemaking.
 7   BY MR. KING:
 8       Q    What does it mean to be involved in
 9   rulemaking?
10       A    So I would serve as a technical
11   consultant, rules that we were developing within
12   large bank pricing on assessment rates.  When I
13   was in the group, we were embarking on a new
14   assessment rate methodology, developing that, and
15   so I was part of a team that would talk about
16   how -- what we wanted that rate, that insurance
17   system to look like.
18           And I was also involved in helping to
19   draft some of the, some of the rules, not all of
20   them, but some of them, but serve as a technical
21   consultant on the rules, and then also speak with
22   various institutions on questions about the rules.
23   I served as a contact for some of the rules.
24       Q    Okay.  We'll come back to that.
25           So your next position was as -- let me
```

```
                                        Page 17
```

1   make sure I have this right -- as risk management

2   supervisor in the complex financial -- maybe you

3   can repeat.

4              In September of 2014, you moved to a new

5   job; yes?

6        A    That's right, yes.

7        Q    Okay.  Explain what that -- give me the

8   name of the job again, and --

9        A    Sure.

10        Q    -- then explain the responsibilities.

11        A    Yes.  So in I believe it was

12   September-ish of 2014, I moved to our complex

13   financial institutions group, and -- as a senior

14   financial analyst in our financial products and

15   practices group, and in that role I was more of

16   a -- I was responsible for performing risk

17   analysis of particular risk stripes across our

18   SIFI universe.

19              So in complex financial institutions, we

20   monitor the 14 systemically important financial

21   institutions, of which Bank of America Corporation

22   is one of those, but my role was to do -- perform

23   horizontal analysis of various risks across the

24   complex banking industry.

25        Q    Okay, and then you moved into a role

                                              Page 18

1   more recently?

2          A     That's correct, yes.

3          Q     Okay.  Give me the name of that role

4   again.

5          A     So I'm chief of supervisory programs,

6   Section 1, and in that role -- well --

7          Q     You anticipated correctly.  What was

8   your -- what's your job now?

9          A     And so I supervise a team of specialists

10  or examiners who actually go out and perform

11  targeted reviews at the various SIFIs.

12         Q     And you began in that role when?

13         A     October of 2018.

14         Q     For the benefit of the court reporter,

15  SIFI is capital S-I-F-I?

16         A     That's correct.  It stands for

17  systemically important financial institutions.

18         Q     Okay.  I want to focus on, go back to

19  the period when you were in the large bank pricing

20  section of the division of insurance and research.

21  That, that was from, if I have that right,

22  approximately December 2008 to September-ish 2014;

23  is that right?

24         A     Correct.

25         Q     Okay.  Tell me what the role of the

 1   large bank pricing section was within the FDIC.

 2        A    So could you clarify?  Role in general

 3   or --

 4        Q    What, what, what functions did that

 5   group serve within the FDIC?

 6        A    Sure.

 7             So our, our mission, if you will, or

 8   our, our charge was to ensure that large, uh,

 9   large institutions, large insured depository

10   institutions, which would be institutions

11   $10 billion in total assets or greater, were

12   assessed for deposit insurance appropriately, and,

13   and it was our responsibility to ensure that the

14   systems that we had in place to monitor that

15   firm's assessment rates were being charged

16   appropriately, were, were accurate, fair, and so

17   forth.

18        Q    And how, how did you determine whether

19   something was appropriate?  What was the defining

20   guidelines for appropriateness?

21                  MR. LYTTLE:  Form.

22                  THE WITNESS:  So there was a

23        pricing system in place that we -- that, that

24        FDIC had adopted, so the FDIC adopts a

25        rulemaking notice and comment and all that

Page 20

```
 1        through the industry, what the pricing system

 2        should be, so there was already a system in

 3        place, and so we -- our role was to make sure

 4        that banks were being priced according to

 5        that particular system.

 6   BY MR. KING:

 7        Q    Were you making sure that the banks were

 8   complying with the rules that were in place?  Was

 9   that your job?

10        A    I would say yes.  However, the degree to

11   which we would make sure they were complying

12   varied, depending on staffing, depending on many

13   things.

14        Q    Okay.  Is there another group within the

15   FDIC that was primarily charged with ensuring that

16   banks were complying with the rules regarding

17   pricing?

18                  MR. LYTTLE:  Form.

19                  THE WITNESS:  No.  I mean in large

20        bank pricing, it was a very specialized

21        system, so when I first came aboard, there

22        was one system that banks were assessed

23        under.

24                  During my tenure within large bank

25        pricing, we developed a new assessment
```

                                                      Page 21

1          system, and it was very specialized, and the
2          only group that, that had that expertise was
3          the large bank pricing section.
4     BY MR. KING:
5          Q    Help me a little bit with the hierarchy
6     of the FDIC.  Where does the large bank pricing
7     section sit within the hierarchy?
8          A    So the FDIC has I believe seven or eight
9     divisions, and so division of insurance and
10    research is where the large bank pricing section
11    fits in, a lot of economists in that area, it's
12    insurance pricing, it's the deposit insurance fund
13    management, so it's the group that makes sure that
14    the deposit insurance fund is, is solvent.
15              And then there are various other
16    divisions such as risk management supervision,
17    which is the division that I started in where most
18    of our examiners are, and then there's the
19    division of finance, there's the division of
20    consumer -- actually DIT, which is division of
21    information technology.  So DIR is a separate
22    division, separate from supervision.
23         Q    When you began in the large bank pricing
24    section in 2008, who were you reporting to?
25         A    Lisa Ryu.

```
                                          Page 22

 1        Q      Could you spell that?

 2        A      R-Y-U is the last name.

 3        Q      And for how long did you report to Lisa

 4   Ryu?

 5        A      I'm kind of guessing here.  I, I want to

 6   say maybe two, three years.

 7        Q      Okay, and then who became your, your

 8   boss?

 9        A      Pat Mitchell.

10        Q      Okay, and how long -- is that a man?

11        A      Yes, mm-hmm.

12        Q      How long was Mr. Mitchell in that role?

13        A      I want to say maybe one or two years.

14        Q      Okay, and then who did you begin

15   reporting to?

16        A      Scott Ciardi, C-I-A-R-D-I.

17        Q      And each of those -- was there anybody

18   else you reported to at a later time after

19   Mr. Ciardi?

20        A      Within large bank pricing?

21        Q      Yes.

22        A      No.

23        Q      Okay.  All right.  What was, what was

24   the title or position of each of these individuals

25   when they were your boss?
```

```
                                              Page 23

 1        A    Chief of the large bank pricing section.

 2        Q    And who did they report to?

 3        A    They would have reported to the

 4   associate director for that area, and for a

 5   time -- that's who they would have reported to.

 6        Q    When you say "that area," the associate

 7   director of insurance -- make sure I have this

 8   right -- insurance and research?

 9        A    I can't recall if it was -- that's the

10   division itself, and there's different branches,

11   and I, I can't recall the actual branch that the

12   associate director would be over, but it's -- it

13   would, it would encompass the large bank insurance

14   pricing section.  They have another section, too,

15   but I can't recall the, the overall name of that

16   section.

17        Q    What were the other branches within the

18   division of insurance and research?

