# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FEDERAL DEPOSIT INSURANCE COROPORATION,** | |
| Plaintiff/Counterclaim Defendant, | Civil Action No. 17-cv-36-LLA-MAU |
| v. | |
| **BANK OF AMERICA, N.A.,** | |
| Defendant/Counterclaim Plaintiff. | |

## MEMORANDUM OPINION[1]

After the 2008 financial crisis, Plaintiff the Federal Deposit Insurance Corporation ("FDIC" or "the Agency") promulgated a rule ("2011 Rule") which changed the formula for the nation's largest banks to assess and report their risk to the Agency. Those reports, in turn, served as the basis for the calculation of the banks' assessments due to the Deposit Insurance Fund ("the Fund" or "DIF"), which Congress created ninety years ago to insure depositors.

The FDIC contends that Defendant Bank of America, N.A. ("BANA" or "the Bank") intentionally failed to report information to the FDIC under the 2011 Rule so as to appear less risky, thereby reducing the Bank's insurance premiums by $1.12 billion from 2012 to 2014. The FDIC sues under the Federal Deposit Insurance Act ("FDIA" or the "Act"), 12 U.S.C. § 1817, and a common law theory of unjust enrichment. ECF No. 8–1 at 19–21.[2] BANA raises a number of

---

[1] On March 1, 2024, the Court issued this Memorandum Opinion under seal in light of the fact that certain materials referenced in the Parties' respective briefs were filed under seal. *See* ECF Nos. 258 & 264. The Parties have met and conferred and represented to the Court that no redactions to this Memorandum Opinion are necessary. *See* ECF No. 341.

[2] When citing electronic filings throughout this Opinion, this Court cites to the ECF page number, not the page number of the filed document. Moreover, although the Court may have cited portions of the Reports or the record that are under seal, when citing to the Parties' briefs, the

defenses to the FDIC's claims, including challenges to the 2011 Rule itself under the Administrative Procedure Act ("APA").

On April 10, 2023, this Court issued a Report and Recommendation on the Parties' cross motions for summary judgment, recommending that the motions be granted in part and denied in part. ECF No. 315 at 2, 71–72. Before the Court are the FDIC's Motions to Strike two expert reports BANA submitted in support of its dispositive motion. ECF Nos. 258–4, 256–12, 264, 265. For the reasons set forth below, the Court **GRANTS** the FDIC's Motions to Strike the Expert Reports of Scott Carnahan and Paul Kupiec (collectively "the Experts" or "the Reports").

## **FACTUAL BACKGROUND**

### **The FDIC and the Deposit Insurance Fund**

The Court assumes the Parties are familiar with the facts and arguments in this case and will not repeat the entire detailed factual background set forth in the Report and Recommendation except to provide some background. ECF No. 315 at 2–12.

In 1933, Congress created the FDIC to, among other things, "insure . . . the deposits of all banks . . . entitled to the benefits of insurance." National Banking Act, Pub. L. No. 73–66, § 8, 48 Stat. 162, 168 (1933). Today, the "FDIC insures deposits; examines and supervises financial institutions for safety, soundness, and consumer protection; makes large and complex financial institutions resolvable; and manages receiverships." About the FDIC, Fed. Deposit Corp., https://www.fdic.gov/ (last visited February 25, 2024).

The Agency insures deposits by requiring insured depository institutions ("IDIs") to pay assessments into the DIF. ECF No. 248–4, [hereinafter "Cain Decl."] ¶ 4–5. If an IDI fails and the bank does not have sufficient assets to return to its consumers, the FDIC pays the balance of

_____

Court has cited to the unsealed versions, as those were the versions the Parties provided to the Court as courtesy copies.

2

up to $250,000 per depositor from the Fund.  *Id.* ¶ 4; 12 U.S.C. § 1821(a)(1)(E).  The system for calculating an institution's assessment due to the Fund varies depending on whether it is classified as a small bank, large bank, or highly complex institution ("HCI").[3]  12 C.F.R. § 327.16(a)–(b).  Common to all, however, is the FDIA's mandate that the assessment systems be "risk-based."  12 U.S.C. § 1817(b)(1)(A).  BANA is an HCI that pays quarterly assessments into the Fund, which provides its consumers the security of insurance from the FDIC.  ECF No. 257–3 ¶¶ 114–15, 120.

### This Lawsuit

This case is largely about the meaning of one phrase in the 2011 Rule: "consolidated entity level."  The FDIC promulgated the 2011 Rule to revise the deposit insurance assessment system for HCIs such as BANA.  76 Fed. Reg. 10672 (Feb. 25, 2011) (codified at 12 C.F.R. § 327.9(b)(2)).  The 2011 Rule sought to measure more accurately an HCI's risk based on recent experience that "show[ed] that the concentration of [an HCI's] exposures to a small number of counterparties . . . significantly increases [an HCI's] vulnerability to unexpected market events."  75 Fed. Reg. 72612, 72621 (Nov. 24, 2010).  The 2011 Rule required HCIs to calculate exposures to their counterparties at the "consolidated entity level."  76 Fed. Reg. at 10721.

