**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL DEPOSIT INSURANCE
CORPORATION,

        *Plaintiff*,

   v.

BANK OF AMERICA, N.A.,

        *Defendant*.

Civil Action No. 17 - 36 (LLA)

## <u>MEMORANDUM OPINION</u>

Plaintiff, the Federal Deposit Insurance Corporation (the "FDIC"), brings this action against Defendant, Bank of America, N.A. ("BANA"), alleging its failure to pay $1.12 billion in deposit insurance assessments in violation of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1817, and its resulting unjust enrichment.  ECF No. 10.  BANA raises several affirmative defenses to the FDIC's claims and brings counterclaims against the FDIC for violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, arising out of the FDIC's promulgation and enforcement of a 2011 regulation that set the formula for calculating deposit insurance assessment rates.

This matter is before the court on the FDIC's partial motion for summary judgment, ECF No. 361, and BANA's cross-motion for summary judgment, ECF No. 366.  Upon consideration of the motions and supporting documentation, the court will grant in part and deny in part the FDIC's partial motion for summary judgment, and grant in part and deny in part BANA's motion for summary judgment, and it will enter judgment in favor of the FDIC and against BANA in the

amount of $540,261,499.90, representing BANA's underpaid assessments from 2Q 2013 through 4Q 2014, plus pre- and post-judgment interest.

## I.     FACTUAL BACKGROUND

### A.     The FDIC and the FDIA

The FDIC was created in 1933 during the Great Depression.  Since that time, it has played an "important role in maintaining stability and public confidence in the banking system and in protecting the savings of ordinary Americans."  ECF No. 364, at 5.  The FDIC does this by insuring banks: when an insured bank fails, the FDIC "provides depositors access to their insured accounts at that institution," and where "the institution's assets are insufficient, the FDIC pays the balance from the Deposit Insurance Fund."  *Id.*[1]

The FDIC finances the Deposit Insurance Fund by collecting quarterly premiums, called "assessments," from the banks it insures.  *Id.* ¶ 5.  The FDIA directs the FDIC to "by regulation, establish a risk-based assessment system for insured depository institutions."  12 U.S.C. § 1817(b)(1)(A).  The risk-based assessment system must be based on:

> (i) the probability that the Deposit Insurance Fund will incur a loss with respect to the institution, taking into consideration the risks attributable to—
>
>> (I) different categories and concentrations of assets;
>>
>> (II) different categories and concentrations of liabilities . . .; and
>>
>> (III) any other factors the [FDIC] determines are relevant to assessing such probability;

---

[1] The FDIC pays up to $250,000 per depositor, per FDIC-insured bank, for each account ownership category (single accounts, joint accounts, certain retirement accounts, trust accounts, employee benefit plan accounts, corporation/partnership/unincorporated association accounts, and government accounts).  FDIC, *Understanding Deposit Insurance*, https://perma.cc/24H7-GTM9.

(ii) the likely amount of any such loss; and

(iii) the revenue needs of the Deposit Insurance Fund.

*Id.* § 1817(b)(1)(C).

The FDIA permits the FDIC to use "separate risk-based assessment systems for large and small" banks. *Id.* § 1817(b)(1)(D). Accordingly, the FDIC employs different methodologies for calculating a bank's risk depending on whether the bank is a small institution, a large institution, or a highly complex institution ("HCI"). ECF No. 248-4 ¶ 5. HCIs are "the largest and most complex banks." *Id.* ¶ 7. During the time period relevant to this case, there were only nine HCIs in the United States, including BANA. *Id.* ¶ 12.[2]

Being insured by the FDIC makes a bank more appealing to customers because they know that their savings are safe. But as with any insurance system, where there is greater risk, the insurer charges a higher premium. Just as a teenage driver pays more in car insurance than an adult driver, a risky bank will pay higher quarterly assessments to the FDIC.

### B.    The 2011 Rule

After the Great Recession in 2008, it became clear to lawmakers that existing regulations did not go far enough in ensuring the stability of the national banking system. 76 Fed. Reg. 10672, 10674 (Feb. 25, 2011). In 2010, Congress passed the Dodd-Frank Wall Street Reform and

---

[2] The FDIC defines an HCI as: "(i) An insured depository institution (excluding a credit card bank) that has had $50 billion or more in total assets for at least four consecutive quarters . . . that is controlled by a U.S. parent holding company that has had $500 billion or more in total assets for four consecutive quarters, or controlled by one or more intermediate U.S. parent holding companies that are controlled by a U.S. holding company that has had $500 billion or more in assets for four consecutive quarters; or (ii) A processing bank or trust company." 12 C.F.R. § 327.8(g)(1). In addition to BANA, the other HCIs at the time were Bank of New York Mellon; Citibank, N.A.; Goldman Sachs Bank USA; JPMorgan Chase Bank, N.A.; Morgan Stanley N.A.; The Northern Trust Company; State Street Bank and Trust Company; and Wells Fargo Bank, N.A. ECF No. 248-4 ¶ 12.

Consumer Protection Act (the "Dodd-Frank Act") to "improve[] accountability and transparency in the financial system" and "end 'too big to fail.'" Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Dodd-Frank Act achieved this goal in part by requiring the FDIC to amend its regulations for calculating banks' assessment rates. *Id.* at 1376, 1538; *see* 76 Fed. Reg. at 10674.

In response to the Dodd-Frank Act, the FDIC began "develop[ing] a comprehensive, long-range management plan for the [Deposit Insurance Fund]." 76 Fed. Reg. at 10674; *see* 75 Fed. Reg. 23516 (May 3, 2010); 75 Fed. Reg. 72582 (Nov. 24, 2010); 75 Fed. Reg. 72612 (Nov. 24, 2010). In November 2010, it issued Notices of Proposed Rulemaking and Requests for Comment. The proposed rules suggested revisions to the assessment methodologies for large banks and HCIs. 75 Fed. Reg. at 72582; 75 Fed. Reg. at 72612. The FDIC published the final rule ("the 2011 Rule") in February 2011, and it went into effect in 2Q 2011. 76 Fed. Reg. at 10672 (codified at 12 C.F.R. § 327.9(b)(2) (2011)).

In promulgating the 2011 Rule, the FDIC aimed to "revise the large insured depository institution assessment system to better differentiate for risk and better take into account losses from large institution failures that the FDIC may incur" "if a large insured depository institution fails." *Id.* at 10672, 10688. Before the 2011 Rule, the FDIC placed each large bank or HCI into one of four risk categories depending on its capital levels and supervisory evaluations. *Id.* at 10672. The 2011 Rule eliminated those categories and instead implemented "scorecards": one scorecard for large banks and another for HCIs like BANA. *Id.* at 10688.

The scorecards for both large banks and HCIs included a "performance score" and a "loss severity score." *Id.* at 10695. The performance score "measure[d] [a bank]'s financial performance and its ability to withstand stress," while the loss severity score "measure[d] the relative magnitude of potential losses to the FDIC in the event of [the bank]'s failure." *Id.*

at 10689.  The FDIC multiplied the performance score by the loss severity score to produce a

bank's "combined score," which determined the amount of the bank's quarterly payment.  *Id.*

As one can see from the HCI scorecard, replicated below, the FDIC used a number of

sub-factors to determine the performance and loss severity scores.

| | Measures and components | Measure weights (percent) | Component weights (percent) |
|---|---|---|---|
| TABLE 16—SCORECARD FOR HIGHLY COMPLEX INSTITUTIONS | | | |
| P .......... | Performance Score | ............ | 30 |
| P.1 ........ | Weighted Average CAMELS Rating | 100 | 30 |
| P.2 ........ | Ability to Withstand Asset-Related Stress | ............ | 50 |
| | Tier 1 Leverage Ratio | 10 | ............ |
| | Concentration Measure | 35 | ............ |
| | Core Earnings/Average Quarter-End Total Assets | 20 | ............ |
| | Credit Quality Measure and Market Risk Measure | 35 | ............ |
| P.3 ........ | Ability to Withstand Funding-Related Stress | ............ | 20 |
| | Core Deposits/Total Liabilities | 50 | ............ |
| | Balance Sheet Liquidity Ratio | 30 | ............ |
| | Average Short-Term Funding/Average Total Assets | 20 | ............ |
| L .......... | Loss Severity Score | ............ | ............ |
| L.1 ........ | Loss Severity Measure | ............ | 100 |

*Id.* at 10695.  One factor that the FDIC used to determine performance (specifically, to assess a

bank's ability to withstand asset-related stress) was the "concentration measure," which quantified

how concentrated (not diversified) a bank's risk exposure was.  *Id.* at 10696.

The 2011 Rule calculated the concentration measure for large banks and HCIs differently.

The HCI scorecard "consider[ed] the [HCI's] top 20 counterparty exposures . . . and the largest

counterparty exposure . . . instead of the growth-adjusted portfolio concentrations measure used in

the scorecard for large institutions."  *Id.* at 10696.  As the 2011 Rule explained, the HCI scorecard

used these measures "because recent experience show[ed] that the concentration of a[n HCI]'s

exposures to a small number of counterparties—either through lending or trading activities—

significantly increase[d] the institution's vulnerability to unexpected market events.  The FDIC

use[d] the top 20 counterparty exposure and the largest counterparty exposure to capture this risk."

*Id.*

Importantly, the 2011 Rule defined "counterparty exposure" as "the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all unfunded commitments) for each counterparty or borrower at the *consolidated entity level*." *Id.* at 10721 (emphasis added). It is the meaning of this phrase that is at the heart of this case.

The 2011 Rule and its subsequent permutations that also required reporting at the "consolidated entity level," were in effect from April 1, 2011 through December 31, 2015. 12 C.F.R. § 327.9 (2011). Every quarter during this period, HCIs reported their required information to the FDIC in a "Call Report." ECF No. 248-4 ¶ 13. In June 2011, the FDIC published instructions accompanying the Call Report stating that HCIs should report the amount of their largest counterparty exposure and the total amount of their twenty largest counterparty exposures "at the consolidated entity level of the counterparty." ECF No. 256-4, at 9. In March 2012, the FDIC updated those instructions, adding that counterparty exposures should be reported on a "fully consolidated basis." ECF No. 286-2, at 4. In December 2012, the FDIC published a notice stating that "highly complex institutions should report counterparty credit exposure on a consolidated entity basis (legal consolidated entity)." 76 Fed. Reg. 77315, 77322 (Dec. 12, 2011). The notice further stated that the "FDIC believes that highly complex institutions should have the ability to aggregate exposures arising from financial contracts with entities within a legal consolidated entity and report the exposure as outlined in the final rule." *Id.*

### C.    The 2016 Audit

In 2016, an FDIC audit revealed that "BANA had not consolidated its counterparty exposures to the ultimate parent level as required" for 1Q 2012 through 4Q 2014.[3]  ECF No. 248-4 ¶ 26.  Instead, "BANA reported the amount of its direct exposure to a given counterparty without adding to that amount its exposures to the counterparty's subsidiaries or to other members of the counterparty's corporate family."  *Id.*  This lowered BANA's concentration measure, which in turn considerably lowered the overall amount that BANA paid in assessments for those quarters.  After completing the audit, the FDIC invoiced BANA $1,120,563,178.49 in underpaid assessments.  ECF No. 364, at 15.  BANA declined to pay.  *Id.*

## II.    PROCEDURAL HISTORY

In January 2017, the FDIC filed suit against BANA, alleging that BANA had failed to pay over $500 million dollars in mandatory assessments for 2Q 2013 through 4Q 2014, as required by the FDIA.  ECF No. 1 ¶¶ 50-51.  In April 2017, the FDIC amended its complaint, alleging that BANA had failed to pay $1.12 billion in mandatory assessments in violation of the FDIA (Count I) and had unjustly enriched itself at the FDIC's expense by retaining that money (Count II).  ECF No. 10 ¶¶ 72-94.

BANA moved to dismiss in part, arguing that some of the assessment quarters fell outside the statute of limitations and that the FDIC could not bring a claim for unjust enrichment.  ECF No. 13.  The FDIC responded with a pre-discovery motion for summary judgment.  ECF No. 39.  In March 2018, the court (Sullivan, J.) determined that it would be premature to dismiss as untimely the FDIC's claims concerning certain quarters and that the FDIC could plead unjust

---

[3] BANA consolidated its counterparty exposures correctly for 2Q 2011 and 3Q 2011, the first two quarters that the 2011 Rule was in effect.  *See* ECF No. 364, at 27; ECF No. 376-2, at 27.

enrichment as an alternative theory of liability. *Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*, 308 F. Supp. 3d 197, 204-07 (D.D.C. 2018). The court therefore denied BANA's motion to dismiss. *Id.* at 207. Shortly thereafter, the court denied the FDIC's motion for summary judgment without prejudice so that the parties could proceed with discovery. Apr. 9, 2018 Minute Order.

