**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL DEPOSIT INSURANCE
CORPORATION,

    *Plaintiff*,

  v.

BANK OF AMERICA, N.A.,

    *Defendant*.

Civil Action No. 17 - 36 (LLA)

**MEMORANDUM OPINION AND ORDER**

Plaintiff, the Federal Deposit Insurance Corporation (the "FDIC"), brought this action against Defendant, Bank of America, N.A. ("BANA"), alleging BANA's failure to pay $1.12 billion in deposit insurance assessments in violation of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1817, and its resulting unjust enrichment. ECF No. 10. In March 2025, the court granted in part and denied in part both the FDIC's Motion for Partial Summary Judgment, ECF No. 361, and BANA's Motion for Summary Judgment, ECF No. 366. *See* ECF Nos. 385, 386. The court held that BANA is liable to pay $540,261,499.90 for its failure to comply with the FDIC's 2011 regulation setting the formula for calculating deposit insurance assessment rates, plus pre- and post-judgment interest. ECF No. 385, at 59. But it agreed with BANA that the FDIC is not entitled to the equitable remedy of disgorgement based on BANA's purported unjust enrichment. *Id.* at 54-56.

The parties now dispute the amount of pre- and post-judgment interest BANA owes the FDIC. BANA has filed a motion to deem the judgment satisfied pursuant to Federal Rule of Civil Procedure 60(b)(5), or, in the alternative, to amend the judgment pursuant to Rule 60(a). ECF

No. 395.  It asks the court to calculate the pre- and post-judgment interest owed based on the so-called "regulatory rate" set forth in 12 C.F.R. § 327.7(b).  *Id.* at 12-18.  The FDIC has filed a cross-motion under Rule 60(a) arguing that the court should calculate pre-judgment interest based on the prime rate—which is what banks charge for short-term, unsecured loans to creditworthy customers—rather than the regulatory rate, and post-judgment interest based on the rate provided by 28 U.S.C. § 1961(a), the statutory post-judgment interest provision.  *See* ECF No. 398.  For the reasons discussed below, the court grants in part and denies in part both motions, applies the rate set forth in 12 C.F.R. § 327.7(b) to pre-judgment interest, applies the rate set forth in 28 U.S.C. § 1961(a) to post-judgment interest, and directs the parties to file a joint status report with their respective calculations of the amounts of pre- and post-judgment interest on or before April 14, 2026.

## I.      BACKGROUND AND PROCEDURAL HISTORY

The court assumes the parties' familiarity with the case and details here only the facts necessary to resolve the pre- and post-judgment interest dispute.

The FDIC helps "maintain[] stability and public confidence in the banking system and in protecting the savings of ordinary Americans" by insuring banks: when an insured bank fails, the FDIC "provides depositors access to their insured accounts at that institution," and where "the institution's assets are insufficient, the FDIC pays the balance from the Deposit Insurance Fund." ECF No. 364, at 5.  It finances the Deposit Insurance Fund by collecting quarterly premiums, called "assessments," from the banks it insures.  ECF No. 248-4 ¶ 5.

The FDIA directs the FDIC to issue regulations "establish[ing] a risk-based assessment system for insured depository institutions."  12 U.S.C. § 1817(b)(1)(A).  It also permits the FDIC to use "separate risk-based assessment systems for large and small" banks.  *Id.* § 1817(b)(1)(D).

Accordingly, the FDIC employs different methodologies for calculating a bank's risk depending on whether the bank is a small institution, a large institution, or a highly complex institution ("HCI"). ECF No. 248-4 ¶ 5. HCIs are "the largest and most complex banks." *Id.* ¶ 7. BANA was one of only a few HCIs nationwide during the period relevant to this case. *Id.* ¶ 12.

After the Great Recession in 2008, lawmakers feared that existing regulations failed to ensure the stability of the national banking system. *See* Assessments, Large Bank Pricing, 76 Fed. Reg. 10672, 10674 (Feb. 25, 2011) (codified at 12 C.F.R. pt. 327). In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") to "improv[e] accountability and transparency in the financial system" and "end 'too big to fail.'" Pub. L. No. 111-203, 124 Stat. 1376, 1376 (2010) (codified at 12 U.S.C. § 5301). The Dodd-Frank Act achieved this goal in part by requiring the FDIC to amend its regulations for calculating banks' assessment rates. *Id.* at 1538; *see* 76 Fed. Reg. at 10674.

In February 2011, the FDIC published a final rule ("the 2011 Rule") that revised the assessment methodologies for large banks and HCIs. 76 Fed. Reg. at 10688-10703 (codified at 12 C.F.R. § 327.9(b)(2) (2011)). The 2011 Rule went into effect on April 1, 2011. *Id.* at 10672. It set forth a calculation to determine the "performance score" and "loss severity score" for large banks and HCIs like BANA; together, the scores would determine the bank's quarterly risk-based assessment payment. *Id.* at 10695, 10689. For HCIs, the scores considered the bank's "top 20 counterparty exposures" and "largest counterparty exposure," *id.* at 10696, and the 2011 Rule defined "counterparty exposure" based in part on each banks' counterparties or borrowers "at the *consolidated entity level*," *id.* at 10721 (emphasis added). The 2011 Rule, as subsequently amended, was in effect until December 31, 2014. *See* Assessments; RIN 3064-AE37, 79 Fed. Reg. 70427, 70427, 70433-34, 70438 (Nov. 26, 2014) (codified at 12 C.F.R. pt. 327).