19        A    What were the other branches?

20        Q    Yes.

21        A    I honestly cannot remember.  As I said,

22   there was -- I think there was an economic,

23   economic analysis section.  There was a section

24   that would monitor the, the fund pricing, but

25   honestly, I can't remember their name.
```

Page 24

1      Q     Okay.

2            Was the large bank pricing section

3   responsible for interacting directly with any of

4   the large banks during that period of time?

5                    MR. LYTTLE:  Form.

6                    THE WITNESS:  So that was, that was

7        not our responsibility.  In fact, we -- the

8        protocol is to work through the on-site teams

9        that are part of RMS supervision.  So we

10       would have -- we have -- FDIC has teams of

11       individuals in place or working, uh,

12       monitoring the risks of the various SIFIs,

13       but we are not the primary federal regulator,

14       so therefore our protocol is to work through

15       those teams first.  If we had any questions

16       for any of the SIFIs, we would go through the

17       team first.

18            Occasionally we might have to

19       directly speak with the bank if they would

20       reach out to us with deposit insurance

21       pricing questions or if the teams would refer

22       the bank to us on deposit insurance pricing

23       matters.

24   BY MR. KING:

25       Q    Okay.  You used the term "RMS

Page 25

1   supervision."

2        A    Oh, yes.

3        Q    Could you explain what that is?

4        A    Yes.  That's the division -- that's the

5   risk management supervision division of FDIC.

6   That's the supervision function of FDIC.

7        Q    Is that a branch within the division of

8   insurance and research or, or a different

9   division?

10       A    That's a different division.

11       Q    What division?  Is that a whole

12  division?

13       A    Right.

14       Q    That's a division in and of itself?

15       A    That's correct.

16       Q    Thank you.

17            During the period of time when you were

18  in the large bank pricing section, did you have

19  people reporting to you?

20       A    Not officially, but when I was in the

21  role of sort of gathering commentary and

22  discussion on rulemaking, I was the point of

23  contact for discussion and so forth, but, but not

24  an official supervisor.

25       Q    During your tenure in the large bank

```
                                        Page 26
 1   pricing section, did you have interaction directly
 2   with anyone from Bank of America?
 3        A    Could you repeat that question, please.
 4        Q    During the period of time that you were
 5   in the large bank pricing section, did you have
 6   interaction directly with anyone at Bank of
 7   America?
 8        A    Yes.
 9        Q    Okay.  What do you recall about those
10   interactions?
11        A    I did present a presentation on large
12   bank pricing to, to the bank.  I was also -- I
13   would discuss some questions the bank might have
14   about insurance pricing matters.
15        Q    Are you finished?
16        A    Yes.
17        Q    Okay.  How often did you discuss
18   questions the bank had about insurance pricing
19   matters?  One occasion?  Ten occasions?  110
20   occasions?
21        A    I would say less than a handful.
22        Q    Do you remember who the contact was at
23   Bank of America?
24        A    I do remember emailing with La'Tonza --
25   I can't recall her last name --
```

Page 27

1    Q    Okay.

2    A    -- on a particular matter.  That's all

3  that I remember.  There could be more, but I, I

4  don't remember.

5    Q    Do you remember the, the matter that you

6  were emailing this La'Tonza Pettus, P-E-T-T-U-S?

7    A    Okay.

8    Q    Is that who you were thinking of?

9    A    Yes.

10    Q    Okay.  Probably not too many La'Tonzas.

11         Do you remember the subject that you

12  were emailing with her about?

13    A    Yes.  I believe it was about -- we had

14  this transition guidance for how to -- actually, I

15  think, ████████████████████████████████████████

████  ██████████████████████    ████████████████████

████  ████████████████████████████████████████████

████  █████████████████████  and we did have a, sort of a

19  transition rule for, for presenting that material

20  for banks to report that information, and so I do

21  remember emailing with her back and forth

22  regarding that issue.

23    Q    Do you remember what year that was?

24    A    I don't.  Uh, I don't.

25    Q    Can you pinpoint it as being before 2011

Page 28

1    or after 2011?

2         A    It would have been after 2011.

3         Q    Do you know who Christopher Hovik is?

4         A    Yes.

5         Q    Who is Mr. Hovik?

6         A    He's an on-site team member at Bank of

7    America.  Works for the FDIC.

8         Q    And while you were a senior financial

9    analyst in the large bank pricing section, did you

10   have occasion to interact with Mr. Hovik

11   concerning Bank of America?

12        A    Yes.

13        Q    What do you remember about your

14   interactions with Mr. Hovik?

15        A    I recall for a time he was -- he might

16   have been the lead for that team, which means he

17   would be the person I would first reach out to if

18   I had questions about the risk profile of the

19   institution or questions about maybe something I

20   might have read in a report of examination related

21   to the firm, and so I would reach out to Chris to

22   gather facts about how that might impact the

23   firm's risk profile.

24        Q    Okay.  Anything else you can recall

25   about those interactions?

1      A      Nothing specific.  I think it was more

2   about sort of picking his brain about what does he

3   know about the firm and their risk profile and how

4   could that impact my role in terms of are we

5   properly assessing them for insurance.

6      Q      Do you know who Christopher Cook is?

7      A      Yes.

8      Q      And who is Mr. Cook?

9      A      Chris Cook was also a team member, an

10  on-site team member for the FDIC at Bank of

11  America.

12     Q      Okay, and did you have interactions with

13  him while you were in the large bank pricing

14  section concerning Bank of America?

15     A      Yes.

16     Q      Okay, and what do you recall about your

17  interactions with him?

18     A      I do recall reaching out to Chris on --

19  asking him why -- well, reaching out to the team

20  with several questions about Bank of America, but

21  one of the questions in particular was why the

22  ████████████████████████████████████████████████,

23  and this, this was right around the time that the

24  firm had amended their call reports I think for

25  second and third quarter 2011 for errors in

1   people didn't come on board until after that rule,

2   so they wouldn't be involved, obviously.

3        Q    Thank you.

4             What was the purpose of developing the

5   new pricing system?

6                  MR. LYTTLE:  Again, I'm going to

7             caution her to not disclose internal

8             deliberations under the deliberative process

9             privilege.  However, she can answer as to her

10            own individual knowledge.

11                 THE WITNESS:  So we were actually

12            mandated from Dodd-Frank Act to implement a

13            new risk-based deposit insurance premium

14            system, one that would incorporate losses to

15            the deposit insurance fund for large

16            institutions, and one that would be more

17            forward-looking, and one that would exclude

18            the use of debt ratings in assessing deposit

19            insurance -- in assessing firms for deposit

20            insurance.

21   BY MR. KING:

22        Q    Was there a particular person who was in

23   charge of the effort to develop the new pricing

24   system?

25        A    Yes.  Lisa Ryu was leading the effort.

```
                                              Page 41

 1        Q     Is Lisa Ryu still at the FDIC?

 2        A     No.

 3        Q     Where is she today?

 4        A     She works for the Federal Reserve Board.

 5        Q     The new pricing system that was

 6   developed had a concentration measure as part of

 7   it.

 8              Are you familiar with that?

 9        A     Yes.

10        Q     Okay.  What was the -- what was your

11   understanding of the purpose of the concentration

12   measure?

13                   MR. LYTTLE:  Again, same caution

14         not to disclose any internal deliberations

15         under the deliberative process provision.

16         However, if you can answer as to your own

17         individual knowledge and understanding, do

18         that.

19                   THE WITNESS:  It was one of the

20         inputs, one of the metrics used to measure

21         the risk exposure or the risk profile of

22         institutions.