The FDIC alleges that, in 2016, it discovered that BANA's reporting was inconsistent with the 2011 Rule's "consolidated entity level" reporting requirement.  ECF No. 248–2 at 32–41.  As such, the FDIC invoiced BANA for $1.12 billion, the amount the FDIC claims BANA should have paid in deposit insurance had BANA been reporting according to the FDIC's interpretation during

---

[3]     An HCI is "(i) an insured depository institution (excluding a credit card bank) that has had $50 billion or more in total assets for at least four consecutive quarters . . . that is controlled by a U.S. parent holding company that has had $500 billion or more in total assets for four consecutive quarters, or controlled by one or more intermediate U.S. parent holding companies that are controlled by a U.S. holding company that has had $500 billion or more in assets for four consecutive quarters; or (ii) A processing bank or trust company."  12 C.F.R. § 327.8(g).  During the relevant time period, there were only nine HCIs in the United States.  Cain Decl. ¶ 12.

the period in question.  *Id.* at 31.  The Parties disagree over a number of issues, including whether BANA intentionally failed to comply with the new formula under the 2011 Rule and whether the FDIC was aware of BANA's reporting method before 2016.  ECF No. 315 at 39–45.

Not surprisingly, the Parties have different views of what the 2011 Rule required when it instructed HCIs to report counterparty exposures at the "consolidated entity level."  Each party has offered legal arguments in support of its respective interpretation and, as set forth below, BANA has sought to bolster its argument with expert testimony.

## STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony.   Rule 702 provides that an expert may testify if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determinate a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court established the reviewing court's role as gatekeeper, requiring that expert testimony be both relevant and reliable.  509 U.S. 579, 589 (1993).  In this role, the Court first asks whether the expert's testimony is based on "scientific knowledge."  *Id.* at 592–93.  Next, the Court asks whether the testimony "will assist the trier of fact to understand or determine a fact in issue."  *Id.* at 592.  The Court's gatekeeper role applies to all expert testimony, not just testimony based in science, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), and "[a] district court has broad discretion regarding the admission or exclusion of expert testimony."  *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008) (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567 (D.C. Cir. 1993)).

4

## ANALYSIS

### I.      The FDIC's Motions to Strike are Ripe.

BANA urges the Court to reserve ruling on the FDIC's Motions to Strike the Reports until after the summary judgment stage, arguing that resolving the motions now is premature.  ECF No. 298 at 11, 19–20; ECF No. 275 at 23–24.  The FDIC argues that deferring the motions would be needlessly inefficient and that Federal Rule of Civil Procedure 56(c)(2) "expressly permits challenges to the admissibility of evidence used to support an adverse party's motion for summary judgment."  ECF No. 278 at 16-20; ECF No. 279 at 14.  The Court agrees with the FDIC.

It is clear that the FDIC may raise objections to the Reports at this stage, and it is BANA's burden to show the proposed testimony is admissible.  As set forth in Federal Rule of Civil Procedure Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); *see also* Fed. R. Civ. P. 56(c)(2) advisory committee's note on 2010 amendment ("The objection *functions much as an objection at trial, adjusted for the pretrial setting*.  The burden is on the *proponent* to show that the material is admissible as presented or to explain the admissible form that is anticipated.") (emphasis added).  Moreover, a trial court is well-positioned to "exercis[e] its prerogative to manage its docket, and its discretion to determine how best to accomplish [that] goal."  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (citing *Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 567–68 (7th Cir. 1992)).

Indeed, courts in this District have often decided *Daubert* motions at the summary judgment stage.  *See, e.g.*, *Davenport v. Safeway, Inc.*, No. 20-cv-1207, 2022 WL 4379016 (D.D.C. Sept. 22, 2022) (simultaneously deciding motion for summary judgment and motion to exclude expert testimony); *Harris v. Bowser*, No. 18-cv-768, 2021 WL 4502069 (D.D.C. Oct. 1, 2021) (same); *Robinson v. Panera, LLC*, No. 1:17-cv-2071, 2019 WL 5216265 (D.D.C. Oct. 16, 2019)

(same); *West v. Bayer HealthCare Pharm. Inc.*, 293 F. Supp. 3d 82 (D.D.C. 2018) (same); *Sacchetti v. Gallaudet University*, 344 F. Supp. 3d 233 (D.D.C. 2018) (same).

BANA relies principally on *Williams v. United States Dep't of Veterans Affs.*, No. 16-cv-2062, 2020 WL 1323305 (D.D.C. Mar. 20, 2020), for the broad proposition that "motions to exclude expert testimony are more amenable for consideration after the summary judgment stage." ECF No. 298 at 19.  In that case, the plaintiff brought a claim against the Department of Veterans Affairs ("VA") for medical malpractice under the Federal Tort Claims Act ("FTCA") and engaged a medical expert to opine on the applicable standard of care.  2020 WL 1323305, at *1.  During the dispositive motions phase, the defendants simultaneously moved for summary judgment and to exclude the plaintiff's medical expert on the basis that the expert was not qualified to offer testimony about the standard of care.  *Id.* at *3–4.  The plaintiff's expert, however, had not yet offered any opinions or declaration on summary judgment.  *Id.*  In response to the defendants' motion to preclude the plaintiff's expert, the plaintiff moved for leave to reopen discovery to either amend his expert's opinions or substitute his medical expert.  *Id.* at *4.