In April 2018, BANA filed an answer and counterclaims, denying the FDIC's allegations and raising various challenges to the 2011 Rule under the APA. ECF No. 68. After an initial round of discovery concluded in 2020,[4] the parties filed cross-motions for summary judgment. ECF Nos. 247, 257. The court referred the case, first to Magistrate Judge Faruqui and then to Magistrate Judge Upadhyaya, for full case management. Oct. 13, 2020 Minute Order; Aug. 29, 2022 Minute Order.

In April 2023, Judge Upadhyaya issued a Report & Recommendation ("R&R"), recommending that both parties' motions for summary judgment be granted in part and denied in part. ECF No. 312. On Count I, which concerns BANA's liability under the FDIA, she concluded that the FDIC had the better interpretation of the 2011 Rule and that BANA was thus liable for the unpaid assessment fees, but she found that genuine disputes of material fact warranted a trial on whether the FDIC's claims concerning BANA's underpaid assessments for 1Q 2012 through 1Q 2013 were time-barred. ECF No. 312, at 14, 40-45, 71-72. On Count II, which concerns the FDIC's claim for unjust enrichment, Judge Upadhyaya concluded that the claim failed because the FDIC had an adequate remedy at law and that, even if the FDIC could pursue such a claim, it could not seek disgorgement as a remedy because the FDIA restricts recovery to the amount of unpaid

---

[4] The court determined that it was proper to bifurcate discovery on BANA's liability and the FDIC's disgorgement remedy because "any calculations of a disgorgement award will be unnecessary if the trier of fact finds in favor of BANA on the FDIC's unjust enrichment claim." Apr. 2, 2020 Minute Order.

assessments. *Id.* at 46-54, 71. With regard to BANA's counterclaims, she concluded that the 2011 Rule did not violate the APA, entitling the FDIC to summary judgment without needing to consider its affirmative defenses (laches, acquiescence, and waiver) to BANA's counterclaims. *Id.* at 56-72 & n.19.

Both parties filed objections to Judge Upadhyaya's R&R. ECF Nos. 322, 326. BANA objected to Judge Upadhyaya's recommendation on Count I, arguing that: (1) there was no need for a trial because the FDIC's claims concerning the assessments for 1Q 2012 through 1Q 2013 were time-barred as a matter of law; (2) BANA had the correct reading of the 2011 Rule; and (3) BANA lacked fair notice of the FDIC's interpretation of the Rule. ECF No. 322, at 1-2. BANA also objected to her recommendation on its counterclaims, arguing that: (1) the FDIC's scorecards were not risk-based; (2) the 2011 Rule lacked a reasonable evidentiary basis; and (3) the FDIC's concentration measure for HCIs was arbitrary and capricious. *Id.* at 2-3. For its part, the FDIC objected to Judge Upadhyaya's statute-of-limitations analysis on Count I, arguing that its claims related to the assessments for 1Q 2012 through 1Q 2013 were timely. *See* ECF No. 326, at 4. It also objected to her recommendation on Count II, arguing that it may pursue a claim of unjust enrichment and seek disgorgement as a remedy. *Id.* at 3-4. The parties completed briefing on their objections in July 2023. ECF Nos. 323 to 325, 327 to 335. In March 2024, Judge Upadhyaya issued a second R&R concerning an expert dispute that was relevant to her R&R on summary judgment. ECF No. 340. The parties completed briefing on their objections to that R&R in May 2024. ECF Nos. 344 to 350.

Meanwhile, the case was reassigned to the undersigned in December 2023. *See* Dec. 14, 2023 Docket Entry. In June 2024, the court held a status conference where it asked for the parties' views on whether the court needed to resolve the expert dispute before it could consider

Judge Upadhyaya's R&R on summary judgment and whether the case was likely to be affected by the Supreme Court's forthcoming decision in *Loper Bright Enterprises v. Raimondo*, No. 22-451 (U.S.). *See* June 7, 2024 Minute Entry. After the hearing, BANA represented that the court could defer resolving the expert dispute until it had resolved the parties' objections to Judge Upadhyaya's R&R on summary judgment. ECF No. 354.

In July 2024, the Supreme Court decided *Loper Bright*, 603 U.S. 369 (2024), overruling *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Given the magnitude of that decision and its potential effect on the case, the court vacated Judge Upadhyaya's R&Rs, denied the parties' outstanding objections as moot, and denied the parties' cross-motions for summary judgment without prejudice to refiling. July 1, 2024 Minute Order. The parties filed new cross-motions for summary judgment, and briefing was completed in October 2024. ECF Nos. 361, 367, 372, 376. In November 2024, this court held a hearing on the cross-motions. Nov. 20, 2024 Minute Entry. The motions are ripe for disposition.

## III.    LEGAL STANDARDS

### A.    Summary Judgment Generally

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see* Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor," *id.* at 651 (first alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295-96 (D.C. Cir. 2015). For a factual dispute to be "genuine," the non-moving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and it cannot rely on "mere allegations" or conclusory statements, *see Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (quoting *Sierra Club v. Env't Prot. Agency*, 292 F.3d 895, 899 (D.C. Cir. 2002)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the nonmoving party, with the court "determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright

et al., *Federal Practice and Procedure* § 2720 (3d ed. 2016)); *see Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016); *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016).

## B.    Summary Judgment Under the APA

Rule 56's summary judgment standard does not apply to BANA's counterclaims arising under the APA. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Instead, "the district judge sits as an appellate tribunal" and the "'entire case' on review is a question of law." *Id.* The court must "decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). This means that the court must "hold unlawful and set aside" agency actions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

## IV.    DISCUSSION

In evaluating the parties' cross-motions for summary judgment, the court will first consider BANA's challenge to the 2011 Rule, because the court need only interpret the rule if it was lawfully promulgated. The court will then consider BANA's liability under the 2011 Rule, before turning to the statutory and equitable remedies available to the FDIC. The court will conclude by examining the availability of BANA's equitable defenses.

## A.    Validity of the 2011 Rule

BANA raises several challenges to the validity of the 2011 Rule under the APA, ECF No. 367-2, at 24-36, but they collapse into two groups: (1) that the 2011 Rule was inconsistent

with the FDIA, *id.* at 24-27; and (2) that, even if the FDIA permitted the FDIC to promulgate the 2011 Rule, the rule is arbitrary and capricious and procedurally flawed, *id.* at 27-36.  The FDIC responds that the 2011 Rule was within the boundaries of the broad discretion conferred upon the FDIC by the FDIA and that it promulgated the rule consistent with the APA's evidentiary and procedural requirements.  ECF No. 372-2, at 43-58.  The court concludes that the 2011 Rule comported with the FDIA, was based on sufficient evidence, and was properly promulgated under the APA.

After *Loper Bright*, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  603 U.S. at 412.  Even when the meaning of a statute is unclear, "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."  *Id.* at 413.  That is because statutes have "a single, best meaning," *id.* at 400, and "the final interpretation of the laws [is] the proper and peculiar province of the courts," *id.* at 385 (internal quotation marks omitted) (quoting The Federalist, No. 78, at 535 (A. Hamilton)).

That said, in many instances, the best reading of a statute may be that Congress intended for the agency to retain some measure of discretion.  *Id.* at 394.  When Congress "delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it."  *Id.* at 413.  This is especially the case where statutes "'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term," *id.* at 394 (alteration in original) (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)), "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme," *id.* at 395 (quoting *Wayman v. Southard*, 10 Wheat. 1, 43 (1825)), or allow an agency to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate'

or 'reasonable,'" *id.* (citation omitted) (quoting *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 752 (2015). In such cases, the task before the court is to "fix[] the boundaries of [the] delegated authority," *id.* (second alteration in original) (quoting H. Monaghan, *Marbury and the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983)), and then "ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries," *id.* (quoting *Michigan*, 576 U.S. at 750).

1.    **The FDIC acted within the bounds of the broad discretion accorded by the FDIA**

Applying the above principles, the court concludes that the FDIA confers substantial discretion on the FDIC to determine the relevant components of a "risk-based assessment system" as that term is defined in the statute. 12 U.S.C. § 1817(b)(1)(C). As noted, the FDIA states that the FDIC "shall, by regulation, establish a risk-based assessment system for insured depository institutions." *Id.* § 1817(b)(1)(A). The statute defines a "risk-based" assessment system as one based on:

> (i) the probability that the Deposit Insurance Fund will incur a loss with respect to the institution, taking into consideration the risks attributable to—
>
> > (I) different categories and concentrations of assets;
> >
> > (II) different categories and concentrations of liabilities . . . ; and
> >
> > (III) any other factors the [FDIC] determines are relevant to assessing such probability;
>
> (ii) the likely amount of any such loss; and
>
> (iii) the revenue needs of the Deposit Insurance Fund.

*Id.* § 1817(b)(1)(C). BANA contends that the statutory mandate that the FDIC base its assessment system on "the risk that a bank will fail in a way that causes losses to the Fund, with attention to the amount of those losses" precludes the FDIC from considering "'other policy factors.'" ECF No. 367-2, at 24-25 (quoting *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024)).

In BANA's view, the 2011 Rule's use of "scorecards" that based 80% of an HCI's assessment rate on its "performance score" and 20% on its "loss severity score" is inconsistent with the FDIA's command because the "statutory factors were being given [only] 20% weight." *Id.* at 25-27; *see* 12 U.S.C. § 1817(b)(1)(C)(i).

The FDIC counters that the scorecards' performance score component *did* measure the probability of an HCI incurring a loss to the Fund, because it "explicitly takes into consideration the risks attributable to different categories and concentrations of assets, different categories and concentrations of liabilities, and many other relevant factors regarding loss." ECF No. 372-2, at 45 (quoting 76 Fed. Reg. at 10701). Therefore, the FDIC argues, the 2011 Rule's performance score "falls squarely within the FDIC's statutory authority," *id.*, and the court need not "rely on any deference to [the FDIC's] statutory interpretation . . . to reject BANA's . . . claims," *id.* at 44. The court agrees with the FDIC that the 2011 Rule did not exceed the scope of its delegated authority under the FDIA.

The court begins, as it must, with the plain text of the FDIA. *Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 113 F.4th 943, 948 (D.C. Cir. 2024). "To construe th[e] text, [courts] look to the ordinary meaning of [the statute's] key terms." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024). The FDIA requires that the FDIC "establish a risk-based assessment system," 12 U.S.C. § 1817(b)(1)(A), which is defined as a system for calculating assessments based on (1) "the probability that the Deposit Insurance Fund will incur a loss" by "*taking into consideration* the risks attributable to," *id.* § 1817(b)(1)(C)(i) (emphasis added), a few categories and concentrations of assets and liabilities enumerated in the statute, *id.* § 1817(b)(1)(C)(i)(I), (II), as well as "*any other factors* [that] the [FDIC] *determines are relevant* to assessing such probability," *id.* § 1817(b)(1)(C)(i)(III) (emphases added) and (2) "the likely

amount of any such loss," *id.* § 1817(b)(1)(C)(ii).  To take a factor into "consideration" is to "weigh[] or take[] [it] into account when formulating an opinion or plan."  Consideration, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993).[5]  "Any" is a broad term, meaning "one, some, or all indiscriminately of whatever quantity" or "unmeasured or unlimited in amount, number, or extent."  Any, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993).  To "determine" is "to find out or come to a decision about by investigation, reasoning, or calculation."  Determine, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993).  Finally, something is "relevant" when it has "significant and demonstrable bearing on the matter at hand."  Relevant, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993).  Taken together, the plain meanings of these words confer a great deal of discretion on the FDIC.  The agency is called on to incorporate into its risk-based assessment system as many or as few factors as it wishes, as long as its "investigation, reasoning, or calculation" leads it to believe that those factors may have "significant or demonstrable bearing" on the Deposit Insurance Fund's likelihood of incurring a loss.  In other words, so long as a factor bears on the risk of the Fund incurring a loss, the FDIC has wide latitude to consider it in designing the assessment system.