In 2016, an FDIC audit revealed that "BANA had not consolidated its counterparty exposures to the ultimate parent level as required" for 1Q 2012 through 4Q 2014.[1]  ECF No. 248-4 ¶ 26.  Instead, "BANA reported the amount of its direct exposure to a given counterparty without adding to that amount its exposures to the counterparty's subsidiaries or to other members of the counterparty's corporate family."  *Id.*  This lowered BANA's concentration measure, which in turn considerably lowered the overall amount that BANA paid in assessments for those quarters.  After completing the audit, the FDIC invoiced BANA $1,120,563,178.49 in underpaid assessments.  ECF No. 364, at 15.  BANA declined to pay.  *Id.*

In January 2017, the FDIC filed suit against BANA, alleging that BANA had failed to pay over $500 million dollars in mandatory assessments for 2Q 2013 through 4Q 2014, as required by the FDIA.  ECF No. 1 ¶¶ 50-51.  The FDIC subsequently amended its complaint, alleging that BANA had failed to pay $1.12 billion in mandatory assessments for 1Q 2012 through 4Q 2014 in violation of the FDIA (Count I) and had unjustly enriched itself at the FDIC's expense by retaining that money (Count II).  ECF No. 10 ¶¶ 72-94.  The case was reassigned to the undersigned in December 2023.  Dec. 14, 2023 Docket Entry.

In March 2025, the court granted in part and denied in part both the FDIC's Motion for Partial Summary Judgment, ECF No. 361, and BANA's Motion for Summary Judgment, ECF No. 366.  *See* ECF Nos. 385, 386; *Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*, 783 F. Supp. 3d 1 (D.D.C. 2025).  First, the court concluded that 2011 Rule was a valid exercise of the FDIC's rulemaking authority, that the rule was supported by substantial evidence, and that it was not arbitrary or capricious.  ECF No. 385, at 17-28.  Next, the court found BANA liable for failing to

---

[1] BANA consolidated its counterparty exposures correctly for 2Q 2011 and 3Q 2011, the first two quarters that the 2011 Rule was in effect.  *See* ECF No. 364, at 27; ECF No. 376-2, at 27-28.

properly aggregate its exposures and held that, consistent with the statute of limitations, the FDIC could recoup BANA's underpayments from 2Q 2013 through 4Q 2014. *Id.* at 44-53. Finally, the court determined that the FDIC was not entitled to disgorgement because it had an adequate remedy at law in the form of pre-judgment interest. *Id.* at 54-56. The court entered judgment in the FDIC's favor and ordered BANA to pay $540,261,499.90 in underpaid assessments, plus pre- and post-judgment interest. ECF No. 386.

Following the court's summary judgment decision, the parties moved to stay enforcement of the judgment pursuant to Federal Rule of Civil Procedure 62(b) and any deadline for a bill of costs or motion for fees or costs pursuant to Rule 54(d)(1) and Local Civil Rule 54.1(a), ECF No. 390, at 1, which the court granted, ECF No. 391, at 1. The parties twice moved to extend the stay while they calculated pre- and post-judgment interest and arranged for BANA's satisfaction of the judgment, ECF No. 392, at 2; ECF No. 393, at 2, and the court granted both requests, June 11, 2025 Minute Order; June 26, 2026 Minute Order.

The parties were ultimately unable to reach an agreement on the applicable interest rates, ECF No. 394, and they have filed competing motions. BANA seeks to have the court deem the judgment satisfied pursuant to Federal Rule of Civil Procedure 60(b)(5), or, in the alternative, to amend the judgment pursuant to Rule 60(a). ECF No. 395. FDIC requests that the court set pre- and post-judgment interest under Rule 60(a). ECF No. 398. Both motions are fully briefed. ECF Nos. 395, 396, 398, 400 to 402. In November 2025, the court directed the parties to file supplemental briefs addressing whether Rule 59(e) was relevant to the parties' requests, ECF No. 404, which the parties did, ECF Nos. 406, 407, 412, 413.

## II.    LEGAL STANDARDS

### A.    Rule 60(a)

Federal Rule of Civil Procedure 60(a) allows the court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment."  Fed. R. Civ. P. 60(a).  "The rule's limitation to 'clerical' mistakes and those arising from 'oversight and omission' means that it cannot be used to change the substance of an order or judgment."  *Fanning v. George Jones Excavating, L.L.C.*, 312 F.R.D. 238, 239 (D.D.C. 2015) (quoting Fed. R. Civ. P. 60(a)).  "Thus a motion under Rule 60(a) only can be used to make the judgment or record speak the truth and cannot be used to make it say something other than what originally was pronounced."  11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2854 (3d ed. 2025).

### B.    Rule 60(b)

Under Rule 60(b), the court may "relieve a party . . . from a final judgment" for one of six reasons:  (1) "mistake, inadvertence, surprise, or excusable neglect";  (2) "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)";  (3) "fraud . . . , misrepresentation, or misconduct by an opposing party";  (4) "the judgment is void";  (5) "the judgment has been satisfied, released, or discharged," or was based on similar grounds, or applying it would "no longer [be] equitable";  or (6) "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(1)-(6).  Three grounds are potentially applicable here: Rule 60(b)(1), 60(b)(5), and 60(b)(6).