23   BY MR. KING:

24        Q     Why was it used?

25                   MR. LYTTLE:  Same caution.
```

```
 1              THE WITNESS:  During the financial
 2         crisis, it was determined that counterparty
 3         risk was a very significant cause of near
 4         failures of our large institutions.
 5    BY MR. KING:
 6         Q    What's the basis for your understanding
 7    of that determination?
 8         A    I think it's based on research and, and
 9    knowledge of the -- well, based on research that
10    was performed, not by myself, but by others on
11    what happened to banks during the financial
12    crisis.
13         Q    And in your understanding, how did the
14    concentration measure attempt to capture the risk
15    posed to a bank?
16         A    So there were several concentration
17    measures.  There were the higher risk asset
18    measures, there were the higher risk
19    securitization measures, the concentration
20    measures.
21              Can you repeat the question again?
22         Q    Sure.
23              How did the concentration measure
24    attempt to capture the risk posed to a bank?
25                   MR. LYTTLE:  In her understanding?
```

1                    THE WITNESS:  Yeah, so in my

2          understanding, it was the greater the

3          exposure that banks had to these higher risk

4          assets -- in other words, the, the more these

5          higher risk assets that they had on their

6          books, the higher their risk profile would

7          be.

8    BY MR. KING:

9          Q    There were -- part of the concentration

10   measure had nothing to do with the nature of the

11   risk assets; am I right?  It just had to do with

12   the amount of concentration in a counterparty?

13                    MR. LYTTLE:  Form.

14                    THE WITNESS:  So the measure itself

15         was, was the dollar amount measure, but we do

16         have, we do have, we do have other tools

17         within our pricing system that allow us to

18         adjust for qualitative factors.

19   BY MR. KING:

20         Q    Those are, those are other inputs --

21   I'm sorry.  I didn't mean to interrupt.  Were you

22   finished with your answer?

23         A    Yes.

24         Q    Those are other inputs into the pricing

25   formula, correct?

1      A      Could you be more specific?

2      Q      When you said there are other tools

3   within the pricing system that allow you to adjust

4   for qualitative effect, what you mean is there are

5   other inputs into the pricing system that assess

6   the level of risk of a particular asset, correct?

7                    MR. LYTTLE:  Form.

8                    THE WITNESS:  So the, uh, there's

9         the qualitative part of the pricing system,

10        yes, so that would allow us to adjust for the

11        qualitative factors.

12   BY MR. KING:

13     Q      And what's your understanding of how

14   the -- well, let's be more specific, I suppose.

15             Let's mark this as Defendant's Exhibit

16   1.

17                    (Exhibit 1 was marked for

18                    identification.)

19   BY MR. KING:

20     Q      All right.  Ms. Bruno, we've handed you

21   what we've marked as Defendant's Exhibit 1.  Could

22   you take a moment to look at that and tell me if

23   you recognize it as the instructions for Schedule

24   RC-O that were developed and went into effect in

25   2011?

Page 45

```
 1      A     So, so technically what I see on the
 2   bottom here, the date is March of 2012.  It is
 3   possible that, that some of these definitions
 4   might have changed since 2011, but this tells me
 5   that as of March 2012, these are the definitions.
 6      Q     Fair enough.
 7            Let me direct your attention to the
 8   second-to-last page of the document, which has a
 9   number in the bottom corner that ends in 904.
10            Do you see that?
11      A     Yes.
12      Q     All right.  Let me know if you recognize
13   the instructions on this page as the instructions
14   for memorandum items 14 and 15 of Schedule RC-O
15   that were in effect in 2011 and 2012.
16      A     Yes.  I will say I recognize this
17   definition, and given the date -- it's March of
18   2012 -- like I said, it's possible there could
19   have been changes, but . . .
20      Q     Am I right that the memorandum items 14
21   and 15 applied only to highly complex
22   institutions?
23      A     That is correct, yep.
24      Q     Why was the decision made to apply those
25   items and require submission of information
```

```
                                       Page 46
 1    regarding those items only of highly complex
 2    institutions?
 3               MR. LYTTLE:  I'm going to instruct
 4         her to only -- not to disclose any
 5         deliberations under the deliberative process
 6         privilege.  However, if she has an individual
 7         understanding or view, she can give that
 8         answer.
 9               THE WITNESS:  So we did know that
10         the Fed had been collecting information on
11         counterparty exposures since 2008, also using
12         that consolidated entity level instruction,
13         and so obviously that had already been an
14         industry indicator of risk to these large,
15         highly complex institutions.
16               And then aside from that, all of
17         the metrics, as you, you can see from the
18         rule, were, were sort of tested and
19         statistically validated, and so this was one
20         of those metrics that was statistically
21         tested to see how, how well it correlated to
22         an increasing risk profile or an
23         institution's potential failure.
24    BY MR. KING:
25         Q    Okay.  Let's -- uh, let me unpack that a
```

1                as to the deliberate process privilege.

2                          THE WITNESS:  I mean in, in my own

3                opinion, it was because counterparty

4                exposures were so large for these highly

5                complex firms, there would be more -- they're

6                just -- they just had more counterparty

7                exposure than the smaller large banks, if you

8                will.

9        BY MR. KING:

10               Q    Okay.  How did you know that?

11               A    I think once again it was probably based

12       on others who, who were in the know about that.

13               Q    Others on the large bank pricing team?

14               A    The large bank pricing team and possibly

15       some others in RMS.  Remember, RMS is that

16       separate division, the supervision division.

17               Q    So your understanding is simply because

18       the absolute amount of their counterparty

19       exposures was greater than for other banks?

20       That's why these provisions applied only to HCIs?

21                          MR. LYTTLE:  Form.

22                          THE WITNESS:  I would say that's

23               partially it.  There's, there's a full

24               explanation in the rule as to why we included

25               it.  Unfortunately, I don't remember all of

```
 1        that.  I would say that was a big part of it,

 2        and, and as I said earlier, during the 2008

 3        financial crisis, when people had done

 4        look-backs to find out what were some of the

 5        major causes, they found that counterparty

 6        exposure was a really big risk for some and

 7        helped to, to actually bring down some of the

 8        bigger firms.

 9   BY MR. KING:

10        Q    Was counterparty exposure a risk for

11   smaller banks?

12                  MR. LYTTLE:  Form.  Foundation.

13                  THE WITNESS:  Yes.  Counterparty

14        risk would be a risk for any, any bank, but

15        it's, it's more prevalent in the larger

16        banks.

17   BY MR. KING:

18        Q    Do you recall discussions within the

19   large bank pricing section regarding whether the

20   requirement to report counterparty exposures

21   should apply only to HCIs or should apply to

22   others as well?

23                  MR. LYTTLE:  She can answer that

24        question as to the fact of discussions.

25                  THE WITNESS:  Can you repeat that
```

                                                              Page 52

1          question again, please?

2                    MR. KING:  Can you read it back?

3                    THE REPORTER:  Yes.

4                    (Whereupon, reporter reads

5                    requested material.)

6                    THE WITNESS:  I can't recall

7          specific discussions.  I mean unfortunately I

8          can't.

9     BY MR. KING:

10         Q    Do you recall the fact of discussions?

11                   MR. LYTTLE:  Asked and answered.

12    BY MR. KING:

13         Q    Do you recall generally that there were

14    such discussions?

15                   MR. LYTTLE:  Asked and answered.

16                   THE WITNESS:  I don't know that I

17         was a part of those, so I can't say for sure.

18    BY MR. KING:

19         Q    All right.  I think you said you were

20    designated as a contact person to whom banks could

21    direct questions regarding the pricing rules; is

22    that correct?

23         A    That's correct, yes.

24         Q    So were you authorized to speak on

25    behalf of the FDIC in answering those questions?

1            MR. LYTTLE:  Form.

2            MR. KING:  What was wrong with the

3       form?

4            MR. LYTTLE:  "Authorized to speak,"

5       I don't know what that means.

6  BY MR. KING:

7       Q    You can answer the question.

8       A    Yeah, I guess I have that question, too.

9  I guess is there a certain capacity or --

10      Q    Did someone tell you that you could

11  answer the questions that, that banks might have

12  regarding pricing?

13      A    I don't know that someone explicitly

14  told me, but if you look at the language in the

15  rule, it will say "for questions, contact," you

16  know, a number of people, and then our names would

17  be there, so yeah.

18      Q    How did you come to be one of the people

19  who was designated as a contact person?

20      A    My supervisor, Lisa Ryu, put me as a

21  contact on the rule.

22      Q    Did she tell you you were allowed to

23  answer questions when people called?

24      A    I would think so, yeah.

25      Q    What's counterparty exposure?