The court granted plaintiff's request and declined to entertain the defendants' motions until after the close of the reopened limited expert discovery.  *Id.*  In so ruling, the court noted that demonstrating the applicable standard of care through expert testimony is an "essential element" of plaintiff's FTCA claim.  *Id.* at *1.  The court also noted it was guided by the principle that it had "wide latitude to receive evidence as it sees fit" and to "exercise considerable discretion in handling discovery matters, including deciding whether to reopen or extend discovery."  *Id.* at *10 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) and *United States v. Kellogg Brown & Root Servs., Inc.*, 285 F.R.D. 133, 137 (D.D.C. 2012)) (internal quotations omitted).

*Williams* is inapposite for a number of reasons.  First, neither party has requested the reopening of discovery for purposes of developing further expert testimony.  Moreover, as discussed below, neither one of BANA's experts provides opinions on an essential element of the case that *must* be established through expert testimony, such as whether a doctor departed from the standard of care in a malpractice case.  Nor has the FDIC sought to preemptively strike the expert reports at issue.  Here, BANA relied on and put its two experts at issue in its Cross Motion for Summary Judgment.  ECF No. 257–2.  The FDIC's motions to strike are triggered by BANA's reliance on those experts.  ECF Nos. 264, 265.

Finally, unlike in *Williams*, the FDIC does not challenge the *qualifications* of the experts to offer the proffered testimony, but rather challenges the opinions themselves as inadmissible.  As such, this is not the *Williams* situation where a more-developed record or *Daubert* hearing could potentially change the opponent's arguments.  Discovery has closed and the experts' opinions will presumably remain unchanged.  Given this, and the authority outlined above, there is no reason in this case to defer ruling on the motions to strike.[4]

## II.     Scott Carnahan

The FDIC first challenges BANA's expert Scott Carnahan, a CPA who formerly worked for one of the big four accounting firms with a stated background in auditing and consulting for

---

[4]      None of the other cases upon which BANA relies require the Court to defer a decision on the pending motions to strike until trial.  *See Carmichael v. West*, No. 12-cv-1969, 2015 WL 10568893, at *7 (D.D.C. Aug. 31, 2015) (quoting *Cortes-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)) (explaining that excluding expert testimony "can play a role during the summary judgment phase of civil litigation," even if courts "must be cautious" in doing so).  *But cf. Landmark Health Solutions, LLC v. Not for Profit Hosp. Corp.*, 950 F. Supp. 2d 130 (D.D.C. 2013) (deferring evaluation of plaintiff's challenge to defendant's experts in part because defendant had not yet put experts at issue); *Sloan v. Urban Tile Servs.*, 770 F. Supp. 2d 227 (D.D.C. 2011) (deferring evaluation of defendant's challenge to plaintiff's experts in part because defendants filed only a summary judgment motion and failed to file a standalone *Daubert* motion).

financial institutions.  ECF No. 258–4 at 4–5.  According to Mr. Carnahan, BANA asked him to "opine on whether the 2011 Rule and the Call Report Instructions provided a clear directive for reporting counterparty exposures that would have been understood by employees of highly complex institutions . . . to require aggregation of counterparty exposures at the top-tier parent level of the counterparty . . . ."  ECF No. 258–4 at 4, ¶ 1.

The FDIC challenges two of Mr. Carnahan's overarching opinions: (1) his view about the meaning and interpretation of the 2011 Rule, including that the 2011 Rule and the Call Report Instructions are "unclear"; and (2) his opinion about the factual inferences to be drawn from the interactions between the Parties, including that the "FDIC's failure to note any objections to [BANA's] quarterly filings in a timely manner, despite its awareness of BANA's reporting methodology, could have reasonably been construed as confirmation of BANA's methodology." *Id.* at 7–22, 29.

### A.  Mr. Carnahan's Opinion About the 2011 Rule and Call Report Instructions is a Legal Opinion.

The FDIC argues that Mr. Carnahan's opinion about the meaning of the 2011 Rule is an inadmissible legal opinion disguised as an accounting report.  ECF No. 264 at 10–12.  BANA disagrees, claiming that everything about Mr. Carnahan's Report "is about accounting" and that he opines on the meaning of the 2011 Rule by explaining specialized accounting terms that the Rule allegedly implicates.  ECF No. 298 at 11–15.  BANA maintains that Mr. Carnahan's opinions about accounting will assist the trier of fact in understanding the evidence.  *Id.*  This Court agrees with the FDIC.

"Expert testimony that consists of legal conclusions cannot properly assist the trier of fact" in either "understand[ing] the evidence or . . . determin[ing] a fact in issue."  *See Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (quoting Fed. R. Evid. 702).  An

expert's testimony is likely to constitute a legal conclusion where "it track[s] the language of the applicable statute" and uses terms that "ha[ve] a specialized legal meaning that [are] more precise than the lay understanding of the term." *Id.* at 1212.  Although an expert may offer an opinion "as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied," an expert "may not testify as to whether the legal standard has been satisfied." *Id.* at 1212–13 (holding expert testimony constituted impermissible legal conclusion when expert invoked "legal term of art" "lifted directly from the text [of a] . . . regulation[]").