In *Doolin Security Savings Bank, F.S.B. v. Federal Deposit Insurance Corp.*, 53 F.3d 1395 (4th Cir. 1995), the Fourth Circuit confirmed that the FDIA's language confers significant discretion on the FDIC.  There, the court was interpreting an older, but nearly identical, version of Section 1817(b).  *Id.* at 1400.  The court explained that the plaintiff's "selective emphasis on certain words in the [FDIA] cannot detract from the fact that *the statute expressly gives the FDIC considerable discretion* by allowing the FDIC to consider 'any other factors the [FDIC] determines

---

[5] The court relies on dictionary definitions from the time Congress added the relevant language to the FDIA.  *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 278 & n.3 (2024) (looking to ordinary meaning at the time of the statute's enactment).

are relevant' in calculating an institution's semiannual assessment." *Id.* (second alteration in original) (emphasis added) (quoting 12 U.S.C § 1817(b)(1)(C)). BANA argues that the FDIC's reliance on *Doolin* is inapposite because that court relied on the now-overruled doctrine of *Chevron* deference in arriving at its holding. ECF No. 376-2, at 3. While it may be true that the court's ultimate disposition of the case relied on *Chevron* deference, the court's conclusion that the FDIA gives the FDIC considerable discretion was based on its plain-text reading of the statutory language. *See Doolin*, 52 F.3d at 1400. Thus, the plain reading of the statute that the court arrives at today regarding the scope of the FDIC's discretion in choosing factors to consider when measuring the likelihood of loss accords with *Doolin* even in the absence of *Chevron* deference.

Under the plain text of the FDIA, as long as the FDIC believes that a factor is relevant to the determination of a bank's likelihood of incurring a loss, the FDIC may consider it. Having "fix[ed] the boundaries of [the] delegated authority," *Loper Bright*, 603 U.S. at 395 (second alteration in original) (quoting H. Monaghan, *Marbury and the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983)), the court concludes that the FDIC had the authority to promulgate the 2011 Rule.

### 2. The FDIC engaged in "reasoned decisionmaking," the 2011 Rule is supported by substantial evidence, and the process was not procedurally flawed

Having dispensed with BANA's argument that the 2011 Rule exceeded the scope of authority granted to the FDIC by the FDIA, the court considers whether the FDIC engaged in "reasoned decisionmaking" in arriving at the 2011 Rule. *Id.* at 396 (quoting *Michigan*, 576 U.S. at 750). BANA argues that the rule "lacked any reasonable evidentiary basis," ECF No. 367-2, at 24; *see id.* at 24-27, 34-35; that the FDIC "rel[ied] on flawed and dimly explained statistical models," *id.* at 24; *see id.* at 30-33, and failed to engage with commenters that pointed this out, *id.*

at 30-33; and that the FDIC failed to explain why it changed one key metric between two versions of the proposed rule, *id.* at 35-36.  The court disagrees and addresses each in turn.

*Evidentiary basis.*  "[T]he process by which [an agency] reaches [its] result must be logical and rational," and "agency action is lawful only if it rests 'on a consideration of the relevant factors.'"  *Michigan*, 576 U.S. at 750 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In assessing the reasonableness of an agency's decision-making process, the court must not "substitute its judgment for that of the agency."  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.  Instead, it must apply the "deferential" arbitrary-and-capricious standard, *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and consider whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made,'" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  The burden of proof rests on the party challenging the agency's action as arbitrary and capricious.  *Pierce v. Sec. & Exch. Comm'n*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

BANA first argues that it is incorrect to understand the FDIC's performance score as a "risk-based" measure because "[t]here is an undisputed and material difference" between the performance of a bank generally and its risk of losses to the Deposit Insurance Fund.  ECF No. 376-2, at 3.  BANA explains that, in many instances, poorly performing banks have failed without any loss to the Fund and that the FDIC has deemed healthy banks to have failed simply because they received non-fund government support.  *Id.* at 3-4.  The FDIC responds that "[t]he performance score focuses on the *probability* that a bank will fail," ECF No. 372-2, at 46, and is thereby tethered to Section 1817(b)(1)(C)(i)'s "probability that the [Deposit Insurance Fund] will

incur a loss," 12 U.S.C. § 1817(b)(1)(C)(i), "while the loss severity score focuses on the *magnitude of loss* in the event of failure," ECF No. 372-2, at 46, and is tethered to Section 1817(b)(1)(C)(ii)'s requirement that the FDIC consider "the likely amount of any such loss," 12 U.S.C. § 1817(b)(1)(C)(ii).  In the FDIC's view, both metrics are doing important and independent work because, for example, "[a] bank that fails (or would have failed without significant government support) but causes no loss may not shed light on the *magnitude* of loss, but it can reveal factors affecting the *probability* of failure."  ECF No. 372-2, at 46.  Taking care not to substitute its judgment for the agency's, the court considers whether the FDIC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'"  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168).

The court finds compelling the FDIC's explanation that the performance score inherently accounts for "risks attributable to different categories and concentrations of assets, different categories and concentrations of liabilities, and many other relevant factors regarding loss."  ECF No. 372-2, at 45 (quoting 76 Fed. Reg. at 10701); *see* 76 Fed. Reg. at 10695-96, 10712-14 (discussing components of the performance score).  Examination of the HCI scorecard bears this out, revealing that many factors used in calculating a bank's performance score have a "rational connection," *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168), to its likelihood of incurring a loss.

TABLE 16—SCORECARD FOR HIGHLY COMPLEX INSTITUTIONS

| | Measures and components | Measure weights (percent) | Component weights (percent) |
|---|---|---|---|
| P ........... | Performance Score | | |
| P.1 ......... | Weighted Average CAMELS Rating | 100 | 30 |
| P.2 ......... | Ability to Withstand Asset-Related Stress | | 50 |
| | Tier 1 Leverage Ratio | 10 | |
| | Concentration Measure | 35 | |
| | Core Earnings/Average Quarter-End Total Assets | 20 | |
| | Credit Quality Measure and Market Risk Measure | 35 | |
| P.3 ......... | Ability to Withstand Funding-Related Stress | | 20 |
| | Core Deposits/Total Liabilities | 50 | |
| | Balance Sheet Liquidity Ratio | 30 | |
| | Average Short-Term Funding/Average Total Assets | 20 | |
| L ............ | Loss Severity Score | | |
| L.1 ......... | Loss Severity Measure | | 100 |

76 Fed. Reg. at 10695. For example, the performance score expressly takes into account a bank's ability to withstand asset- and funding-related stress—both variables that the court finds have a rational connection to the bank's risk of incurring a loss to the Fund. Similarly, a bank's "CAMELS" score, which comprises 30% of the overall performance score and incorporates risk factors like "[c]apital adequacy," "[a]sset quality," and "[l]iquidity," similarly provides a reasonable way of assessing the bank's likelihood of failure. 76 Fed. Reg. at 10709.

BANA points to various historical examples to make the point that there is not always a clear correlation between a bank's performance score and its likelihood of incurring a loss. ECF No. 376-2, at 3-5. But these examples are unavailing. The law does not require the FDIC to develop a perfect measure of predicting a bank's risk of incurring a loss—the FDIC is merely required to develop one that comports with the statutory criteria and demonstrates "reasoned decisionmaking" evidenced by a "rational connection between the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168). Accordingly, even if the HCI scorecard is not a perfect measure of the likelihood of

loss, the court finds that the FDIC has cleared the bar of explaining the rational connection between its performance score and a bank's risk of loss to the Fund.[6]

BANA relatedly argues that even if the FDIC is able to articulate a rational connection between its performance score and risk of a loss to the Fund *now*, it did not do so at the time it promulgated the 2011 Rule and also failed to respond to concerns raised by commenters. ECF No. 367-2, at 25, 27-30. As support, BANA claims that the FDIC "specifically disclaimed any relationship between the performance score and *either* of the statutory criteria" when it promulgated the rule, instead supporting the performance score with "a boilerplate recitation of the statutory criteria, not a reasoned analysis." ECF No. 376-2, at 4-5; *see Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). The FDIC contests this characterization, pointing to various parts of the rule in which it explains how the performance score captures risk. ECF No. 372-2, at 45. The court agrees that the FDIC has consistently maintained that the performance score captures risk and is not now relying on post-hoc justifications.

"[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper

---

[6] BANA relatedly argues that it was arbitrary and capricious for the FDIC to "adopt[] an assessment system that shifted the burden of assessments away from smaller institutions and increased the share of overall assessments paid by HCIs, despite undisputed evidence and comments that HCIs pose a lower risk to the Fund." ECF No. 367-2, at 34-35. However, as described, the FDIC's focus on the magnitude of loss—reflected in the loss severity score—is tied to the statutory requirement that the FDIC consider "the likely amount of any . . . loss," in the event of a bank failure, 12 U.S.C. § 1817(b)(1)(C)(ii), not just the probability of failure itself. Because the failure of an HCI has the potential to be far more catastrophic than the failure of a non-HCI, it was not arbitrary and capricious for the FDIC to charge HCIs more in assessments. In other words, there is a clear "rational connection between the facts found and the choice made." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 1368).

basis." *Chenery Corp.*, 332 U.S. at 196.  Therefore, courts must "look to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations." *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015).

Within the 2011 Rule itself, the FDIC articulated the connection between performance score and risk, specifically as it related to HCIs:

> For a large insured depository institution, the performance score (which explicitly takes into consideration the risks attributable to different categories and concentrations of assets, different categories and concentrations of liabilities, and many other relevant factors regarding loss) . . . [combined with the other scorecard criteria] reasonably represent both the probability that the [Deposit Insurance Fund] will incur a loss with respect to the institution and the likely amount of any such loss.

76 Fed. Reg. at 10701.  While BANA claims this is merely a "boilerplate recitation of the statutory criteria," ECF No. 376-2, at 4, the court does not agree.  Rather, the court reads this explanation as offering a "rational connection," *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, between the aims of the statute—assessing the "probability" and "likely amount" of loss to the Deposit Insurance Fund, 12 U.S.C. § 1817(b)(1)(C)—and the use of the performance score, which accounts for various kinds of risks.

*Statistical models and engagement with commenters.*  The "rational connection" between the HCI scorecard and the FDIC's mandate to consider the risk of loss to the Deposit Insurance Fund when setting assessment rates is further supported by the FDIC's validation methods and data, which indicate that the HCI scorecard measures exactly what it sets out to measure.  BANA contests the robustness of the FDIC's validation measures, arguing that the HCI scorecard lacked a sufficient evidentiary basis because its validation relied on "flawed and dimly explained statistical models."  ECF No. 367-2, at 24.  In BANA's view, "the 'expert judgment rankings'" that were used to validate the HCI scorecard "were nothing more than the personal views of 'a

small group of FDIC staff,' . . . as to which large banks were 'risky.'"  ECF No. 367-2, at 31 (quoting ECF No. 165, at 18-19; ECF No. 165-2, at 5).  BANA further argues that "[t]he FDIC was required to provide commenters a complete description of its models and their methodology, and then 'further opportunity for comment.'"  *Id.* at 33 (quoting *Chamber of Com. v. Sec. & Exch. Comm'n*, 443 F.3d 890, 901 (D.C. Cir. 2006)).  In BANA's view, the FDIC's appendices supporting the proposed rule were "inadequate" because they "merely explained how the models worked at a very high level of generality[] or listed their purported results."  ECF No. 367-2, at 32-33; *see* Fed. Reg. at 10689, 10720-22, 10727-31.

The FDIC responds that it provided sufficient notice of the methodology it used to develop the scorecards: "[i]t published two separate notices of proposed rulemakings," "explained that it fashioned the performance score using a statistical model that predicted the 'rank ordering of risk for large institutions' 'based on a consensus view of staff analysts' . . . following their review of 'information available through the FDIC's Large Insured Depository Institution (LIDI) program' of the relative riskiness of large banks," and "fully disclosed and explained the methodology and results of the statistical analysis it used to verify that the selected risk measurements identified by the expert judgment rankings were correlative and predictive of the risk of bank failure."  ECF No. 372-2, at 54; 75 Fed. Reg. at 23518, 23548-54, 72614 n.11.  The court agrees that the FDIC's validation methods were sufficiently robust, and that the FDIC provided sufficient notice of its methodology to the public.