The Supreme Court has determined that "Rule 60(b)(1) covers all mistakes of law made by a judge."  *Kemp v. United States*, 596 U.S. 528, 534 (2022).  In doing so, the Court "overruled the precedent of this Circuit [and held] that *any* legal error, including those that are not 'obvious' or 'manifestly erroneous,' may constitute 'mistake'" under Rule 60(b)(1).  *Woods v. District of*

*Columbia*, No. 20-CV-782, 2022 WL 17989326, at *3 (D.D.C. Dec. 29, 2022).  But the Court left in place "the general rule of this jurisdiction that motions for reconsideration are still 'disfavored' and granting them should be 'unusual.'"  *Id.* (quoting *Walsh v. Hagee*, 10 F. Supp. 3d 15, 18 (D.D.C. 2013)).

As for Rule 60(b)(5), courts have "rarely" provided relief from a final judgment because it "has been satisfied, released, or discharged."  11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2863.  "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"  *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).  Parties often invoke Rule 60(b)(5) in institutional reform litigation, when "an injunction typically remains in place for many years."  *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017).

Rule 60(b)(6) "provides only grounds for relief not already covered by the preceding five [Rule 60(b)] paragraphs," and it is "available only in narrow circumstances."  *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 211 (2025).  While a court retains discretion to grant a Rule 60(b)(6) motion, *Jones v. U.S. Dep't of Just.*, 315 F. Supp. 3d 278, 279 (D.D.C. 2018), it should do so "sparingly" and only under "extraordinary circumstances," *People for the Ethical Treatment of Animals v. U.S. Dep't of Health & Hum. Servs.*, 901 F.3d 343, 355 (D.C. Cir. 2018) ("*PETA*") (first quoting *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980); then quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)).  The party seeking relief "bears the threshold burden of proving that a 'significant change' in legal or factual circumstances

'warrants revision of the [court's] decree.'"  *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 492 (D.C. Cir. 2018) (quoting *Rufo*, 502 U.S. at 383).

"In considering a Rule 60(b) motion, the district court 'must strike a "delicate balance between the sanctity of final judgments . . . and the incessant command of a court's conscience that justice be done in light of *all* the facts."'"  *PETA*, 901 F.3d at 354-55 (alteration in original) (quoting *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988)).  A court considering a Rule 60(b) request has "general discretion whether to reopen a judgment," as well as "further discretion to impose those conditions [the court] sees fit . . . so long as they are a reasonable exercise of [that] discretion."  11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2857.

## III.    DISCUSSION

The parties dispute three issues: the correct procedural vehicle for assessing pre- and post-judgment interest, the applicable rate for pre-judgment interest, and the applicable rate for post-judgment interest.  The court concludes that the proper vehicle is Rule 60(b)(1), that 12 C.F.R. § 327.7 governs the rate of pre-judgment interest, and that 28 U.S.C. § 1961 governs the rate of post-judgment interest.

### A.    Procedural Issues

In its motion, BANA seeks relief under Rule 60(b)(5).  ECF No. 395.  BANA argues that pre- and post-judgment interest should be calculated at the regulatory rate in 12 C.F.R. § 327.7(b) and that any judgment incorporating its preferred rate has been satisfied because it "has already paid [an] amount" reflecting that rate, ECF No. 395, at 11, into "an account maintained with a depository and granted the FDIC a security interest in [the collateral]," ECF No. 390, at 1.

Alternatively, BANA asks the court to amend the judgment pursuant to Rule 60(a).  ECF No. 395, at 3, 11.  In its cross-motion, the FDIC seeks an amendment to the judgment under Rule 60(a) that calculates pre-judgment interest based on a market rate and post-judgment interest under 28 U.S.C. § 1961(a).  ECF No. 398, at 3, 7.

After reviewing the parties' briefs, the court directed the parties to file supplemental briefs addressing whether an award of pre-judgment interest pursuant to Rule 60(a) is appropriate because the Supreme Court has held that a "postjudgment motion for discretionary prejudgment interest constitutes a motion to alter or amend the judgment under Rule 59(e)."  ECF No. 404, at 2 (quoting *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989)).  If the parties' motions concerning the rate of pre-judgment interest were construed as arising under Rule 59(e)—which allows the court to alter or amend a judgment within twenty-eight days of "the entry of judgment," Fed. R. Civ. P. 59(e)—they would be untimely and the court would have no authority to consider them.  *Id.* R. 6(b)(2); *see Banister v. Davis*, 590 U.S. 504, 507-08 (2020); *Oladokun v. Corr. Treatment Facility*, 309 F.R.D. 94, 98 (D.D.C. 2015).

In its supplemental briefs, BANA reiterates its request for Rule 60(b)(5) relief, or, alternatively, for a corrected judgment under Rule 60(a).  ECF No. 407, at 2-6.  BANA further asserts that the FDIC's Rule 60(a) motion is improper because it requires the court to exercise discretion in choosing an interest rate, ECF No. 412, at 2, whereas awarding BANA relief under Rule 60(a) is permissible because that "would conform the judgment to the rate . . . required by law," ECF No. 407, at 3.  Accordingly, BANA characterizes the FDIC's Rule 60(a) motion as seeking untimely relief under Rule 59(e).  ECF No. 412, at 3-7.