```
                                                    Page 54
 1       A     So counterparty exposure arises when
 2   another party owes you money.
 3       Q     Are there different ways of calculating
 4   counterparty exposure?
 5       A     Yes.
 6       Q     What's a counterparty?
 7       A     Well, in the financial sense, a
 8   counterparty would be an individual -- or would be
 9   an entity or another entity that owes you money.
10   You've, you've engaged in some sort of a trade or
11   a deal.
12       Q     How was it decided to require HCIs to
13   report their top 20 counterparty exposures as
14   opposed to some other number of counterparty
15   exposures?
16                 MR. LYTTLE:   I'm going to instruct
17        her not to answer that question under the
18        deliberative process privilege.
19   BY MR. KING:
20       Q     Did you ever raise a question in your
21   own mind -- did you ever have a question in your
22   own mind of why the rule required HCIs to report
23   their top 20 counterparty exposures as opposed to
24   the -- some other number of top counterparty
25   exposures?
```

1                MR. LYTTLE:  You can answer.

2                THE WITNESS:  No.

3     BY MR. KING:

4         Q    Under the instructions that were in

5     place for the period of 2011 through 2014 -- do

6     you have that in mind?

7         A    (Nods.)

8         Q    Yes?

9         A    Could you be more specific about which

10    instructions?

11        Q    When the, when the instructions that are

12    in front of you, when Defendant's Exhibit 1 were

13    in place --

14        A    Okay.

15        Q    -- would a bank's exposures to its own

16    related entities constitute counterparty exposure?

17        A    Yes.

18        Q    Does the rule say that?

19        A    Does the rule say that?  I'd have to

20    look at the exact language in the rule, but yes,

21    that, that was the intent.

22        Q    That was the intent?

23        A    It's probably written in the rule as

24    well, but yes, that was absolutely the, the

25    language, and the, the definition that I'm looking

```
                                          Page 56
 1    at in front of me here also includes various
 2    exclusions, but it does not include exclusions for
 3    related entities.
 4        Q    Okay.  Does a bank's exposure to its own
 5    subsidiaries constitute counterparty exposures
 6    that should have been included in the reporting on
 7    lines 14 and 15 of Schedule RC-O?
 8        A    So rephrase the question to make sure I
 9    understand, because it does matter if we're
10    talking about the bank's subsidiary or another
11    subsidiary.
12        Q    I'm talking about the bank's subsidiary.
13        A    Okay.
14        Q    So the question is:  Does a bank's
15    exposure to its own subsidiaries constitute
16    counterparty exposures that should have been
17    included in the calculations in lines 14 and 15 of
18    Schedule RC-O?
19        A    No.
20        Q    And why is that?
21        A    Because a bank's subsidiaries get
22    consolidated up to the bank level, so in
23    consolidation they would not be owing each other
24    money.  Those -- that counterparty risk -- the
25    counterparty exposure cancels out in
```

 1   consolidation.  That's different than exposure to

 2   an affiliate that is not a subsidiary.

 3        Q    And why is it different?

 4        A    So an affiliate that is not a

 5   subsidiary -- so if you -- in the example of Bank

 6   of America, so BANA, the, the parent holding

 7   company would be an affiliate of Bank of -- of

 8   BANA.  Bank of America could owe -- Bank of

 9   America Corporation could owe BANA money.

10             So in the event of a failure, our

11   concern at the FDIC is what -- who owes the IDI

12   money, the insured depository institution, who

13   owes BANA money -- yes, insured depository

14   institution, and so any -- so our view is looking

15   at the, the IDI, like I said, the insured

16   depository institution, so in this case, BANA, and

17   any exposure that BANA has to other affiliates

18   that are not subsidiaries of BANA, that's money

19   that they're owed.

20             And so in a, in a failure situation or

21   a, in a bankruptcy situation or so forth, it's

22   possible BANA may not get their money from these

23   other affiliates that are not subsidiaries of

24   BANA, and so, therefore, we look at that as a

25   separate exposure, a separate risk.

Page 119

1    saying, hey, we're on slide 2 or we're on slide 3,

2    but I, I don't know for sure.

3        Q    So looking at the, the page that you're

4    looking at now, there's a bunch of invitees listed

5    both from Bank of America and from the FDIC in the

6    middle of the page.

7            Do you see that?

8        A    Yes.

9        Q    Do you know which of these people was

10    actually on the call?

11        A    I don't.

12        Q    Do you, do you have a recollection

13    independent, well, by reference to this or

14    independently, of who was on the call?  Let's

15    start with from the FDIC.

16        A    I honestly can't tell you for sure who

17    was on that call that day.  I don't recall.  I

18    made a lot of these presentations.

19        Q    And is the same true of, of the, the

20    participants from Bank of America?

21        A    That's, that's right.  I, I don't know

22    who was on that call.

23        Q    Okay.  The agenda is set out at the

24    bottom of this page for an hour's worth of, of a

25    meeting.

Page 120

1          Do you recall that's about how long the
2   meeting lasted?
3       A    I think so, yeah.
4       Q    And the bulk of the time allocated is,
5   is to a presentation by the FDIC on the new
6   deposit insurance methodology, right?
7       A    Yes.
8       Q    Is it your recollection that that is how
9   the meeting proceeded, with, with the FDIC taking
10   up the bulk of the time with the presentation?
11       A    Yes.
12       Q    Okay.
13          Attached behind the next green sheet --
14   and it's FDIC, Bates number FDIC 4830, is -- is
15   this the presentation material that you walked
16   through with the Bank of America participants?
17       A    Yes, it looks to be the same one.
18       Q    Okay.  Were you the lead presenter?
19       A    Yes.  I was the only presenter.
20       Q    That was my next question.  Thank you.
21          Do you recall whether -- what role Keith
22   Mayle played during that, that presentation?
23       A    I, I don't.  I, I don't recall
24   interacting with Keith very long, so I'm not sure
25   what his role was on the team and when he rolled

```
                                             Page 121
 1   off that team.
 2        Q    Okay.  Do you recall Patrick Mitchell
 3   being part of the presentation?
 4        A    I don't.  I don't recall if he was there
 5   or not.
 6        Q    Okay.  What do you recall -- well, let
 7   me ask it a different way.
 8             What was the purpose of the meeting?
 9        A    So the purpose was for us to -- well,
10   there's the back purpose, right?  As I said, we
11   were new to -- our on-site team was new to Bank of
12   America, and so we reached -- ███████████████████
     ████████████████████████████████████████████████
     ████████████████████████████████████████████████
     ████████████████████    Once again, we felt it would be
16   some value added the FDIC could provide to the
17   bank, and so that was it.  It was more about it's
18   the new pricing system, would you be interested in
19   hearing about it, and so the bank accepted.
20        Q    I think you said you were -- you did
21   many of these presentations; is that right?
22        A    I did, mm-hmm.
23        Q    Did you do, do similar presentations to
24   other highly complex institutions?
25        A    I don't recall giving any of these
```

Page 122

1    presentations specifically to other banks.

2         Q    Focusing on the Bank of America

3    presentation, do you recall whether you received

4    any questions from anyone at Bank of America on

5    the conference call?

6         A    I, I don't recall.  I'd have to assume I

7    got questions, but I don't recall what they were.

8         Q    Do you recall anything about the

9    discussion that was held?

10        A    I don't.

11        Q    Okay.  I asked you a moment ago whether

12   you did similar presentations to other highly

13   complex institutions, and you said you didn't --

14   you don't recall giving it to other banks.

15        A    Correct.

16        Q    Who did you give the presentations to if

17   not banks?

18        A    Internally or to other groups within the

19   FDIC, other supervisors or regulators, to the --

20   to maybe the staff at the OCC or at the Fed, and

21   during various training sessions within the FDIC.

22        Q    Got it.

23        A    And also industry.

24        Q    What do you mean the "industry"?

25        A    Well, actually, I have to think about