Mr. Carnahan opines that the 2011 Rule and Call Report instructions—the meaning of which BANA concedes "form[] the heart of this dispute"—are "unclear and suggest that accounting interpretations are required to calculate counterparty exposures."  ECF No. 298 at 5; ECF No. 258–4 at 7.  Throughout his report, Mr. Carnahan repeatedly offers his opinion on the purported ambiguity in the 2011 Rule and other related Agency documents.  *See* ECF No. 258–4 (including repeated use of words and phrases such as "unclear," "even less clear," "failed to provide any clarity," and "underscores the lack of clarity").  BANA does not shy away from this, conceding that part of Mr. Carnahan's opinion is that the key phrase at issue in this case "is susceptible to multiple interpretations, and the interpretation employed by BANA was a *reasonable* one."  ECF No. 298 at 12.

Mr. Carnahan's opinion that the Rule is "unclear" or "susceptible to multiple interpretations" is simply another way to claim that the Rule is ambiguous.  An opinion that the Rule is ambiguous, however, is a legal opinion squarely in the Court's domain.  *See Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 684 n.4 (D.C. Cir. 1996) ("An expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise . . . ."); *see also Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018, 1023 (D.C. Cir. 2014)

(holding that court first determines whether statute is silent or ambiguous and then moves on to determine whether agency's interpretation of statute is reasonable).  The Carnahan opinion would purport to tell the decisionmaker "exactly what result to reach on this contested issue in this particular case."  *See United States ex rel. Morsell v. Symantec Corp.*, No. 12–800, 2020 WL 1508904, at *6 (D.D.C. Mar. 30, 2020); *see also* Fed. R. Evid. 704 advisory committee's note on 1972 proposed rules (explaining that experts may not offer opinions "phrased in terms of inadequately explored legal criteria").

As stated above, both Parties agree that the meaning of "consolidated entity level" forms the crux of this case.  *Compare* ECF No. 248–2 at 16 (referencing the meaning of "consolidated entity level" and stating that the phrase is well understood), *with* ECF No. 257–2 at 43, 48, 58, 61 (repeatedly describing "consolidated entity level" as "opaque").  Although the Parties offer different interpretations of this key phrase, what *is clear* is that "[d]etermining the meaning of a . . . regulation . . . presents a classic legal question."  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2432 (2019) (Gorsuch, J., concurring) (highlighting that the APA directs courts to "determine the meaning" of any relevant "agency action," including agency-promulgated rules) (quoting 5 U.S.C. § 706) (citing 5 U.S.C § 551(13)).  Allowing Mr. Carnahan to opine on the meaning or even ambiguity of the 2011 Rule and related Agency documents would usurp the role of the Court.

Although BANA relies on several cases from other district courts for the proposition that "experts may opine on considerations relevant to how to interpret [] regulations," those cases are inapposite.  ECF No. 298 at 14–15.  Three of the cases deal with Food and Drug Administration ("FDA") regulations, which are treated uniquely for the purpose of expert testimony, as reflected in each of the cited cases.  *See, e.g., In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 467 (S.D.N.Y 2016) ("Admitting expert testimony in this context makes sense given the

complicated nature of FDA regulations . . . ."); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 465 (E.D.N.Y. 2011) (citing cases that hold a lay juror "cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry") (quoting *In re Fosamax Prods. Liab. Litig.,* 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009)); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 3:9–md–02100, 2011 WL 6302287, at *20 (S.D. Ill. Dec. 16, 2011) (holding that, to the extent the expert does offer legal conclusions, the expert's testimony is permissible because of the "complex regulatory framework that informs the standard of care in the pharmaceutical industry").

BANA's other cases are likewise unavailing, particularly where none of them stand for the proposition that the expert was allowed to provide an opinion about the meaning or ambiguity of a law or regulation.  *See Trinidad v. Moore*, No. 2:15-cv-323, 2016 WL 5239866, at *2, 5–6 (M.D. Ala. Sept. 20, 2016) (allowing expert to testify as a "technical expert concerning the safety standards of the tractor-trailer industry" and to "rely upon federal regulations as a basis for opining on the standard of care" in that industry, while finding some of the expert's opinions inadmissible as legal conclusions).  Even cases BANA cites appear to respect the distinction that it is the Court, not the expert witness, that will interpret the law and determine whether it is ambiguous.  *Compare United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (admitting expert testimony in part because expert "did not couch his opinions in terms that derived their definitions from judicial interpretations"), *with* ECF No. 258–4 (repeatedly using terms such as "unclear," "clarity," and "meaning" to opine on the meaning of the phrase "consolidated entity level").

### B.  Mr. Carnahan's Opinions About Factual Inferences that Can be Drawn from the Parties' Interactions are Inadmissible and Invade the Province of the Jury.