Courts must not "'second-guess' an agency's [technical] analysis, but will uphold regulations based on such an analysis if the agency 'has established in the record a reasonable basis for its decision.'"  *In re Core Commc'ns., Inc.*, 455 F.3d 267, 279 (D.C. Cir. 2006) (quoting *Nat'l Wildlife Fed'n v. Env't Prot. Agency*, 286 F.3d 554, 565 (D.C. Cir. 2002)).  "'[A]n agency's

predictive judgments about areas that are within the agency's field of discretion and expertise' are entitled to 'particularly deferential' review, as long as they are reasonable." *Milk Indus. Found. v. Glickman*, 132 F.3d 1467, 1478 (D.C. Cir. 1998) (quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983)).  Indeed, courts "can reverse only if the model is so oversimplified that the agency's conclusions from it are unreasonable." *Small Refiner Lead Phase-Down Task Force v. Env't Prot. Agency*, 705 F.2d 506, 535 (D.C. Cir. 1983).  The agency need only "examine the relevant data and articulate a satisfactory explanation for its action." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168).  The court finds that the FDIC provided a reasonable basis for its decision to utilize expert judgment rankings as a validation measure for its scorecards.

The 2011 Rule explains in various places the factors that made the FDIC's reliance on its expert judgment rankings sufficiently reasonable.  First, the data indicates that the measure was a reasonably reliable one: "[a]ll but one of the risk measures showed a statistically significant correlation at either the five- or one-percent level across all four years examined, with the remaining factor showing a statistically significant correlation for two years."  ECF No. 372-2, at 51; *see* 76 Fed. Reg. at 10729.  The FDIC additionally noted the limitations of its analysis, admitting that "any statistical analysis is necessarily backward looking and that risks may arise in the future that are not adequately captured in the scorecard" but that, regardless, "the FDIC feels that the proposed framework is more comprehensive and reduces the likelihood of such an occurrence compared to the current system."  76 Fed. Reg. at 10703.  Finally, the FDIC satisfactorily explains the overall purpose of the expert rankings—use in a regression model to help the FDIC determine "the risk measures included in the performance score and the weights assigned to those measures."  *Id.* at 10702-03.

The court also disagrees with BANA's complaint that the FDIC did not provide enough notice of its methodology.  ECF No. 367-2, at 32-33.  An agency's notice of its methodology "is sufficient 'if it affords interested parties a reasonable opportunity to participate in the rulemaking process,' and if the parties have not been 'deprived of the opportunity to present relevant information by lack of notice that the issue was there.'"  *Am. Radio Relay League, Inc. v. Fed. Commc'ns Comm'n*, 524 F.3d 227, 236 (D.C. Cir. 2008) (quoting *WJG Tel. Co. v. Fed. Commc'ns Comm'n*, 675 F.2d 386, 389 (D.C. Cir. 1982)).

As the 2011 Rule explains, "Appendix 2 contains the detailed description of the scorecard model, the result of statistical analysis, and the derivation of weights."  ECF No. 372-2, at 54 (quoting 76 Fed. Reg. at 10702); *see* 76 Fed. Reg. at 10727-31 (Appendix 2).  And, in response to commenters, "the FDIC meaningfully responded by fully disclosing the validation of its expert-judgment rankings and scorecard with a separate independent verification method: the bank-failure model."  ECF No. 372-2, at 55; *see* 76 Fed. Reg. at 10703, 10730, 10732.

The court also finds unconvincing BANA's related argument that the FDIC "failed to make public basic methodological information such as: (1) whether staff considered the statutory criteria; (2) which specific 'financial performance metrics' staff used; (3) how staff went about ranking banks using those metrics; or (4) what assumptions staff used in that process," ECF No. 376-2, at 6, because the exclusion of this information did not actually impede commenters' abilities to analyze and critique the FDIC's statistical models.  The data provided by the FDIC sufficiently "afford[ed] interested parties a reasonable opportunity to participate in the rulemaking process," and the information provided in no way "deprived [commenters] of the opportunity to present relevant information by lack of notice that the issue was there."  *Am. Radio Relay League, Inc.*, 524 F.3d at 236 (quoting *WJG Tel. Co.*, 675 F.2d at 389).  Commenters were provided with

enough information to evaluate the FDIC's use of expert judgment rankings, as well as the performance score more broadly—and indeed, they did provide comments pointing out the problems they perceived.  76 Fed. Reg. at 10703.  The FDIC then reasonably responded to these concerns by referring commenters to the rule's appendices, which provided more granular data, and it further justified its reliance on the scorecards by explaining that, for example, "large institutions with a total [scorecard] score in the top decile as of year-end 2006 represented a disproportionately high percentage of failures between 2006 and 2009."  *Id.*

*Change in the HCI concentration measure.*  Finally, BANA takes issue with the FDIC's decision to change the HCI concentration measure from the May 2010 proposed rule—which did not include counterparty exposures—to the November 2010 proposed rule—which did include counterparty exposures.  *Compare* 75 Fed. Reg. at 23520/2, 23525 tbl. 12, *with* 75 Fed. Reg. at 72612.  BANA argues that when the FDIC ultimately published the final 2011 Rule, it failed to explain why it had abandoned the May 2010 measure, explaining only that "recent experience shows that the concentration of a highly complex institution's exposures to a small number of counterparties . . . significantly increases the institution's vulnerability to unexpected market events."  ECF No. 367-2, at 35 (quoting 76 Fed. Reg. at 10,696/2).  The FDIC counters that, in effect, BANA is challenging the November 2010 proposed rule for not being a "logical outgrowth" of the May 2010 proposed rule, but that there is no requirement that a proposed rule be a "logical outgrowth" of another proposed rule.  ECF No. 372-2, at 57.  BANA responds that "the logical-outgrowth doctrine has nothing to do with this case" and that it does not challenge the changes between the proposed rules, but rather "the FDIC's failure in the *final* 2011 Rule to acknowledge the change in approach and to explain why the new concentration measure was

superior to the old one, which the agency continued to use for other large banks." ECF No. 376-2, at 8-9. The court finds that the FDIC has the better of the argument.

Final rules must be "logical outgrowth[s]" of proposed rules, a standard which requires that "interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (quoting *Ne. Md. Waste Disposal Auth. v. Env't Prot. Agency*, 358 F.3d 936, 952 (D.C. Cir. 2004)). But the "logical outgrowth" requirement applies only to final rules, not proposed rules. *See id.* And courts "do not have authority to review proposed rules." *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015).

The court agrees with the FDIC that BANA is effectively challenging the November 2010 proposed rule for not being a "logical outgrowth" of the May 2010 proposed rule. It is indeed true, as BANA points out, that the concentration measure for HCIs changed between the two proposed rules. But proposed rules are not "final agency actions" that this court has authority to review. The 2011 Rule was a "logical outgrowth" of the November 2010 proposed rule, and that is all that the law requires. *CSX Transp., Inc.*, 584 F.3d at 1080. Thus, the FDIC's decision to change its HCI concentration measure from the May 2010 proposed rule to the November 2010 proposed rule was not arbitrary and capricious.

\*     \*     \*

For the above reasons, the court concludes that the 2011 Rule was within the scope of the authority delegated to the FDIC by the FDIA. The court additionally finds that the FDIC complied with the APA because it exercised "reasoned decisonmaking" when it decided to use banks' performance scores in the HCI scorecard because it "articulate[d] a satisfactory explanation" that

explained the "rational connection" between the performance score and a bank's likelihood of incurring a loss to the Deposit Insurance Fund, *State Farm Mut. Auto. Ins. Co*., 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc*., 371 U.S. at 168), because its decision to use the scorecards was backed up by reasonable validation techniques, and because the public had the information necessary to engage in robust notice-and-comment.

## B.    BANA's Liability Under the 2011 Rule

Having concluded that the 2011 Rule was valid, the court now turns to the core question in this case: whether BANA is liable for failing to comply with the 2011 Rule as it was understood by the FDIC.  Squarely at issue are two paragraphs in the rule's appendix, which are meant to define "Top 20 Counterparty Exposure" and "Largest Counterparty Exposure"—two key measures in the HCI scorecard.  The first provision provides that the "Top 20 Counterparty Exposure" measure is the:

> Sum of the total exposure amount to the largest 20 counterparties (in terms of exposure amount) divided by Tier 1 capital and reserves. Counterparty exposure is equal to the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all unfunded commitments) *for each counterparty or borrower at the consolidated entity level*.

76 Fed. Reg. at 10721 (emphasis added).  The second explains that the "Largest Counterparty Exposure" measure is:

> The amount of exposure to the largest counterparty (in terms of exposure amount) divided by Tier 1 capital and reserves. Counterparty exposure is equal to the sum of Exposure at Default (EAD) associated with derivatives trading and Securities Financing Transactions (SFTs) and the gross lending exposure (including all unfunded commitments) *for each counterparty or borrower at the consolidated entity level*.

*Id.* (emphasis added).  While the parties agree that BANA was required to report these two counterparty exposure measures at the "consolidated entity level" in their quarterly call reports, they disagree about what that key phrase means.

The FDIC argues that "[b]y instructing HCIs to report their counterparty exposures 'for each counterparty or borrower' at the 'consolidated entity level,' the 2011 Rule is clear that an HCI must report its exposures to all members of a corporate family (each counterparty or borrower) at the position (level) at which those exposures are joined together into one identifiable whole (consolidated entity)."  ECF No. 364, at 18.  In the FDIC's view, the "plain meaning of [consolidated entity level]" is therefore unambiguously "the *level* at which all members of a corporate family are *consolidated* into a single *entity*—that is, the ultimate parent level."  *Id.* at 17.  In other words, the FDIC interprets "consolidated entity level" to require banks to consolidate up to the ultimate parent level on the counterparty side of the ledger.  While the FDIC principally argues that the court should look to the plain meaning of "consolidated entity level," it also describes the phrase as a "term of art" and encourages the court to adopt the definition from a program administered by the Federal Reserve Bank of New York that predated the 2011 Rule.  *See id.* at 19 ("When a term of art is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" (quoting *George v. McDonough*, 596 U.S. 740, 746 (2022))).

In BANA's view, "consolidated entity level" is a "technical" term of art—rather than a regulatory term of art—and its meaning should be gleaned from technical dictionaries and principles.  ECF No. 376-2, at 23-24; ECF No. 367-2, at 10.  Relying on principles of accounting, BANA posits that "the best reading of the requirement to report exposures 'for each counterparty or borrower at the consolidated entity level' is that HCIs should cancel out intra-company transactions using consolidation accounting and, together with the HCIs' own subsidiaries, report

exposures to each counterparty individually." ECF No. 367-2, at 61 (emphases omitted). In other words, BANA reads the disputed language as requiring consolidation only on its side of the ledger. Consistent with that understanding, BANA consolidated its own exposures to a given counterparty with the exposures of its own subsidiaries rather than consolidating its counterparties' exposures up to the ultimate parent level. *See* ECF No. 376-2, at 23 ("[I]f BANA loaned $1 million to Counterparty 1, and BANA's subsidiary also loaned another $1 million to Counterparty 1, then consolidation accounting requires BANA to report a $2 million exposure.").

When a regulation is "genuinely ambiguous," *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019), a court may defer to an agency's "reasonable" interpretation of that regulation, *id.* at 576. However, "before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id.* at 575 (quoting *Chevron U.S.A. Inc.*, 467 U.S. at 843 n.9, *overruled by Loper Bright*, 603 U.S. 369 (2024)). This means that the "court must 'carefully consider[]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency [interpretation] to fall back on." *Id.* (first alteration in original). "[O]nly when that legal toolkit is empty and the interpretive question still has no single right answer can a judge conclude that it is 'more [one] of policy than of law.'" *Id.* (second alteration in original) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991)). But where a court finds no ambiguity, "[t]he regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.* Upon consideration of the text, context, history, and purpose of the 2011 Rule, the court concludes that its use of "consolidated entity level" is unambiguous and requires consolidation at the ultimate parent level on the counterparty side of the ledger.