For its part, the FDIC contends that *Osterneck* and its progeny apply only when a party seeks pre-judgment interest "for the first time after a judgment" has been issued "that does not

already provide for [it]." ECF No. 406, at 3. The FDIC further maintains that its Rule 60(a) motion is proper because the court need not exercise discretion to set the presumptively appropriate prime rate. *Id.* at 4-5. In the alternative, the FDIC argues that the court's judgment, ECF No. 386, was not "final" if pre-judgment interest "cannot be computed through a simple ministerial act," in which case the pre-judgment interest request would be governed by Rule 54(b), ECF No. 406, at 6. Rule 54(b) provides that a judgment "adjudicat[ing] fewer than all the claims or the rights and liabilities . . . does not end the action . . . and [the judgment] may be revised at any time before the [final judgment]." Fed. R. Civ. P. 54(b). Finally, the FDIC claims that the court may construe its pre-judgment interest motion as one brought under Rule 60(b) seeking relief from judgment or as one under Rule 69(a)(1) seeking enforcement of a judgment. ECF No. 406, at 9-10.

The court agrees with the FDIC that *Osterneck* and Rule 59(e) do not apply here. In *Osterneck*, the trial court entered a judgment that did not mention pre-judgment interest and a party later moved—outside the Rule 59(e) window—to have interest included in the total amount it was owed. 489 U.S. at 172. The Supreme Court held that a post-judgment motion for discretionary pre-judgment interest fell within Rule 59(e)'s ambit, and the Court acknowledged in dicta that it would view a motion for mandatory pre-judgment interest the same. *Id.* at 176-77 & n.3. The D.C. Circuit has applied *Osterneck* under similar circumstances—when a party's first request for pre-judgment interest came *after* the court had issued a judgment that was silent as to any interest owed. *Winslow v. Fed. Energy Regul. Comm'n*, 587 F.3d 1133, 1134-36 (D.C. Cir. 2009). Other circuits have done the same. *See id.* (collecting cases); *see also Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 160 F.4th 38, 41, 43 (2d Cir. 2025). As the First Circuit has recognized— in an opinion cited by the *Winslow* Court as a proper application of *Osterneck*'s rule, 587 F.3d

10

at 1136—"Rule 59(e) is the proper procedural vehicle for motions seeking . . . an *initial* award of prejudgment interest," *Crowe v. Bolduc*, 365 F.3d 86, 93 (1st Cir. 2004) (emphasis added).

Here, in its amended complaint, the FDIC requested interest on all underpayments. ECF No. 10, at 22. BANA contended at the summary judgment stage that the availability of pre-judgment payments gave the FDIC an adequate remedy at law and rendered the equitable remedy of disgorgement unavailable. ECF No. 367-2, at 71-72. And the court's March 2025 judgment awarded the FDIC pre- and post-judgment interest. ECF No. 386. The FDIC's motion to set the pre-judgment interest rate at the prime rate was not an *initial* request for interest and *Osterneck* is therefore inapposite. *Cf. Cannon v. Peck*, 36 F.4th 547, 577 (4th Cir. 2022) (holding that a post-judgment request for pre-judgment interest fell under Rule 59(e) because the plaintiff "never requested prejudgment interest at any time prior to entry of the judgment" and "[t]he district court's judgment award[ed] interest at the post-judgment rate but never mention[ed] or award[ed] prejudgment interest" (internal quotation marks omitted)).

Instead, the court sees two plausible approaches to resolving the instant dispute over the rates of pre- and post-judgment interest. First—and consistent with the court's intent when it issued its summary judgment opinion and left the FDIC's request for interest unresolved—the court could consider the judgment, ECF No. 386, not "final" with respect to the interest-related matters. *See Com. Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 37 (1st Cir. 2000) (determining that a judgment was not "final" within the meaning of 28 U.S.C. § 1291 because the court issued a judgment but "reserved" the issue of deciding the "appropriate date and rate for calculating pre-judgment interest and ordered the parties to submit further briefs on the[] issues" (internal quotation marks omitted)). Second—and to the extent that the court's judgment *was* final

11

with respect to interest—the court could construe the parties' pre-judgment interest requests as though they seek relief from a final judgment under Rule 60(b)(1).

Because the court's March 2025 judgment was, by its own terms, final within the meaning of Rule 58(a), *see* ECF No. 386, the court will proceed under Rule 60(b)(1).  Notwithstanding any apparent finality, "deciding . . . how much prejudgment interest should be granted" requires the court to "examine . . . matters encompassed within the merits of the underlying action." *Osterneck*, 489 U.S. at 176.  By suggesting that its order was final without resolving the parties' dispute over the applicable interest rates, the court made a legal error.  *See Kemp*, 596 U.S. at 534 (holding that Rule 60(b)(1) encompasses a judge's legal errors).  Contrary to BANA's suggestion, the FDIC's motion for pre-judgment interest at the prime rate is not a "Trojan horse for sneaking . . . [a] tardy Rule 59(e) motion[] into the courtroom under the guise of Rule 60(b)."  ECF No. 407, at 8 (quoting *United States v. Deutsch*, 981 F.2d 299, 302 (7th Cir. 1992)).  It was the *court's* error, not the FDIC's, to issue a seemingly final judgment when the FDIC's request for judgment-related interest remained outstanding.  Accordingly, the court will award the FDIC pre- and post-judgment interest under Rule 60(b)(1) and direct the parties to file a joint status report with pre- and post-judgment interest calculations before the court issues a corrected and final Rule 58(a) judgment.