```
                                        Page 130
 1        Q    Was that a written protocol or just a
 2   practice that developed?
 3        A    I don't believe it was written.  I think
 4   it was just practice.
 5        Q    Are you familiar with the FDIC's process
 6   for reviewing the call reports that were submitted
 7   on a quarterly basis by the HCIs?  I'll focus on
 8   the HCIs unless, unless I'm -- unless my question
 9   is specifically asking about some others.  At
10   least I'll try to make it that way, so let's,
11   let's start with the basics.
12             The -- each of -- there are eight HCIs;
13   is that right?  Nine?
14        A    It might be nine.
15        Q    Nine HCIs?
16        A    I think there were nine.
17        Q    There were nine HCIs at all, at all
18   times that you were in the large bank pricing
19   section?
20        A    I think that's right, but I don't know
21   for sure, but I think so.
22        Q    And they submitted call reports on a
23   quarterly basis; is that right?
24        A    That's correct.
25        Q    And included on those call reports was
```

Page 131

1    Schedule RC-O; is that right?

2         A    Yes.

3         Q    Okay, and Schedule RC-O included the

4    counterparty exposure reporting in items 14 and

5    15, correct?

6         A    Yes, that's correct.

7         Q    All right.  Are you familiar with the

8    process by which the FDIC reviewed the quarterly

9    submissions from the HCI -- from the HCIs?

10        A    Could you be more specific, like time

11   frames, what, what was the process, which process?

12        Q    Beginning, beginning in 2011, okay, what

13   did the FDIC do with call reports when they were

14   submitted?

15                  MR. LYTTLE:  Form.  Foundation.

16                  THE WITNESS:  I'm not sure what the

17        FDIC did, but in my group, we, we didn't do

18        anything with them.

19   BY MR. KING:

20        Q    Okay.  Was there a group within the FDIC

21   that was responsible for reviewing them?

22        A    So no.  I mean I, I think in general, on

23   exams, if it was part of a scope of an exam,

24   examiners might review portions of a call report,

25   but they wouldn't review RC-O.

Page 132

1      Q    Someone at --

2      A    When --

3      Q    Go ahead.  I'm sorry.

4      A    I was going to say when I say "review,"

5  I mean I verify call reports, but, but not RC-O,

6  because -- in fact, we, we made a push to try to

7  have our call report unit review RC-O, and they

8  said they wouldn't do it, because they don't have

9  the expertise, to which we agreed, like okay, and

10  we said, well, we could train you, and they said

11  no, we, we don't really have the staff for that,

12  we prefer you guys handle it.

13      Q    What's the call report unit?

14      A    It's, it's the group that -- I'm

15  actually not quite sure what they do, but they're

16  a separate group.  Well, they, they answer

17  questions from the public on different questions

18  they might have on the call report, and aside from

19  that, I'm not sure what they do.

20      Q    I haven't yet asked a good question,

21  because I haven't -- because this should be clear,

22  but I'll try and make it clear.

23           The call reports were used to determine

24  the assessments that each HCI received each

25  quarter; am I right?

1      A      The call reports provided an input into

2    the scorecard --

3      Q      Okay.

4      A      -- which then calculated the assessment.

5      Q      What group within the FDIC was

6    responsible for taking those inputs, running them

7    through your scorecard, and determining the

8    assessment that was to be made?

9      A      So I'm not, I'm not sure if it was

10   automated or not, but I do know -- like Robert

11   Oshinsky was someone who worked in DIR who we

12   would contact if we had questions about what a

13   bank's assessment rate was for previous quarters

14   or, or whatnot, but I, I, I don't know.  I, I feel

15   like the system was automated where, when the bank

16   submitted their call report numbers, it was

17   plugged right into the scorecard, but I don't know

18   that, I don't know that for sure.

19     Q      Did the large bank pricing section have

20   any involvement in reviewing the Schedule RC-Os

21   that were submitted by the HCIs?

22              MR. LYTTLE:  Do you want to put a

23        time period around that or no?

24   BY MR. KING:

25     Q      2011 to 2014.

1      A     Could you repeat that?

2      Q     I blame Eric for --

3                  MR. LYTTLE:  I was trying to help.

4  BY MR. KING:

5      Q     During 2011 through 2014, did the large

6  bank pricing section have any involvement in

7  reviewing the Schedule RC-Os that were submitted

8  by the HCIs?

9      A     Not that I recall, but if we saw -- so

10  no, we, we -- I don't recall having any

11  specific -- being tasked with verifying call

12  reports at all, but if we saw changes in numbers,

13  we might ask questions.

14      Q     What would lead you to notice a change

15  in the number if you weren't responsible for

16  reviewing these?

17      A     So we had templates that we, that we've,

18  that we've developed that have various metrics for

19  each of the firms; helps us to track the risk

20  profile.  So it's templates that have hundreds and

21  hundreds of metrics on there, and if we would see

22  a metric that changed a lot from quarter to

23  quarter, and we could see that that was a result

24  of something that was reported on RC-O, then we

25  would ask -- we would, we would go to the on-site

                                                    Page 135

1    teams and have them ask the question of the bank.

2         Q    So let me ask this question:  Did you

3    ever, from 2011 to 2014, yourself, look at a

4    Schedule RC-O that an HCI submitted?

5         A    I, I might look at them, but, but I

6    wouldn't -- I didn't verify numbers.

7         Q    And so the, the templates that you're

8    referring to with the various metrics, these were

9    templates that someone else was responsible for

10   maintaining, some other group was responsible for

11   maintaining?

12        A    No.  They were templates in our group.

13        Q    Okay.  So how did the numbers come to

14   populate these templates?

15        A    I, I'm not sure.  I think it was again

16   one of those automatic inputs, the SAS program

17   that was written to pull from --

18        Q    SAS?

19        A    S-A-S.  It's a programming program,

20   yeah, but I, I'm not sure exactly who developed

21   those templates, but we would use those templates

22   to help us look for changes in numbers.

23        Q    Is there a particular person within the

24   large bank pricing section who was responsible for

25   maintaining those templates?

Page 201

1    email.  Once you're done reading the email, I'll

2    ask you some questions.

3         A    It's the examiner in me.  Can't help it.

4              (Witness peruses document.)

5              THE WITNESS:  Okay.

6    BY MR. KING:

7         Q    All right.  So what I want to do is

8    direct your attention ██████████████████████████

█    ████████████████████████████████████

10             Do you see that?

11        A    Yes.

12        Q    Understanding that you were not a

13   recipient of this particular email, is this

14   ████████████  something you have ever seen before?

15        A    I did see this one yesterday.

16        Q    Is that the first time you saw it?

17        A    Yes.

18        Q    Did you know -- ████████████████████

█    ████████████████████████████████████

█    ████████████████████████████████████

█    ██████████████████████████████

22             MR. LYTTLE:  Form.

23             THE WITNESS:  No, absolutely not.

24   You know, as I said, my, ██████████████████████████

█        ██████████████████████████  ████████████████

Page 202

1　████████████ , ██████████████████████

　　████████████████████████████████

　　████████████████████████████████

　　████████████████████████████ ████████

　　████████████████ ██████████████████

　　████████████████████████████

7　BY MR. KING:

8　　██ ██████████████████████████

　██████████████████████████████████

　████████████████████████████████████████

　████████████████████████████████

　████████████████████████████████████████

　████████████

　　██ ██████████████████████████

　██████████████████████████████████████

16　　　Q　How do you know that Chris Cook doesn't

17　know what the rule is?

18　　　A　You know, as I said before, it's, it's

19　such a specialized rule, there was only a very

20　small group of people who's really versed in it,

21　and we're a separate division, and so we, we don't

22　expect -- well, we don't expect RMS to understand

23　the rule, which is why, when there are questions

24　about the rule, they come to us.

25　　　Q　Do you know what kind of training the

Page 203

1    examiners receive regarding their jobs?

2        A    So I, I should be clear.  Chris Cook was

3    not a commissioned FDIC examiner.  I think he was

4    actually new to the FDIC at this time as well, but

5    examiners don't receive training on the pricing

6    rule.

7             I believe that we provided -- probably

8    that same presentation that we gave Bank of

9    America, we provided to CFI as a whole at some

10   point, but I'm not sure.  It was an hour

11   presentation, and it's not the ins and outs of how

12   things are calculated.

13       Q    So let me ask a related question.

14   ████████████████████████████████████████████

██ ████████████████████████████████████████████████

██ ████████████████████████████████████████████

██ ██████████████████████████████████████████████████

██ ██████████████

19             MR. LYTTLE:  Form.

20   ███████████████████ █████████████████████

██ ████████████████████████████████████████

██ ████████████████████████████████████████

██ ████████████████████████████████████████

██ ████████ ██████████████████████████████████

25       they don't know the rule that way.  They

Page 204