The FDIC argues that Mr. Carnahan's opinion in which he draws factual inferences from the record is inadmissible as it is within the ken of the jury and not appropriate grounds for expert

testimony.  ECF No. 264 at 12–15.  Specifically, the FDIC challenges Mr. Carnahan's opinions, among other things, that the "FDIC's failure to note any objections to the quarterly filings in a timely manner . . . could have reasonably been construed as confirmation of BANA's methodology."  No. 258–4 at 8–9.  Mr. Carnahan also opines that the FDIC's "[s]ilence . . . given the obviousness of the reporting methodology from the face of the spreadsheet as admitted by the FDIC's witnesses, could easily be inferred as acceptance of BANA's methodology."  *Id.* at 29.  BANA, on the other hand, argues that Mr. Carnahan's opinion is relevant not only to the interpretation of the 2011 Rule, but also to BANA's affirmative defenses of fair notice, waiver and estoppel, and that his opinion would assist the trier of fact in the evaluation of those defenses.  ECF No. 298 at 16.[5]  This Court agrees with the FDIC.

Expert testimony must assist jurors in understanding an issue "beyond the ken of the average juror."  *United States ex rel. Landis v. Tailwind Sports Corp.*, No. 10-cv-00976, 2017 WL 5905509, at *15 (D.D.C. Nov. 28, 2017) (finding "the average juror is entirely capable of" reviewing testimony and drawing conclusions as to what parties knew or should have known) (citing *United States v. Mitchell*, 49 F.3d 769, 780 (D.C. Cir. 1995)).  It is for the jury, not an expert, to review the testimony presented and "determine what factual conclusions to draw from that testimony."  *Tailwind Sports Corp.*, 2017 WL 5905509, at *15.  Juries are presumed fit to make such determinations based on their "natural intelligence and . . . practical knowledge of men and the ways of men."  *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 (1891).

---

[5]     BANA also argues that it "did not rely on this section of Mr. Carnahan's report in its Opening Brief," and, accordingly, the Court need not address this portion of the opinion now.  ECF No. 298 at 16.  Even if BANA did not rely on this particular opinion in its opening summary judgment brief, the FDIC has moved to strike Mr. Carnahan's report based on the inadmissible opinion.  The Court sees no reason to defer ruling on this portion of the Motion, particularly where there appears to be no change in circumstances between now and trial which would convert Mr. Carnahan's opinion into an admissible one.

Mr. Carnahan's opinions about what inferences one could draw from the FDIC's interactions with BANA are within the "natural intelligence" of an average factfinder. *See id*; *see also United States v. Boney*, 977 F.2d 624, 628, (D.C. Cir. 1992) ("[Expert] testimony should ordinarily not extend to matters within the knowledge of laymen."). BANA contends that a jury "is unlikely to be equipped to understand . . . the process that employees at an HCI with accounting backgrounds would engage in for interpreting a financial regulation . . ." ECF No. 298 at 16. Yet, Mr. Carnahan's opinion fails to elucidate that process in accounting terms that would be helpful to the factfinder. Instead, Mr. Carnahan offers several opinions—some of which briefly mention accounting principles—that ultimately lead to his conclusions about what actions and interpretations were "reasonable" and what could be "inferred" from the same. *See* ECF No. 258–4 at 24, ¶ 59 (". . . where reporting requirements or accounting standards are susceptible to more than one reasonable interpretation, it is common for experienced professionals to interpret those requirements or standards differently."). Such conclusions do not invoke Mr. Carnahan's "special or peculiar training" and are, thus, a function of the jury. *See Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962) (explaining that "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing conclusions from them as are" expert witnesses, expert testimony may be properly excluded) (citation and quotations omitted).

*Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.* is instructive. 315 F. Supp. 3d 101 (D.D.C. 2018). In *Bazarian*, the defendants filed a *Daubert* motion to exclude the plaintiff's expert testimony and report, arguing in part that the expert's opinions went to matters of common understanding. *Id.* at 110. The court granted the defendants' motion in part, holding that an expert cannot simply restate the facts and opine as to how the jury should interpret them.

*Id.* at 122–23 (emphasizing that the expert's testimony amounted to a "recitation of what occurred in the relationship" among the parties, "relying largely on the plaintiff's version of the facts, rather than offering much in the way of expert testimony about the function of [such] relationships within the industry."). Moreover, where "the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose." *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016) (quoting *Henkel v. Varner*, 138 F.2d 934, 935, (D.C. Cir. 1943)).

This Court has no doubt that Mr. Carnahan's credentials and experience are impressive. That is why, however, there is danger in allowing him to use the imprimatur of expert testimony to draw inferences and make findings on hotly-contested factual issues the jury is fully capable of making for itself. These issues include, as even BANA concedes, the factual elements of its affirmative defenses. Moreover, this Court has found that BANA has raised genuine issues of material fact warranting a trial regarding, among other things, BANA's "intent to comply with the Rule and whether the FDIC knew or should have known of BANA's reporting method." ECF No. 315 at 43–45. The jury is fully capable of determining whether and to what effect, if any, the FDIC's alleged failure to object to BANA's methodology in a timely manner resulted in consent or led any particular BANA witness to believe the methodology was correct. As such, the Court grants the FDIC's motion to strike the Carnahan report.