### 1.    The meaning of "consolidated entity level" is unambiguous

*Text and context.*  The court again begins with the text.  As a threshold matter, the court notes that "[o]rdinary meaning is of limited utility . . . when determining the proper interpretation of a [technical] term." *Teva Pharms. USA, Inc. v. U.S. Food & Drug Admin.*, 514 F. Supp. 3d 66, 99 (D.D.C. 2020) (quoting *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 19 (D.D.C. 2012)). Therefore, "'where a statutory or regulatory term is a technical term of art, defined more appropriately by reference to a particular industry usage than by the usual tools of statutory construction,' [a court] will employ that industry usage." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 168 (1st Cir. 2009) (quoting *United States v. Lachman*, 387 F.3d 42, 53 (1st Cir. 2004)); *see La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 372 (1986) ("[T]echnical terms of art should be interpreted by reference to the trade or industry to which they apply[.]").[7]  In interpreting the text, the court therefore looks to technical resources in order to evaluate what the phrase "consolidated entity level" would have communicated to the average industry member.

The Oxford Dictionary of Accounting defines "consolidation" as "[t]he process of combining and adjusting financial information from the individual financial statements *of a parent undertaking and its subsidiaries* to prepare consolidated financial statements . . . [that] present financial information for the group *as a single economic entity*."  Consolidation, A Dictionary of

---

[7] "[T]his canon of construction requires the disputed term to actually be a technical term of art." *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d at 168 (quoting *Lachman*, 387 F.3d at 53); *cf. Kennecott Corp. v. Env't Prot. Agency*, 684 F.2d 1007, 1017 (D.C. Cir. 1982) (finding that "nonferrous" is neither a term of art nor a technical term); *Am. Legion v. Derwinski*, 54 F.3d 789, 796 (D.C. Cir. 1995) (finding that "results" is neither a term of art nor a technical term). Because "consolidated entity level" is not a phrase "of common parlance," *Am. Legion*, 54 F.3d at 796, the court concludes that it is a technical term.

Accounting, Oxford University Press (4th ed. 2010) (emphases added).[8]  According to the Oxford Handbook of International Financial Terms, to "consolidate" is to "group[] the accounts of different legal entities so that *the whole position, the consolidated position* can be treated as a whole."  Consolidate, The Handbook of International Financial Terms, Oxford University Press (1st ed. 1997) (emphasis added).[9]  This process "applies to subsidiaries which are more than 50% owned by the parent or holding company." *Id.*  The Financial Accounting Standards Board, which "establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow Generally Accepted Accounting Principles (GAAP)"[10] states in its master glossary that a "consolidated group" is "a parent and all its subsidiaries." Consolidated Group, Master Glossary, Financial Accounting Standards Board.[11]  It also defines "consolidated financial statements" as "[t]he financial statements of a consolidated group of entities that include *a parent and all its subsidiaries presented as those of a single economic entity*."  Consolidated Financial Statements, Master Glossary, Financial Accounting Standards Board (emphasis added).[12]  Finally, an "entity" is simply "[t]he unit for which accounting records are maintained and for which financial statements are prepared."  Accounting Entity, A Dictionary of Accounting, Oxford University Press (4th ed. 2010).[13]

Taken together, these definitions of "consolidate," "consolidated," and "entity"—gathered from various industry-specific resources—all paint a similar picture: when "consolidate" is used

---

[8] *Available at* https://perma.cc/YW8K-JQFD.

[9] *Available at* https://perma.cc/QMA9-9ET3.

[10] *Available at* https://perma.cc/JV7X-LXMN.

[11] *Available at* https://perma.cc/3BAN-KVD5.

[12] *Available at* https://perma.cc/3BAN-KVD5.

[13] *Available at* https://perma.cc/2B95-D5WM.

in an accounting context, it refers to grouping a parent and its subsidiaries so that the "whole" financial position of the unit may be assessed. *See* Consolidate, The Handbook of International Financial Terms, Oxford University Press (1st ed. 1997). This "whole" position, which includes a parent and its subsidiaries, must necessarily be the ultimate parent level.

With this understanding in mind, the court looks at the context in which this language appears in the 2011 Rule. Specifically, the rule explains that the Top 20 Counterparty Exposure and Largest Counterparty Exposure were added to the HCI scorecard "because recent experience shows that the concentration of a highly complex institution's exposures to a small number of counterparties . . . significantly increases the institution's vulnerability to unexpected market events . . . [and] the top 20 counterparty exposure and the largest counterparty exposure . . . capture this risk." 76 Fed. Reg. at 10696. This additional context should have informed regulated parties that the FDIC was focused on measuring exposures to each counterparty at the counterparty's ultimate parent level: if a "small number of counterparties" were "significantly increas[ing]" institutional vulnerabilities, this implies that the counterparties were being assessed at the ultimate parent level—otherwise, a small number of counterparties could not have the "significant[]" impact on institutional vulnerability.

The court also notes that the FDIC's understanding of "consolidated entity level" is consistent with that term's use in other areas of the industry. For example, in April 2012, the Commodity Futures Tradition Commission ("CFTC") promulgated a final rule that required risk management at the "consolidated entity level" because "a top level company may be in the best position to evaluate risk due to its organization-wide view." 77 Fed. Reg. 20128, 20173 (Apr. 3, 2012). While that rule did not define "consolidated entity level," no regulated party questioned this term during the rulemaking process. The term "consolidated entity level" was also used in a

2014 Rule proposed by a variety of financial regulatory agencies, including the FDIC. 79 Fed. Reg. 57348, 57366 (Sept. 24, 2014). That regulation also does not define the term, although it does explain how it would apply by way of a hypothetical about how to consolidate to the counterparty's parent level. *Id.* Given this regulatory landscape, the court comfortably concludes that the term "consolidated entity level" was intelligible to industry members on its face.[14]

The FDIC's understanding of "consolidated entity level" is further supported by its later rulemaking materials, including its June 2011 and March 2012 Call Report Instructions and its December 2011 Notice.[15] In the June 2011 Call Report Instructions, the FDIC reiterated the language of its 2011 Rule, defining "counterparty exposure" as "the sum of [two types of exposures] for each counterparty or borrower at the *consolidated entity level of the counterparty.*" ECF No. 367-2, at 9 (emphasis added) (quoting 76 Fed. Reg. at 10721). Later that year, in a December 2011 Notice, the FDIC responded to industry comments about the two counterparty exposure measures and elaborated further on its expectations for reporting. 76 Fed. Reg. at 77322. Notably, the FDIC specifically addressed a concern, put forward by three bankers' organizations,

---

[14] BANA argues that these regulations "contain[] definitions and explanations that the 2011 Rule does not, which simply underscores that the phrase 'consolidated entity level,' by itself, does *not* require reporting exposures at the ultimate parent level." ECF No. 367-2, at 58; *see* ECF No. 376-2, at 24. The court disagrees. Taking the CFTC rule as an example, the rule noted that risk management should be done at the consolidated entity level because "a top level company may be in the best position to evaluate risk due to its organization-wide view." 77 Fed. Reg. at 20173. That does nothing to define "consolidated entity level," but instead explains why such consolidation is warranted. In this way, the CFTC rule is no different than the 2011 Rule, in which the FDIC explained that consolidation was warranted because "a highly complex institution's exposures to a small number of counterparties . . . significantly increases the institution's vulnerability to unexpected market events . . . [and] the top 20 counterparty exposure and the largest counterparty exposure . . . capture this risk." 76 Fed. Reg. at 10696.

[15] These documents went through notice-and-comment rulemaking, *see, e.g.*, 76 Fed. Reg. 10688; 76 Fed. Reg. 77315, and therefore carry the force of law, *see Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) ("[T]he [agency]'s disputed regulations in this case were adopted pursuant to notice and comment rulemaking and undoubtedly were intended to carry the force of law.").

that "the term 'legal consolidated entity,' as used in th[e] definition in relation to a counterparty, should be clarified." *Id.* In response to the comment, the FDIC stated that it "continues to believe that, for the purposes of calculating deposit insurance premiums, highly complex institutions should report counterparty credit exposure on a consolidated entity basis (legal consolidated entity) . . . [and] that highly complex institutions should have the ability to aggregate exposures arising from financial contracts with entities within a legal consolidated entity and report the exposure as outlined in the final rule." *Id.* The FDIC further noted that the absence of a particular proposed system did not "preclude institutions from internally aggregating their exposures to entities within a legal consolidated entity" as the rule instructed. *Id.* Thus, although the court concludes that the 2011 Rule's use of "consolidated entity level" was sufficiently clear given industry understandings of the constitutive words, any lingering uncertainty should have been resolved by the December 2011 Notice's clarification that reporting counterparty exposures on a "consolidated entity basis" meant reporting at the level of the "legal consolidated entity"— especially given the FDIC's further note that such reporting required "aggregat[ing] exposures arising from financial contracts with entities within a legal consolidated entity." *Id.*

The FDIC provided further clarity in its updated March 2012 Call Report Instructions, which instructed regulated parties to report several measures, including their Top 20 Counterparty Exposure and Largest Counterparty Exposure on a "fully consolidated basis." ECF No. 286-2. To do something "fully" is to do it "completely." Fully, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993). There is no conceivable way to consolidate "fully" without "completely" consolidating the subsidiaries up to the parent level. Thus, while any reasonably informed industry member should have been able to properly comprehend what the FDIC meant by "consolidated entity level" based purely on the technical meanings of "consolidate" and "entity," *see supra*

pp. 31-33, the March 2012 Call Report Instructions made it clear beyond argument that consolidation must occur and be reported at the ultimate parent level of the counterparty.

BANA offers several points in support of its argument that the requirement to report at the "consolidated entity level" was unclear, but each fails upon closer scrutiny. First, BANA points out that ███████████████████████████████████████████████. ECF No. 367-2, at 66. This, in BANA's view, proves that "consolidated entity level" was an ambiguous term. *Id.* This might help BANA if ████████████████████████████████

████████████████████████████████████████████████████

████████,[16] ██████████████████████████████████████

██████████████████████████████ ECF No. 248-4 ¶ 62. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*Id.* ¶ 63. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ *Id.* ¶ 64. ████████████████████

████████████████████████ *Id.* ████████████████████████

████████████████████████████████████████████████████

---

[16] Pursuant to an agreement previously reached by the parties in this case and the eight other HCIs, identifying information in documents regarding the other HCIs is redacted and the HCIs are referred to by anonymous code names. *See* ECF No. 248-4, at 16 n.1.

███████████████ with the publication of the December 2011 Notice, 76 Fed. Reg. at 77322, which provided additional clarification about the meaning of the 2011 Rule.[17]

Next, BANA offers its own reading of the 2011 Rule in an attempt to provide a plausible alternative to the FDIC's interpretation.[18]  Like the court, BANA relies upon technical definitions of relevant terms—specifically as they are used in the consolidation accounting context.  *See* ECF No. 376-2, at 23-24.  As BANA explains, "consolidation" in this context "'requires elimination of intra-entity transactions and balances' . . . which cancels out exposures among parents and subsidiaries, and adds up exposures that parents and subsidiaries have to the same counterparties." *Id.* at 23.  In practice, this meant that BANA was consolidating its *own* exposures with those of its subsidiaries, but that it failed to consolidate its counterparties with *their* subsidiaries when it reported exposures.

The trouble with this reading is that it does not square with the text of the rule, which explains that counterparty exposure is "the sum of [three kinds of exposure] for each counterparty or borrower at the consolidated entity level." 76 Fed. Reg. at 10721.  BANA claims that its process of not consolidating its counterparty exposures was specifically consistent with the text's

---

[17]  The court additionally notes that ████████████████████████████████████████████████████████████████████████████████████. ECF No. 286-27, at 326:16-20. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[18] Even if BANA *now* argues that it understood the FDIC's rule differently, it originally interpreted it in line with the FDIC's definition of "consolidated entity level."  BANA data analyst Brian Wood testified in January 2012 that "[t]he request for data at the 'consolidated entity level of the counterparty' was originally interpreted as an ultimate parent level." ECF No. 364, at 21 (quoting ECF No. 287-25, at 3).  BANA's 30(b)(6) corporate representative, John James, confirmed this, testifying that "BANA, in fact, originally interpreted the consolidation requirement to require consolidation up to the ultimate parent level in 2Q and 3Q 2011." *Id.* (quoting ECF No. 286-27, at 326:16-20).

command to report exposures "*for each* counterparty or borrower."   ECF No. 376-2, at 23 (emphasis added).  However, this reading completely ignores the phrase that immediately follows "for each counterparty or borrower": "at the consolidated entity level." 76 Fed. Reg. at 10721.  In effect, BANA gives "consolidated entity level" no effect, reading it out of the regulation altogether. It is one thing for BANA to argue that the meaning of "consolidated entity level" is unclear while highlighting its attempts to understand and comply with the phrase; it is another altogether for BANA to explain that its preferred interpretation simply ignores the phrase at issue.  Because courts must "give effect, if possible, to every clause and word" of statutes and regulations, *Sierra Club v. Env't Prot. Agency*, 536 F.3d 673, 680 (D.C. Cir. 2008) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)), BANA's omission of a key term in its interpretation makes its argument a non-starter.