### B.    Pre-Judgment Interest Rate

Congress has enacted a general "statute governing the award of postjudgment interest in federal court litigation," but "there is no comparable legislation regarding prejudgment interest." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995) (citation omitted); *see* 28 U.S.C. § 1961 (setting a post-judgment interest rate); *see also infra* Section III.C (awarding post-judgment interest).  Nor does the FDIA explicitly make pre-judgment interest available.  *See*

12 U.S.C. § 1817.  Instead, Congress has directed the FDIC to promulgate regulations concerning risk-based assessments owed by members of the Deposit Insurance Fund, *id.* § 1817(b), and mandated that "payments . . . be made in such manner and at such time or times as the [FDIC] . . . prescribe[s] by regulation," *id.* § 1817(c)(2)(B).  Those regulations require each "insured depository institution" to pay interest "on any underpayment of [an] assessment," 12 C.F.R. § 327.7(a)(1), but also commit the FDIC to "pay[ing] interest on any overpayment," *id.* § 327.7(a)(2).

BANA did not dispute in its summary judgment briefs that the FDIC would be entitled to pre-judgment interest if the court determined that BANA was liable under the FDIA.  *See generally* ECF Nos. 367-2, 376-2.  Indeed, BANA's principal objection to the FDIC's equitable unjust enrichment claim was that the "availability of prejudgment interest" provided the FDIC with an adequate remedy at law.  ECF No. 367-2, at 71; ECF No. 376-2, at 33.  The sole contested issue concerning pre-judgment interest is what rate applies to the amount that BANA must pay.  *See* ECF No. 395, at 10 n.7.

To answer that question, BANA asserts that the "binding text" of the FDIC's regulation, 12 C.F.R. § 327.7(b)(1), "requires calculating prejudgment interest" at the so-called "regulatory rate," ECF No. 395, at 14.  The regulatory rate for a given fiscal quarter "is the coupon equivalent yield of the average discount rate set on the 3-month Treasury bill at the last auction held by the United States Treasury Department during the preceding [quarter]."  12 C.F.R. § 327.7(b)(1).  The FDIC rejects the premise that its own regulation binds the court.  ECF No. 398, at 16-20.  Rather than rely on the regulatory rate, the FDIC asks the court to award pre-judgment interest based on the "prime rate"—a "generally applicable 'market rate,'" *id.* at 8 (quoting *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996))—"to prevent unjust enrichment, disincentivize

13

litigation delay, and compensate [the FDIC] for the time value of money," *id.* at 10. Having considered the parties' arguments—including BANA's and the FDIC's respective expert reports that bear on the interest rate calculation, ECF Nos. 250-5, 400-4—the court concludes that the regulatory rate adopted by the FDIC is the appropriate remedy under the circumstances. The court therefore declines to reach BANA's argument that 12 C.F.R. § 327.7 prohibits the court from setting pre-judgment interest at any other rate.[2] ECF No. 395, at 14; ECF No. 400-2, at 3-7 & n.1.

"[W]hether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations." *Oldham v. Korean Air Lines Co., Ltd*, 127 F.3d 43, 54 (D.C. Cir. 1997) (alteration in original) (quoting *Motion Pictures Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)). "The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation." *Id.*; *see Motion Pictures Ass'n of Am.*, 969 F.2d at 1157 ("[I]nterest compensates for the time value of money, and thus is often necessary for full compensation."). Pre-judgment interest therefore prevents a party from unjustly enriching itself by retaining wrongfully withheld money. *See Moore v. CapitalCare, Inc.*, 461 F.3d 1, 13 (D.C. Cir. 2006) (discussing the purposes of pre-judgment interest in a case involving unpaid benefits). It also "promotes settlement and deters any attempt to benefit unfairly from inevitable litigation delay." *Id.* These considerations from the D.C. Circuit substantially overlap with those the Supreme Court outlined in a related context. In *Osterneck*, the Court explained that when overseeing a securities action, a court "deciding if and how much prejudgment interest should be granted" will "consider a number of factors, including whether prejudgment interest is necessary

---

[2] The court similarly declines to consider BANA's argument that the FDIC has conceded during this litigation that the regulatory rate is appropriate. ECF No. 395, at 14-17; ECF No. 400-2, at 9-11.

14

to compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness." 489 U.S. at 176.

According to the FDIC, the prime rate fulfills these purposes, but the regulatory rate does not. ECF No. 398, at 10-15. The FDIC contends that "BANA's underpayments were effectively an involuntary, interest-free loan from the [Deposit Insurance Fund]," which BANA "was able to use to make loans or other investments at market rates." *Id.* at 11. It further argues that awarding pre-judgment interest at the regulatory rate "would enable banks to earn substantial windfalls by capitalizing on the difference between the market rate of return and the low 3-month rate" set forth in 12 C.F.R. § 327.7(b). ECF No. 398, at 12. Finally, the FDIC maintains that BANA's proposed rate "would severely undercompensate the FDIC" because the three-month Treasury rate has "frequently hovered around 0%" and therefore "does not compensate for the effects of inflation." *Id.* at 13.

To be sure, the D.C. Circuit has held that "the use of the prime rate for determining prejudgment interest is well within the district court's discretion." *Forman*, 84 F.3d at 450. In *Forman*—which involved a damages judgment for a plaintiff against a foreign airline—the Circuit concluded that the prime rate was "*more* appropriate" than the "Treasury bill rate." *Id.* The *Forman* Court reasoned that the prime rate was "what the victim must pay—either explicitly if it borrows money or implicitly if it finances things out of cash on hand—and the rate the wrongdoer has available to it." *Id.* at 450-51 (quoting *In re Oil Spill by the Amoco Cadiz off Coast of Fr. on March 16, 1978*, 954 F.2d 1279, 1332 (7th Cir. 1992)). The FDIC's argument about the prime rate relies heavily on the fact that it is presumptively appropriate. *See* ECF No. 398, at 7-10; ECF

15

No. 402, at 2-5.  Yet the D.C. Circuit has also confirmed that a district court has "the *authority* to adopt a rate" *other* than the prime rate "that better approximates what a specific defendant might pay for an unsecured loan."  *Cont'l Transfert Tech. Ltd. v. Federal Government of Nigeria*, 603 F. App'x 1, 4 (D.C. Cir. 2015) (emphasis added).