```
1        don't know the, the definitions.
2    BY MR. KING:
3        Q    Okay, and how do you know they don't
4    know the definitions?
5        A    Well, it's just not their job.  They
6    don't have to know.  We've got, we've got a
7    pricing section that knows that, and so they're
8    not tasked with having to know those regulations.
9        Q    And so whose job was it to verify --
10   whose job, if anybody's, was it to verify that the
11   amounts reported on Schedule RC-O for the
12   counterparty exposure, the top 20 counterparty
13   exposures were correct?
14                  MR. LYTTLE:  Form.  Foundation.
15                  THE WITNESS:  It's actually the
16       bank's responsibility and then their internal
17       auditors to also check.
18   BY MR. KING:
19       Q    Internal auditors at the bank?
20       A    Yes.
21       Q    Is there anybody at the FDIC, to your
22   knowledge, whose job is to look at the submissions
23   of the counterparty exposure numbers and verify
24   whether it's correct or not?
25       A    I believe the, that group is doing that
```

```
 1   now, the DIR large bank, large bank pricing group.

 2        Q    They're doing that now?

 3        A    Yes.

 4        Q    When did that begin?

 5        A    I don't know.

 6        Q    How do they go about doing that?

 7        A    I'm not sure of that either.

 8        Q    Okay.

 9             I know I asked you specifically about

10   this document.  Maybe we can save a little time in

11   re-marking and showing you a lot of others.

12   ███████████████████████████████████████

██   ███████████████████████████████████████████

██   ████████████████████████

██      ███   █████████████████

16        Q    So just we do have one example, but take

17   a look at the second attachment there.  Let's make

18   sure we're talking about the same thing.  ████████

██   █████████████████████████████████████████████

██   █████████████████████████████

21             Do you see that?

22        A    Yes.

23        Q    And is it true, is it the case that you

24   have never seen this ██████████████  either?

25        A    I saw this one like --
```

Page 206

1      Q    Yesterday.

2      A    -- two days ago in preparing for this

3  litigation.

4      Q    I'm sorry.  I apologize.  Thank you.

5      A    But prior to that, no.

6      Q    And if I were to show you additional

7  spreadsheets in this same form for additional

8  quarters, your answer would be the same?

9      A    Yes.

10      Q    That saves a little bit of time.

11           All right.  What's a detailee?

12      A    That's someone that works in one area of

13  the corporation, but then they, they have a short

14  assignment in another area of the corporation,

15  maybe three months long or something like that.

16                (Exhibit 11 was marked for

17                identification.)

18  BY MR. KING:

19      Q    I've handed you Defendant's Exhibit 11,

20  which is an email chain with Bates number FDIC

21  2539, the top email of which is to you from

22  Donna Florence -- I'm sorry -- to you from Kevin

23  Bruno, your husband, May 11, 2012.

24           Let me direct your attention first to

25  the email that kicks off this chain at the bottom.

Page 207

1      A      Okay.

2      Q      It's from Mr. Oshinsky to Mr. Stinson.

3      A      Mm-hmm.

4      Q      Remind me who Mr. Oshinsky was.

5      A      He worked in DIR but in a different

6  section of DIR, not in the large bank pricing

7  section, but he did provide support for numbers

8  and things like that.

9      Q      All right, and Mr. Stinson was in the

10 large bank pricing section; yes?

11     A      That's correct.

12     Q      All right.  Mr. Oshinsky's email refers

13 to being in a meeting with Matt.

14            Do you know who "Matt" refers to?

15     A      Yeah, that would be Matt Green, the

16 associate director over large bank pricing for the

17 FDIC.

18     Q      ███████████████████████████████████████

██ █████████████████████████████████████████████

██ ███████████████████████████████████

21     A      Yes.

22     Q      Does that refresh your recollection that

23 the ███████████████████████████████████████████

██ ████████████████████████████████████████

██ ████████████

1      A     Yes.  I mean it says it here.

2      Q     Does it refresh your recollection?

3      A     I suppose so.

4      Q     Okay.  Mr. Stinson forwards this email

5  to you and, and your husband, asking about

6  following up with someone about the reported

7  counterparty numbers.

8           Is that how it came to your attention

9  that ██████████████████████████████████████

   ████████████████████████████████████████████

   ███  ██████████████████████████████

12     A     I think it was, and the reason I say

13  that is call report numbers are available 30 days

14  after the quarter end, so it would have been like

15  April 30th, and then Robert Oshinsky would have

16  been running the numbers to see what the

17  preliminary assessments would be for that quarter,

18  and it looks like right around May 10th is when

19  they had those numbers, so that's the first they

20  knew that.

21     Q     And my question is more specific.  Do

22  you think this is how you came to learn of it?

23     A     I think so, yes.

24     Q     Okay.  Earlier you testified that it was

25  in your review of the templates, but does this,

1   does this change your recollection now?

2        A    Yes, it does.

3        Q    ███████   ███████████████████████████

███████████████████████████████████████████

█████████████

           █████████████████████████

      █    █████████   ███████████████████████

      █    █████████   ███████████████████████████

      █    ███████████████████████████████████████

██   █████████████████████████████████████

██   █    █████████   █████████████████████

██   ████████████████████████████████████████

13       Q    Okay.  You sent an email to -- two, two

14  emails up from that one.  At 11:44 a.m., you sent

15  an email to your husband and Mr. Stinson, and you

16  asked, "Kevin, are we going to give a detailee

17  BANA and its subs this quarter?"

18       A    Mm-hmm.

19       Q    Understanding what you explained about

20  detailee before, what did, what did you mean by

21  "giving a detailee BANA and its subs"?

22       A    I think I meant will they be the person

23  assigned to look at BANA from a scorecard

24  perspective.  Remember, I told you every quarter

25  we would take a look at all the firms, and we, we

Page 210