## III. Paul Kupiec

The FDIC also seeks to strike the expert report of Dr. Paul Kupiec. ECF No. 265. Having previously worked for the FDIC's Division of Insurance and Research, Dr. Kupiec is a resident scholar at the American Enterprise Institute ("AEI") and studies the regulation of banks and

financial markets, particularly risk measurement and management.  ECF No. 256–12 at 5.  BANA

hired Dr. Kupiec to opine on: (1) "whether the FDIC's assessment system for HCIs such as BANA

under the 2011/2012 Final Rule is risk-based and accurately reflects the risk of losses to the DIF";

and (2) "whether aggregating exposures to counterparties that are affiliated to one other through a

common parent for purposes of calculating counterparty exposure accurately reflects counterparty

risk."  *Id.* at 8.  As BANA concedes, it relies on the Kupiec Report on summary judgment solely

to support its counterclaim under the APA, specifically its Section 553[6] challenge to the 2011 and

2012 Rules.  ECF No. 275 at 10.

Dr. Kupiec offers six overall opinions.  ECF No. 256–12 at 9–14.  First, he describes the

purpose of the FDIC Improvement Act and concludes that the 2011 Rule "is not risk-based."  *Id.*

at 9–10.  Second, he distinguishes HCIs such as BANA from other IDIs, noting that HCIs "have

certain attributes that minimize the probability that a failure will occur."  *Id.* at 10.  Third, Dr.

Kupiec discusses the "regulatory tools available to the FDIC," explaining that "even if an HCI

failure were to occur," the FDIC could limit losses to the Fund.  *Id.* at 10–11.  Fourth, Dr. Kupiec

opines that, given the "unique attributes of HCIs, as well as the regulatory tools available to the

FDIC," the 2011 Rule is flawed and not risk-based.  *Id.* at 11.[7]  Fifth, Dr. Kupiec states that the

2011 Rule's assessment system "does not accurately reflect the risk posed by HCIs to the DIF."

---

[6]     The FDIC argues that BANA has failed to plead a Section 553 counterclaim.  ECF No. 278
at 6-8.  This Court need not resolve that question at this time because Dr. Kupiec's opinion is
inadmissible even if BANA had pled the claim. *See* discussion *infra* pp. 16–22.

[7]     Dr. Kupiec opines on five flaws he sees with the 2011 Rule: (1) the FDIC failed to apprise
interested parties of "the details necessary to independently validate the models and assumptions"
underlying the assessment system; (2) the FDIC "arbitrarily capped" the loss severity measure in
the scorecards HCIs used to report exposures; (3) the 2011 Rule failed to reflect the "risk-
mitigating attributes of HCIs"; (4) the 2011 Rule failed to "reflect the regulatory tools available to
the FDIC" to combat an HCI's failure; (5) the counterparty exposure measure in the 2011 Rule
failed to "reflect the risk of such counterparty exposure to the HCI, and thus, the risk of potential
losses to the DIF."  ECF No. 256–12 at 11–14.

*Id.* at 14.  Finally, after questioning whether the assessments the FDIC imposed are "fair and equitable," Dr. Kupiec concludes that the "FDIC's method for determining assessments for HCIs systematically overstates the risk that HCIs posed to the DIF."  *Id.*  Notably, each of Dr. Kupiec's opinions focuses on risk, whether it be the risk that HCIs will fail or the FDIC's assessment of the same.

### A. Dr. Kupiec's Report is Not Admissible to Establish Prejudice in Support of BANA's Counterclaims.

The FDIC first argues that the Court cannot consider Dr. Kupiec's Report on summary judgment because doing so would violate the whole record rule.  ECF No. 265 at 10–11; ECF No. 278 at 7.  Under this rule, it "is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'"  *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013 (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).

BANA does not dispute that the Report is not part of the administrative record, nor that the whole record rule generally applies in APA cases.  ECF No. 275 at 15, 16.  Instead, BANA argues that this Circuit allows a party such as BANA to raise new arguments and introduce new evidence for the purpose of satisfying the prejudice prong of a Section 553 claim.  ECF No. 275 at 15.  In so arguing, BANA relies almost exclusively on *Chamber of Com. of the U.S. v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006) ("*Chamber II*") (allowing a party to supply extra-record evidence to show it was prejudiced by the agency's allegedly defective rulemaking).

BANA has failed to dispute FDIC's argument that Dr. Kupiec's Report is not part of the administrative record.  *See Hopkins v. Women's Div., General Bd. of Global Ministries,* 284 F. Supp. 2d 15, 25 (D.D.C. 2003) *aff'd* 98 Fed.Appx. 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only

certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). Accordingly, because a "a reviewing court cannot consider information that was unavailable to the agency when it made its decision," Dr. Kupiec's Report should be excluded unless BANA's arguments prevail. *See Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 895 F.3d 90, 102 (D.C. Cir. 2018) (internal citations omitted). Because BANA's argument that it is entitled to introduce Dr. Kupiec's opinions for the purpose of satisfying the prejudice prong of a Section 553 claim fails, this Court agrees with the FDIC.

The APA requires that a notice of proposed rulemaking include "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and that the agency "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." § 553(c); *see Air Transp. Ass'n v. CAB,* 732 F.2d 219, 224 (D.C. Cir. 1984). It is also "[i]ntegral" that the agency "identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules." *See Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007) (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)). A Section 553 claim is subject, however, to the rule of prejudicial error in Section 706, and a court will not set aside a rule unless the challenger meets its burden to show "that [it] suffered prejudice from the agency's failure to provide an opportunity for public comment." *See Gerber v. Norton,* 294 F.3d 173, 182 (D.C. Cir. 2002) (emphasizing that courts must take "due account" of "the rule of prejudicial error") (quoting 5 U.S.C. § 706).