Finally, BANA argues that textual changes in the 2014 Rule show that the language in the 2011 Rule was unclear.  *See* ECF No. 367-2, at 20-21; ECF No. 376-2, at 24-25.  It is true that the FDIC changed some of the language regarding the exposure measures in its 2014 Rule. Specifically, while the 2014 Rule used the same HCI scorecard as the 2011 Rule, in its explanations of the Top 20 Counterparty Exposure and Largest Counterparty Exposure measures, the FDIC omitted the term "consolidated entity level" and instead provided:

> The total exposure amount is equal to the sum of the institution's exposure amounts to one counterparty (or borrower) for derivatives, securities financing transactions (SFTs), and cleared transactions, and its gross lending exposure (including all unfunded commitments) to that counterparty (or borrower).  A counterparty includes an entity's own affiliates.  Exposures to entities that are affiliates of each other are treated as exposures to one counterparty (or borrower).

79 Fed. Reg. 70427, 70438 (Nov. 26, 2014).  BANA argues that the FDIC's "decision to rewrite the [r]ule in 2014 confirms that confusion abounded prior to that amendment and that the

2011 Rule did not provide regulated parties with fair notice of what the FDIC now says the [r]ule required." ECF No. 376-2, at 2. The FDIC counters that "[t]he 2014 Rule is irrelevant[] [because] it cannot retroactively change the 2011 Rule's meaning," ECF No. 372-2, at 11, and that, in any case, the changes in the 2014 Rule were "'stylistic,' not 'substantive,'" *id.* (quoting ECF No. 287-3, at 66:4-13, 67:18-70:2). In BANA's view, however, this is "beside the point" because "the 2014 Rule confirms that the 2011 Rule *never had the meaning that the FDIC now ascribes to it*—as the agency itself recognized in using completely different language to adopt the new requirement that it now tries to retroactively impose on BANA." ECF No. 376-2, at 24.

"[W]hen a legislative or executive body adopts a new clarifying law or rule, it does not necessarily follow that an earlier version did not have the same meaning." *Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 229 (D.C. Cir. 2009); *see Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) ("A 'change[] in statutory language need not *ipso facto* constitute a change in meaning or effect . . . [and instead may only] make what was intended all along even more unmistakably clear.'" (quoting *United States v. Montgomery County*, 761 F.2d 998, 1003 (4th Cir. 1985))). Indeed, if courts understood any revision to the wording of a regulation as substantively changing its meaning, agencies would be disincentivized from making improvements to their regulatory language. Here, whether or not the language of the 2014 Rule might have been clearer than that of the 2011 Rule, the court finds that the language of the 2011 Rule was still sufficiently clear on its own terms. The court therefore declines to view changes in the 2014 Rule as evidence that the 2011 Rule was unclear.

*History and purpose.* The FDIC's interpretation of the 2011 Rule also accords with the FDIA's history and purpose. In creating the FDIC, Congress wanted to ensure the solvency of the banking system in the United States. After the 2008 recession, Congress determined that the

FDIC's regulations did not go far enough in ensuring the stability of the national banking system—and that this inadequacy was in part driven by a lack of information that made it difficult for the FDIC to evaluate banks' vulnerabilities.  76 Fed. Reg. at 10674.  In passing the Dodd-Frank Act, Congress directed the FDIC to reconsider how it assessed banks to make sure assessments were based on a bank's total assets.  Pub. L. No. 111-203, 124 Stat. 1376, at 1376, 1538; *see* 76 Fed. Reg. at 10674.  As a result, the FDIC reevaluated its assessment metrics to, among other things, "revise the large insured depository institution assessment system to better differentiate for risk and better take into account losses from large institution failures that the FDIC may incur." *Id.* at 10672.  To better account for the fact "that the concentration of a highly complex institution's exposures to a small number of counterparties . . . significantly increases the institution's vulnerability to unexpected market events," *id.* at 10696, the FDIC included in the 2011 Rule an assessment scorecard for HCIs to "capture this risk," *id.*

The FDIC's interpretation of the 2011 Rule, which requires that an HCI consolidate its exposure to its counterparties, plainly achieves the aim of protecting against the heightened risk posed by "the concentration of a [HCI]'s exposures to a small number of counterparties." *Id.* at 10672.  BANA's view does not—nor does BANA try to explain how its interpretation best achieves the aims of the FDIA and the Dodd-Frank Act.

What is more, evaluating institutional risk in the way the FDIC did was not a new concept at the time the 2011 Rule was promulgated.  In 2008, the Federal Reserve Bank of New York ("FRBNY") began administering a program called the Top 20 Counterparty Project.  ECF No. 360, at 4;[19] ECF No. 364, at 6.  The aim of the program was to "highlight concentrations and changes in bilateral exposure relationships that warrant further attention," thereby enabling banks to better

---

[19] Citations to this filing are to the PDF page numbers, rather than to its internal pagination.

monitor the "levels, sensitivities, and . . . direction of counterparty exposure" and "execute appropriate risk mitigation and capital conservation transactions" when needed. ECF No. 360, at 7. To this end, program participants, including BANA's parent company Bank of America Corporation ("BAC"), and the parent companies of several other HCIs, aggregated and reported their counterparty exposures at the "consolidated entity level." ECF No. 364, at 6. Aggregation at the "consolidated entity level" was defined as "aggregation across all connected entities for which the parent provides an explicit guarantee or implicit support for reputational or other reasons." ECF No. 360, at 14.

To be sure, the parties dispute the relevance of the FRBNY program. The FDIC argues that the program's definition of "consolidated entity level" is necessary context for the court to consider as it determines the meaning of the same term in the 2011 Rule. *See* ECF No. 364, at 19. BANA responds that the 2011 Rule offers none of the explanation of "consolidated entity level" that the FRBNY's instructions did—and that, in any case, the 2011 Rule makes no mention of the FRBNY program or its definition of "consolidated entity level." ECF No. 367-2, at 12-13. The court need not weigh into that dispute because it is not looking to the FRBNY to define "consolidated legal entity" in the FDIC's 2011 Rule. Instead, the court merely notes that the financial industry writ-large was concerned with the heightened risks of having an institution's risks highly concentrated in a small number of counterparties. This indicates that the FDIC's interpretation of the 2011 Rule best fits with the rule's purpose.

Accordingly, based on the regulatory landscape at the time the 2011 Rule was being developed, the FDIC's stated purposes in promulgating the 2011 Rule, and the fact that other agencies equated reporting at the "consolidated entity level" with reporting at the ultimate parent

level, the court concludes that the relevant history and the purpose of the 2011 Rule support interpreting "consolidated entity level" to mean "ultimate parent level."

*        *        *

Because the text, context, history, and purpose of the 2011 Rule all support the reading that counterparty exposures must be consolidated at the ultimate parent level, this court concludes that the meaning of the rule is not ambiguous.[20]

### 2.    BANA's fair-notice defense fails

BANA argues, as an affirmative defense, that because the FDIC failed to provide fair notice of the 2011 Rule, "BANA cannot be held retroactively liable" for its failure to follow it.  ECF No. 367-2, at 37.  BANA posits that "[r]egardless of whether the FDIC's interpretation is defensible as an interpretive matter, due process requires that agencies provide regulated parties with fair notice of what the law requires before they impose liability for past conduct."  *Id.* at 4. In BANA's view, because the 2011 Rule caused industry-wide "confusion about the language at issue," it did not sufficiently provide fair notice.  *Id.* at 65.  In response, the FDIC rests on the plain language of the rule, arguing that BANA received "notice of the [FDIC]'s interpretation in the most obvious way of all: by reading the regulations."  *Gen. Elec. Co. v. Env't Prot. Agency*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fed. Commc'ns Comm'n v. Fox*

---

[20] The court recognizes that the FDIC "does not request that its interpretation be accorded [*Kisor*] deference."  ECF No. 364, at 22.  However, had the court found the 2011 Rule ambiguous, the FDIC's reading would be entitled to deference because it is "reasonable," the "character and context of the agency interpretation entitle[] it to controlling weight," the interpretation was an official one made by the FDIC, the interpretation is related to the FDIC's expertise, and the interpretation reflects the FDIC's "fair and considered" judgment.  *Kisor*, 588 U.S. at 576-79.

*Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  This protection is especially crucial "[w]here, as here, hundreds of millions of dollars are at stake."  *SNR Wireless LicenseCo, LLC v. Fed. Commc'ns Comm'n*, 868 F.3d 1021, 1046 (D.C. Cir. 2017).  Enforcement of an agency regulation runs afoul of due process requirements if the "regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Fox Television Stations, Inc.*, 567 U.S. at 253 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  But, if "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation."  *Gen. Elec. Co.*, 53 F.3d at 1329.  For this reason, fair-notice defenses are not available in "case[s] where the agency's interpretation is the most natural one."  *NetworkIP, LLC, v. Fed. Commc'ns Comm'n*, 548 F.3d 116, 125 (D.C. Cir. 2008).

The court agrees with the FDIC that, after reading the text of the 2011 Rule and "acting in good faith," BANA should have been able to "identify[] with 'ascertainable certainty,' the standards" it was expected to apply.  *Gen. Elec. Co.*, 53 F.3d at 1329 (quoting *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976)).  As the court has explained, the text of the 2011 Rule is unambiguous, *see supra* Part IV.B.1, and therefore the FDIC's "interpretation is the most natural one," *NetworkIP, LLC*, 548 F.3d at 124.  Accordingly, BANA "received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations."  *Gen. Elec. Co.*, 53 F.3d at 1329.  Upon consideration of the FDIC's "other public statements," *id.*, including multiple sets of Call Report

instructions, and the December 2011 notice, the court cannot find that BANA lacked fair notice of what was required of it.

Additionally, although BANA claims that it was confused about the meaning of the 2011 Rule, it never sought clarification from the FDIC about how it was meant to be followed. ECF No. 364, at 28. While a failure to seek clarification is not fatal to a fair-notice defense, especially where a party did not seek clarification because it believed it understood a rule correctly, *see Gen. Elec. Co.*, 53 F.3d at 1333, the BANA employee responsible for reporting counterparty exposures under the 2011 Rule testified that she "d[id] not recall whether she [had] read the 2011 Rule, Call Report Instructions, or December 2011 . . . Notice," ECF No. 267-3 ¶ 67. A key BANA employee's failure to read the relevant regulatory materials, combined with BANA's general failure to seek clarification from the FDIC, *see* ECF No. 248-4 ¶¶ 53-55, dooms its fair-notice defense.

### 3.    BANA's liability

BANA does not dispute that it failed to pay the $1.12 billion that the FDIC determined it had underpaid in assessments for 1Q 2011 through 4Q 2014 under the 2011 Rule, instead challenging the validity of the rule and the FDIC's interpretation of it. Because the court determines that the law is not on BANA's side—concluding that the 2011 Rule was properly promulgated and that "consolidated entity level" unambiguously means what the FDIC says it means—BANA is liable to the FDIC for any unpaid assessments the court determines are "lawfully payable." 12 U.S.C. § 1817(g)(1).

### C.    Remedies

Having established that BANA is liable for underpaying its assessments, the court turns to the question of remedy. The FDIC seeks both the unpaid assessments under 12 U.S.C.

§ 1817(g)(1) and disgorgement.  *See* ECF No. 364, at 28-51.  BANA counters that the FDIC's claims for unpaid assessments for certain quarters are barred by the statute of limitations and that the FDIC is not entitled to the equitable remedy of disgorgement.  *See* ECF No. 367-2, at 37-54, 70-79.  The court concludes that the FDIC may recover unpaid assessments from 2Q 2013 through 4Q 2014, but that its other requests for relief fail.