Notwithstanding any presumption in favor of the prime rate, the regulatory rate better approximates both what was available to BANA when it underpaid its assessments *and* the corresponding loss to the FDIC.  The FDIC's insistence otherwise, ECF No. 398, at 7-18, is squarely undermined by the justification the agency offered when it adopted the current formula for the regulatory rate.  More than thirty years ago, the FDIC promulgated a rule that changed the applicable interest rate on unpaid or overpaid assessments.  Truth in Lending; Mortgage Disclosures; Correction, 60 Fed. Reg. 50400, 50403 (Sep. 29, 1995) (codified at 12 C.F.R. pt. 226) ("1996 Final Rule").  The FDIC previously had used the Treasury Department's current value of the federal funds rate, issued under the Treasury Fiscal Requirements Manual ("TFRM rate"), but the FDIC determined that the TFRM rate was "based on aged data" and "quickly bec[a]me[] obsolete in volatile interest-rate markets."  *Id.* at 50401.  Accordingly, the FDIC replaced the TFRM rate with a more "market-sensitive" measure: the "coupon equivalent rate set on the 3-month Treasury bill at the last auction held by the U.S. Treasury Department before the start of each quarter."  *Id.* at 50403.  Critical to the current dispute is *why* the FDIC chose the three-month Treasury rate: it "more closely (but not necessarily exactly) approximates the market value of funds both for the [financial] institution and for the FDIC."  *Id.*  Upon receipt of an overpayment, the FDIC anticipated "return[ing] to the institution the benefit that the institution would have been able to obtain by investing the excess amount."  *Id.*  And if a bank underpaid its assessment, "the

16

institution will have to restore to its fund . . . the economic value of the interest that the fund would otherwise have earned." *Id.*

When promulgating the 1996 Rule, the FDIC considered but rejected a proposal offered by a bankers' association to use the Federal Funds rate because "the FDIC invests its funds with the Treasury Department, and not in the Federal Funds market." *Id.* at 50405. The FDIC further explained in the proposed version of the 1996 Rule that it had considered but rejected another approach that would set interest rates at the "'composite yield at market' rate," which "look[s] at the interest that the [FDIC's] portfolios actually earned."[3] Assessments, 60 Fed. Reg. 40776, 40779 (Aug. 10, 1995) ("1996 Proposed Rule"). Put differently, the composite yield at market rate "would represent the FDIC's actual benefits (or costs) from the overcollection (or undercollection) of assessments": "[i]f an institution were to overpay its assessment, the FDIC would return to the institution every bit of the benefit that the FDIC had received from the overpayment[,]" and "if an institution were to underpay its assessment, it would be obliged to restore to its fund the economic value of the interest the fund would otherwise have earned, and the fund would be made whole." *Id.* at 40780. Despite the accuracy of this approach, the FDIC nevertheless concluded that the composite yield at market rate was not suitable for a regulatory rate because it relies on "proprietary information" and fails to "approximate the market value of the funds—that is, the interest that an institution earned or could have earned by investing the funds." *Id.*

---

[3] At the time, the FDIC maintained two portfolios, the Bank Insurance Fund ("BIF") and Savings Association Insurance Fund ("SAIF"). *See* 1996 Rule, 60 Fed. Reg. at 50403. In the Federal Deposit Reform Act of 2005, Pub. L. No. 109-173, §§ 8-9, 119 Stat. 3601, Congress merged the BIF and SAIF into the Deposit Insurance Fund, *id.* at 3610-19.

The upshot of the FDIC's regulatory history is that the regulatory rate prevents unjust enrichment and adequately compensates the FDIC.  As it concerns unjust enrichment, the FDIC implemented the regulatory rate because it "approximate[s] the market value" of money retained by a bank "investing the funds" rather than paying its full assessment.  *Id.*  Over three decades, the FDIC has promulgated rules affecting assessment payments but left undisturbed both the regulatory rate and the rate's underlying justification.  *See e.g.*, Assessments, 71 Fed. Reg. 69270, 69271 (Nov. 30, 2006) (codified at 12 C.F.R. pt. 327) (adopting various changes including quarterly, rather than semiannual, assessments); Special Assessment Pursuant to Systemic Risk Determination, 88 Fed. Reg. 83329, 83331, 83348 (Nov. 29, 2023) (imposing a special assessment on insured depository institutions, the underpayment of which is subject to interest payments calculated according to the regulatory rate).  At bottom, the FDIC's rationale for adopting the regulatory rate is compelling evidence that requiring BANA to pay interest at that rate prevents any unjust enrichment.  *See* ECF No. 398, at 10 (arguing that "prejudgment interest serves three core purposes," including "to prevent unjust enrichment").