```
 1    see whether or not they're priced appropriately,
 2    and so that was my question:  Is the detailee
 3    going to be looking at BANA?
 4        Q    And that would be a detailee from some
 5    other division who was working in your division
 6    temporarily?
 7        A    Not necessarily from another division.
 8    It could have been someone else from DIR.  It
 9    could have been from -- I'm not sure where the
10    detailee was from.
11        Q    I misspoke.  I meant -- I misused the
12    term "division."  What I meant was a detailee who
13    was temporarily assigned to the large bank pricing
14    section from another group within the FDIC.
15        A    Yes.
16        Q    Is that what you meant?
17        A    Yes, yes.
18        Q    Okay.  Your email goes on to say, "BANA
19    is my bank to monitor normally, so I'll look into
20    these issues along with the others related to BANA
21    and its smaller affiliates."
22             Does this refresh your recollection that
23    by no later than May of 2012, you had been
24    assigned responsibility for reviewing issues
25    relating to Bank of America?
```

```
                                                   Page 211
 1                MR. LYTTLE:  Form.
 2                THE WITNESS:  I think it kind of
 3        goes back to those earlier emails where I put
 4        those talking points together for Pat, so
 5        since I had been assigned BANA at that time,
 6        it just made sense for me to carry forward
 7        and keep BANA this time.
 8   BY MR. KING:
 9        Q    Okay.  Your husband's response said that
10   "BANA is not assigned to a" -- a typo, I think,
11   but "not assigned to a detailee.  None of the Big
12   4 are assisted to help."
13            What does the second sentence there
14   mean, "none of the Big 4 are assisted to help"?
15   Let's -- I can break it --
16        A    I can tell you right now my husband is a
17   bad speller, so I'm assuming he meant to say none
18   of the Big 4 are assigned to help, meaning
19   assigned to detailees.  The Big 4 would be the
20   four universals, Wells Fargo, Bank of America,
21   CitiBank and J.P. Morgan.
22        Q    So --
23        A    That's what I get out of that.
24        Q    I'm sorry.  Does that mean -- I'm sorry
25   for interrupting.  Does that mean you understood
```

Page 212

1   him to be saying we don't have a detailee assigned

2   to any of the Big 4?

3        A    Yes.

4        Q    All right.  Did you --

5        A    But, but I should back up and clarify

6   that my understanding of that is, depending on the

7   experience of the detailee, we probably wouldn't

8   assign a detailee to the Big 4.

9        Q    Any idea why Mr. Oshinsky initially

10  reached out to Mr. Stinson as opposed to you if

11  you were the person who had some responsibility

12  for Bank of America?

13       A    Yeah, so Ken was really our data guy

14  within the large bank pricing section, so he, he

15  was the guy that was sort of maintaining the

16  templates for us, and so I, I think what would

17  happen is at the end of the quarter, the data

18  would come in, Oshinsky would do the data on his

19  side, Ken would work on the data for our side in

20  terms of putting together a template.

21                  MR. KING:  We're going to mark the

22       next exhibit.

23                  (Exhibit 12 was marked for

24                  identification.)

25

Page 213

1    BY MR. KING:

2        Q    Exhibit 12 is an email dated May 11,

3    2012, Bates number FDIC 1002.

4            Take a moment and review the email, and

5    my question for you, when you're ready, is:  Do

6    you recognize it?

7        A    I do, yes.

8        Q    Okay.  I think you've testified that you

9    reached out to the on-site examiner team to -- for

10   some help in understanding ███████████.

11           Is this, is this the email by which you

12   did so?

13       A    Yes.

14       Q    All right.  Your question -- one of the

15   questions to Mr. Swett was, "Could someone on the

16   DE team follow up with the bank on this for me,

17   ██████████████████████████████████████████████

███  ████████████████

19           What's the "DE team"?

20       A    Dedicated examiner.

21       Q    Okay.  How many dedicated examiners were

22   assigned to Bank of America --

23       A    Uh, maybe --

24       Q    -- at this time?

25       A    Four or five, maybe.  That's still the

Page 214

1   same.

2        Q    Okay, and they included at some points

3   in time Mr. Hovik, Mr. Cook, Mr. Swett, Mr. Mayle?

4        A    That's correct.

5        Q    Anybody else that you can remember being

6   on the dedicated examiner team for Bank of

7   America?

8        A    At that time?

9        Q    Yeah.

10       A    No.

11       Q    At any time while you were in the large

12  bank pricing section?

13       A    Actually, no.

14       Q    Your email goes on to say that "The bank

15  ███████████████████████████████████████████████

    ████████████████████████████████." "

17            What was the difference between the

18  priority list and the ongoing list?

19       A    So the -- so we sort of rank the firms

20  in terms of prioritization in terms of how deep of

21  a dive we want to do into their risk profile, and

22  so the priority list are those firms that I was

23  talking about earlier today where we have decided

24  we're going to take a, a really deep dive and look

25  at their risk profile and determine if we need to

Page 220

1     ███ ███████████████████████ ███████

██ ███████████████████████████

██ █████████████████████

4     Q    Okay.  Do you know what, do you know

5 what the top tier parent entity was of Bank of

6 America's affiliates?

7     A    It would be BAC.

8     Q    ███████ ████████████████████

██ ████████████████████████████████

██ ███████████████████████████

11             MR. LYTTLE:  Form.

12             THE WITNESS:  I -- actually, I'm

13       not sure, but I -- I would assume so, based

14       on this, but I -- now I'm not positive.

15 BY MR. KING:

16     Q    Okay.  You've read Bank of America's

17 10-Ks and, and examiner reports and audit reports;

18 yes?

19     A    I have, yes.

20     Q    And you've gotten up to speed on Bank of

21 America?

22             MR. LYTTLE:  Form.

23             THE WITNESS:  What time frame?

24 BY MR. KING:

25     Q    After May of 2012, you got up to speed

Page 221

1    on Bank of America?

2         A    I think so, but maybe not as of

3    May 17th.

4         Q    Okay.



24                   MR. LYTTLE:  Form.

25                   THE WITNESS:  So in this email,

Page 222



15    BY MR. KING:

16         Q    Okay.  Did you know how much Bank of

17    America had reported as its top single

18    counterparty exposure, top single largest

19    counterparty exposure as of December 31st?

20         A    I could get that information from the

21    call report.

22         Q    You have that information available to

23    you, right?

24         A    I could get it, yes.

25         Q

Page 223



1

2

3

4    Q    Did you ask him?

5    A    I don't believe I did.

6    Q



Page 224

15        Q     This is something you realized in the
16   last two days?
17        A     Yes.
18        Q     Not something you realized before?
19        A     No.
20        Q     So you realized this when you were
21   meeting with the lawyers for the FDIC?
22        A     When I saw the documents that, that they

Page 225



Page 226



Page 227

1   ████████████████████████████████████

█   ███████████████████████████████████████████

█   █████████████████████████████████████

4       Q     Were they misleading Mr. Cook?

5                 MR. LYTTLE:  Form.

6                 THE WITNESS:  I don't want to

7        speculate, but --

8   BY MR. KING:

9       Q     Isn't that the implication you drew in

10  the last two days, that the bank wasn't

11  transparent with Mr. Cook?  Isn't that what you

12  said?

13                MR. LYTTLE:  Form.

14       Mischaracterizes her testimony.

15  BY MR. KING:

16      Q     Did you come to believe -- I'll ask it

17  again.  Did you come to believe in the last two

18  days that the bank wasn't up front with Mr. Cook?

19                MR. LYTTLE:  Form.  Foundation.

20                THE WITNESS:  I would say they

21        weren't up front with the FDIC.

22  BY MR. KING:

23      Q     Okay.  Who, who is the FDIC?

24      A     ███████████████████████████

█   ████████████████████████████████████████████

Page 228



Page 229

1　███████████████████████████████　████████████

███████████████████████████████

███████████████　███████████████████████

███████████████　███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

7　　　　Q　　In the last two days, you formed the