To show that an agency's procedural error was prejudicial, challengers may: (1) "point to inaccuracies in the [supplemental] data," *Solite*, 952 F.2d at 484; (2) show that the agency "hid or disguised the information it used, or otherwise conducted the rulemaking in bad faith," *id.*; or (3)

". . . indicate with 'reasonable specificity' what portions of the [data] it objects to and *how it might have responded* if given the opportunity," *Air Transp. Ass'n of Am. v. FAA,* 169 F.3d 1, 8 (D.C. Cir. 1999) (citing *Air Transport Ass'n. v. CAB*, 732 F.2d 219, 224 n. 11 (D.C. Cir. 1984)) (emphasis added).  Put plainly, the challenger must demonstrate that it "had something useful to say" about the undisclosed data that could have impacted the agency's decision making.  *Chamber II*, 443 F.3d at 905.  In determining prejudice, courts need not rely on "mandatory presumptions and rigid rules," rather, the Supreme Court has encouraged a "case-specific application of judgment" that prevents courts from becoming "impregnable citadels of technicality."  *Shinseki v. Sanders*, 556 U.S. 396, 407–08 (2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 759 (1946)) (confirming that there is no distinction between civil and administrative cases when applying the prejudicial error rule).

BANA relies almost exclusively on *Chamber II* for its proposition that the Kupiec Report can be admitted to show prejudice, but that case establishes a limited exception to the whole record rule that does not apply here.  In *Chamber II*, the Securities Exchange Commission (SEC) refused to reopen the rulemaking record on remand even though it relied on extra-record evidence to affirm its regulation.  443 F.3d at 901–02.  The Chamber of Commerce challenged the SEC's decision, in part under Section 553.  *Id.* at 894.  The D.C. Circuit agreed with the Chamber of Commerce, noting the SEC's "extensive reliance upon extra-record materials," *id.* at 901, in particular, "extra-record bulletins and [a] summarized survey."  *Id.* at 905.  As such, the court allowed the Chamber of Commerce to admit its own extra-record objections and studies to show prejudice.  *Id.* at 904.

In so holding, the *Chamber II* court noted that "the Chamber's failure to critique the [extra-record evidence] until this appeal indicates that it had no reason to anticipate the Commission's ultimate reliance on those materials."  *Id.* at 905.  The same cannot be said here.  It is worth

emphasizing again that it took BANA nine years after the 2011 Rule's promulgation and three years after the FDIC brought suit to produce the Report it now wishes to rely upon to establish prejudice.  In contrast, in *Chamber II*, the Chamber of Commerce immediately challenged the SEC's failure to reopen the rulemaking record on remand and simultaneously sought to admit its own extra-record materials to establish prejudice.  *Compare* Release No. 26,985, 70 Fed. Reg. 39,390, 39,398 (July 7, 2005) (SEC affirms its regulation and relies on extra-record evidence), *with Chamber II*, 443 F.3d at 894 (Chamber of Commerce immediately sues, and the lower court stays the SEC's regulation on August 10, 2005).

Moreover, BANA cannot use Dr. Kupiec's Report to demonstrate, for purposes of the prejudice requirement, that it "had something useful to say" about the data it alleges the FDIC failed to properly explain while promulgating the 2011 Rule.  ECF No. 275 at 14.  Although BANA may have met its burden to "indicate with reasonable specificity what portions" of the rulemaking record to which it objects, *id.* at 13, BANA cannot use Dr. Kupiec's Report to show "how it might have responded if given the opportunity" when his opinions derive largely from information and data that post-date the 2011 Rule.  *See, e.g., Troy Chem. Corp. v. EPA*, 837 Fed. Appx. 1, 5–6 (D.C. Cir. 2020) (holding that challenger failed to show prejudice because he did not sufficiently identify how he would have responded to the missing material, to which he had access "for over five years").  It would have been impossible for BANA to respond with much of the information in Dr. Kupiec's Report during the 2011 notice and comment period given that his Report is largely based on data and information that did not exist at that time.  *See generally* ECF No. 256–12 at 142–48 (listing a variety of publicly available sources upon which Dr. Kupiec relied in drafting his Report, including 2018 articles from the Congressional Research Service and the Department of Treasury, and 2019 publications from the FDIC and the Federal Reserve System).

Dr. Kupiec wrote his Report in the summer of 2020, nine years after the 2011 Rule's notice and comment period closed and three years after BANA initiated this lawsuit. ECF No. 256–12 at 2. The FDIC argues that there is no justification to consider the Report which was created nine years after the administrative record closed, ECF No. 265 at 13, but BANA fails to address this issue of timing. A cursory review of the publicly-available materials upon which Dr. Kupiec relies in his Report shows sources as recent as 2019, eight years after the 2011 Rule's promulgation. *See* ECF No. 256–12 at 142–48. Moreover, in his deposition, Dr. Kupiec himself acknowledged that the FDIC could not have considered some of the materials upon which he relied in his Report because those materials did not yet exist. *See* ECF No. 265–1 at 8, 168:19–169:10 (Dr. Kupiec conceding that FDIC could not have considered liquidity coverage ratio rule during 2011 Rule promulgation while simultaneously citing to that rule in his Report).