### 1.      Statutory remedy

Under the FDIA, the FDIC may "recover from any insured depository institution the amount of any unpaid assessment lawfully payable by such insured depository institution." 12 U.S.C. § 1817(g)(1).  But, barring certain exceptions, "[a]ny action by the [FDIC] to recover from an insured depository institution the underpaid amount of any assessment shall be brought within 3 years after the date the assessment payment was due."  *Id.* § 1817(g)(2).  The FDIC brought this action in January 2017.  ECF No. 1.  The parties agree that the FDIC's claims for 2Q 2013 through 4Q 2014 were brought within the FDIA's three-year statute of limitations, but BANA argues that the FDIC's claims related to 1Q 2012 through 1Q 2013 are untimely.  ECF No. 364, at 37; ECF No. 367-2, at 38.  The FDIC raises two arguments in an attempt to save its claims from 1Q 2012 through 1Q 2013: (1) that the statute of limitations for 2Q 2012 through 1Q 2013 reset when the FDIC issued new invoices to BANA after BANA revised its Call Reports for those quarters, ECF No. 364, at 38; and (2) that the statute of limitations for 1Q 2012 through 1Q 2013 is tolled under Section 1817(g)(2)(C), *id.* at 38-47.  The court is not convinced by either argument.

*Revised call reports.*  The FDIC notes that, in March 2015, BANA submitted revised Call Reports for 2Q 2012 through 1Q 2013 (but not for 1Q 2012).  ECF No. 364, at 38.  While these revised reports did not report BANA's counterparty exposures at the consolidated entity level and

are largely irrelevant to the case, the FDIC issued BANA new invoices for its assessments for 2Q 2012 though 1Q 2013 based on the revised Call Reports.  *Id.*  Those revised invoices were due on March 30, 2015, and the FDIC argues that it filed suit within three years of when payment was due on the revised invoices.  *Id.*  The court sees three problems with that argument.

First, the FDIC's argument conflicts with *Norwest Bank Minn. National Ass'n v. Federal Deposit Insurance Corp.*, 312 F.3d 447 (D.C. Cir. 2002).  In that case, the roles were reversed: Norwest Bank brought suit against the FDIC seeking a refund of assessments it had overpaid several years earlier, and the FDIC successfully argued that the claim was time-barred under an older version of Section 1817(g) which had directed that "[n]o action or proceeding shall be brought . . . for the recovery of any amount paid to the [FDIC] in excess of the amount due to it, unless such action or proceeding shall have been brought *within five years after the right accrued for which the claim is made*."  *Id.* at 450 n.3 (second alteration in original) (emphasis added) (quoting 12 U.S.C. § 1817(g) (2006)).  The FDIC argued that because eight years had passed since it had first made the error leading to Norwest Bank's overpayment, the whole claim was time-barred.  *Id.* at 451.  The bank made a similar argument to the one the FDIC makes here, contending that "since each assessment is a separate payment, it [could] recover all payments made within the preceding five-year period."  *Id.* at 453; *see id.* at 452 n.5 ("Norwest argues that each overpayment creates a new cause of action, and so long as a suit for a particular overpayment is commenced within five years after overpayment, it is timely.").

In examining the FDIA, the D.C. Circuit concluded that the "triggering event" for the statute of limitations was when "the right accrued for which the claim is made."  *Id.* at 451 (quoting 12 U.S.C. § 1817(g) (2006)).  Because later assessments could not change the fact that "the wrong ha[d] been committed" when the FDIC had made its initial mistake eight years prior, the court

concluded that all of the bank's claims were time-barred. *Id.* at 451-52. The court further determined that this was the case even though the bank had not had an "immediate financial incentive" to raise the claim "at the time the claim accrued," because allowing later assessments to restart the limitations clock would "effectively suspend the running of the limitations period." *Id.* at 451, 453. While Section 1817(g) has been amended since *Norwest Bank* was decided—a claim must now be brought "within 3 years after the date the assessment payment was due," *id.* § 1817(g)(2)(B)—the same logic applies because the due date of the assessment payment remains the "triggering event" that starts the statute-of-limitations clock. *Norwest Bank*, 312 F.3d at 451.[21]

Next, even if the FDIC could distinguish *Norwest Bank*, it cannot escape Section 1817(g)'s plain language. Section 1817(g)(2)(B) directs that "[a]*ny* action by the [FDIC] to recover [any unpaid] assessment *shall be brought within 3 years after the date the assessment payment was due*." *Id.* (emphases added). For each quarter, there was a deadline by which BANA had to pay that quarter's assessment.[22] The fact that BANA later submitted a revised Call Report to correct an error for a particular quarter does not change the fact that the original assessment deadline had long since passed. Against this, the FDIC relies on implementing regulations, which provide a mechanism for "payment adjustments in succeeding quarters" based on "factors [such] as amendments to prior quarterly reports of condition," 12 C.F.R. § 327.3(e), to argue that "when a bank files an amended Call Report that triggers a revised assessment for a prior quarter, the due

---

[21] The court further notes that the FDIC appears to still hold the position it took in *Norwest Bank*. *See* FDIC, Call Report Amendments & the Statute of Limitations, https://perma.cc/7HJ2-5CP3 (explaining that while "any insured depository institution is free to amend Call Reports for periods outside the statutory limit for the sake of having correct figures on file . . . in order for the [FDIC] to bill for an underpayment, or for any institution to receive a refund of overpayment, Call Report amendments must be made within the three-year statute of limitations period").

[22] Assessment payments are "typically are due three months (*i.e.*, 90 days) after the end of a quarter, and invoices are due 15 days before the payment due date." ECF No. 372-2, at 27; *see* 12 C.F.R. § 327.3(b)(1), (2).

date for payment of that revised assessment becomes the new 'date the assessment payment was due' under 12 U.S.C. §1817(g)(2)(B)."  ECF No. 372-2, at 27.  But a regulation cannot change the plain text of a statute.  *See Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("[A] regulation contrary to a statute is void.").  If Congress had wanted the FDIA's statute of limitations to account for the possibility of a revised assessments, it would have said so.

Finally, courts routinely reject a party's effort to tether a stale claim to new developments to extend the statute of limitations.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) (explaining that a plaintiff "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period"); *see also Rotella v. Wood*, 528 U.S. 549, 554-55 (2000) (similar).  That provides the court with an additional reason to reject the FDIC's effort to restart the limitations clock based on new invoices. *Gabelli v. Sec. & Exch. Comm'n*, 568 U.S. 442, 448-49 (2013).

*Section 1817(g)(2)(C).*    The FDIC also argues that one of the exceptions to Section 1817(g)(2)(B)'s three-year statute of limitations applies; specifically, Section 1817(g)(2)(C), which provides that "[i]f an insured depository institution has made a false or fraudulent statement with intent to evade any or all of its assessment, the [FDIC] shall have until 3 years after the date of discovery of the false or fraudulent statement in which to bring an action to recover the underpaid amount."  12 U.S.C. § 1817(g)(2)(C).  The FDIC contends that BANA "made false or fraudulent statements about its counterparty exposures with the intent to evade its assessments," which prevented the FDIC from discovering BANA's wrongdoing until it conducted an audit in 2016.  ECF No. 372-2, at 29.  Consequently, the FDIC asks the court to measure the three-year statute of limitations from the 2016 "date of discovery," which would render the FDIC's

claims concerning 1Q 2012 through 1Q 2013 timely under Section 1817(g)(2)(C).    ECF No. 372-2, at 29.

BANA vehemently denies that it acted with an intent to evade.    ECF No. 367-2, at 38-52. But it suggests that even if Section 1817(g)(2)(C) applies, the statute of limitations would start running when "the litigant first knows or with due diligence should know facts that will form the basis for an action."    ECF No. 367-2, at 39 (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 646 (2010)).    In BANA's view, because the FDIC had the information it needed to "discover" that BANA was not reporting its counterparty exposures consistent with the 2011 Rule as early as May 2012, any claims concerning 1Q 2012 through 1Q 2013 would still be time-barred even under Section 1817(g)(2)(C)'s "intent to evade" exception.    ECF No. 367-2, at 39-40.

The court agrees with BANA.    Under statutes like Section 1817(g)(2)(C), "[the] cause of action accrues when the injured party discovers—or in the exercise of due diligence should have discovered—that it has been injured."    *Sprint Commc'ns Co., L.P. v. Fed. Commc'ns Comm'n*, 76 F.3d 1221, 1228 (D.C. Cir. 1996).    Where a plaintiff argues that it did not discover the injury because of the defendant's concealment, it is the defendant's burden to show that the plaintiff had sufficient notice.    *Id.* at 1226.    Importantly, inquiry notice does not require that "the injured party has access to or constructive knowledge of all the facts required to support its claim . . . [or] to calculate its damages."    *Id.* at 1228.    Rather, "[o]nce the prospective plaintiff is on notice that it might have a claim, it is required to make a diligent inquiry into the facts and circumstances that would support that claim."    *Id.* at 1228.    And an agency "cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice."    *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 466 n.18 (7th Cir. 1990).

In May 2012, after noticing a drop in BANA's quarterly assessments in 1Q 2012 compared to 4Q 2011, the FDIC's Division of Insurance and Research began an investigation into "the validity of [BANA's] numbers," including its counterparty exposures.  ECF No. 259-30, at 4. Because there was doubt that BANA's "reporting changes [were] legit[imate]," the relevant FDIC team specifically discussed "following-up with someone about [BANA's] reported counterparty numbers."  *Id.* at 3.  In response, Brenda Bruno—a senior FDIC analyst who routinely monitored BANA—stated that she would "look into these issues along with the others related to BANA."  *Id.* Ms. Bruno worked with Chris Cook, the FDIC's on-site examiner for BANA, to gather information about the decrease in BANA's counterparty exposures.  *See* ECF No. 367-5, at 107-14.

Mr. Cook reached out to two individuals at BANA, noting that there had been large drops in BANA's Top 20 Counterparty Exposure and the Largest Counterparty Exposure measures between 4Q 2011 and 1Q 2012 and asking for assistance in gathering information about the reason for the changes.  ECF No. 251-30, at 3.  In a follow-up email the next day, Mr. Cook specifically requested "the data used to fill in the [Call Report] items on counterparty exposure."  *Id.* at 2. BANA responded with two one-page spreadsheets detailing its top exposure data for the 4Q 2011 and 1Q 2012 Call Reports, *id.* at 5-6, which are reproduced below.

**Top BANA Exposures, December 2011**

• Exposure at counterparty level
• Exposure to BANA consolidated legal entity
• Lending Binding defined as exposure hierarchy EA.  Exlcudes EAAV(fed funds/due froms), EAAM & EAD.D(traded products)
• Derivative Post Collateral Credit Equivalent - EAD?
• Dollars in thousands, "--" represents $0 or missing data
• Top 20 highlighted in green



**Top BANA Exposures, March 2012**

• Exposure at counterparty level
• Exposure to BANA consolidated legal entity
• Lending Binding defined as exposure hierarchy EA.  Exlcudes EAAV(fed funds/due froms), EAAM & EAD.D(traded products)
• Derivative Post Collateral Credit Equivalent - EAD?
• Dollars in thousands, "--" represents $0 or missing data
• Top 20 highlighted in green



Above the data on both spreadsheets are two bullets points that say "[e]xposure at the counterparty level" and "[e]xposure to BANA consolidated legal entity." *Id.* at 5-6. The spreadsheets themselves include several counterparties that clearly have not been consolidated at the ultimate parent level. *See id.* For example, three of the top four entries on the December 2011 sheet are clearly unconsolidated affiliates of each other—"████████████████" "████████████████," and "████████████████." *Id.* at 5. Likewise, on the March 2012 spreadsheet, the second and third entries are "████████████████" and "████████████████"—obviously unconsolidated affiliates. *Id.* at 6.

Upon receipt of the spreadsheets, Mr. Cook replied that they were "exactly what [he] needed to see." ECF No. 260-5, at 2. He did not inform BANA that it was reporting its data incorrectly. Mr. Cook then reported back to Ms. Bruno that "[t]he numbers provided for total exposure and single largest exposure tie back to the C[all] R[eport] submissions." ECF No. 260-3, at 3. Importantly, Mr. Cook also wrote: "There was a reduction of ████ of exposure to the Top 20 between 12.31.11 and 3.31.12. Of that ████, over ████ was due to *reductions in exposure among* ████████████████. As of 12.31, their largest single counterparty *was to* ████████████████, which was greatly reduced by 3.31.12." *Id.* (emphases added). This portion of Mr. Cook's email made it clear to Ms. Bruno that the data had not been consolidated at the ultimate parent level of the counterparty—had it been, BANA would not have been reporting exposures to ████████████, nor would its largest single counterparty be ████████████████—rather than ████████████ ████████████████. *Id.*; *see* ECF No. 251-30, at 5-6. In her deposition, upon re-examining the spreadsheets, Ms. Bruno

admitted that the spreadsheets indicated that BANA was not consolidating at the ultimate parent level of the counterparty but stated that she had not made that connection in 2012.  ECF No. 367-4, at 252:24-255:22.  As a result, Ms. Bruno, like Mr. Cook, failed to inform BANA that it was reporting its exposures incorrectly.