The FDIC rejects this conclusion because "[i]f th[e] [regulatory] rate is awarded, BANA would retain the spread between the market rate (prime) and the lower T-Bill rate."  *Id.* at 11.  That argument assumes that BANA could have used the capital saved by underpaying its assessments "to make loans or other investments at market rates (prime)."  *Id.*  For support, the FDIC relies on *First National Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472 (7th Cir. 1999).  There, a district court concluded that in the aftermath of a check-fraud scheme, First National Bank of Chicago had failed to credit Standard Bank & Trust money from checks drawn on Standard Bank accounts.  *Id.* at 474.  To compensate Standard Bank for its loss, the court awarded the bank pre-judgment interest on the returned checks.  *Id.*  The Seventh Circuit held that the district court

18

abused its discretion by setting interest at the lower T-Bill rate rather than the higher prime rate on the basis that the case was "close," which is "not material to the issue of prejudgment interest." *Id.* at 480 (internal quotation marks omitted).  And the Circuit reasoned that First National Bank of Chicago effectively was "allowed to borrow funds from Standard Bank at a rate well below what Standard would have charged any other customer." *Id.* at 481.

*First National Bank of Chicago* has no bearing on this case.  It may be true that, ordinarily, interest pegged to the market rate approximates what the defendant profited, or could have profited, from its unlawful conduct.  But the FDIC's assumption that BANA used money associated with its underpaid assessments to lend or invest at the prime rate is unsupported by the record.  The FDIC provides no authority for the proposition that BANA deployed its capital in that manner, *see* ECF No. 398, at 10-12, except by pointing to Treasury notes that BANA purchased as part of an agreement to pledge collateral that would cover a judgment in this action, ECF No. 402, at 6 (citing ECF No. 400-2, at 12; then citing ECF No. 400-3).  Characterizing those deposits as market-rate profits *to BANA* inverts reality because those payments reflect money set aside *for the FDIC*— and, to the extent the collateral gained interest, it did so at a rate approximating the regulatory, and not the prime, rate.  *See* ECF No. 400-2, at 12; ECF No. 400-3.[4]  Nor can the FDIC's assumption

---

[4] During this litigation, the FDIC's expert, Karl Snow, asserted that "[t]he unpaid deposit insurance assessments, acting as injected equity, were available to BANA for any business purpose," and therefore BANA's ill-gotten profits could be measured by a return on equity. ECF No. 250-5, at 4. Yet BANA's rebuttal expert, E. Emre Carr, explained that considering unpaid assessments as profit from the common shareholders' perspective is flawed because it conflates the bank's performance with its return on its own investments. ECF No. 400-4, at 11-18. The FDIC did not contest Dr. Carr's assessment in its summary judgment briefing, *see generally* ECF Nos. 364, 376-2, or in its briefing on pre- and post-judgment interest, *see* ECF No. 398, at 4, 22 (restating the FDIC's expert's conclusion); ECF No. 402, at 5, even though BANA relied on Dr. Carr's opinion in its opposition to the FDIC's motion seeking interest, ECF No. 400-2, at 12 n.10; ECF

(*continued on next page*)

be squared with the fundamental premise underlying the 1996 Rule, which chose the three-month Treasury bill *because* it "approximates" what "an institution earned . . . by investing the funds" rather than paying the FDIC's assessment.  1996 Proposed Rule, 60 Fed. Reg. at 40780.

The regulatory history also illustrates why the Section 327.7 rate fairly compensates the FDIC for the value of BANA's underpayments.  To be sure, the FDIC acknowledged that a "composite yield at market rate," rather than the regulatory rate, would account for "every bit of the benefit that the FDIC" receives from retaining capital.  *Id.* at 40779-40780.  Such a metric would more closely estimate what the FDIC lost from BANA's underpayments.  When it adopted the regulatory rate, the FDIC nonetheless believed that its chosen rate "closely (but not necessarily exactly) approximates the market value of funds . . . for the FDIC."  1996 Final Rule, 60 Fed. Reg. at 50403.  The court is not inclined to second-guess the FDIC's judgment, refined through notice and comment and left undisturbed for three decades, about what market instruments approximate its own returns for investments in the Deposit Insurance Fund.

The FDIC's rejoinder here—that historically low three-month Treasury yields "do[] not compensate [the FDIC] for the effects of inflation" since BANA underpaid its assessments, ECF No. 398, at 13—is misplaced.  Assessments against financial institutions fund the Deposit Insurance Fund, Fed. Deposit Ins. Corp., *Deposit Insurance Fund*,[5] and money in the Deposit

---

No. 400-4.  Instead, the FDIC admitted that it was not "ask[ing] or expect[ing] the [c]ourt to make factual findings" on the issues surfaced in the expert reports.  ECF No. 402, at 6 n.1.  The court does not principally rely on the parties' expert opinions, but it notes that the assumption made by the FDIC's expert—that unpaid assessments provided BANA capital for any business purpose, including equity for shareholders—is contradicted by the operative assumption in the rule establishing the regulatory rate, which is that the three-month Treasury rate tracks "the interest that an institution earned . . . by investing the funds" it should have paid to the FDIC. 1996 Proposed Rule, 60 Fed. Reg. at 40780.

[5] *Available at* https://perma.cc/H9TQ-FRTH.

Insurance Fund must, by statute, "be invested in obligations of the United States," 12 U.S.C. § 1823(a)(1).  Or, as the FDIC puts it, the Deposit Insurance Fund "invests in treasury securities," ECF No. 398, at 14, which are lower-risk than privately traded securities and therefore offer a lower yield.  Placing too much weight on inflation would ignore the reality that the Deposit Insurance Fund has a relatively conservative portfolio—and for good reason, as it insures deposits and protects depositors of insured banks.  *Cf. Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 808 (6th Cir. 2018) (explaining in a pre-judgment interest dispute that "where the plaintiff is bound by fiduciary duties to invest conservatively, a court does not abuse its discretion in viewing the low market-interest rates associated with 'the safe type of investment that is expected of a fiduciary' as adequate, even if the court fails to 'specifically address the [presumably higher] rate of inflation in relation to the treasury bill rate.'" (alteration in original) (quoting *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 736 (6th Cir. 2017))).