8　conclusion that the bank wasn't up front with

9　Mr. Cook; is that right?

10　　　　A　　Actually, no, I, I don't think that's

11　correct.

12　　　　Q　　I -- am I misunderstanding, or are you

13　changing your testimony?

14　　　　　　　　MR. LYTTLE:  Form.  Argumentative.

15　　　　　　　　THE WITNESS:  I just -- well, the

16　　　　bank, the bank knew they weren't

17　　　　consolidating at the top tier level, and

18　　　　so -- I'm not sure why they didn't think they

19　　　　had to consolidate at the top tier level.

20　BY MR. KING:

21　　　　Q　　But it's not that they hid information

22　from Mr. Cook, is it?

23　　　　　　　　MR. LYTTLE:  Foundation.  Form.

24　　　　　　　　THE WITNESS:  I guess you're right.

25　　　████████████████████████████████

Page 230

1

13   BY MR. KING:

14        Q    Okay, but let's just make sure we have a

15   clear answer now.

16             Sitting here today, do you believe that

17   the bank wasn't up front with Mr. Cook?

18                  MR. LYTTLE:   Asked and answered.

19                  THE WITNESS:   I think my answer was

20        no.

21   BY MR. KING:

22        Q    Thank you.

23             So is it your testimony that upon

24   reading the email from Mr. Cook, you immediately

25   had follow-up questions for him?   Is that what

Page 250

1    I don't see where it says this is a top 20

2    listing.   In fact, I know it's not a top 20

3    listing, because it doesn't tie back to their call

4    report.

5         Q    I know I've asked this before, but these

6    reports that banks provide you with, am I -- is it

7    still the case that you have no recollection of

8    ever seeing a report from an HCI of their top 20

9    counterparties?

10        A    Yes.  So when I speak about --

11        Q    Other than, other than this?

12        A    That's right, yes.  So when I speak

13   about banks providing reports, it's reconciling of

14   all different things, not necessarily top 20.

15        Q    Thank you.

16        A    So yeah, sorry for the confusion.

17             So when I look at this, I, I wouldn't --

18   you know, there's no way I could tie this to a

19   call report.  I'm just seeing that, oh, these are

20   the, these are the affiliates where they're

21   describing the reductions that took place.

22        Q    You could have asked to see the full

23   report?

24        A    I could have, but I, I didn't feel it

25   was necessary, because I wasn't concerned about

Page 251

14                   MR. KING:  All right.  Let me mark

15        another exhibit.

16                   (Exhibit 16 was marked for

17                   identification.)

18   BY MR. KING:

19        Q    You had available to you the call

20   reports themselves, right?

21        A    Yes.

22        Q    Okay.  I'll hand you Defendant's Exhibit

23   16, which is an internal Bank of America email,

24   but with an attachment of a call report, and what

25   we've provided you here, to be clear, is not the

Page 252

1    full call report, which is, I'm sure you realize,

2    is many dozens or hundreds of pages, but excerpts

3    that I may refer to.

4              Okay?

5         A    Okay.

6         Q    And so looking at the attachment,

7    ignoring the email and looking at the attachment,

8    do you recognize that as a call report for the

9    quarter ended December 31, 2011?

10        A    Yes.

11        Q    Okay, and it's for Bank of America NA;

12   you see that on the first page of the attachment?

13        A    Yes.

14        Q    All right.  Let's look at the last page

15   of the exhibit.

16             Do you recognize this as a portion of

17   Schedule RC-O?

18        A    Yes.

19                  MR. LYTTLE:  Marshall, I understand

20        you're trying to do an excerpt, which is

21        fine.  Do you have the verification pages so

22        that we know this is the final one?

23                  MR. KING:  No.

24   BY MR. KING:

25        Q    You recognize -- you see at the bottom

Page 253

1   of that last page are items 14 and 15 of Schedule

2   RC-O; am I right?

3        A     Yes.

4        Q     And that's where Bank of America was to

5   report its single largest counterparty exposure

6   and the total of its top 20 counterparty

7   exposures; is that right?

8        A     Yes.

9        Q     Can you tell me what amount Bank of

10  America entered for its single largest

11  counterparty exposure?

12       A     ███████████████████████

13       Q     Okay.  Could you look at Exhibit 15 and

14  ████████████████████████████████████████████

██  ██████████████

██        ████████████████████████████████████████

██  ██████████████

██        ██     ██████████████████

██        ██     ████████████████████████████████

██        ██     ████████████████████████████

██  ████████████████████████████████████████████

██  ██████████████

██        ██     ████████  ██████████████████████

██  ████████████████████████████████████████████

██  ████████████████████████████████████

Page 254

1          Does that signify to you, sitting here

2    today, that Bank of America was not consolidating

3    its counterparty exposures to the top tier parent

4    company?

5                    MR. LYTTLE:   Form.

6                    THE WITNESS:   For line item 14,

7       yes, it does.

8    BY MR. KING:

9       Q     Because in your view, they should have

10   been adding at least the five counterparty

11   exposures listed in Defendant's Exhibit 15; am I

12   right?

13      A     That is correct.

14      Q     And you had available to you Bank of

15   America's Schedule RC-O from December 31, 2011;

16   yes?

17      A     Yes, that's correct.

18      Q     █████████████████████████████

██   ████████████████████████████████████

██   ██████████████████████

██   █   ████

██   █   ████████████████████████

██   █████████████████████████████████████

██   ████████████████████████████████

██   ██████████████████████████████

Page 255

1     █████████████████████████████

2                    MR. LYTTLE:  Form.

3                    THE WITNESS:  I would say for line

4        item 14, yes, that's definitely the case.

5     BY MR. KING:

6        █  ████████████████████████████████

█  █████████████████████████████████████

█  ████████████████████████████

█  █  █████████████████

10       Q    You have no recollection of having a

11    conversation with anybody about that subject

12    matter in or around June of 2012?

13       A    I do not, no.

14       █  ███████████████████████████

█  ████████████████████████████████████

█  █████████████████████████████████████

█  ███████████████████████████████

█  ██████████████████████████████████████

█  █████████████████

20                    MR. LYTTLE:  Form.

21       ████████████████  ██████████████  ███████

█       █████████████████████

█  █████████████

█  █  ████████████████████████████

█  █████████████████████████████████████

Page 292

1    information from Bank of America, correct?

2                    MR. LYTTLE:   Form.

3                    THE WITNESS:   Information about why

4    ████████████████████████████████████████████

█    ██████████████

6    BY MR. KING:

7         Q    He, he was tasked with getting

8    information from Bank of America, correct?

9                    MR. LYTTLE:   Asked and answered.

10                   THE WITNESS:   He was tasked with

11   ██████████████████████████████████████████

█    ████████████████████████████████████████████████

█    ████████████████████████

14   BY MR. KING:

15        Q    And so he was the person that the FDIC

16   chose to go find out that piece of information

17   from Bank of America; yes?

18        A    Yes.

19        Q    And Bank of America provided Mr. Cook

20   with certain information; am I right?

21        A    They did.

22        Q    ████████████████████████████████████

█    ████████████████████████████████████████████████

█    ██████████████████

█              ████████████████      ████████████████



Page 294

1 ███████████████████████████████

███████████████████████████████

████████

████████████ ███████

████████████ ████████████████

████████████████████████████

████████

8 BY MR. KING:

9     Q    But you would have seen ████████████

████████████ among the top 20, wouldn't you?

11    A    Yes.

12    Q    Probably would have seen ████████████

████████████ among the top 20, right?

14    A    Yes.

15    Q    And that would signal to you that those

16 entities were not being consolidated for purposes

17 of reporting the top 20 counterparty exposures; am

18 I right?

19               MR. LYTTLE:  Form.

20               THE WITNESS:  That would have

21    signaled, yes.

22 BY MR. KING:

23    Q    ████████ ██████████████████████

████████████████████████████

25               MR. LYTTLE:  Foundation.