As the *Chamber II* court expressly warns, its holding "does not mean parties can withhold relevant data and blindside the agency on appeal." 443 F.3d at 904. Although the Chamber of Commerce acted promptly in challenging the SEC's decision—as reflected in its immediate lawsuit and production of evidence to show prejudice—the same cannot be said for BANA here. Allowing BANA to rely on the Kupiec Report to establish prejudice would expand the limited exception the court created in *Chamber II*. *See id.* (outlining limitations to the exception created and urging that "[a] contrary rule would provide a perverse incentive for parties opposing a rule to withhold data in order to seek vacation of the rule on appeal").

### B. Even if Dr. Kupiec's Opinions were Admissible to Establish Prejudice, they are Inadmissible as Legal Opinions.

The FDIC also argues that Dr. Kupiec's Report is inadmissible because it offers legal conclusions. ECF No. 265 at 18. BANA disagrees, arguing that his opinions "fall within the province of testimony long permitted under the Federal Rules of Evidence—testimony on an

'ultimate issue to be decided by the trier of fact.'" ECF No. 275 at 22.[8]  The Court agrees with the

FDIC, and the same legal standards outlined with regard to the Carnahan Report apply here.  *See*

*supra* pp. 8–11.

Dr. Kupiec himself concedes that his opinion is about "whether the 2011 Rule is risk-

based within the meaning of the 1991 [A]ct." *See* ECF No. 265–1 at 5, 102:13–17 (FDIC Counsel:

"[Is] it fair to say that the opinion you're offering in this case focuses on whether the 2011 [R]ule

is risk-based within the meaning of the 1991 [A]ct?"  Dr. Kupiec: "Yes, I think so.").  Dr. Kupiec

also confirms that aside from this issue, he offers no other opinions. *See id.* at 5, 103:10–14 (FDIC

Counsel: "Aside from the issue of whether the 2011 [R]ule is risk-based and all of the various

reasons why you have that opinion, are you offering any other opinions in this case?"  Dr. Kupiec:

"No, I don't think so.").  As discussed above, "[d]etermining the meaning of a . . . regulation, of

course, presents a classic legal question." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2432 (2019) (Gorsuch,

J., concurring); *see also Montana v. Clark*, 749 F.2d 740, 744 (D.C. Cir. 1984) (court "is uniquely

responsible for the final determination of the meaning of statutes.").  It is for the court, not an

expert witness, no matter how qualified, to determine this ultimate legal issue.

BANA's attempt at distinguishing between what it characterizes as the "legal issue—

whether the 2011 Rule violates the [FDIC Act]"—and the "factual issue—whether the 2011 Rule

actually captures the risk that HCIs pose to the Fund in the real world"—fails.  ECF No. 275 at

22–23.  Although it is true that an expert may testify "as to *facts* that, if found, would support a

---

[8]     As alternative to its Section 553 argument, BANA argues that the Report is relevant to the
interpretation of the 2011 Rule and the FDIA's tolling exception, as well as the FDIC's unjust
enrichment claim.  ECF No. 275 at 19–21.  The Court need not address whether the Report is
relevant to these issues because relevance is not the standard in determining admissibility in this
instance, as noted above.  Even if it were relevant, the Report is inadmissible as a legal opinion.
*See* discussion *infra* pp. 21–22.

conclusion that the legal standard at issue was [or was not] satisfied," an expert "may not testify as to whether the legal standard has been satisfied." *Morsell*, 2020 WL 1508904, at *4 (quoting *Burkhart*, 112 F.3d at 1212–13). "[T]he line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or determining a fact in issue is not always bright." *Burkhart*, 112 F.3d at 1212. It is likely that an expert's testimony is a legal conclusion where "it track[s] the language of the applicable statute" and uses terms that "ha[ve] a specialized legal meaning that [are] more precise than the lay understanding of the term." *Morsell*, 2020 WL 1508904, at *4 (quoting *Burkhart*, 112 F.3d at 1212). Similar to Mr. Carnahan, that is what Dr. Kupiec does in his Report. *See, e.g.*, ECF No. 256–12 at 10 ("[A]s I explain in this report, the assessment system for HCIs such as BANA under the 2011/2012 Final Rule does not accurately reflect many aspects that lower the risk of failure of HCIs, or potential losses to the DIF, if any, in the event of the failure of such institutions, *and thus is not risk-based*.") (emphasis added). As even BANA argues, Dr. Kupiec's "Report is relevant to the *proper interpretation of the 2011 Rule* and the FDIC's unjust enrichment claim." ECF No. 275 at 19. Because Dr. Kupiec's testimony invades the Court's role in determining as a matter of law whether the FDIC acted in accordance with its statutory obligations, his opinions are inadmissible.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court **GRANTS** the FDIC's Motions to Strike the Expert Reports of Scott Carnahan and Paul Kupiec.

**SO ORDERED**.

Date: March 8, 2024

_____

MOXILA A. UPADHYAYA
United States Magistrate Judge