Based on this information, it is apparent to the court that the FDIC had in its possession information from which its employees could have concluded that BANA was not consolidating its counterparties at the ultimate parent level in May 2012.  The FDIC cannot argue that it did not have notice merely because it "fail[ed] to read[] the documents that would put [it] on inquiry notice."  *DeBruyne*, 920 F.2d at 466 n.18.  Nor can it plausibly argue that it "exercise[d] . . . due diligence" when it had the relevant information before it—as the result of its own investigation, no less—but failed to act on it.  *Sprint Commc'ns Co.*, 76 F.3d at 1228.  Because the FDIC had inquiry notice beginning in May 2012, its claims regarding underpaid assessments from 1Q 2012 through 1Q 2013 are time-barred even if Section 1817(g)(2)(C)'s intent-to-evade exception applied.[23]

*    *    *

Because the FDIC's claims concerning 1Q 2012 through 1Q 2013 are time-barred, the FDIC may only seek to recoup BANA's underpayments from 2Q 2013 through 4Q 2014.[24]

---

[23] Because the claims are time-barred, the court need not determine whether BANA made "false or fraudulent statement[s] with the intent to evade." 12 U.S.C. § 1817(g)(1)(C).  However, given BANA's repeated disclosures about its reporting method, *see supra* pp. 50-52, the court is hard-pressed to understand how its actions indicate an intent to evade.

[24] The amount of underpaid assessments for 2Q 2013 through 4Q 2014 is $540,261,499.90.  *See* ECF Nos. 249-13, 249-14.

53

## 2.    Equitable remedies

In addition to seeking the FDIA's statutory remedy, the FDIC brings a claim for unjust enrichment under both federal law and District of Columbia law, arguing that BANA was unjustly enriched "by receiving the benefit of federal deposit insurance from the FDIC without paying its fair share of assessments."  ECF No. 364, at 28.  As a result, the FDIC maintains that it is entitled to disgorgement of the profits that BANA made off that money as an equitable remedy.  *Id.* at 30-31.  BANA responds that the FDIC cannot seek equitable relief because Section 1817(g) provides it with "a remedy 'as complete, practical[,] and efficient as that which equity could afford.'"  ECF No. 367-2, at 71 (quoting *Terrace v. Thompson*, 263 U.S. 197, 214 (1923)).  That is especially so, BANA maintains, because the FDIC is entitled to prejudgment interest, which, "like disgorgement, is to prevent the unjust enrichment of [the] defendant[]."  *Id.* (quoting *Sec. & Exch. Comm'n v. Shaoulian*, No. 00-CV-4614, 2003 WL 26085847, at *5 (C.D. Cal. May 12, 2003)).  The FDIC replies that its statutory remedy is not adequate because it would not get at BANA's ill-gotten gains and thereby deter BANA from future wrongful conduct, ECF No. 364, at 35-36, and that Section 1817(h)'s savings clause permits it to seek equitable remedies in addition to statutory remedies, *id.* at 32-33.  The court concludes that the FDIC may not avail itself of equitable remedies because it has an adequate statutory remedy and nothing in Section 1817(h)'s savings clause changes that analysis.[25]

"It is a 'basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied

---

[25] Because the court holds that disgorgement is not available to the FDIC, it need not determine whether the elements of unjust enrichment—that the "plaintiff conferred a benefit on the defendant," that the defendant "retain[ed] th[at] benefit," and that the "retention of the benefit is unjust"—are met.  *Bregman v. Perles*, 747 F.3d 873, 876 (D.C. Cir. 2014) (quoting *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008)).

equitable relief.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)).  This principle holds even where the plaintiff is a government agency.  *See, e.g.*, *United States v. Bame*, 721 F.3d 1025, 1031 (8th Cir. 2013); *Fed. Deposit Ins. Corp. v. Gonzalez-Gorrondona*, 833 F. Supp. 1545, 1561 (S.D. Fla. 1993).  Likewise, under District of Columbia law, "[i]t is 'axiomatic' that equitable relief will not be granted where the plaintiff has a complete and adequate remedy at law."  *Kakaes v. George Wash. Univ.*, 790 A.2d 581, 583 (D.C. 2002) (quoting *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 184 (D.C. 1993)).

Here, the FDIC has an adequate remedy at law in the form of recouping BANA's underpaid assessments along with interest.  While the FDIC argues that an unjust enrichment claim "allows [it] to recover *additional* amounts, namely the ill-gotten profits BANA earned from its unjust retention of the assessment amounts," ECF No. 364, at 34, it fails to explain why that renders its statutory remedy inadequate.  As BANA explains, "[e]quitable relief will virtually always offer a remedy distinct from or additional to the remedy available under a legal claim," ECF No. 376-2, at 32, but that it would be incorrect to consider a statutory remedy inadequate simply because it is different from potential equitable relief, *id.*

BANA has the better of the argument.  The remedy at law need not be identical to the equitable remedy; rather, it must be "sufficient" and "as practical and efficient to the ends of justice."  *Watson v. Sutherland*, 72 U.S. 74, 78 (1866).  The remedy provided by FDIA—the FDIC's ability to recoup unpaid assessments for quarters not barred by the statute of limitations, with interest—reflects Congress's judgment that the FDIC should be made whole for the losses it faced due to BANA's actions.  And because the FDIC's legal and unjust enrichment claims arise

from the same facts and circumstances, there is no additional conduct that is addressed by the unjust enrichment claim.

The court is further not convinced that equitable relief would be more "practical" or "efficient" at dissuading banks from further wrongdoing. *Id.* at 76. "[D]isgorgement is an extraordinary remedy, and if it is ever appropriate, it should be used only in situations where the deterrence rationale is so important that only disgorgement will serve a socially useful purpose." *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 886 F. Supp. 2d 14, 20 (D.D.C. 2012). The FDIC fails to show how the already substantial sum BANA will have to pay under the FDIA— which will be over five hundred million dollars, plus interest—would not dissuade future, intentional wrongdoing. In the absence of an additional "deterrence rationale," the court does not find the "extraordinary remedy" of disgorgement appropriate. *Id.*

Additionally, nothing in Section 1817(h)'s savings clause authorizes equitable relief when the FDIC already has an adequate remedy at law. To be sure, Section 1817(h) provides that "[t]he remedies provided in this subsection and in subsections (f) and (g) shall not be construed as limiting any other remedies against any insured depository institution, but shall be in addition thereto." 12 U.S.C. § 1817(h). But, as BANA points out, "Section 1817(h) is a rule of construction clarifying that other remedies are available"—"it does not override *independent* legal requirements," ECF No. 367-2, at 76, namely, that the FDIC must still meet the ordinary requirements of eligibility for equitable relief. Because the FDIC cannot show that it lacks an "adequate" remedy, the court agrees with BANA that the savings clause "does nothing to aid the FDIC's argument" that it is entitled to equitable relief. ECF No. 367-2, at 76.[26]

---

[26] The parties dispute what the statute of limitations would be for an unjust enrichment claim. The FDIC posits that the relevant statute is 28 U.S.C. § 2415(a), which provides that an "agency" may

**D.    Availability of Equitable Defenses**

Finally, BANA raises several affirmative equitable defenses, including acquiescence, estoppel, and waiver, which it argues each "independently foreclose all of the FDIC's claims."[27] ECF No. 376-2, at 29.    The FDIC responds that "[e]quitable estoppel and acquiescence are unavailable as a matter of law against the FDIC," and that in any event, BANA fails to satisfy the elements of each defense.    ECF No. 372-2, at 59-60.    The court agrees that, in limited circumstances, a defendant can assert equitable defenses against a government agency, but that BANA has failed to substantiate them here.

While the Supreme Court has held that "the Government may not be estopped on the same terms as any other litigant," it has repeatedly declined to "rule that estoppel may not in any circumstances run against the Government." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984).    The Supreme Court's hesitation in *Heckler* was driven by its reluctance "to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Id.*    And the D.C. Circuit has held that "the doctrines of unjust enrichment and of equitable lien . . . are available to private parties seeking equitable relief against the

---

file a claim founded upon a "contract . . . implied in law" any time "within six years after the right of action accrues."    ECF No. 364, at 37 (quoting 28 U.S.C. § 2415(a)).    BANA responds that the three-year limitations period in "Section 1817(g) governs over general, default limitations periods found elsewhere in the U.S. Code."    ECF No. 376-2, at 21.    The court need not decide this question because it concludes that equitable relief is not available.    While the court would have needed to decide the issue if the FDIC had argued that Section 1817(g)(2)(B)'s three-year statute of limitations rendered its remedy at law inadequate as it pertained to assessment quarters beyond the statute of limitations, the FDIC does not make such an argument.    *See generally* ECF No. 364, at 47-50; ECF No. 372-2, at 18-26, 40.

[27] BANA previously asserted a laches defense, ECF No. 67, at 14, which it does not present here. *See* ECF No. 372-2, at 59; ECF No. 376-2, at 29 n.11.

government" because "the 'sovereign' nature of an agency's action does not immunize the agency from the reach of equity." *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1113 (D.C. Cir. 1988); *see Trans-Bay Eng'rs & Builders, Inc. v. Hills*, 551 F.2d 370, 376 (D.C. Cir. 1976).

However, while equitable defenses are available against the government in some circumstances, their use is limited.  This is because "[t]o allow a private party to assert equitable doctrines . . . against the government when it is enforcing the interests of the 'citizenry as a whole' would be to punish the broader public and undermine enforcement of law 'because [of] the conduct of [the government's] agents.'"  *Hyatt v. Vidal*, No. 05-CV-2310, 2022 WL 17904225, at *6 (D.D.C. Dec. 23, 2022) (third and fourth alterations in original) (quoting *Heckler*, 467 U.S. at 60). And "[t]his principle is at its apex when the government is 'attempting to enforce a congressional mandate in the public interest.'"  *Id.* (quoting *Sec. & Exch. Comm'n v. Gulf & Western Indus., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980)).  Thus, private parties seeking to assert equitable defenses against the government must "establish government misconduct rising to such an egregious level as to overwhelm 'the public interest in ensuring that the Government can enforce the law free from estoppel' with prejudice rising to the degree 'of a constitutional violation.'"  *Id.* (quoting *Bartko v. Sec. & Exch. Comm'n*, 845 F.3d 1217, 1227 (D.C. Cir. 2017)).

Accordingly, while the court concludes that equitable defenses can be asserted against the government, BANA has not presented the court with any reason to believe that the FDIC's conduct was so "egregious" that they are warranted.  *Hyatt*, 2022 WL 17904225, at *6 (quoting *Bartko*, 845 F.3d at 1227).  Indeed, the parties' briefing on BANA's equitable defenses is sparse, *see* ECF No. 364, at 53-55; ECF No. 367-2, at 70; ECF No. 372-2, at 59; ECF No. 376-2, at 10, 29-30, and BANA does not substantiate its claim beyond stating that the elements of its three equitable defenses are satisfied for "all the reasons discussed above with respect to fair notice and intent to

evade," ECF No. 367-2, at 70.  The court has already rejected the argument that BANA lacked fair notice, and BANA's defense on the FDIC's intent to evade argument does not carry its affirmative burden of showing acquiescence, estoppel, or waiver.

## V.     CONCLUSION

For the foregoing reasons, the court concludes that the 2011 Rule is valid, that BANA is liable under it, and that the FDIC may seek to recoup BANA's unpaid assessments from 2Q 2013 through 4Q 2014.  Accordingly, the court will grant in part and deny in part the FDIC's Motion for Partial Summary Judgment, ECF No. 361, and grant in part and deny in part BANA's Motion for Summary Judgment, ECF No. 366, and it will enter judgment in favor of the FDIC and against BANA in the amount of $540,261,499.90, representing the underpaid assessments from 2Q 2013 through 4Q 2014, plus pre- and post-judgment interest.  A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 31, 2025