The FDIC lodges another overarching objection to BANA's request for the regulatory rate: Section 327.7 governs only "short-term" assessments "in the course of the regulatory process," not "court-ordered prejudgment interest on a litigation judgment."  ECF No. 398, at 4.  As the argument goes, the 1996 Rule's adoption of a quarterly-based assessment system merely "approximates the value of funds for a 91-day delay in payment."  *Id.* at 5.  That is true but irrelevant.  Although in any given quarter, the FDIC estimates the value of under- or overpaid assessments based on a quarterly "delay in payment," *id.*, Section 327.7 accounts for market fluctuations by pegging the interest rate to the performance of the three-month Treasury bill, 12 C.F.R. § 327.7(b)(1).  Interest accrued in one quarter continues to grow in the next at the next quarter's applicable interest rate.  *See* ECF No. 395-3 (detailing the change in interest rates and

21

accrued interest on a quarterly basis).  Put differently, the regulatory rate *is* a market rate—just a lower one than the FDIC would like.

BANA has calculated the amount of pre-judgment interest based on the Section 327.7(b) rate for the relevant time period, ECF No. 395-2, at 3 (concluding that pre-judgment interest should be $109.8 million), and the FDIC appears to agree with that calculation, *see* ECF No. 398, at 11 (noting that pre-judgment interest "at the 3-month rate" would be "$109 million").  Accordingly, the court will award the FDIC pre-judgment interest at the regulatory rate.  ECF No. 395-2, at 3.  However, in an abundance of caution, the court will direct the parties to file a joint status report on or before April 14, 2026 setting forth their calculations for pre-judgment interest under the regulatory rate.

### C.    Post-Judgment Interest

The parties also dispute the appropriate rate for post-judgment interest.  In BANA's view, the regulatory rate applies with equal force to a post-judgment interest award, ECF No. 395, at 20, whereas the FDIC asserts that the statutory rate set forth in 28 U.S.C. § 1961(a) is appropriate, ECF No. 398, at 25; ECF No. 402, at 15.  The court agrees with the FDIC and will award post-judgment interest as prescribed by the governing statute.

"[P]ost-judgment interest is a creature of statute."  *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 248 (D.C. Cir. 1987).  Congress has determined that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a).  "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  *Id.*

BANA's assertion that "'more specific provisions . . . may control' over that default rate," ECF No. 395, at 21 (quoting *In re Imperial Petrol. Recovery Corp.*, 84 F.4th 264, 272 (5th Cir. 2023) (per curiam)), has no force here.  The Fifth Circuit decision that BANA cites rightly notes that courts have followed a more specific *statutory* provision concerning post-judgment interest rather than relying on 28 U.S.C. § 1961.  *In re Imperial Petrol. Recovery Corp.*, 84 F.4th at 272 (collecting cases in the bankruptcy context); *cf. Holly v. Chasen*, 639 F.2d 795, 797 (D.C. Cir. 1981) (noting that "detailed statutory provisions" governing interest available for certain judgments against the United States would "become superfluous" if 28 U.S.C. § 1961 "confer[red] an automatic entitlement to interest at [that statute's] rate").  But BANA has not located any authority for the proposition that an agency's regulation may supersede Congress's determination of the appropriate post-judgment interest rate.  Nor does the FDIC's regulation, 12 C.F.R. § 327.7, expressly address interest following a judgment in an assessment action under 18 U.S.C. § 1817(g)(1).  Absent a specific statute that controls post-judgment interest in civil actions brought by the FDIC, the court concludes that the mandatory provision for interest governs here.

Accordingly, the court will award the FDIC post-judgment interest at a rate of 4.088%, which the parties concede is the rate provided by 28 U.S.C. § 1961(a).  ECF No. 395, at 21; ECF No. 398, at 25.  Post-judgment interest will accrue from the date of the court's summary judgment merits order and be computed daily and compounded annually.  ECF No. 386; 28 U.S.C. § 1961(b).  The court takes the parties to agree that post-judgment interest should accrue from that date.  Neither argues otherwise—and, for the parties to agree that 4.088% is the rate mandated by 28 U.S.C. § 1961(a), they necessarily determined that the "date of the judgment" was March 31,

2025.[6]  *See* 28 U.S.C. § 1961(a) (requiring interest to run "from the date of the entry of the judgment" at a rate based on the "Treasury yield . . . for the calendar week preceding the date of the judgment").

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that BANA's Motion to Deem Judgment Satisfied, or in the Alternative, Amend Judgment, ECF No. 395, is **GRANTED** in part and **DENIED** in part, and the FDIC's Cross-Motion to Fix Pre- and Post-Judgment Interest, ECF No. 398, is **GRANTED** in part and **DENIED** in part.  It is further **ORDERED** that the parties shall file a joint status report on or before April 14, 2026 advising the court of the parties' calculations for pre-judgment and post-judgment interest consistent with this opinion.  *See supra* Sections III.B, III.C.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   March 31, 2026

---

[6] Nevertheless, in an abundance of caution, the court will direct the parties to confirm in the forthcoming status report, *see supra* p. 22, their calculations for the appropriate amount of post-judgment interest.